No. 24-11033

---

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

PATRICK AKERLUND, ET AL.,

*Plaintiffs-Appellants,*

v.

ATLAS AIR, INC., ET AL.,

*Defendants-Appellees.*

---

APPELLANTS' REQUIRED APPENDIX

---

Andrew M. Green
JOHN PIERCE LAW P.C.
(*Pro Hac Vice for Oral Argument Pending*)
21550  Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
(516) 474-4278
andrew@johnpiercelaw.com
Attorney for *Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page(s)**

PLAINTIFFS' VERIFIED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFFS' FIRST AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FAC . . . . . . . . . . . . . . . . . . . . . . . .150

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MTD FAC . . . . . . . . . . . . . . . . . . . . . . . 205

DEFENDANTS' REPLY IN SUPPORT OF MTD FAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

ORDER DISMISSING FAC WITHOUT PREJUDICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .295

PLAINTIFFS' SECOND AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .298

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SAC . . . . . . . . . . . . . . . . . . . . . . . 351

DECLARATION OF CARLEEN YBARRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MTD SAC . . . . . . . . . . . . . . . . . . . . . . . 411

DECLARATION OF MARK SOUTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .437

DEFENDANTS' REPLY IN SUPPORT OF MTD SAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . 454

ORDER DISMISSING SAC WITHOUT PREJUDICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .470

PLAINTIFFS' THIRD AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .485

ATLAS AIR, INC'S MTD TAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .541

PLAINTIFFS' OPPOSITION TO MTD TAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 561

ATLAS AIR'S REPLY IN SUPPORT OF MTD TAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

ORDER DISMISSING TAC WITH PREJUDICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .568

FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 574

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS),**

**PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G. BALLARD JR. , CINDY BARRIONUEVO, LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, DOUGLAS BERRY, GREGORY BERRY, DOUGLAS BOHNERT, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, BRETT L. CHAPMAN, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, JONATHAN FUSSLE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, GREG GORDON, DANIEL GREER, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, DAVID KEEN, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, DANIEL LEE, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR, MONTAGUE MCMILLAN, APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN**

Case No. _____

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

1

**MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, STEVEN MURATORE, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, SIEGFRIED PITTET, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, GREGORY SAMSON, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, AUSTIN STATON, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN,** individuals,

Plaintiffs,

v.

**ATLAS AIR INC.,** a Delaware corporation,

**FLIGHT SERVICES INTERNATIONAL, LLC,** a Texas limited liability company,

**ENCOMPASSAIR, LLC,** an Alaska limited liability company, and

**JOHN W. DIETRICH, PATRICIA GOODWIN-PETERS, JEFFREY CARLSON,** individuals,

Defendants.

2

## **INTRODUCTION**

1.      This is a lawsuit by pilots and other crew members of Atlas Air, Inc. and its affiliated companies over unlawful vaccine mandates, religious and medical discrimination, unlawful coercion, unfair and deceptive labor practices, retaliation, and violations of labor laws and their Collective Bargaining Agreement.

2.      Fundamentally, this lawsuit is also about the safety of America's airline industry. Should pilots – among the healthiest workers in the world – be subjected to mandated experimental "vaccines" that are now shown to have potentially deadly, long-term side effects, while flying massive aircraft in our skies?

3.      The COVID-19 policies imposed by Atlas Air, Inc. on its crews have led to a very dangerous situation among Atlas pilots. Pilots whose health is now compromised because of Atlas Air's coercion are now afraid to come forward with chest pains and other indicators of conditions that will soon cause a mass casualty airline event. They are afraid to lose their jobs, but failing to come forward itself is a criminal act. At the same time, pilots whose health is perfect because they had the foresight to refuse the vaccine are daily harassed, intimidated and deprived of work and hours and threatened with the loss of their careers. A comprehensive solution to this problem is desperately, and quickly, needed. It will require money, legislative action and cooperation among all the stakeholders in the aviation industry acting in good faith.

4.      Although the plaintiff pilots and crew have been among the healthiest and most conscientious pilots and crew in the world, Atlas Air and other defendants have acted in lockstep with the U.S. government in efforts to impose unlawful and unnecessary draconian COVID-19 restrictions and controls on them.

5.      For now, litigation to obtain justice for those who have been wronged (and hopefully to bring attention to a situation that is rapidly morphing into a national security issue), must suffice.

6.      The Plaintiffs in this lawsuit include pilots, flight attendants and other staff of Defendant Atlas Air, Inc. ("Atlas Air" or "Atlas")—the largest air cargo shipper in the world and the world's largest operator of Boeing 747 aircrafts, as well as certain of its affiliated entities. Throughout the global COVID-19 pandemic beginning in March 2020 and continuing to the present, Atlas Air has imposed relentless, ever-shifting pandemic mitigation restrictions on these Plaintiffs, including deceptive messaging which changed from month to month and kept plaintiffs in constant fear for their jobs.

7.      Atlas Air's COVID-19-related liberty infringements rose to a company-wide COVID-19 vaccine injection mandate announced in the fall of 2021, in violation of United States law, prior promises, statements and hiring agreements including the Collective Bargaining Agreement ("Agreement") between Atlas and its employees.

8.      Coinciding with Atlas' unlawful vaccine mandate have been wholly arbitrary, retaliatory and punitive travel and work restrictions for Plaintiffs but not others, discriminatory policies, and pay differences among employees in violation of Atlas Air's labor agreements.

9.      The ultimate goal of these tactics – driven by an executive leadership team obsessed with doing the Biden Administration's bidding with respect to the COVID-19 vaccine mandate issue – has been to frighten plaintiffs and their co-workers into feeling they had no choice but to choose between a paycheck and having an experimental (and now proven to be extremely dangerous) drug injected into their bodies.

10.     Plaintiffs are largely unvaccinated[1] pilots, flight attendants and other Atlas or Atlas-affiliate staff who have suffered devastating financial, physical, psychological and other harm due to these violations, and who are now potentially subject to impending discharge and termination by Atlas and Atlas-affiliated entities following the recent imposition of the May 1, 2022 company mandate.  Many (and perhaps most or even all) of these Plaintiffs have provable natural immunity to the COVID-19 virus. Many also have religious or medical exemptions from being injected with so-called COVID-19 "vaccines" – although it is currently unclear based on recent communications from Atlas and other Defendants whether they are actually still recognizing the religious or medical accommodations they have already granted these employees (purportedly because the accommodations already granted are somehow moot because enforcement of the federal-contractor mandate pursuant to which the accommodations were granted has been enjoined by multiple federal district courts).

11.     Perhaps most significantly, it is in contravention of long-standing FAA guidance for pilots to take medications that have not been approved by the FDA and then in use for twelve months. The use of, or administration of a drug that does not meet these standards – such as the COVID-19 "vaccines" at issue in this case – is a blatant violation of long-standing FAA procedure. Yet Atlas has encouraged, coerced and even paid pilots to violate this FAA guidance and procedure. Further, Federal Aviation Regulation 61.53(a)(2) prohibits pilots who have taken a medication with side effects that would render them unable to meet the requirements of the FAA medical certificate from acting in any capacity as a member of a flight crew.

12.     Based upon recent revelations from documents released from the very pharmaceutical companies that produced the vaccines, as well as VAERS and D-MED data, it is

---

[1] Some Plaintiffs may be partially vaccinated. Hereafter the Complaint will refer to all Plaintiffs with less-than-sufficient vaccination status (in the eyes of Defendants) as "unvaccinated."

5

clear the vaccines have numerous dangerous and detrimental side effects such as myocarditis, pericarditis, blood clots, strokes, and cardiac arrest, all of which can lead to sudden death. The vaccines can also lead to severe neurological conditions. This has created the classic example where a catastrophe is waiting to happen. It is simply not safe – and in fact is *illegal* under federal regulatory law – for vaccinated pilots to be flying right now. No better example of this is the near-disastrous situation that recently occurred on April 9, 2022, when the pilot of American Airlines Flight 1067 into Dallas Forth Worth – Rob Snow – had a cardiac event and flat-lined minutes after landing. A possible mass casualty event was barely avoided. There have now been multiple other similar incidents that have occurred around the country.

13. This is entirely consistent with Atlas Air's pattern of conduct, specifically its CEO John Dietrich and Senior Vice President for Human Resources Patricia Goodwin-Peters. Their lust for power and money has led to – among other things – massive windfalls from American taxpayers during COVID-19 as well as a major and deadly aircraft disaster. For Atlas Air, COVID-19 and the government and corporate mandates that surround it have nothing to do with a virus, a vaccine or safety. They have only to do with power, politics and money.

14. Although theoretically represented by the International Brotherhood of Teamsters Airline Division ("Teamsters" or "the Union"), Plaintiffs have been abandoned by the union in connection with the COVID-19 mandates and restrictions, because the union has opted to align itself politically with Atlas Air and the Biden administration instead of Atlas workers.

15. Indeed, on March 30, 2022, the majority of Teamsters Local 2750 members present at their quarterly Executive Board Meeting and General Membership Meeting voted to have the Teamsters oppose Atlas Air's vaccine mandate. Yet soon after the resolution was passed, Teamsters Union officials unlawfully and unilaterally denounced the vote and announced the Teamsters would support Atlas Air's unlawful vaccine mandates.

6

16.     Thus, Plaintiffs are now forced to bring this action against Atlas Air and the other Defendants to enforce workers' rights and the Collective Bargaining Agreement without the help of the Teamsters.

17.     Plaintiffs will show at trial that the Teamsters has intentionally abandoned Plaintiffs so that Atlas Air will fire Plaintiffs and other Teamsters members will obtain boosts in their seniority and pay.

18.     The so-called vaccines mandated by Atlas Air (1) do not provide immunity from COVID-19, (2) have waning effectiveness, (3) and pose significant risks to those who take them, in violation of the Collective Bargaining Agreement and other law.

19.     Plaintiffs seek to recover all damages relating to Atlas Air's and other Defendants' vaccine mandate and related misconduct (and associated coercive mandates, including weekly testing and constant masking).

20.     Plaintiffs also seek to enjoin Defendants from ever enforcing their unlawful COVID-19 vaccine mandate, or from firing, terminating, punishing, retaliating or otherwise further harming Plaintiffs for not being vaccinated.

21.     **Plaintiff Landon Caviness** is an individual and joint personal representative of employee, the Estate of Lane Caviness

22.     **Plaintiff Morgan Caviness** is an individual and joint personal representative of employee, the Estate of Lane Caviness

23.     **Plaintiff Patrick Akerlund** is an individual and employee of Atlas.

24.     **Plaintiff Michael Alzati** is an individual and employee of Atlas. He resides in the state of Florida.

25.     **Plaintiff Eric W. Anderson** is an individual and employee of Atlas.

26.     **Plaintiff Michael G. Ballard Jr.** is an individual and employee of Atlas.

27. **Plaintiff Cindy Barrionuevo** is an individual and employee of FSI

28. **Plaintiff Larry James Bearce, Jr.** is an individual and employee of Atlas.

29. **Plaintiff Robert Bellman** is an individual and employee of Atlas. He resides in the state of Florida.

30. **Plaintiff Benjamin Bendiburg** is an individual and employee of Atlas.

31. **Plaintiff Douglas Berry** is an individual and employee of Atlas.

32. **Plaintiff Gregory Berry** is an individual and employee of Atlas.

33. **Plaintiff Douglas Bohnert** is an individual and employee of Atlas.

34. **Plaintiff Lynette Botha** is an individual and employee of Atlas.

35. **Plaintiff Caleb Buehrer** is an individual and employee of Atlas. He resides in the state of Florida.

36. **Plaintiff Richard Bullock** is an individual and employee of Atlas. He resides in the state of Florida.

37. **Plaintiff Jon Carroll** is an individual and employee of Atlas.

38. **Plaintiff Vergil Caskey** is an individual and employee of Atlas.

39. **Plaintiff James Castor** is an individual and employee of Atlas.

40. **Plaintiff Brett L. Chapman** is an individual and employee of Atlas.

41. **Plaintiff Nathan Charboneau** is an individual and employee of Atlas.

42. **Plaintiff Shawn Churchel** is an individual and employee of Atlas. He resides in the state of Florida.

43. **Plaintiff Joel Colon** is an individual and employee of Atlas. He resides in the state of Florida.

44. **Plaintiff Mark Connor** is an individual and employee of Atlas.

45. **Plaintiff Matthew Cronauer** is an individual and employee of Atlas.

46.     **Plaintiff Fred Cunningham** is an individual and employee of Atlas.

47.     **Plaintiff Royal Danza** is an individual and employee of Atlas.

48.     **Plaintiff Elliot De Sousa** is an individual and employee of Atlas.

49.     **Plaintiff Eric Desandro** is an individual and employee of Atlas. He resides in the state of Florida

50.     **Plaintiff Steve Dixon** is an individual and employee of Atlas.

51.     **Plaintiff James Erickson** is an individual and employee of Atlas.

52.     **Plaintiff Luis Esquivia** is an individual and employee of Atlas. He resides in the state of Florida.

53.     **Plaintiff Lee Estes** is an individual and employee of Atlas.

54.     **Plaintiff Robert Fratti** is an individual and employee of Atlas.

55.     **Plaintiff Jason Frisbie** is an individual and employee of Atlas.

56.     **Plaintiff Timothy Frye** is an individual and employee of Atlas. He resides in the state of Florida.

57.     **Plaintiff Jonathan Fussle** is an individual and employee of Atlas.

58.     **Plaintiff Tony Gamboa** is an individual and employee of Atlas. He resides in the state of Florida.

59.     **Plaintiff Dennis Gebhard** is an individual and employee of Atlas. He resides in the state of Florida.

60.     **Plaintiff Reza Ghods** is an individual and employee of Atlas. He resides in the state of Florida.

61.     **Plaintiff Mark Gilman** is an individual and employee of Atlas.

62.     **Plaintiff Robert Giudice** is an individual and employee of Atlas.

63.     **Plaintiff Eric Gordon** is an individual and employee of Atlas.

64.     **Plaintiff Greg Gordon** is an individual and employee of Atlas.

65.     **Plaintiff Daniel Greer** is an individual and employee of Atlas.

66.     **Plaintiff Rexford T. Heivilin** is an individual and employee of Atlas.

67.     **Plaintiff Jason Henning** is an individual and employee of Atlas.

68.     **Plaintiff David Hewson III** is an individual and employee of Atlas. He resides in the state of Florida.

69.     **Plaintiff Todd Hontz** is an individual and employee of Atlas. He resides in the state of Florida.

70.     **Plaintiff Daniel Hudson** is an individual and employee of Atlas.

71.     **Plaintiff Roger Justice** is an individual and employee of Atlas.

72.     **Plaintiff Venancius Kassandji** is an individual and employee of Atlas. He resides in the state of Florida.

73.     **Plaintiff John Kearins** is an individual and employee of Atlas.

74.     **Plaintiff David Keen** is an individual and employee of Atlas.

75.     **Plaintiff Ricky Kinder** is an individual and employee of Atlas.

76.     **Plaintiff Beth Kirby** is an individual and employee of Atlas. She resides in the state of Florida.

77.     **Plaintiff Andreas N. Koustas** is an individual and employee of Atlas.

78.     **Plaintiff Chad Kravetz** is an individual and employee of Atlas. He resides in the state of Florida.

79.     **Plaintiff Daniel Lee** is an individual and employee of Atlas.

80.     **Plaintiff Carl Lindberg** is an individual and employee of Atlas.

81.     **Plaintiff Joseph Loschiavo** is an individual and employee of Atlas.

82.     **Plaintiff Andrew Lutz** is an individual and employee of Atlas. He resides in the state of Florida.

83.     **Plaintiff Blythe Lutz** is an individual and employee of Atlas. She resides in the state of Florida.

84.     **Plaintiff Rafael Macario** is an individual and employee of Atlas. He resides in the state of Florida.

85.     **Plaintiff Douglas P. Mayo Jr.** is an individual and employee of Atlas. He resides in the state of Florida.

86.     **Plaintiff Montague McMillan** is an individual and employee of Atlas.

87.     **Plaintiff April McQuillen** is an individual and employee of Atlas. She resides in the state of Florida.

88.     **Plaintiff Christopher McQuillen** is an individual and employee of Atlas. He resides in the state of Florida

89.     **Plaintiff Steven Meissner** is an individual and employee of Atlas. He resides in the state of Florida.

90.     **Plaintiff Jeffrey Michonski** is an individual and employee of Atlas.

91.     **Plaintiff Andrew Mickler** is an individual and employee of Atlas.

92.     **Plaintiff Corey Morris** is an individual and employee of Atlas. He resides in the state of Florida.

93.     **Plaintiff Steven Muratore** is an individual and employee of Atlas. He resides in the state of Florida.

94.     **Plaintiff Gregory Myers** is an individual and employee of Atlas.

95.     **Plaintiff Peter Napora** is an individual and employee of Atlas.

96.     **Plaintiff Joel Pardo** is an individual and employee of Atlas.

11

97.   **Plaintiff Lance Phillips** is an individual and employee of Atlas.

98.   **Plaintiff Patrick Phillips** is an individual and employee of Atlas.

99.   **Plaintiff Siegfried Pittet** is an individual and employee of Atlas.

100.   **Plaintiff Glen Pronk** is an individual and employee of Atlas.

101.   **Plaintiff Charles Randall** is an individual and employee of Atlas.

102.   **Plaintiff Peter Raymond** is an individual and employee of Atlas.

103.   **Plaintiff Joshua Roberts** is an individual and employee of Atlas.

104.   **Plaintiff Rebecca Robertson** is an individual and employee of FSI.

105.   **Plaintiff Jason Rogers** is an individual and employee of Atlas.

106.   **Plaintiff Gregory Samson** is an individual and employee of Atlas.

107.   **Plaintiff Kimberly Schreck** is an individual and employee of Atlas.

108.   **Plaintiff William Serritella** is an individual and employee of Atlas. He resides in the state of Florida.

109.   **Plaintiff Gentry Shelton** is an individual and employee of Atlas.

110.   **Plaintiff Todd Snaza** is an individual and employee of Atlas.

111.   **Plaintiff Donald Sorrentino** is an individual and employee of Atlas.

112.   **Plaintiff Mark South** is an individual and employee of Atlas.

113.   **Plaintiff Michael Stark** is an individual and employee of Atlas.

114.   **Plaintiff Austin Staton** is an individual and employee of Atlas.

115.   **Plaintiff Elizabeth Stoneking** is an individual and employee of FSI.

116.   **Plaintiff Forrest Stowells** is an individual and employee of Atlas.

117.   **Plaintiff Barbara Janeice Surber** is an individual and employee of FSI.

118.   **Plaintiff John Swift** is an individual and employee of Atlas.

119.   **Plaintiff Nick Taylor** is an individual and employee of Atlas.

120.    **Plaintiff Mark Thien** is an individual and mechanic contracted to Atlas from Encompass Air LLC.

121.    **Plaintiff William Thompson** is an individual and employee of Atlas. He resides in the state of Florida.

122.    **Plaintiff Brandon Thoroughman** is an individual and employee of Atlas.

123.    **Plaintiff Geri Tonda** is an individual and employee of FSI.

124.    **Plaintiff Ricardo Torres Abarca** is an individual and employee of FSI.

125.    **Plaintiff Gustavo Verdes** is an individual and employee of Atlas.

126.    **Plaintiff James Villella** is an individual and employee of Atlas. He resides in the state of Florida.

127.    **Plaintiff Farshad Zarrabian** is an individual and employee of Atlas. He resides in the state of Florida.

128.    **Defendant Atlas Air, Inc. ("Atlas" or "Atlas Air")** is a Delaware corporation with its principal place of business in Purchase, New York. It is a wholly owned subsidiary of Atlas Air Worldwide Holdings, is a cargo airline, passenger charter airline, and aircraft lessor.

129.    Atlas Air is a common carrier as defined in federal law.

130.    Atlas Air has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists of 30,000 square feet of administrative and instructional space, including the operation of six flight simulation training devices. It "provides a wide range of advanced training solutions, specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000 pilots, flight engineers, flight attendants, and other aviation professionals each year."

13

131.     **Defendant Flight Services International, LLC** is a Texas limited liability company with its principal place of business in Houston, Texas. It is a company whose exclusive business is to contract flight attendants to Atlas Air. All the flight attendants who are staffed on Atlas Air flights are contracted through FSI. FSI was founded by an Atlas contract attorney and his spouse. All its employees receive all their training at the Atlas training facility in Miami. FSI contracts its flight attendants to Atlas Air and receives millions in dollars from Atlas Air in return.

132.     **Defendant EncompassAir, LLC** is an Alaska limited liability company with its principal place of business in Anchorage, Alaska. It is a company whose business is to contract mechanics to Atlas Air and other airlines.

133.     **Defendant John W. Dietrich** is an individual and is President and Chief Executive Officer for Atlas Air, and is a Board Member of Atlas Air. He keeps an executive office in Miami, FL.

134.     **Defendant Jeffrey Carlson** is an individual and is Senior Vice President for Flight Operations for Atlas Air. He keeps an executive office in Miami, FL.

135.     **Defendant Patricia Goodwin-Peters** is an individual and Senior Vice President for Human Resources for Atlas Air. She keeps an executive office in Miami, FL.

## JURISDICTION AND VENUE

136.     This Court has subject matter jurisdiction over this case under 28 U.S. Code § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

137.     This Court has personal jurisdiction over defendants because under *International Shoe* and its progeny, they have at least minimum contacts with Florida such that traditional notions of fair play and substantial justice would not be offended by the exercise of jurisdiction. In addition, personal jurisdiction is appropriate under Florida's long-arm statute, 48.193. Atlas,

14

its affiliated companies, and Atlas executives engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida as well as acts outside the state of Florida that caused harm to numerous plaintiffs in the state of Florida.

138.    Venue is proper in the U.S. Southern District of Florida because Atlas Air and its affiliates, and leadership do a high percentage of their business and stage a high percentage of their flights in and around southern Florida and the Miami International Airport. In addition, the 30,000 square foot Atlas Training Center that trains 10,000 people per year is located in this judicial district.

## FACTUAL ALLEGATIONS

139.    By mid-March 2020, COVID-19 had been declared a pandemic. The subsequent lockdowns and other draconian measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

140.    News of the COVID-19 global pandemic spread through the air transportation industry like wildfire, beginning in January and February 2020. Plaintiffs heroically performed their duties throughout early 2020 while many people around the world were locked down or sheltered in their homes, and while many businesses and industries were shuttered. From the earliest days of the pandemic, many Atlas pilots and crewmembers contracted the COVID-19 virus and recovered. Thus, many or most of the Plaintiffs in this lawsuit have developed natural immunity throughout the history of the pandemic.

141.    Beginning around December 2020, it was announced that there had been three mRNA "vaccines" purportedly developed for COVID-19: Pfizer, Moderna and Johnson & Johnson. These did not go through any standard form of lengthy, multi-phase clinical trials or

15

normal CDC or FDA approval. Rather, they were rushed through pursuant to Emergency Use Authorizations ("EUAs") and then an extremely abbreviated FDA "approval" process.

142. Initially, it was widely claimed that these vaccines prevented infection and transmission of the COVID-19 virus; but soon it became obvious that these vaccines were not vaccines in the classic dictionary sense. Rather these "vaccines" were mere gene therapy treatments and did not provide any immunity, only reduced severity of symptoms, for those who took them. This distinction is important; it means that any alleged benefits of taking the shots were merely for the individual recipient and provided no protection for others.

143. Tens of millions of Americans, including Plaintiffs, questioned this process and were adamantly opposed to taking these vaccines due to this questionable process as well as religious, medical or other reasons.

144. Those who chose to not take a COVID-19 vaccine were prescient. These vaccines have turned out to be ineffective, dangerous and, in some cases, deadly, as shown both anecdotally and through the Vaccine Adverse Effects Reporting System ("VAERS") and DOD DMED database.

145. Perhaps most significantly, per long-standing FAA guidance, Plaintiffs were prohibited from taking experimental medications prior to 12 months post-FDA approval. Federal Aviation Regulation 61.53(a)(2) prohibits pilots who have taken a medication with side effects that would render them unable to meet the requirements of the FAA medical certificate from acting in any capacity as a member of a flight crew. Atlas encouraged, coerced and even paid pilots to violate these long-standing federal regulations, yet the ones who refused to comply were the ones punished as set forth below.

146. Atlas Air has the largest wide-body fleet of aircraft in the world. Atlas Air holds the world's largest 747 fleet of aircraft in the world.

16

147.    Atlas Air is the largest customer of the Department of Defense ("DOD") Air Mobility Command ("AMC"). Atlas carries more U.S. troops and military material than any other airline in the world.

148.    Atlas Air receives many millions of dollars from the DOD and AMC.

149.    Atlas flies more revenue freight ton miles internationally than UPS or FedEx. In this respect it is the largest air freight carrier in the world.

150.    Atlas Air is a behemoth in the air cargo and VIP charter industry, yet its executives relish the anonymity and relative invisibility they have enjoyed up to this time.

151.    Atlas Air intentionally negotiated in bad faith with its pilot group, avoiding renewing their pilot contract from 2016 to 2021, enabling the executives to keep hundreds of millions of dollars. This made Atlas Air management the highest compensated aviation executives in the world while at the same time keeping their pilot group the lowest paid in the industry for that entire time.

152.    In 2020, Atlas Air made eight times the net profit they made from the previous record year in 2019. During this time, CEO John Dietrich applied for and successfully lobbied and received $407,000,000 in COVID-19 bailout monies from American taxpayers.

153.    Atlas Air agreed to pay $100,000,000 to settle an international cargo price fixing scheme to avoid going to trial. They finished paying off the $100,000,000 in 2020, the same year they received the $407,000,000 in taxpayer bailout cash from the government.

154.    Patricia Goodwin-Peters joined Atlas Air as Senior Vice President of Human Resources after leaving Kate Spade, having a background in women's fashion. She had zero experience in aviation. Despite this fact, she immediately began overseeing the training and hiring standards of the pilots of Atlas Air.

155. Scott Anderson, who was the Senior Director of Flight Proficiency, Training, and Standards at Atlas Air was ultimately fired by Goodwin-Peters.

156. Anderson was a graduate of the United States Naval Academy, retired Naval Aviator, Blue Angels Pilot, and former Delta Airlines 747-400 Captain, 767 Captain, and FAA Designated Examiner (APD). Captain Anderson was also a Check Airman for Delta on both the 747 and 767.

157. Due to the deteriorating and toxic conditions within the operation, Atlas Air was losing pilots faster than they could be replaced. Goodwin-Peters pressured Anderson to replace these very experienced and seasoned pilots with pilots fresh out of flight school and with very little experience. Anderson explained to Patricia Goodwin-Peters that these very low-hour pilots did not have the experience or proficiency to pilot large, widebody aircraft safely across oceans and continents.

158. Anderson informed Goodwin-Peters that although he could legally hire them, they were not competent to safely operate these large aircraft in complex conditions around the world. Goodwin-Peters insisted that Anderson hire these inexperienced pilots despite that they were not competent for these missions. Anderson refused and was fired by Goodwin-Peters.

159. In a 2020 United States Senate Safety Oversight report, the FAA Inspector assigned to Atlas Air's training standards stated that Atlas Air violated FAA regulatory compliance for a decade and called Atlas' operations the worst he had ever seen for any certificate holder under the Certificate Holder Evaluation Process ("CHEP"). He was reassigned to regulate another airline after refusing to accept the constant violations by Atlas Air. In his opinion, he was being retaliated against by the FAA due to its cozy relationship with Atlas Air.

160. At or about the beginning of September 2021, Goodwin-Peters sent a message to all Atlas employees (following up on a message sent by Dietrich) and announced all employees

18

would be required to be "fully vaccinated" with a COVID-19 vaccine pursuant to the Biden Administration's mandate regarding federally-contracted employees by December 8, 2021. She also announced that employees were required to report their vaccination status to the company. According to the notice, "per the Centers for Disease Control and Prevention (CDC), people are considered <u>fully vaccinated</u> two weeks after their second dose of the Pfizer-BioNTech or Moderna COVID-19 vaccines, or two weeks after the single-dose Johnson & Johnson's Janssen COVID-19 vaccine." (Emphasis in original)

161.    Goodwin-Peters' announcement of the vaccine mandate policy demonstrated Atlas' disingenuousness from the beginning. Atlas purported to stand for personal choice regarding COVID-19 vaccines: "As a Company, we support the views of health experts that vaccines reduce the impact and spread of COVID-19. That said, we have been consistent in our position that vaccination is a personal choice and we were not planning to mandate vaccines for our employees. However, we are now required to comply with this Executive Order." As set forth below, after the Biden Administration's mandate was enjoined by various federal courts around the country, Atlas immediately reverted to a company-directed mandate.

162.    Atlas directed that Friday, October 22, 2021 was the deadline "for crewmember[s] to request an exemption due to medical or religious reasons."

163.    Atlas directed that Wednesday, October 27, 2021 was the deadline for crewmembers to receive their "first vaccine if electing to receive the Pfizer BioNTech or Moderna vaccine that requires two shots."

164.    Atlas directed that Wednesday, November 24, 2021 was the deadline for crewmembers to "receive [their] vaccine if electing to receive the Johnson & Johnson's Janssen vaccine that requires one shot."

19

165.    Atlas directed that Wednesday, November 24, 2021 was the deadline for crewmembers to "receive [their] second vaccine if electing to receive the Pfizer BioNTech or Moderna vaccine that requires two shots."

166.    Atlas directed that Thursday, November 25, 2021 was the deadline for crewmembers to "report [their] vaccination status to the Company."

167.    FSI, whose sole business and source of revenue was to contract flight attendants to Atlas, quickly followed suit in multiple communications. On September 4, 2021, FSI President Joni French sent an e-mail to employees that made brazenly explicit the discrimination in work conditions and compensation faced by those who were choosing to not take the experimental and dangerous vaccine, falsely stating that it was about "health and safety." She wrote:

> The health and safety of all our Cabin Crewmembers remains a top priority for FSI. To support your well-being, as well as that of your work colleagues, we encourage everyone to pursue the COVID-19 vaccine. Cabin Crewmembers who have proof of vaccination will increasingly be able to operate with more flexibility under less restrictive quarantine rules.
>
> We are pleased to let you know that we will now provide 5 hours of additional compensation to every FSI Flight Attendant who receives their COVID-19 vaccine and submits a copy of their vaccination card.

Thus, those who gave into the pressure to take the vaccine would "be able to operate with more flexibility under less restrictive quarantine rules" and would receive more compensation than those who did not.

168.    Numerous Plaintiffs applied for and received a medical or religious accommodation with respect to the mandate. Some did not, yet remained adamantly opposed to taking what they considered to be an experimental and dangerous vaccine.

20

169.    Prior to the December 8, 2021 federal contractor vaccine mandate going into effect, the mandate was enjoined by a federal district court in Kentucky. Several other federal district courts throughout the country issued similar injunctions throughout December and January 2022.

170.    On or about January 13, 2022, The Supreme Court of the United States blocked the OSHA mandate requiring businesses with over 100 employees to impose vaccine and testing requirements.

171.    On or about January 25, 2022, in light of the Supreme Court's ruling, OSHA announced it was withdrawing its vaccine and testing requirements that were at issue. However, President Biden called upon businesses to voluntarily impose the mandates themselves.

172.    Because Atlas and the other Defendants no longer had the cover of a federal contractor vaccine mandate or OSHA requirement – and despite their previous statements that they believed in personal choice when it came to COVID-19 vaccine mandate issues and were only reluctantly following federal law – Atlas Air immediately and dutifully obeyed the word of the Biden Administration and announced it would do the President's bidding.

### Harassment, Retaliation, and Intentional Infliction of Emotional Distress.

173.    The lives of plaintiffs were effectively put on hold since October 2021 with constant threats of unpaid leave and termination by defendants against plaintiffs.

174.    On January 25, 2022, Goodwin-Peters sent out a communication stating:

> Earlier today, you received notice that all U.S. employees who must travel as an essential function of their position must be fully vaccinated by May 1, 2022. *This policy applies to you*. We recognize that you previously sought an accommodation from the COVID-19 vaccine mandates the company previously implemented to comply with Executive Order 14042 (applicable to federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees).

(Emphasis added).

21

175.   Goodwin-Peters in the same communication indicated that employees would not be required to submit new medical or religious accommodation requests – rather that ones they previously submitted would be processed:

> Given your requests for accommodation from the Company's previous COVID-19 vaccination mandates, the Company is assuming you are seeking a request for accommodation from the vaccine policy that will take effect May 1, unless you respond to this email and indicate otherwise by Friday, January 28, 2022. If you do not respond by January 28, the Company will process your new request for accommodation based on the information already in its possession and follow-up with you thereafter to identify any reasonable accommodations the Company can offer without undue hardship.

So Atlas employees who were unvaccinated were left in a continued state of legal, emotional and career limbo. Those who had submitted a prior request for medical or religious accommodation were hopeful that it would be granted again, and those who did not or were not seeking such an accommodation yet chose not to take the vaccine were facing termination by May 1, 2022.

176.   All unvaccinated employees remained subject to the same **harassment**, disparate treatment and fear of losing their jobs that they had been under for months. The companies' vaccinated pilots became **harassers, snitches, and tattletales** with the willing approval of Atlas Air, building a network of gossip and dissension similar to the practice of snitch cultivation in the worst prison systems.

177.   For example, Plaintiff Richard Bullock, a pilot who often flew cargo to southeast Asia, found himself subjected to retaliatory discipline after he became known throughout the company as being unvaccinated and a critic of mandates. Snitching fellow pilots initiated exaggerated disciplinary proceedings against Bullock based on a mere late-night disagreement with angry bar patrons at a tavern in South Korea.

22

178. Another plaintiff, Jimmy Villella, was actually told by defendants that he *needed to change his religion* when he informed them that his religion forbade participation in weekly testing.

179. In at least one case, the defendants' intentional infliction of emotional distress **led to violent death**. Atlas pilot Lane Caviness was a leading plaintiff in the original complaint filed in this dispute and took a lead role in finding counsel and sharing his grievances with Atlas mandates and related imposition. When Caviness became known as an anti-mandate activist within the company, he became a target for discrimination and lost prospects. The distress stemming from Caviness' isolation within Atlas Air ultimately contributed to a violent confrontation with law enforcement in August 2022 in which Caviness was tragically killed.

180. During the years of 2020, 2021 and 2022 Atlas Air coerced, intimidated, harassed and harangued its employees into complying with various COVID-19 related rules, including mask and then vaccine requirements, at the same time violating both the religious and medical rights of those same employees. Atlas continually demanded they submit to an experimental medical procedure regardless of their medical conditions or religious beliefs.

181. During this time, Atlas Pilots, flight attendants, mechanics, load masters, general employees, and even some members of management endured an extremely hostile and toxic work environment. One pilot particularly obsessed with the issue would compare unvaccinated employees to January 6th protestors (believing it was some kind of insult apparently). CEO Dietrich also felt compelled to weigh in on the events of January 6th with some "personal thoughts" on January 7th.

182. Often employees were interrogated before beginning their shifts or flight assignments with demands for answers to questions of personal and protected medical and religious information. Atlas employees were leaking passwords to databases containing this

23

legally protected information, and that information was then disseminated to their coworkers who often berated and attacked them for not being "vaccinated."

183. "Vaccinated" crew members were demanding "unvaccinated" coworkers work the entire flight with a facial covering while the "vaccinated" remained uncovered.

184. Atlas Air, Inc. CEO John Dietrich openly encouraged this behavior by making written and oral statements that "vaccinated" crews felt unsafe with "unvaccinated" crews and intimated that this was an unfair situation for the "vaccinated" crews.

185. Both Dietrich and Goodwin-Peters made repeated statements that if air crews expected to have a future at Atlas Air, they would have no choice other than to be "vaccinated." Both Dietrich and Goodwin-Peters also stated that religious and medical exemptions to being "vaccinated" would not be accepted and that "unvaccinated" crews would be placed on unpaid leave or terminated with ever-changing and lengthening deadlines in an attempt to intimidate and coerce vaccination against a minority of employees whose religious convictions and personal medical conditions precluded these procedures.

186. On March 8, 2022, after the January 25, 2022 Goodwin-Peters communication, things got worse for the Plaintiff flight attendants who worked for FSI.

187. They received a communication from FSI President Joni French stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence regardless of the fact they had previously requested an accommodation:

> Atlas Air, Inc. has advised FSI that **all** FSI employees who work on Atlas flights must be fully-vaccinated by May 1, 2022. (Obviously, Atlas is entitled to determine the terms under which FSI's flight attendants are eligible to work on Atlas flights.)
>
> We recognize that you previously requested an accommodation (exemption) from the COVID-19 vaccine mandates the Company implemented to comply with Executive Order 14042 (applicable to

24

federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees). Atlas is experiencing increasing global regulations and COVID-19 vaccine mandates, including significant travel restrictions such as limited access to critical hotels/restaurants that are used by its flight crews during travel. **Given this highly-restrictive environment, Atlas has revised its vaccine policy for the ongoing safety, compliance and viability of its operations as well as to protect its employees, customers and members of the public.**

Unfortunately, if you are unable or unwilling to obtain COVID-19 vaccinations, you will not be eligible to work on Atlas Air flights. In that event, FSI has no other work, including flights for its flight attendants to crew. If we do not receive evidence that you have been fully vaccinated by April 30, 2022, you will be placed on an unpaid leave of absence (LOA).

(Emphasis in original).

188.   At various times, Atlas and the other Defendants ordered that unvaccinated employees be tested weekly. Yet despite language in the Collective Bargaining Agreement indicating vaccines and testing is to be provided at no cost, Plaintiffs have been expected to pay for the mandatory testing at their own expense.

189.   Some Plaintiffs took the vaccine, upon Defendants' repeated deception and coercion, without informed consent.

190.   At no time during the period covered by this complaint did Atlas or the other defendants provide the full complete inserts regarding the vaccines to Atlas employees who took the injections.

191.   At no time during the period covered by this complaint did Atlas or the other defendants inform those who took the injections, or any employees, of reports of vaccine injuries as reported in the VAERS database.

192.     Some plaintiffs and employees became vaccinated only to be told later that to be allowed to fly into Germany, it was mandatory to get "booster" shots for those crewmembers that received the one-shot Johnson & Johnson vaccine.

193.     On or about March 23, 2022, with the politics of COVID-19 and vaccine mandates having changed dramatically in the preceding weeks (and with word spreading that undersigned counsel would be representing Plaintiffs), Atlas suddenly changed its tune. In the course of these shifting pronouncements, the hypocrisy of Atlas' and other Defendants' actions has been nothing less than stunning, and these moves have been a day late and a dollar short.

194.     First, despite terrorizing plaintiffs over COVID-19 restrictions from the onset of COVID-19 to the present day, as the global politics of the COVID-19 mandate issues began to change, Dietrich was actually among a group of major airline CEOs who signed a letter to President Biden on March 23, 2022, requesting that he lift various COVID-19 restrictions. In the letter, the CEOs write:

> Given that we have entered a different phase of dealing with this virus, we strongly support your view that "COVID-19 need no longer control our lives." **Now is the time for the Administration to sunset federal transportation travel restrictions – including the international predeparture testing requirement and the federal mask mandate – that are no longer aligned with the realities of the current epidemiological environment.**

(Emphasis in original). Despite this public posturing, Atlas still enforces company-wide COVID-19 restrictions that are harassing, discriminatory and are meant as retaliation against those who have stood up to Atlas' leadership and other Defendants' tyrannical conduct.

195.     Then, on March 25, 2022, the company attempted to mollify Plaintiffs by purporting to assure them that – despite maintaining a private company-wide vaccine mandate – those who had previously obtained a religious or medical exemption pursuant to the federal

26

contractor mandate would purportedly be allowed to fly after the May 1, 2022 company vaccine mandate deadline "so long as they undergo requisite COVID-19 testing at their expense."

196. The communication Atlas sent to its employees made clear that Atlas has not changed its policy of discriminating against those who have chosen to not be vaccinated for religious or other personal reasons of informed consent or bodily autonomy. Specifically, Goodwin-Peters made clear that Atlas believes its prior actions in discriminating against the unvaccinated was justified, and that Atlas could revise its policy at any time in the future (to, for example, fire unvaccinated employees or place them on unpaid leave or re-assign them). Specifically, for example, Goodwin-Peters stated:

> As a reminder, employees who travel as an essential function of their position must be vaccinated by May 1 pursuant to the Company's Policy.
>
> . . .
>
> Throughout the pandemic, we have closely monitored the state of the pandemic and changing regulations, both domestically and globally, and with your help, have adjusted our operations and policies to adapt to the evolving environment to protect our employees and our operations.
>
> *The Company maintains the right to revise this Policy as appropriate and at its sole discretion, including based on changing domestic and global regulations and the state of the pandemic.* We will continue to closely watch the global vaccination and testing requirements and metrics tied to the pandemic, and communicate any necessary changes to our policies as appropriate.

(Emphasis added).

197. Thus, despite this move, Atlas employees were *still* faced with the prospect of working at a company that could pull the rug out from under their employment at any time because of their vaccination status.

198.   On March 31, 2022, Goodwin-Peters sent another e-mail underscoring the discrimination that would persist at Atlas Air. It mandated that unvaccinated employees with medical or religious accommodations would have to undergo testing at their own expense pursuant to a complicated process, as well as wear masks indoors despite the widespread knowledge that wearing paper masks over one's face has accomplished absolutely nothing with respect to transmission of COVID-19.

199.   Throughout this time period, Goodwin-Peters repeatedly sent e-mails to employees urging them to review and re-acknowledge the Atlas Air employee handbook.

200.   On April 21, 2022 there was even more confusion, whether intentional or otherwise. That day, Goodwin-Peters sent out an updated Atlas Air Worldwide COVID-19 Vaccination & Testing Policy, along with Atlas Air Worldwide COVID-19 Vaccine Policy: Frequently Asked Questions. A mere *ten days* before Atlas' May 1st vaccination mandate policy was to go into effect, these documents clearly purported to *reverse* the announcement on or around April 1st that those with religious and medical accommodations would be allowed to fly and otherwise remain gainfully employed. In addition to testing at employee expense, a further requirement was mandated that all COVID tests will be videotaped by the employee and retained to be given to Human Resources upon demand.

201.   The Policy stated that "Employees who travel as an essential function of their position must be fully vaccinated against COVID-19 by May 1, 2022." (Emphasis in original). It then stated that "Employees not in compliance with this Policy may be subject to discipline, up to and including termination pursuant to applicable law." It further states that

> Essential-travel employees who do not choose to be vaccinated, and who are not in compliance with the Policy as of the effective date of May 1, 2022, may not be permitted to continue traveling and may be placed in an alternate position or subject to an unpaid leave status.

28

202. Further, the FAQ document made unequivocally clear that the prior medical and religious accommodations obtained by employees – which Atlas and other Defendants indicated on January 25, 2022 would be applicable going forward – would *no longer be recognized*:

> If you were previously granted an accommodation from a Company policy or practice designed to comply with the federal Executive Order mandating vaccination, *your accommodation is no longer effective*. The Executive Order has been stayed by a federal court and is not applicable to us at this time, so there is no longer any Company policy or practice being implemented to comply with the Executive Order from which an accommodation is necessary.
>
> At this time, the Company anticipates *it will be unable to permit unvaccinated employees to perform travel duties after May 1* without jeopardizing business continuity and/or incurring substantial administrative and other costs. The Company is experiencing ever-increasing global regulations and vaccine mandates related to COVID-19, including travel restrictions as well as limited access to critical hotels/restaurants that are used by employees during travel. The Company is reviewing what if any reasonable accommodations it may be able to provide to unvaccinated employees who are eligible for an accommodation after May 1, *including unpaid leave and reassignment*.

(Emphasis added).

203. This was directly contrary to prior company guidance. It created such an instantaneous uproar that the company was forced to retract it the very next day on April 22, 2022:

> It has been brought to our attention that employees have inadvertently been directed to an out-of-date Vaccination & Testing Policy and related FAQs, which contained information that is no longer accurate. In particular, **if you have previously been granted a religious or medical accommodation to the vaccination policy, your exemption is still in effect**. Beginning May 1, you will be required to test as set forth in the Policy and FAQs. Please see below for the correct links.

(Emphasis in original).

204. To add insult to injury, while the entire world (including the federal government thanks only to a federal district judge's recent decision in Florida) is taking off their useless masks

on airplanes, in airports and otherwise, President Joni French of FSI is insisting that everyone continue to wear a mask on Atlas flights. This was announced on April 19, 2022, leading one Atlas flight attendant to marvel at the fact that the first time in 9 months American soldiers deployed to the most dangerous places in the world were required to wear a paper mask over their faces is when they boarded an Atlas Air flight.

205.    Throughout the entire course of the foregoing events, EncompassAir followed the lead of Atlas Air and mirrored Atlas policies and conduct with respect COVID-19 related mandates for its employees who were contracted to Atlas.

206.    Throughout the pandemic, executives at Atlas urged Atlas employees including Plaintiffs, to get injected with the vaccines, while simultaneously insisting that the company would never support a vaccination mandate. The Teamsters Union signed an agreement with the company that the Union would help the company push and promote vaccination among Atlas employees. The Teamsters and Teamsters Local 2750 even agreed to roll out a program in violation of the Collective Bargaining Agreement which allowed vaccinated employees to receive a bonus, and thus higher pay than unvaccinated employees.

207.    Local 2750 and the Teamsters were overwhelmingly led and directed by partisan Democrats and loyalists of U.S. President Biden. And, as elsewhere, the vaccine rollout within Atlas became tinged with political animosity. Upon information and belief, the Teamsters and Local 2750 *have never once voiced any criticism* of Atlas' vaccination push to the company, despite knowing that many Atlas employees did not wish to become vaccinated, were religiously or medically exempt, or naturally immune.

208.    Throughout the spring, summer and fall of 2021, all the parties, including Teamsters Local 2750 and the International Brotherhood of Teamsters Airline Division negotiated a new Collective Bargaining Agreement.  These negotiations occurred *during, and in*

30

*the midst of the global COVID-19 panic and pandemic and while COVID-19 and discussions about COVID-19 mitigation strategies including vaccines and ideas about vaccine mandates were in the international news every single day*. Concerns about the vaccines, and about whether vaccines would be mandated, were high in the thoughts of every Atlas Air pilot, flight attendant and employee, as well as among Atlas Air executives and executives and officers of the Teamsters and Teamsters Local 2750.

209. Throughout this period of contract negotiation, Atlas Air and its defendant executives repeatedly assured concerned employees, including all Plaintiffs, that the company would not be mandating the COVID vaccines (which were available throughout 2021).

210. On **September 10, 2021**, the Collective Bargaining Agreement (the "Agreement") was signed and executed by Atlas, the Teamsters, and flight deck crew members. The final agreement plainly gave the company no authority whatsoever to impose vaccination mandates upon Atlas employees (or any other invasions of workers' medical autonomy). The only section specifically addressing vaccinations was Article 27F, which provides: "The Company shall provide, at no cost to Crew Members, an immunization plan that includes, at a minimum, the following vaccinations . . . (Yellow fever, Hepatitis, Typhoid, Tetanus, etc.)."

211. Art. 27F(10) of the agreement provides that the Company shall provide, at no cost, "Any other immunizations recommended by the current United States Center for Disease Control 'Advice for International Travel' document." The plain language of 27F(10) gives no authority for Atlas Air to mandate such immunizations. The referenced "Advice for International Travel" document of the CDC appears to be several documents and/or web pages, none of which mandate COVID-19 vaccinations for U.S. Citizens. Indeed, the CDC's published instructions (https://www.cdc.gov/coronavirus/2019-ncov/travelers/proof-of-vaccination.html) contains a section dedicated to airline crew members. The Technical Instructions applicable to crew

31

members plainly do not mandate airline pilots or crew members to be injected with COVID-19 vaccine treatments.[2]

212.    The **September 10, 2021** date of the agreement is quite significant in light of events. Just the day before, on **September 9, 2021**, President Biden announced that all companies with more than 100 employees were required to implement COVID-19 vaccine mandates or require weekly testing of employees. This announcement must have been on the forefront of everyone's mind when the Collective Bargaining Agreement was signed. Nothing in the agreement gave Atlas any authority whatsoever, independent of a government-imposed mandate, to impose its own mandate. (In fact, as described below, the agreement explicitly protected Atlas employees from exposure to any unsafe conditions or events.)

213.    Following the early September communication from Goodwin-Peters regarding the federal contractor mandate, on **October 5, 2021**, Defendant **John Dietrich,** President & Chief Executive Officer of Atlas Air, sent an email to all Atlas employees saying, "President Biden recently signed an Executive Order providing for certain mandates related to COVID-19 for federal contractors and subcontractors, and the U.S. government has now issued further guidance for implementing this Order." Dietrich wrote that "[t]hrough the course of the pandemic, we've been very clear in our intention that we would not mandate that our employees be vaccinated.  However, as a federal contractor who flies the military and their equipment, we will be required to comply with the Order issued by the President."

214.    The **October 5, 2021** email claimed Biden's "Executive Order requires that we determine the vaccination status of all of our U.S.-based employees. Therefore, we are now

---

[2]    https://www.cdc.gov/quarantine/order-safe-travel/technical-instructions.html.

32

<u>requiring all of our U.S. workforce to provide us with your vaccination status</u>." (Emphasis in original).

215.   The email went further than the federal pronouncement and announced that Atlas Air would soon roll out electronic vaccine passports ("electronic proof of your vaccination card") within the company.

216.   The email announced that Atlas Air would recognize religious and medical exemptions and would restrict workers' vaccine status information to "Human Resources, Legal and limited members of the COVID-19 Safety Team."

217.    Significantly, the Oct.5, 2021 email by Defendant John Dietrich announced that vaccinated employees would be paid "five hours of compensation" while unvaccinated employees would not.

218.   On **January 13, 2022**, the US Supreme Court struck down the OSHA mandate as unconstitutional. However, Defendant Atlas Air continued to maintain its Atlas-wide injection mandate. Neither Local 2750 nor the Teamsters voiced any concern or opposition to Atlas Air.

219.   Moreover, Atlas Air violated the Collective Bargaining Agreement's Art. 25 regarding scheduling ("The Company shall offer Out-Base assignments by system-wide seniority. . ."). Specifically, Atlas Air has discriminated against Plaintiffs in bids for flights to certain Asian, South American and European bases—despite such destinations having NO laws or restrictions against unvaccinated crewmembers. The lack of any mandatory vaccination requirements for crewmembers was repeatedly transmitted via email to the union and company by citing the government websites of the destination countries that specified there were NO requirements at the time. That information was ignored, and the Atlas management-imposed travel bans on unvaccinated Atlas crewmembers remained in place.

220. This discrimination and arbitrary retaliatory and punitive treatment of Plaintiffs have cost Plaintiffs significant monetary damages and emotional distress.

221. Atlas Air's communications promised that Atlas employees' vaccination statuses would be kept confidential within "Human Resources, Legal and limited members of the COVID-19 Safety Team." But in fact, Plaintiffs' and employees' vaccination statuses were widely disseminated throughout the company in violation of their medical privacy.

222. Atlas Air's promulgation of COVID-19 hype and hysteria created a dangerous and hostile work environment throughout the company for Plaintiffs and employees who dared to question or defy the messaging. Atlas Air's panic-inducing policies produced instances of vicious shouting and screaming among Plaintiffs and other Atlas staff during trans-ocean flights, and occasional unsafe episodes of pilots leaving their cockpits to scream at coworkers for being unvaccinated or for voicing questions or criticisms of Atlas Air pandemic messaging.

223. This toxic, cutthroat atmosphere continues through the present day, as Atlas employees suffering from vaccine injuries struggle to keep their injuries hidden, secret and suppressed in order to protect their careers. Teamsters' members within the company have openly remarked that they look forward to the day that Plaintiffs will be terminated from the company, thus allowing vaccinated employees to rise in seniority and pay.

224. On February 8, 2022, the Teamsters and Local 2750 actually announced that they had joined Atlas and the other Defendants in creating a program to recruit new, vaccinated and compliant hires to replace the plaintiffs upon plaintiffs' termination. Atlas and the Teamsters worked together to pay the pilot group $5,000 per new hire they refer to Atlas to replace the pilots who would be fired because of the vaccine mandate.

225.    On **March 30, 2022** The Executive Board of Teamsters Local 2750 traveled to the Teamsters Local 2750 office in Cincinnati, Ohio and conducted their quarterly Executive Board Meeting and General Membership Meeting.

226.    The Executive Board were surprised by the remote and in-person turnout, as the meeting was attended by approximately 100 members. According to Local 2750's newsletter #99, "During this meeting, **a spirited effort was made to pass** resolutions requiring 'the union to engage in any and all legal disputes in any and all jurisdictions related to disputes arising from the Atlas Air vaccine policies,' and requiring the 'union to donate $300,000 in total to the three following organizations:'" U.S. Freedom Flyers - $100,000, Airline Employees 4 Health Freedom (AE4HF) - $100,000, and Atlas Flight Deck Crewmembers Association (AFDCA) - $100,000.

227.    All three groups were known to oppose Atlas Air's impending vaccine mandate mass termination.

228.    The Teamsters Local 2750 newsletter downplayed the vote, claiming that "a spirited effort was made to pass" the resolutions. In fact, the "spirited effort" had passed, overwhelmingly. Indeed, the newsletter linked to a letter drafted by Teamster General Counsel William Wilder admitting all three resolutions had passed.  But the Teamster lawyer claimed the resolutions conflicted with the Teamsters constitution, which Wilder claimed (falsely, it appears) gave all decision-making authority to Teamsters Executive Board members.

229.    Local 2750's #99 newsletter then stated: "While we appreciate the passionate engagement from these members, the resolutions discussed cannot be enacted." (Again: the resolutions were not merely discussed; they were passed by the membership.) "After legal review," claimed the newsletter, "Local 2750 legal counsel determined these resolutions violate the IBT Constitution and Local 2750 Union Bylaws and are therefore invalid."

230. Wilder even claimed that informed medical consent had been falsely characterized by union members as a "right." Informed consent, said Wilder, "is nowhere mentioned as an object of the Local Union in Section 4 of the Bylaws."

231. Instead of complying with the obvious wishes of membership to defy Atlas Air regarding the impending May 1 mass-termination of hundreds of employees, the Teamsters and Local 2750 provided a link for Atlas Air to "Please click" to identify and retaliate against members of the Atlas Flight Deck Crewmembers Association who opposed the company's mandates. At no time did 2750 even pass on a message to Atlas Air executives regarding employee opposition to the unlawful mandates.

232. Ironically, during this time period, the issues the Teamsters seemed most concerned about had nothing to do with illegal COVID-19 vaccine mandates. Local 2750 President Yngve Paulsen sent out an e-mail on April 15, 2022, touting the following accomplishments: (i) new pillows for all fleets with rest facilities; (ii) business class blankets of a better quality and larger size; (iii) replacing Maxwell House coffee with "better quality coffee"; (iv) including vegetarian hot meals "where meat will be provided separately and not premixed in a dish"; and (v) providing chopped fresh fruit in tray setups.

233. All of the Defendants were aware of all the foregoing conduct and false statements set forth in this Complaint and participated in the acts that have caused massive pain, suffering, emotional distress, mental anguish and loss of job opportunities and future income.

234. In the course of its actions, Atlas Air consistently acted in lockstep with the widely publicized goals of the Biden Administration. For purposes of these actions, whether by incentive or threat, Atlas Air has become a State Actor.

235. In order line the pockets of Atlas Air executives in exchange for doing the government's bidding, the Biden Administration pumped in $407,000,000 in COVID-19 bailout

36

money to a massively profitable corporation. Atlas refused to return the funds when questions were raised in a Congressional hearing on why such a profitable company deserved a $407,000,000 handout of taxpayers' money. In return, Atlas Air acted in concert with the Government to achieve the Administration's objective of coercing all Americans to take a COVID-19 vaccine. There is no other rational explanation for Atlas Air receiving such a windfall from the American taxpayers.

236.   Thus, Atlas Air is a "person" and a State Actor under 42 U.S.C. § 1983.

237.   The Biden Administration has effectively delegated its authority to the private sector and sought companies like Atlas Air to do its bidding. This has been effective: companies like Atlas Air gave its employees an unconscionable ultimatum: choose between their jobs or take an experimental, life-threatening gene therapy/vaccine, for a disease known to have a very high survivability rate of over 99% and for which effective alternative treatments now exist.

238.   The Government has acted in concert with Atlas Air and publicly supported its private mandate since the Biden Administration cannot legislate a public one. Atlas Air's mandate was preconceived. Its purpose was to effectuate the Biden Administration's will and be one of the large, corporate examples so other big employers would follow suit. Atlas, its CEO Dietrich and SVP Goodwin-Peters are engaged in a *quid pro quo* arrangement whereby Atlas Air is enforcing the agenda the Biden Administration knows it cannot legislate or impose by fiat. Stated differently – the government acquires more power through the imposition of private employer mandates. In exchange, the Biden Administration is lining the pockets of big corporations and their executives like Atlas Air, Dietrich and Goodwin-Peters through policy or pecuniary gain at the expense of their own employees' lives.

239.   On information and belief, there have been numerous, private meetings between Dietrich and the Biden Administration regarding the vaccine mandate policies.

37

240.     These meetings, various comments by Dietrich, and Government financial support for Atlas Air show such a close working arrangement between Atlas Air and the Government that Atlas Air should be considered a State Actor for purposes of Section 1983.

241.     The U.S. Equal Employment Opportunity Commission ("EEOC") has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding COVID-19:

> The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services (HHS) Food and Drug Administration (FDA) for the administration of three COVID-19 vaccines. These three vaccines were granted Emergency Use Authorization (EUA) by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of EUA or the FDA approach can visit the FDA's EUA page.

242.     The EEOC has not taken any actions much less made any public statements condemning these patently unlawful employment practices. For these reasons and others set forth below, Plaintiffs are not required to first seek recourse via the EEOC prior to bringing their discrimination and/or employment claims.

243.     Also, irreparable harm will result from the delays associated with exhaustion of administrative remedies. Millions of people have been hurt and thousands have been killed due to the COVID-19 vaccines that Atlas Air mandated Plaintiffs take. Not only can these vaccines cause injury generally, but the gene therapies pose specific harms to Plaintiffs working in the airline industry, which has requirements that employees maintain a certain standard of health for safety purposes. Waiting 180 days for the EEOC process to complete or to receive a right to sue

letter is not a viable option as irreparable harm is imminent not only for their jobs, but also for their safety and the safety of consumers.

244.    Additionally, the EEOC lacks the institutional capacity to resolve the particular types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all of the claims. Also, the EEOC does not have the authority to address the Constitutionality of all the claims associated with the employment practices at issue and does not possess the institutional knowledge or authority to redress those matters relating to health, safety and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile, useless and inadequate to redress Plaintiff's employment issues and to prevent the irreparable harm.

<u>COUNT I</u>
**Title VII, 42 U.S.C. § 2000e, et seq. ("Title VII")**
*Religious Discrimination – Failure to Accommodate*

**All Employee Plaintiffs vs. Atlas Air, FSI and EncompassAir**

245.    Plaintiffs reallege and incorporate paragraphs 1 through 245 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

246.    Title VII of the Civil Rights Act of 1964 ("Title VII) protects workers from employment discrimination based on their race, color, religion, sex (including pregnancy, sexual orientation, and transgender status) national origin, or protected activity. *See* 42 U.S.C. § 2000e(k).

247.    Under Title VII, an employer is prohibited from discriminating because of religion in hiring, promotion, discharge, compensation, or other "terms, conditions or privileges" of

employment, and also cannot "limit, segregate, or classify" applicants or employees based on religion "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a)(1), (2).

248.    Title VII defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate . . . without undue hardship on the conduct of the employer's business."  See 42 U.S.C. § 2000e(j).

249.    These protections apply whether the religious beliefs or practices in question are common or non-traditional, and regardless of whether they are recognized by any organized religion. *See, e.g.*, *Cooper v. Gen. Dynamics, Convair Aerospace Div.*, 533 F.2d 163, 168 (5th Cir. 1976) (stating "*all* forms and aspects of religion, however eccentric, are protected").

250.    The test under Title VII's definition of religion is whether the beliefs are, in the individual's "own scheme of things, religious." [3]

251.    Belief in God or gods is not necessary; nontheistic spiritual beliefs can also be religious for purposes of the Title VII exemption as long as they "'occupy in the life of that individual "a place parallel to that filled by . . . God" in traditionally religious persons.'" [4]

---

[3]    This common formulation derives from the seminal Supreme Court decisions interpreting the conscience exemption in the Military Selective Service Act, 50 U.S.C. § 3806(j). *See, e.g.*, *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) ("We believe the proper test to be applied to the determination of what is 'religious' under § 2000e(j) can be derived from the Supreme Court decisions in *Welsh v. United States*, 398 U.S. 333 (1970), and *United States v. Seeger*, 380 U.S. 163 (1969), i.e., (1) is the 'belief' for which protection is sought 'religious' in person's own scheme of things, and (2) is it 'sincerely held.'" (quoting those decisions)); *Fallon v. Mercy Cath. Med. Ctr.*, 877 F.3d 487, 490-91 (3d Cir. 2017) (applying same test to Title VII claim of religious discrimination); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) (same); *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) (same); *EEOC v. Union Independiente de la Autoridad de Acueductos*, 279 F.3d 49, 56 (1st Cir. 2002) (same); *see also, e.g.*, EEOC Guidelines on Discrimination Because of Religion, 29 C.F.R. § 1605.1 (stating that EEOC has "consistently applied" this standard to Title VII).
[4]    *Fallon*, 877 F.3d at 491 (quoting *Welsh*, 398 U.S. at 340 (quoting *Seeger*, 380 U.S. at 176)).

252.  The non-discrimination provisions of Title VII also protect employees who do not possess religious beliefs or engage in religious practices [5] which here in this case the Plaintiffs allege to include their personal moral and ethical beliefs, spiritual beliefs, and/or conscience even for those who might not derive those from a from structured religious organization.

253.  Obviously, the law does not limit religious exemptions to only those faiths or denominations which enjoy a dominant presence in society. For example, in one case one Plaintiff holds a sincere and genuine belief in his Creator God under the terminology of a higher power and has experienced the help and assistance of his spiritual beliefs in improving himself and his life and overcoming problems and obstacles although pursued in the context of his fellowship of like-minded believers, which have grown to address all spiritual aspects of life.

254.  The Defendant Employers have left Plaintiffs with an unconscionable choice of either taking a COVID-19 vaccine at the expense of their religious beliefs or losing their livelihoods.

255.  Plaintiffs have sincere, religious beliefs that preclude them from taking a COVID-19 vaccine.

256.  Plaintiffs require, requested, and now request reasonable accommodation as defined further in 29 CFR § 1605.2.

257.  Plaintiffs informed their employers of those beliefs and requested (or tried to request) religious accommodations from the vaccine mandate.

---

[5]  *See, e.g.*, *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007) (addressing "non-adherence or reverse religious discrimination claim"); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 933-34 (7th Cir. 2003) ("[F]or these purposes, . . . 'religion' includes antipathy to religion. And so an atheist . . . cannot be fired because his employer dislikes atheists."); *Shapolia v. Los Alamos Nat'l Lab'y,* 992 F.2d 1033, 1037 (10th Cir. 1993) (plaintiff claimed he was fired "because he did not hold the same religious beliefs as his supervisors"); *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140 (5th Cir. 1975) (finding Title VII violated by requiring atheist employee to attend prayer portion of business meeting).

258.    Plaintiffs provided their employers adequate notice of their request for accommodation.

259.    At all relevant times, the Defendant Employers Atlas Air, FSI and EncompassAir have been corporations continuously doing business throughout the country engaged in an industry affecting commerce within the meaning of Title VII and had at least fifteen (15) employees.

260.    The Defendant Employers Atlas Air, FSI and EncompassAir mandated that all their employees take a COVID-19 vaccine or face termination.

261.    The Plaintiffs are all current or former employees of the Defendant Employers, with any separation of the Plaintiffs from the Defendant Employers being a direct and proximate result of the violations complained of herein.

262.    At first, the Defendant Employers announced that they would consider objections and claims of exemption based upon religious beliefs.

263.    In addition to their medical objections and liberty-based objections to being forced to taking a mandated vaccine against their will and without informed consent, also being experimental and not properly tested, and under an emergency authorization rather than proper licensing, all of the Plaintiffs herein also each hold one or more religious-based objections to taking the COVID-19 vaccine.

264.    Indeed, initially the Defendant Employers responded with essentially form letters that were identical in wording and content with only the name of the addressee employee individualized.

265.    In addition, initially, the Defendant Employers made work accommodations such as providing notice of flight routes where the availability of the work opportunity was limited by

vaccination status, allegedly based on the restrictions of the country or countries where the route would land (although in fact this information was always or nearly always false and incorrect).

266. Thus, initially, the Defendant Employers provided work accommodations for the Plaintiffs by allowing them to choose flights domestically and/or on international routes to countries that did not require a vaccination.

267. And in other communications made publicly available within the companies the Defendant Employers also mass-distributed the private medical information of the Plaintiffs' vaccination status.

268. However, the Defendant Employers then effectively -- that is, decisively, strongly, and unambiguously, but while simply pretending their previous grant of exemptions had not been granted -- revoked and withdrew the Plaintiffs' religious exemptions.

269. Defendant Employers revoked then effectively -- that is, decisively, strongly, and unambiguously, but while simply pretending their previous accommodations had not been authorized -- revoked and withdrew their work accommodations for the Plaintiffs.

270. Having invited, received, and granted in writing religious exemptions for the Plaintiffs, the Defendant Employers admit that the Defendants should have granted and the Plaintiffs should have received religious exemptions.

271. However, the Defendant Employers subsequently ordered categorically, unambiguously, and categorically that the Plaintiffs be vaccinated or suffer termination employment and in the interim loss of work opportunities including hours available to work and routes to fly on.

272. Defendant Employers had no basis for not granting and recognizing the Plaintiffs' religious objections and claims of religious exemption, other than the ulterior motives of the

43

political goals of the leadership and the union and desire to cultivate favor with the Biden Administration.[6]

273.   Defendant Employers had no basis for not granting and recognizing the Plaintiffs' religious objections and claims of religious exemption.

274.   Despite empty assurances, the Defendant Employers then began to act as if the religious exemptions did not exist and had never existed and threatened the Plaintiffs with termination and/or other loss of other benefits and work opportunities notwithstanding their previous acknowledgement of the Plaintiffs' religious exemptions.

275.   The Defendant Employers both began to make statements, announcements and declarations and issue orders inconsistent with the religious exemptions of the Plaintiffs but also to act in disregard of those exemptions so as to effectively cancel them.

276.   Pursuant to governing law and the Collective Bargaining Agreement, the Plaintiffs are not required to specify the nature or grounds of their religious objection or their request for a religious exemption.

277.   However, the claims of religious objection include:

A.  the mRNA vaccines for COVID-19 are not traditional vaccines but hijack or rewrite the genetic coding and operations of human cells (even if only RNA rather than the major DNA) so as to offend his Creator's design of the human body),

---

[6] Although the prior Trump Administration had pushed for the accelerated development of the vaccines, which was achieved before Donald Trump left office, despite the industries cutting corners and rushing the process to an extent and in ways the Plaintiffs believe to be unacceptable, the incoming Biden Administration specifically set a campaign promise and policy goal of achieving universal 100% vaccination rates.  Thus, a universal vaccination rate became in national politics a policy objective separate from and in addition to the vaccine itself.

B.  the mRNA technology threatens an ethically offensive and dangerous path to redesigning human bodies as chimera or hybrid humans, for which there is already considerable enthusiasm and activism among some in the scientific community seeking to improve humanity by modifying his Creator's design

C.  the vaccine or its predecessors were developed, cultivated, and/or mass produced using fetal stem cells or fetal tissues that in a Plaintiff's conscience bother him or her as benefitting from the death of others, in this case unborn children

D.  the use of fetal stem cells and fetal tissues incentivizes or normalizes the benefit of one life at the expense of another, which is ethically unacceptable

E.  while even the Catholic Church encourages parishioners to "consider" the COVID vaccine, its guidance is heavily dependent upon balancing the availability of ethically preferable options and the benefits and the exact circumstances and opposes mandates including for the very reason that they block the exercise of conscience; Plaintiffs also insist that the lack of necessary studies and data, and communicated data, prevents their balancing of benefits and ethical concerns. [7]

F.  while Plaintiffs accept medication as religiously tolerable, rushing a new vaccine to market without adequate testing or data or use experience violates the balancing of need versus risk that he believes makes medication religiously acceptable in some cases (as when necessity outweighs concerns)

---

[7] See, e.g., "Health-Care Workers Denied Religious Exemption to COVID-19 Vaccine Mandate Settle Lawsuit for $10.3M," National Catholic Register, July 31, 2022, accessible at: https://www.ncregister.com/cna/health-care-workers-denied-religious-exemption-to-covid-19-vaccine-mandate-settle-lawsuit-for-10-3m

45

G. Plaintiffs object to the excessive faith placed in human effort rather than in his or her Creator

H. Some Plaintiffs may object categorically to vaccines in general on religious grounds as an excessive intrusion into the Creator's design for his body

I. Some Plaintiffs objects to the use of force or coercion to medicate his body not only on liberty and medical grounds but as a religious interference in the exercise of conscience.

J. Plaintiffs also object in addition to on liberty grounds that being forced to medicate his body without freedom of choice by force or coercion will lead to increasing authoritarian control being asserted over him or her and society.

278. Most of the Plaintiffs refused to get vaccinated.

279. A few of the Plaintiffs took the vaccine but declined to disclose their personal choices and private medical information to certify vaccination to their employer.

280. A few of the Plaintiffs relented under coercion and pressure and became vaccinated, and then suffered medical complications, side effects, and injury, including the death of lead Plaintiff Lane Caviness.

281. A few of the Plaintiffs relented under coercion and pressure and became vaccinated.

282. Many of the Plaintiffs contend that although they have taken other vaccines without inquiry in the past, in this case their attention has been publicly drawn to the problems with this COVID-19 vaccination that they were not previously aware of in the past with regards to other vaccines, causing them to research and inquire to a deeper level than ever before and causing them to develop moral, ethical, conscience, and religious concerns and objections not

46

only because the COVID-19 vaccination is different but because their level of awareness has been made greater and deeper than was previously the case.

283. After the reversal of exemptions and accommodations, Plaintiffs' employers refused to engage in meaningful discussion or in the interactive process with Plaintiffs regarding their requests; or conveyed how their refusal to take a vaccine would impact their employers. Rather, their employers responded to Plaintiffs with announcements designed to deter Plaintiffs from exercising their sincere religious beliefs contrary to the purpose of asking for accommodations.

284. Atlas Air, FSI and EncompassAir failed to provide Plaintiffs with reasonable accommodations for their sincere, religious beliefs; instead, they discriminated against Plaintiffs with adverse employment actions.

285. The perpetual threat of unpaid leave is not a reasonable accommodation.

286. Rather, it is an adverse employment action. Atlas Air, FSI and EncompassAir thereby discriminated against Plaintiffs because of their religious beliefs.

287. Atlas Air, FSI and EncompassAir have engaged in these practices with malice and indifference to Plaintiffs' rights, including pursuing ulterior non-business motives.

288. The employers' ultimate failure to provide or continue religious accommodations has harmed and will continue to harm Plaintiffs.

289. Despite the fact that filing charges with the EEOC is mostly futile, many Plaintiffs have done so and many others are in the process of doing so.

**COUNT II**
**Title VII, 42 U.S.C. § 2000e, et seq. ("Title VII")**
*Religious Discrimination – Retaliation*

**All Employee Plaintiffs vs. Atlas Air, FSI and EncompassAir**

290.     Plaintiffs reallege and incorporate paragraphs 1 through 290 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

291.     Specifically, Plaintiffs incorporate by reference all of the allegations in the preceding Count I.

292.     At all relevant times, Atlas Air, FSI and EncompassAir have been a corporation continuously doing business throughout the country engaged in an industry affecting commerce within the meaning of Title VII and had at least fifteen (15) employees.

293.     The employers mandated that all its employees take a COVID-19 vaccine or face termination. Their actions have left Plaintiffs with an unconscionable choice of either taking a COVID-19 vaccine at the expense of their religious beliefs or losing their livelihoods.

294.     Plaintiffs have sincere, religious beliefs that preclude them from taking a COVID-19 vaccine.

295.     Plaintiffs informed their employers of those beliefs and requested (or wanted to request) religious accommodations from the vaccine mandate. Plaintiffs provided their employers adequate notice.

296.     Atlas Air, FSI and EncompassAir violated Title VII when they responded to these requests by retaliating against Plaintiffs, informing them that they would effectively be terminated by being placed on indefinite unpaid leave in attempt to coerce them into taking a COVID-19 vaccine and ultimately doing so.

297.     The sole reason for the employers' adverse employment actions against Plaintiffs was to retaliate against them for their sincerely held religious beliefs.

298.     The employers have engaged in these practices with malice and indifference to Plaintiffs' rights.

48

299. The employers' retaliation has harmed and will continue to harm Plaintiffs. Despite the fact that filing charges with the EEOC is futile, many Plaintiffs have done so and the remainder are in the process of doing so.

**COUNT III**
**42 U.S.C. § 1983 and Bivens**
*Violation of Right to Privacy, Denial of Equal Protection and Due Process*

**All Plaintiffs vs. Atlas Air**

300. Plaintiffs reallege and incorporate paragraphs 1 through 300 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

301. Plaintiffs are citizens of the United States.

302. At all times relevant hereto, Atlas Air was a State Actor and a person acting under the color of law. That is, Atlas Air is the air cargo line of the U.S. Departments of Defense and other government agencies, transporting more tons of air freight for more miles for the government than any other airline including the U.S. Air Force.

303. Many Atlas Air flights are wholly compelled, directed and commanded by the U.S. government. And in many cases, the government compels and directs precisely how Atlas Air must complete its missions. This has been the case throughout the COVID-19 pandemic period.

304. That is, Atlas Air has taken decisive employment actions that have caused Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling Atlas Air's actions whether through incentive or threat.

305. The U.S. government has effectively delegated its authority to the private sector[8]

---

[8] See e.g., West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601 (1975).

49

and used companies like Atlas Air to do its bidding for them.

306.    Atlas Air and other defendants are therefore engaged in a quid-pro-quo arrangement with the DOD whereby Atlas and defendants are enforcing the agenda the Federal government knows it cannot legislate. Stated differently, the government is able to acquire what it always wants – more power – through the imposition of private-employer mandates.

307.    In exchange, the Biden administration is lining the pockets of Atlas and other big corporations and their executives through policy or pecuniary gain; at the expense of their own employees' and Americans' lives.

308.    Atlas is also acting under color of law as it has conspired with Government officials to leverage Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire Plaintiffs personal, genetic information. Atlas Air and the federal government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, Atlas Air has acted in concert with the federal government at the expense of their employees including Plaintiffs.

309.    First, the right to privacy. The Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty and included in this is the guarantee of personal privacy.

310. Applied here, Plaintiffs fundamental right to privacy includes the reasonable expectation to not be coerced or put under duress by Atlas to inject an unwanted, experimental, foreign gene therapy into their body to save their livelihoods.

311. This privacy right also includes Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, Atlas violates Plaintiffs' privacy rights when they broadcast their private information on internal memos, bulletin boards, and other communications.

312. Next, **equal protection**. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

*No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.*

313. Prior to and after the October 2021 announcement of the vaccine mandate, those vaccinated were treated superior to and provided more preferential treatment than those who were not which included increase in pay, scheduling, benefits and privileges.

314. Atlas knowingly and willfully discriminated against those who are not unvaccinated and treated persons who are vaccinated different from those who are not without lawful justification.

315. Allowing similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear masks, is a facial deprivation of equal protection.

316.    While the mandate appears neutral on its face, in practice it denies Plaintiffs equal protection under the law. For example, the mandates deny equal protection to Plaintiffs who have closely held religious beliefs that prevent them from being vaccinated. Because of Atlas's practices, Plaintiffs who hold these beliefs have suffered harm.

317.    Mandated vaccinations, masks and repeated PCR testing are substantial burdens. These employment practices do not have any significant health or safety benefit; thus, there is no legitimate interest promoted. To the contrary, the COVID-19 vaccines can cause death and permanent injury; and evidence suggests the vaccines are actually prolonging the pandemic. Further, natural immunity is more effective and lasts longer than a vaccine.

318.    Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

319.    Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.

320.    The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes Atlas as a State Actor from infringing certain fundamental liberty interests no matter the process provided, unless the infringement is narrowly tailored to serve a compelling state interest.

321.    Here, Atlas' actions are those of a State Actor who lacks a compelling interest to impede or infringe upon Plaintiffs' fundamental rights and fails under any level of scrutiny. Plaintiffs have Constitutional and fundamental liberty interests in bodily integrity and informed

52

consent; and a Constitutional and fundamental liberty interest in not being compelled to provide private medical information to Atlas.

322.    Atlas' vaccine mandates do not serve a legitimate, compelling state interest. While courts have found a compelling state interest in controlling the spread of infection from person-to-person in some instances, this is inapplicable here since these vaccines/gene therapies and masks do not prevent Plaintiffs from dying, being infected or transmitting COVID-19 to another person.

323.    Assuming the vaccines could be said to satisfy the interest of preserving public health, Atlas' mandate is not narrowly tailored since it is not the least restrictive means necessary as numerous, less restrictive means than vaccination exist that serve the public interest of protecting the public's health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to be as equal to or provide greater protection than the COVID-19 vaccines. And safer, less restrictive treatments, preventatives or medications exist like the use of hydroxychloroquine, zinc and ivermectin that does serve the public's interests.

324.    As a direct and proximate result of Atlas' policies, practices, regulations and conduct, Plaintiffs have suffered harm.

325.    The conduct of Atlas as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

**COUNT IV**
**42 U.S.C. § 2000ff-1(a)(1) and (a)(2)**
*Genetic Information Non-Discrimination Act ("GINA")*

53

**All Employee Plaintiffs vs. Atlas Air, FSI and EncompassAir**

326.     Plaintiffs reallege and incorporate paragraphs 1 through 326 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

327.     GINA prohibits discrimination based on genetic information. Specifically, it is unlawful employment practices for an employer to fail to refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee because of genetic information.

328.     GINA also prohibits employers from limiting, segregating, or classifying the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee because of genetic information.

329.     Atlas Air, FSI and EncompassAir are employers within the meaning of GINA, and at all times relevant were engaged in an industry affecting commerce and has at all times had fifteen (15) or more employees.

330.     Plaintiffs are employees as defined by GINA.

331.     The employers have and continue to violate GINA by discriminating against Plaintiffs and other employees based on whether they have been taken a COVID-19 vaccine.

332.     COVID-19 vaccines are actually Virus-Based Gene Therapies according to the FDA's own definition. These vaccines are unequivocally based upon injecting genetic information into a person and changing or manipulating the person's genetic information.

333.     According to the FDA: "Gene therapy products are all products that mediate their effects by transcription and/or translation of transferred genetic material and/or by integrating

54

into the host genome and that are administered as nucleic acids, viruses, or genetically engineered microorganisms."

334.    According to the CDC: "Messenger RNA, or mRNA, is genetic material that tells your body how to make proteins."

335.    According to Genome.gov: "mRNA acts as a cellular messenger. DNA, which is stored in a cell's nucleus, encodes the genetic information for making proteins. mRNA transfers a copy of this genetic information outside of the nucleus, to a cells cytoplasm, where it is translated into amino acids by ribosomes and then folded into complete proteins."

336.    According to Pfizer, its vaccine contains messenger RNA (mRNA), a kind of genetic material, and a piece of the SARS-CoV-2 virus' genetic material that instructs cells in the body to make the virus' distinctive "spike" protein and trigger the immune system to learn to react defensively, producing an immune response against the virus.

337.    As such, those who have been injected with a COVID-19 vaccine necessarily possess different genetic material or genetic information than those who do not. Atlas' employment practices discriminate or provide unequal opportunities based on an employee's COVID-19 status violates GINA.

338.    The employers unlawfully discriminated and violated GINA when they took adverse employment actions against Plaintiffs and other employees because they are not or refuse to be vaccinated.

339.    The employers unlawfully discriminated and violated GINA when they afforded better opportunities (i.e., routes, schedules and benefits) and greater compensation to those who are vaccinated than to Plaintiffs who are not; and requiring those who are unvaccinated to wear masks at certain times, while permitting those who are vaccinated to go without wearing masks.

340. The employers have engaged in these practices with malice and indifference to Plaintiffs' rights.

341. The employers' discrimination has harmed and will continue to harm Plaintiffs.

342. Despite the fact that filing charges with the EEOC is futile, many Plaintiffs have done so and the remainder are in the process of doing so.

<u>**COUNT V**</u>
**42 U.S.C. § 2000ff-1(b)**
*Genetic Information Non-Discrimination Act ("GINA")*

**All Employee Plaintiffs vs. Atlas Air, FSI and EncompassAir**

343. Plaintiffs reallege and incorporate paragraphs 1 through 343 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.GINA also makes it unlawful for an employer to request, require or purchase genetic information with respect to an employee or a family member of the employee.

344. Polymerase Chain Reaction ("PCR") tests are used to amplify small segments of DNA which is genetic material. This is the same sort of test used for forensics, cloning, genome projects for mapping genes and DNA sequencing. Genetic test means a test that analyzes DNA, RNA or chromosomes for purposes of such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis.

345. For genetic tests, the first step is extraction of genetic material from a human specimen either through blood, hair, or oral swab. This is the exact same process used in the PCR test required and requested by Atlas to detect the genetic material of COVID-19.

346. Atlas Air, FSI and EncompassAir have and continue to violate GINA when requesting and requiring the genetic information from their employees by mandating they take

the PCR test. They violates GINA by requesting and requiring its employees to have their genetic information collected via nasopharyngeal or nasal swab (the swab scrapes the cells from inside the nasal cavity which has the genetic material from the person for whom the specimen is collected).

347.    The employers violate GINA when they request their employee's vaccination status by asking Plaintiffs about their vaccination status as they are asking for their genetic information given the vaccines are gene therapies in violation of GINA. They limit, segregate, discriminate or classify employees in a way that adversely affects their opportunities or status.

348.    The employers have engaged in these practices with malice and indifference to Plaintiffs' rights.

349.    The employers' discrimination has harmed and will continue to harm Plaintiffs.

350.    Despite the fact that filing charges with the EEOC is futile, many Plaintiffs have done so and the remainder are in the process of doing so.

## <u>COUNT VI</u>

### *Breach of the Collective Bargaining Agreement*

### Atlas Pilot Employees vs. Atlas and Atlas Executives

351.    Plaintiffs reallege and incorporate paragraphs 1 through 351 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

352.    Defendants' actions against Plaintiffs have violated, and continue to violate, several sections of the Collective Bargaining Agreement, including Article 1(A)(4) ("the Company and Union will each comply with all applicable laws prohibiting discrimination against any Crew Member who is now, or may become, subject to the terms of this Agreement including age, race, sex, . . . religion, . . . handicap or disability, or any other characteristic protected by applicable

local, state or federal law." Indeed, recent communications by Atlas and Defendant Atlas executives have told Plaintiffs that Plaintiffs' religious and even medical exemptions to the vaccine mandates will not be recognized in the future.

353.    Under the Agreement, Management rights are laid out in Art. 1(G)(1), which provides a long list of rights retained by the Company, including to "direct its Crew Member workforce; determine the appropriate number of Crew Members; hire, promote, and discharge Crew Members; establish and enforce rules of conduct; maintain discipline and efficiency; introduce new equipment; determine the location(s) of the work force," etc. Under the ancient legal maxim *Expressio unius est exclusio alterius* ("the express mention of one thing excludes all others"), when a law or agreement includes a list of specific items, that list is presumed to be exclusive. *Nothing in the Agreement's list of Company rights allows the Company to violate employees' bodily integrity by mandating injections of potentially dangerous experimental vaccines which do not provide immunity or prevent transmission.*[9]

354.    Art. 26(R) of the Collective Bargaining Agreement plainly forbids Atlas Air from exposing Plaintiffs to Unsafe Conditions: "1. Nothing in this Agreement will be construed to require a Crew Member to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crew Member or his equipment."

355.    According to the US government's VAERS database, the vaccines have already led to the deaths of 26,000 Americans. Scholarly, peer-reviewed estimates suggest the VAERS database underreports adverse events from vaccines by a rate of at least 90%. At trial, Plaintiffs

---

[9] Nor can there be any "emergency" exception argument allowing for Atlas to impose a vaccine mandate. Art. 22H even provides a list of natural disasters and acts of God which may constitute exceptions over which "the Company has no control," including a natural disaster, a labor dispute, grounding of a substantial number of the Company's aircraft by government agency, war emergency, or acts of terrorism. The Agreement's specification of a "war emergency" evidence that other, contrived "emergencies," such as a virus pandemic posing a 4/100ths of 1% death rate for those under age 70, do not fall within such a catastrophic exception list.

will show that a number of vaccinated coworkers within the Atlas company have already suffered adverse effects and injuries following vaccinations.

356. Art. 15(A)(1) of the Agreement plainly states that "The physical standards required of a Crew Member shall be the standards required by the Federal Aviation Administration (as outlined in 14 CFR Part 67 and as may be amended) . . . ." Current FAA standards do not require vaccination for air crew members.

357. Art. 15(C)(12) provides that "Medical records and other information obtained as a result of a Company required medical examination" or testing shall be "subject to safeguards as to their confidentiality in accordance with applicable law." Yet Atlas and other Defendants have repeatedly violated the medical privacy of Plaintiffs.

358. Defendants have also violated the JUST CAUSE, DISCIPLINE, DISCHARGE AND PROBATION provisions of Article 19 of the Agreement. Plaintiffs have simply been told that they will be terminated on May 1 unless they submit to the experimental injections.

359. Further, Atlas and the Defendant Atlas executives have violated Article 22, which requires that "Except as may otherwise be provided in this Agreement, *seniority will govern with respect to upgrade and* downgrade*, filling of vacancies, displacements, reduction in force (furlough), recall from furlough, Base and aircraft assignments due to expansion or reduction in aircraft and Base staffing, monthly schedules, vacation bidding and when otherwise required by the Agreement."* Article 22D requires that Atlas employees may lose their seniority ranks only upon proper discharge, retirement, death, resignation, extended absence or other terminal events.

360. Yet Atlas Air and the Defendant executives have paid vaccinated employees more than unvaccinated employees, and have maneuvered to terminate large numbers of seniority-status crewmembers.

59

361.     Further, Article 25X plainly and clearly forbids Atlas Air from discrimination "against any Crew Member because of race, color, national origin, *religion*, creed, sex, age, *disability,* veteran status, marital status, or sexual orientation.

362.     The Atlas pilot Plaintiffs are third-party beneficiaries of the Collective Bargaining Agreement.

363.     Several of the Plaintiffs have either religious or medical objections or exemptions to the COVID-19 treatment injections.  Yet Atlas Air and the other Defendants have continued to demand that they be injected with the proven-dangerous, experimental, ineffective vaccine treatments.  This plainly violates Article 25X of the Agreement.

364.     Additionally, the Collective Bargaining Agreement must comply with state and federal law, including Title 7. Defendants violated the CBA by interpreting it to defy state and federal law, as described above.

**COUNT VII**
*Fraud*
**All Plaintiffs vs. All Defendants**

365.     Plaintiffs reallege and incorporate paragraphs 1 through 365 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action. above as if fully set forth herein.

366.     Defendants made (or participated in or approved the making of) numerous false statements to Plaintiffs as set forth above, including regarding the efficacy of COVID-19 vaccines and the fact that Atlas would offer reasonable accommodations for those with religious or medical objections to taking COVID-19 vaccines.

60

367. Defendants also misrepresented facts regarding vaccine requirements of different countries, including Germany and the countries of South America, falsely telling plaintiffs that those countries were off-limits to unvaccinated pilots and crew.

368. Defendants knew that these representations were false at the time they made the representations.

369. For instance, simultaneously while the Company claimed to respect its employees' decisions whether or not to be vaccinated and promised to provide religious and medical accommodations, it also reserved the right to determine that accommodations were no longer reasonable.

370. The Company then repeatedly equivocated on whether employees with accommodations were permitted to work without getting vaccinated or whether these employees would be placed on leave without pay.

371. Moreover, Defendants knew that their representations regarding "full vaccination" status were false at the time they made the representations.

372. The Company originally informed employees that they would be fully vaccinated in compliance with Company guidelines upon receiving a single dose of the Johnson & Johnson vaccine.

373. However, the Company then informed employees that they would not be permitted to fly to Germany, South America, and certain other areas even if they had received one dose of the Johnson & Johnson vaccine.

374. The Company falsely stated that these areas legally required people flying into those areas to be vaccinated with more than a single dose of the Johnson & Johnson vaccine, but the Company knew that these areas had no such restrictions.

61

375. The Company discriminated against employees who refused to take any or additional vaccines despite the Company's repeated promises to respect the right to refuse the vaccine.

376. Defendants intended that their representations would induce Plaintiffs to act on those representations.

377. For instance, Defendants implemented a Company-wide vaccine mandate and repeatedly warned employees that they faced potential unemployment if they refused to be vaccinated.

378. Further, Defendants paid employees five hours of compensation upon being vaccinated, and Defendants removed the ability for unvaccinated employees to fly to certain places.

379. Plaintiffs reasonably relied on those false statements. Some Plaintiffs lost hundreds of hours and thousands of dollars of income.  Some Plaintiffs relied on them to actually take the vaccine.

380. As a direct and proximate result of these false statements, Plaintiffs have suffered harm.

381. For example, Plaintiffs who were coerced into being vaccinated suffered intense stress upon learning that the vaccines are ineffective and carry a high risk of injury.

382. Plaintiffs who did not get vaccinated suffered loss of income because the Company prohibited them from many flights and required them to pay for their own COVID-19 tests, loss of job security because the Company constantly informed them that they were on the verge of unemployment, and stigmatization because the Company treated them as more disposable than their vaccinated colleagues.

383.   Defendants acted willfully and with malicious intent in making these false statements.

**COUNT VIII**
**Restatement (Second) of Torts § 46 (1965)**
*Intentional Infliction of Emotional Distress*

**All Plaintiffs vs. All Defendants**

384.   Plaintiffs reallege and incorporate paragraphs 1 through 384 above as if fully set forth herein and incorporates all of the foregoing factual allegations and all inferences and implications drawn therefrom in support of this Count and cause of action.

385.    Defendants acted intentionally or recklessly with respect to the conduct set forth in this Complaint, when Defendants' obligation that employees be vaccinated or lose their jobs resulted in inflicted mental, and emotional distress upon them. Even if Defendants did not intend to cause these symptoms on Plaintiffs, their deliberate disregard of a high degree of probability that the emotional distress will follow is enough to satisfy the element. There is a high degree of probability that Plaintiffs would suffer from severe emotional distress by getting fired, retaliation from the Defendants, being forced to get the vaccine, or a pay cut.

386.   Defendants' conduct has been and continues to be extreme and outrageous, because Defendants engaged in conduct that would be considered outrageous including but not limited to: threats, harassment, embarrassment, yelling, and intimidation that is so extreme in degree, as to go beyond all possible bounds of decency. The conduct displayed by Defendants would not be considered mere insults, indignities, annoyances, petty oppressions, or other trivialities such as inconsiderate or unkind. It was conduct that was aimed to show hatred, intimidation, contempt, and disgust towards the Plaintiffs.

387. As a proximate result of Defendants' actions, Plaintiffs have suffered severe emotional distress including but not limited to highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. For example, Defendants hostility and retaliation towards Plaintiffs caused several Plaintiffs to suffer economic injury, mental anguish, humiliation and embarrassment, as well as other emotional injuries.

388. For instance, on account of Defendant's illegal discrimination, harassment, and retaliation, several Plaintiffs were stricken with grief, distress, anxiety which has and continues to harm Plaintiffs to this day. For others, the decision to get a forced inoculation or lose their job with no other options or recourse caused Plaintiffs to suffer from problems such as emotional distress, depression, increased drug use, lost enjoyment of life, increased tobacco consumption, sexual problems, lack of sleep, nightmares, pain and suffering, mental anguish, anxiety, or a reduced sense of well-being.

389. The harm caused by Defendants to Plaintiffs was reasonably foreseeable, because it is foreseeable that Plaintiffs will suffer substantially when facing the prospect of attempting to provide for their families without any income or trying to find a job in a very difficult market. Besides the stress and pain that come with losing a job there were specific Plaintiffs that would have difficulty feeding their infants and worrying that the baby might get sick or die due to their exposure in being forced to go to work, some that have experienced trouble sleeping or can barely go to sleep at all resulting in physical symptoms, or stress and humiliation being ridiculed, harassed, and criticized by coworkers.

390. For example, it is reasonable that a Plaintiff will suffer from severe emotional distress if they are laughed at, ridiculed, mocked, and bullied by fellow employees and supervisors due to their religious beliefs. In addition, the policies produced by management resulted in

64

instances of vicious shouting and screaming among Plaintiffs and other staff during flights, occasional unsafe episodes of pilots leaving their cockpits to scream at coworkers for being unvaccinated, Plaintiffs being harassed or discriminated every day on the job and some even bullied into getting the vaccine suffering from severe emotional distress.

391.     Further, it is reasonable to predict that when Defendants violate the fundamental interests of the Plaintiffs (religious/medical) in a deceptive manner it will result in the Plaintiffs being denied rights granted to other employees, along with the emotional distress and anguish that comes along with that

**<u>Prayer for Relief</u>**

Plaintiffs demand judgment against Defendants as follows:

    i.    An award of compensatory damages in appropriate amounts to be established at trial, no less than an average of $1,000,000 per Plaintiff (total of at least $159,000,000);

    ii.    Punitive damages no less than $30,000,000 per Plaintiff or the maximum permitted by law as determined by the jury;

    iii.    Preliminary and permanent injunctive relief enjoining Defendants from any further COVID-19 related mandates or restrictions on Plaintiffs or any prospective future employees;

    iv.    Awards of damages tailored to make vaccine-injured plaintiffs whole with regard to their manifest and likely future long-term injuries and disabilities;

    v.    An award of attorneys' fees and costs associated with this action;

65

vi.       An award of prejudgment and post-judgment interest at the legal rate to the maximum extent permitted by law;

vii.     Injunctive relief preventing Defendants from further implementing their unlawful COVID-19 vaccine mandate, or from further firing, terminating, punishing, retaliating or otherwise further harming Plaintiffs; and

viii.    Such other and further relief as the Court may deem just and proper.

## JURY  DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Date: October 27, 2022

John M. Pierce
**JOHN PIERCE LAW P.C.**
21550 Oxnard Street
3rd Floor, PMB#172
Woodland Hills, CA 91637
(213) 279-7846
jpierce@johnpiercelaw.com

*PHV to be Submitted*

*Attorneys for Plaintiffs*

ANTHONY F. SABATINI, ESQ.
FL BAR No. 1018163
**SABATINI LAW FIRM, P.A.**
411 N DONNELLY ST, STE #313
MOUNT DORA, FL 32757
T: (352)-455-2928
anthony@sabatinilegal.com

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| **ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS), PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G. BALLARD JR. , CINDY BARRIONUEVO, LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, DOUGLAS BERRY, GREGORY BERRY, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, JONATHAN FUSSLE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, GREG GORDON, DANIEL GREER, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR, APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, STEVEN MURATORE, GREGORY MYERS, PETER NAPORA, JOEL PARDO,** | Cause No. 1:22-cv-23519-KMM<br><br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

**Amended Complaint and Demand For Jury Trial-- 1**

67

**LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**

individuals,

Plaintiffs,

v.

**ATLAS AIR INC**., a Delaware corporation, **FLIGHT SERVICES INTERNATIONAL, LLC**, a Texas limited liability company, **ENCOMPASSAIR, LLC,** an Alaska limited liability company, and **JOHN W. DIETRICH, PATRICIA GOODWIN-PETERS, JEFFREY**

**CARLSON,** individuals,

Defendants.

---

**Amended Complaint and Demand For Jury Trial-- 2**

**NATURE OF THE CASE**

1.      Plaintiffs are pilots, flight attendants, mechanics and other ground staff of Atlas Air, Inc. ("Atlas") and its affiliated companies Flight Services International, LLC ("FSI") and EncompassAir, LLC, ("ECA"), whose rights were brazenly violated in connection with Defendants' implementation of mandates, policies and procedures relating to COVID-19 vaccinations.

2.      This is an action for legal and equitable relief to redress Defendants' invasions of privacy, negligence, breach of contract, retaliation, failure to accommodate, disparate treatment, creation of a hostile work environment, violations of the Genetic Information Non-Disclosure Act ("GINA") and intentional and negligent infliction of emotional distress.  Such wrongful conduct was predicated on Defendants' unlawful discrimination, harassment, and retaliation against Plaintiffs.

3.      This lawsuit also seeks declaratory relief from the Defendants' vaccine mandate on the basis that Defendants' conduct was indistinguishable from that of the U.S. Government and Defendants' vaccine mandate, as applied, violates privacy, equal protection and due process protections secured by both the Constitution of Florida and the Constitution of the United States.

4.      Defendants used deception, discrimination, psychological manipulation, and physical isolation to force Plaintiffs, under threat of termination, to participate in a dangerous social and medical experiment.

5.      Defendants have made Plaintiffs second-class citizens within their respective companies and targeted them in a campaign of harassment designed to force Plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy.

**Amended Complaint and
Demand For Jury Trial-- 3**

69

Defendants' vaccine mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never wanted to make: take an experimental gene-based therapy at the expense of their religious beliefs and/or health or lose their livelihoods and the means by which they provide for their families.

6.      Defendants granted Plaintiffs religious 'accommodation' with an ever-present possibility of termination and immediately proceeded to deny them benefits and equal opportunities and created a hostile work environment by forcing Plaintiffs to wear individually identifiable symbols distinguishing them from their peers and gave public disclosure of their private and protected health information.

7.      Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the vaccine without any information on the potential risks or benefits. Several Plaintiffs (and other Atlas employees) have suffered adverse side-effects and harm as a result of submitting to the vaccine. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects. This suit is further brought to redress the harms Defendants have dispassionately brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved.

**Amended Complaint and
Demand For Jury Trial-- 4**

8.      These risks may even extend to the public if pilots who submitted to Defendant pressure to take the vaccines suffer health effects while flying.[1]

## PARTIES

9.      Plaintiff **Landon Caviness** is an individual and joint personal representative of employee, the Estate of Lane Caviness

10.     Plaintiff **Morgan Caviness** is an individual and joint personal representative of employee, the Estate of Lane Caviness

11.     Plaintiff **Patrick Akerlund** is an individual and employee of Atlas.

12.     Plaintiff **Michael Alzati** is an individual and employee of Atlas. He resides in the state of Florida.

13.     Plaintiff **Eric W. Anderson** is an individual and employee of Atlas.

14.     Plaintiff **Michael G. Ballard Jr**. is an individual and employee of Atlas

15.     Plaintiff **Cindy Barrionuevo** is an individual and employee of FSI

---

[1] *See, e.g.*, Hoft, Jim. "Pilot dies suddenly after collapsing shortly after takeoff from Chicago airport," *Gateway Pundit.* November 22, 2022 (detailing sudden death of a vaccinated pilot for another airline while in flight; only the skill of a copilot saved the lives of dozens of passengers). There is a long list of pilots and crew members who have been incapacitated or died during or shortly before or after flights following vaccination. Further, the FAA has now discouraged pilots from getting the Johnson & Johnson vaccine due to increased risk of stroke unless no other vaccination option is available. Clearly, the FAA is accepting the increased risk of stroke from the J&J vaccine as opposed to remaining vaccine free.  This is a safety of flight issue.

**Amended Complaint and
Demand For Jury Trial-- 5**

16.      Plaintiff **Larry James Bearce, Jr**. is an individual and employee of Atlas.

17.      Plaintiff **Robert Bellman** is an individual and employee of Atlas. He resides in the state of Florida.

18.      Plaintiff **Benjamin Bendiburg** is an individual and employee of Atlas.

19.      Plaintiff **Douglas Berry** is an individual and employee of Atlas.

20.      Plaintiff **Gregory Berry** is an individual and employee of Atlas.

21.      Plaintiff **Lynette Botha** is an individual and employee of Atlas.

22.      Plaintiff **Caleb Buehrer** is an individual and employee of Atlas. He resides in the state of Florida.

23.      Plaintiff **Richard Bullock** is an individual and employee of Atlas. He resides in the state of Florida.

24.      Plaintiff **Jon Carroll** is an individual and employee of Atlas.

25.      Plaintiff **Vergil Caskey** is an individual and employee of Atlas.

26.      Plaintiff **James Castor** is an individual and employee of Atlas.

27.      Plaintiff **Nathan Charboneau** is an individual and employee of Atlas.

28.      Plaintiff **Shawn Churchel** is an individual and employee of Atlas. He resides in the state of Florida.

29.      Plaintiff **Joel Colon** is an individual and employee of Atlas. He resides in the state of Florida.

30.      Plaintiff **Mark Connor** is an individual and employee of Atlas.

31.      Plaintiff **Matthew Cronauer** is an individual and employee of Atlas.

32.      Plaintiff **Fred Cunningham** is an individual and employee of Atlas.

33.      Plaintiff **Royal Danza** is an individual and employee of Atlas.

**Amended Complaint and
Demand For Jury Trial-- 6**

72

34. Plaintiff **Elliot De Sousa** is an individual and employee of Atlas.

35. Plaintiff **Eric Desandro** is an individual and employee of Atlas. He resides in the state of Florida

36. Plaintiff **Steve Dixon** is an individual and employee of Atlas.

37. Plaintiff **James Erickson** is an individual and employee of Atlas.

38. Plaintiff **Luis Esquivia** is an individual and employee of Atlas. He resides in the state of Florida.

39. Plaintiff **Lee Estes** is an individual and employee of Atlas.

40. Plaintiff **Robert Fratti** is an individual and employee of Atlas.

41. Plaintiff **Jason Frisbie** is an individual and employee of Atlas.

42. Plaintiff **Timothy Frye** is an individual and employee of Atlas. He resides in the state of Florida.

43. Plaintiff **Jonathan Fussle** is an individual and employee of Atlas.

44. Plaintiff **Tony Gamboa** is an individual and employee of Atlas. He resides in the state of Florida.

45. Plaintiff **Dennis Gebhard** is an individual and employee of Atlas. He resides in the state of Florida.

46. Plaintiff **Reza Ghods** is an individual and employee of Atlas. He resides in the state of Florida.

47. Plaintiff **Mark Gilman** is an individual and employee of Atlas.

48. Plaintiff **Robert Giudice** is an individual and employee of Atlas.

49. Plaintiff **Eric Gordon** is an individual and employee of Atlas.

50. Plaintiff **Greg Gordon** is an individual and employee of Atlas.

**Amended Complaint and
Demand For Jury Trial-- 7**

51.      Plaintiff **Daniel Greer** is an individual and employee of Atlas.

52.      Plaintiff **Rexford T. Heivilin** is an individual and employee of Atlas.

53.      Plaintiff **Jason Henning** is an individual and employee of Atlas.

54.      Plaintiff **David Hewson III** is an individual and employee of Atlas. He resides in the state of Florida.

55.      Plaintiff **Todd Hontz** is an individual and employee of Atlas. He resides in the state of Florida.

56.      Plaintiff **Daniel Hudson** is an individual and employee of Atlas.

57.      Plaintiff **Roger Justice** is an individual and employee of Atlas.

58.      Plaintiff **Venancius Kassandji** is an individual and employee of Atlas. He resides in the state of Florida.

59.      Plaintiff **John Kearins** is an individual and employee of Atlas.

60.      Plaintiff **Ricky Kinder** is an individual and employee of Atlas.

61.      Plaintiff **Beth Kirby** is an individual and employee of Atlas. She resides in the state of Florida.

62.      Plaintiff **Andreas N. Koustas** is an individual and employee of Atlas.

63.      Plaintiff **Chad Kravetz** is an individual and employee of Atlas. He resides in the state of Florida.

64.      Plaintiff **Carl Lindberg** is an individual and employee of Atlas.

65.      Plaintiff **Joseph Loschiavo** is an individual and employee of Atlas.

66.      Plaintiff **Andrew Lutz** is an individual and employee of Atlas. He resides in the state of Florida.

**Amended Complaint and
Demand For Jury Trial-- 8**

74

67.     Plaintiff **Blythe Lutz** is an individual and employee of Atlas. She resides in the state of Florida.

68.     Plaintiff **Rafael Macario** is an individual and employee of Atlas. He resides in the state of Florida.

69.     Plaintiff **Douglas P. Mayo Jr.** is an individual and employee of Atlas. He resides in the state of Florida.

70.     Plaintiff **April McQuillen** is an individual and employee of Atlas. She resides in the state of Florida.

71.     Plaintiff **Christopher McQuillen** is an individual and employee of Atlas. He resides in the state of Florida.

72.     Plaintiff **Steven Meissner** is an individual and employee of Atlas. He resides in the state of Florida.

73.     Plaintiff **Jeffrey Michonski** is an individual and employee of Atlas.

74.     Plaintiff **Andrew Mickler** is an individual and employee of Atlas.

75.     Plaintiff **Corey Morris** is an individual and employee of Atlas. He resides in the state of Florida.

76.     Plaintiff **Steven Muratore** is an individual and employee of Atlas. He resides in the state of Florida.

77.     Plaintiff **Gregory Myers** is an individual and employee of Atlas.

78.     Plaintiff **Peter Napora** is an individual and employee of Atlas.

79.     Plaintiff **Joel Pardo** is an individual and employee of Atlas.

80.     Plaintiff **Lance Phillips** is an individual and employee of Atlas.

81.     Plaintiff **Patrick Phillips** is an individual and employee of Atlas.

**Amended Complaint and**
**Demand For Jury Trial-- 9**

82.     Plaintiff **Glen Pronk** is an individual and employee of Atlas.

83.     Plaintiff **Charles Randall** is an individual and employee of Atlas.

84.     Plaintiff **Peter Raymond** is an individual and employee of Atlas.

85.     Plaintiff **Joshua Roberts** is an individual and employee of Atlas.

86.     Plaintiff **Rebecca Robertson** is an individual and employee of FSI.

87.     Plaintiff **Jason Rogers** is an individual and employee of Atlas.

88.     Plaintiff **Kimberly Schreck** is an individual and employee of Atlas.

89.     Plaintiff **William Serritella** is an individual and employee of Atlas. He resides in the state of Florida.

90.     Plaintiff **Gentry Shelton** is an individual and employee of Atlas.

91.     Plaintiff **Todd Snaza** is an individual and employee of Atlas.

92.     Plaintiff **Donald Sorrentino** is an individual and employee of Atlas.

93.     Plaintiff **Mark South** is an individual and employee of Atlas.

94.     Plaintiff **Michael Stark** is an individual and employee of Atlas.

95.     Plaintiff **Elizabeth Stoneking** is an individual and employee of FSI.

96.     Plaintiff **Forrest Stowells** is an individual and employee of Atlas.

97.     Plaintiff **Barbara Janeice Surber** is an individual and employee of FSI.

98.     Plaintiff **John Swift** is an individual and employee of Atlas.

99.     Plaintiff **Nick Taylor** is an individual and employee of Atlas.

100.    Plaintiff **Mark Thien** is an individual and mechanic contracted to Atlas from Encompass Air LLC.

101.    Plaintiff **William Thompson** is an individual and employee of Atlas. He resides in the state of Florida.

**Amended Complaint and
Demand For Jury Trial-- 10**

102.     Plaintiff **Brandon Thoroughman** is an individual and employee of Atlas.

103.     Plaintiff **Geri Tonda** is an individual and employee of FSI.

104.     Plaintiff **Ricardo Torres Abarca** is an individual and employee of FSI.

105.     Plaintiff **Gustavo Verdes** is an individual and employee of Atlas.

106.     Plaintiff **James Villella** is an individual and employee of Atlas. He resides in the state of Florida.

107.     Plaintiff **Farshad Zarrabian** is an individual and employee of Atlas. He resides in the state of Florida.

108.     Defendant **Atlas Air, Inc.** ("Atlas") is a Delaware corporation with its principal place of business in Purchase, New York. It is a wholly owned subsidiary of Atlas Air Worldwide Holdings, is a cargo airline, passenger charter airline, and aircraft lessor.[2]

109.     Atlas is a common carrier as defined under federal law.

110.     Atlas has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists of 30,000 square feet of administrative and instructional space, including the operation of six flight simulation training devices. It "provides a wide range of advanced training solutions, specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000 pilots, flight engineers, flight attendants, and other

---

[2] A previous EEOC investigation into Polar Air, a subsidiary of Atlas, found that it had discriminated against female pilots by not allowing them to fly into the Middle East. Polar Air was ordered to pay the individual $50,000 and to modify their discrimination/harassment policy.

**Amended Complaint and
Demand For Jury Trial-- 11**

77

aviation professionals each year."[3] The Atlas Miami Training Center ("MTC") has more pilots in a day than any base or station on the globe. All Atlas pilots are trained at the MTC, including annual or biannual recurrent training. There is always a massive presence of Atlas pilots, crew and other personnel in Miami.

111.    Atlas' flight training has always, since inception, been in Miami. If Atlas were to cease all operations at the MTC, it would cause a significant and detrimental impact on the operations of Atlas world-wide. Pilots do *not* spend any significant time at Atlas' Purchase, New York location.

112.    Several very important departments are based in Miami. The Vice President of Ground Operations has his primary office at the MTC because he oversees the following departments that are based at the MTC: Dangerous Goods, Special Loads and Ground Operations Training.

113.    Defendant **Flight Services International, LLC** ("FSI") is a Texas limited liability company with its principal place of business in Houston, Texas. It is a company whose exclusive business is to contract flight attendants to Atlas Air. All the flight attendants who are staffed on Atlas Air flights are contracted through FSI. FSI was founded by an Atlas contract attorney and his spouse. All its employees receive all their training at the Atlas training facility in Miami. All FSI flight attendants are trained at the MTC, including annual or biannual recurrent training. There is always a significant presence of FSI personnel in Miami. FSI

---

[3] See, https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/ (noting that "as pilots get their Atlas career off the ground, their first stop is Miami, <u>home</u> to the Atlas Air's world class Training Center." (Emphasis added).

**Amended Complaint and
Demand For Jury Trial-- 12**

contracts its flight attendants to Atlas Air and receives millions in dollars from Atlas Air in return.

114.     Defendant **EncompassAir, LLC** ("ECA") is an Alaska limited liability company with its principal place of business in Anchorage, Alaska. It is a company whose business is to contract mechanics to Atlas Air and other airlines.

115.     Defendant **John W. Dietrich** ("Dietrich") is an individual and is President and Chief Executive Officer for Atlas, and is a Board Member of Atlas. He keeps an executive office in Miami, FL at the MTC.

116.     Defendant **Jeffrey Carlson** is an individual and is Senior Vice President for Flight Operations for Atlas. He keeps an executive office in Miami, FL.

117.     Defendant **Patricia Goodwin-Peters** ("Goodwin-Peters") is an individual and Senior Vice President for Human Resources for Atlas. She keeps an executive office in Miami, FL.

## **MISNOMER/ ALTER EGO**

118.     In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification", "misnomer," and/or such parties are/were "alter egos' of parties named herein.  Alternatively, Plaintiffs contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## **JURISDICTION AND VENUE**

119.     This Court has subject matter jurisdiction over this case under 28 U.S. Code § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

120.     This Court has personal jurisdiction over defendants because under *International Shoe* and its progeny, they have at least minimum contacts with Florida such that traditional

**Amended Complaint and
Demand For Jury Trial-- 13**

79

notions of fair play and substantial justice would not be offended by the exercise of jurisdiction. In addition, personal jurisdiction is appropriate under Florida's long-arm statute, 48.193. Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida as well as acts outside the state of Florida that caused harm to numerous plaintiffs in the state of Florida.

121.    Venue is proper in the U.S. Southern District of Florida because Atlas Air and its affiliates, and leadership do a high percentage of their business and stage a high percentage of their flights in and around southern Florida and the Miami International Airport. In addition, the 30,000 square foot Atlas Training Center, that trains 10,000 people per year, is located in this judicial district as set forth above.

**BACKGROUND**

I.    **The COVID-19 Pandemic and Vaccine Response**

122.    The United States government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus" (SARS-COV-2), commonly known as "COVID-19," that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

123.    On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization ("WHO") declared the outbreak a "Public Health Emergency of International Concern."

124.    Three (3) separate COVID-19 vaccines have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson.  None of the products are vaccines in the traditional meaning of the word.  Vaccines developed to eliminate

**Amended Complaint and
Demand For Jury Trial-- 14**

80

diseases like polio, smallpox and the measles provide individuals with immunity from contracting the particular condition.  These products do not provide individuals with immunity from contracting COVID-19.  Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

125.    Traditional vaccines contain whole or part of a harmless bacteria or virus that is sought to provide inoculation by speeding up a process that occurs naturally.  These traditional vaccines allow one's cells to "learn" how to defend against the viral agent without suffering the consequence of a "live" virus.  In contrast, all three COVID-19 vaccines utilize (never-before tested on humans) technology which constitutes "gene therapy."  Two vaccines contain messenger ribonucleic acid ("mRNA"), inserted into the cell nucleus, which serve as instructions or a recipe for the creation of a spike protein that triggers an immune response; they are synthetic surrogates of the body's genetic information. Johnson & Johnson's medical product uses a different platform but retains same type of gene therapy outcome.

126.    The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the medical product manufactured by Pfizer-BioNTech on December 11, 2020.  One week later, the FDA issued an EUA for the Moderna COVID-19

**Amended Complaint and
Demand For Jury Trial-- 15**

medical product.  Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 medical product on February 27, 2021.[4]

127.  An EUA is not synonymous with FDA approval.  Instead, an EUA is an administrative mechanism that allows the use of an 'unapproved' medical product.  An EUA may be granted by the FDA to (among other reasons) facilitate medical countermeasures against the spread of infectious diseases.  EUA's may be terminated or revoked by the FDA as additional information about the use of the individual medical product becomes better known.

**II.       Recent History of Vaccination Mandates & Accompanying Litigation.**

128.  Three realms of employment have been the primary issue in COVID-19 litigation: (i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

129.  First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors.  On January, 20, 2021, President Joe Biden signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic.[5]  On September 9, 2021,

---

[4] On August 23, 2021, the FDA issued an approval for the Pfizer vaccine, Comirnaty, for individuals sixteen (16) years of age and older.  On January 31, 2022, the FDA announced the approval of Moderna's COVID-19 vaccine that is marketed as Spikevax.  At this time, Johnson & Johnson's COVID-19 vaccine has yet to be FDA approved for anything other than EUA.

[5] 86 Fed. Reg. 7,045-48 (Jan. 20, 2021).

**Amended Complaint and
Demand For Jury Trial-- 16**

Biden signed Executive Order 14042 ("EO 14042"),[6] to "promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."[7]  On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[8]  The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S.  The Eleventh Circuit Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[9]

130.    Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, *NFIB v. OSHA*.[10]  On September 9, 2021,

---

[6] 86 Fed. Reg.  50,985-88 (Sept. 9, 2021).

[7] *Id.*

[8] *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

[9] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[10] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

**Amended Complaint and
Demand For Jury Trial-- 17**

Biden announced "a new plan to require more Americans to be vaccinated." This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[11] The declared purpose of the mandate was to increase vaccination rates at "businesses all across America,"[12] forcing eighty-four (84) million Americans to submit to the medical products. Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII[13] of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin. The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.[14]

131. Third, the U.S. Supreme Court on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare

---

[11] *Id*. at 663.

[12] *Id*. (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

[13] *See*, Fed. Reg. 61402-551 (Nov. 5, 2021).

[14] *Id*.

**Amended Complaint and
Demand For Jury Trial-- 18**

84

and Medicaid funding to require their employees to be vaccinated.[15] However, the Court held that a facility *must recognize* an individual's religious and medical accommodation/ exemption *requests* pursuant to the rule, and *must comport with* the obligations prescribed by *Title VII.[16]* (Emphasis added).

### III.        Conflation of Issues and Strict Interpretation of Religion under Title VII

132.     Plaintiffs are of the belief that recent litigation efforts to redress unlawful business practices have been to no avail because business entities, like Defendants, are able to side-step their obligations under Title VII for two (2) primary reasons. First, Plaintiffs contend that recent litigation surrounding this developing area of the law has conflated the issues of vaccination mandates with Title VII discrimination analysis. Second, Plaintiffs also contend that there has been too strict of an interpretation given to an individual's sincerely held

---

[15] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[16] 86 Fed. Reg. 61571-72.

**Amended Complaint and
Demand For Jury Trial-- 19**

religious beliefs and that Plaintiffs "sincerely held religious beliefs" are synonymous with Title VII's enumerated depiction of the word "religion."[17]

133.    In addressing the first issue, one of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[18] While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

134.    In addressing the second issue, Plaintiffs contend that there has been too strict of an interpretation of their "sincerely held religious beliefs" and that their religious beliefs are to

---

[17] Title VII of the Civil Rights Act of 1964 provides in pertinent part:

    (a)    It shall be an unlawful employment practice for an employer-

    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…<u>religion</u>…; or

    (2) to limit, segregate, or classify his employees or applicants for employment in a way which would deprive or tend to deprive any individual of employment opportunities or adversely affect his status as an employee, because of such individual's…<u>religion</u>.

42 U.S.C. § 2000e-(2)(a)(1) and (2) (emphasis added).

[18]See, 42 U.S.C. § 2000e et seq.

**Amended Complaint and
Demand For Jury Trial-- 20**

86

be considered synonymous with the Title VII's specific statement affording protections based on "religion." Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[19] Furthermore, this broad definition has been incorporated by the U.S. Equal Employment Opportunity Commission ("EEOC") in promulgation of regulations pertaining to religious discrimination.

135.   Plaintiffs sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

**IV.     Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law**

136.   Plaintiffs possess sincerely held religious beliefs that their body is a temple, and that their Creator planned their existence upon their creation.  Plaintiffs conscience prohibits them from being inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

137.   Plaintiffs' sincerely held religious beliefs are commonly shared by millions of people around the world.

138.   Plaintiffs religious beliefs are not based upon social, political, economic, or personal philosophies.

139.   Plaintiffs' religious beliefs are founded by the teachings of a globally accepted religion that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

---

[19] 42 U.S.C. § 2000e(j).

**Amended Complaint and
Demand For Jury Trial-- 21**

140.    Moreover, Plaintiffs contend that it is instrumental to note that the current three commercialized "vaccines" are not vaccines by any traditional definition; rather, these vaccines are gene-altering experimental therapies.  Plaintiffs contend that the introduction of mRNA into their body, or gene therapy, which contains a body-foreign biological/medical substance that delivers metaphorical instructions that alter cell behavior and design, is incongruent with their deeply held religious beliefs that their body is a temple and that their Creator planned their existence and biological design before birth.  Further, the introduction of gene therapy medical products causes a fundamental change in the genetic design that their Creator imparted within them.  This differentiation illustrates a fundamental difference between traditional vaccines, such as chicken pox or the measles, and the three commercialized COVID-19 "vaccines."

141.    Based on this interpretation, Plaintiffs contend there is a substantial difference between non-mRNA vaccinations and gene therapy vaccines in terms of their religious beliefs. Accordingly, Plaintiffs contend comparing a these two types of vaccines is a false equivalency.

142.    Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

### GENERAL ALLEGATIONS

143.    By mid-March 2020, even though the untreated mortality rate was below one-half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

144.    The three "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to EUA's.

**Amended Complaint and
Demand For Jury Trial-- 22**

145.    A vaccine may be deemed unreasonably dangerous because of the absence of an adequate warning accompanying the product, as the product may be unavoidably unsafe without such warning. No warnings regarding these medical products were provided by Defendants to Plaintiffs.

146.    Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, and of the extent to which such benefits and risks are unknown.  "Consent" establishes that all persons must have the option to refuse administration of the product. Punishments or consequences for refusing medical products are strictly prohibited based on the express wording and intent of the law.[20]

147.    Further, the administration of these vaccines is performed through intermuscular injection and implicates significant, Constitutionally protected privacy interests, such as the right to be safe from battery.

148.     Plaintiffs are not unique or abhorrent. Millions of Americans refused to take these experimental medical products for numerous reasons, including for religious reasons.

149.    Those who chose to not take a COVID-19 "vaccine" were prescient. These vaccines are ineffective, dangerous and – in many cases – deadly, as shown both anecdotally and through the Vaccine Adverse Effects Reporting System ("VAERS") and Department of Defense Medical Epidemiology Database ("DOD DMED").[21]  These data were referenced to

---

[20] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III).

[21]*See,*https://openvaers.com/?utm_source=newsletter_31&utm_medium=email&utm_campaig

**Amended Complaint and
Demand For Jury Trial-- 23**

the Defendants before Defendant's mandate deadline.  Cases of myocarditis, pericarditis, Sudden Adult Death Syndrome (SADS), and other unexplainable deaths appear to be unique to people who did receive these COVID-19 vaccines.

150.    COVID-19 vaccines are Virus-Based Gene Therapies ("VBGT") according to the FDA's own definition.[22] These medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's genetic information.

151.    According to the FDA: "Gene therapy products are all products that mediate their effects by transcription and/or translation of transferred genetic material and/or by integrating into the host genome and that are administered as nucleic acids, viruses, or genetically engineered microorganisms."[23]

---

n=the-openvaers-red-box-report ; *See also* https://health.mil/Military-Health-Topics/Health-Readiness/AFHSD/Data-Management-and-Technical-Support/Defense-Medical-Epidemiology-Database ; *See also* https://renz-law.com/dmed-data/

[22] *See*, https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy

[23] *See*, Section I, Ftn't 1 of FDA's guidance entitled: "Design and Analysis of Shedding Studies for Virus or Bacteria-Based Gene Therapy and Oncolytic Products" dated August, 2015. https://www.fda.gov/media/89036/download

**Amended Complaint and**
**Demand For Jury Trial-- 24**

152.     According to the Center for Disease Control ("CDC"): "Messenger RNA, or mRNA, is genetic material that tells your body how to make proteins."[24]

153.     According to Genome.gov: "mRNA acts as a cellular messenger. DNA, which is stored in a cell's nucleus, encodes the genetic information for making proteins. mRNA transfers a copy of this genetic information outside of the nucleus, to a cells' cytoplasm, where it is translated into amino acids by ribosomes and then folded into complete proteins."[25]

154.     According to Pfizer, its VBGT contains messenger mRNA, a kind of genetic material, and a piece of the SARS-CoV-2 virus' genetic material that instructs cells in the body to make the virus' distinctive "spike" protein and trigger the immune system to learn to react defensively, producing an immune response against the virus.[26] The Johnson & Johnson VBGT uses viral vector technology to instruct the cells, and causes similar gene altering effects, much like the other two gene therapies.

---

[24] *See*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/vaccines/COVID-19-mRNA-infographic_G_508.pdf

[25] See, https://www.genome.gov/genetics-glossary/messenger-rna

[26] *See*, https://www.pfizer.com/science/innovation/mrna-technology; *See also,* https://www.pfizer.com/news/articles/what_makes_an_rna_vaccine_different_from_a_convent ional_vaccine; *See also*, https://www.pfizer.com/news/articles/understanding_six_types_of_vaccine_technologies

**Amended Complaint and**
**Demand For Jury Trial-- 25**

155.     Accordingly, the three COVID-19 VBGT's change the patient's genetic composition.[27]

156.     As such, the use of the word "vaccine" to describe these products is a misnomer and those who have been injected with a COVID-19 VBGT necessarily possess different genetic material or genetic information from those who were not injected. Defendants employment practices further discriminated and/or provided unequal opportunities against Plaintiffs because of this genetic difference resulting from having not been injected with these VBGT's.  This wrongful conduct was in violation of the Genetic Information Non-Discrimination Act ("GINA").[28]

157.     These genetic alterations are prohibited by Plaintiffs who have sincerely held religious beliefs and objections to these alterations.  Further, these VBGT's were developed using stem cells harvested from human embryos.  Plaintiffs have a conscientious duty to refuse participation in activities repugnant to human life and dignity.

---

[27] *See*, Zhang L., et. al., "Reverse-transcribed SARS-CoV-2 RNA can integrate into the genome of cultured human cells and can be expressed in patient-derived tissues." *PNAS,* 2021.Vol. 118, No. 21 e2105968118 https://doi.org/10.1073/pnas.2105968118; *See also*, Alden, M. et al., "Intracellular Reverse Transcription of Pfizer BioNTech COVID-19 mRNA Vaccine BNT162b2 In Vitro in Human Liver Cell Line." *Curr. Issues Mol. Biol.* 2022, Vol.44, 1115–1126. https://doi.org/10.3390/cimb44030073

[28] See, 42 U.S.C. § 2000ff-1, *et seq.*

**Amended Complaint and
Demand For Jury Trial-- 26**

92

158.     Some Plaintiffs are legally prohibited from taking the experimental vaccine since none of them have been approved by the Federal Aviation Administration ("FAA").[29] Only "FAA-approved" drugs may be taken by pilots.  Pilots must declare any drugs or medical procedures they have taken since their last flight physical.[30] If a pilot takes an unapproved medical product, the issuing flight surgeon must take administrative measures to revoke or deny issuance of a flight physical certificate until the FAA rules on the safety of that product. Typically, it takes twelve months for an FDA approved drug to be approved by the FAA.[31] The use of, or administration of a drug not approved by the FAA is a violation of federal aviation

---

[29] See, attached exhibit entitled "Vaccines" (noting that COVID-19 vaccines are not included in the list of FAA approved vaccines).

[30] See, FAA's Guide for Aviation Medical Examiners https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/; *See also*, FAA's Guide for Aviation Medical Examiners- Pharmaceuticals (Therapeutic Medications) Do Not Issue - Do Not Fly https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/dni_dnf/

[31] Note that the FAA cannot approve the COVID vaccines because they have not been officially "approved" by the FDA.

**Amended Complaint and**
**Demand For Jury Trial-- 27**

regulation.[32] Nonetheless, Defendants encouraged, coerced and even paid pilots to violate federal law, yet the ones who refused to break the law were the ones punished and discriminated against, as set forth below.

159.    The FDA approved the Pfizer Comirnaty vaccine on August 23, 2021. And, on September 9, 2021, Biden signed EO 14042.  Thus, Defendant Goodwin-Peters sent an electronic communication to all Atlas employees (following up on a communication sent by Dietrich) and announced all Plaintiffs would be required to be "fully vaccinated" with a COVID-19 VBGT pursuant to EO 14042 by December 8, 2021.

160.    Goodwin-Peters also announced that Plaintiffs were required to report their VBGT status to the company. According to the notice, "per the Centers for Disease Control and Prevention (CDC), people are considered fully vaccinated two weeks after their second dose of

---

[32] *See*, 14 C.F.R. § 61.53, which states in pertinent part, "no person who holds a medical certificate…may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person:

(1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation; or

(2) Is taking medication or receiving other treatment for a medical condition that results in the person being unable to meet the requirements for the medical certificate necessary for the pilot operation.

**Amended Complaint and
Demand For Jury Trial-- 28**

the Pfizer-BioNTech or Moderna COVID-19 [VBGT], or two weeks after the single-dose

Johnson & Johnson's Janssen COVID-19 [VBGT]."

161.    Goodwin-Peters' announcement of the VBGT policy demonstrated Atlas'

disingenuousness from the beginning as she purported to stand for personal choice regarding

COVID-19 vaccines:

> As a Company, we support the views of health experts that [the
>
> VBGT] reduce the impact and spread of COVID-19. That said, we
>
> have been consistent in our position that [a VBGT] is a personal
>
> choice and we were not planning to mandate [VBGT's] for our
>
> employees. However, we are now required to comply with [EO
>
> 14042].[33]

162.    However, Defendants' concerns about safety overwhelmingly support Plaintiffs'

decisions to *not* be injected with a COVID-19 VBGT.

163.    If safety had been Defendants' real objective, they would have grounded all

flights until it was safe to fly. In truth, Defendants' objective was to increase profit through

rent-seeking activities in-spite-of perceived dangers.

164.    This was made obvious by Defendants' own actions, since Defendants (i) did not

mandate any passenger flying on its aircraft or interacting with its staff to be vaccinated;

---

[33] After the Biden Administration's mandate was enjoined by various federal courts, Atlas

immediately reverted to a company-directed mandate.

**Amended Complaint and
Demand For Jury Trial-- 29**

95

(ii) did not mandate VBGT's for employees from other countries, (even though many Plaintiffs worked on the same aircraft and had contact with them); (iii) did not mandate VBGT's for pilots from other airlines allowed to ride in the "jump seat" of any Atlas aircraft.

165.    To intimate compliance with Title VII, Defendants sent electronic communications to Plaintiffs informing them that they must file for religious or medical exemption to avoid VBGT inoculation.  Defendants also created a Crewmember Vaccine Portal.  Plaintiffs were required to upload their VBGT status to the portal, and were told the information would be protected.

166.    Defendants directed that October 22, 2021, was the deadline "for [Plaintiffs] to request an exemption due to medical or religious reasons."

167.    However, many of Plaintiffs religious or medical objections were not triggered until after October 22, 2021, upon discovery of the VBGT's gene therapy effects, adverse health consequences, and the stem cell development practices that brought these products to market.

168.    Defendants directed that October 27, 2021, was the deadline for Plaintiffs to receive their "first [VBGT] if electing to receive the Pfizer BioNTech or Moderna [VBGT] that requires two shots."

169.    Defendants directed that November 24, 2021, was the deadline for Plaintiffs to "receive [their VBGT] if electing to receive the Johnson & Johnson's Janssen vaccine that requires one shot."

170.    Defendants directed that November 24, 2021, was the deadline for Plaintiffs to "receive [their] second [VBGT] if electing to receive the Pfizer BioNTech or Moderna [VBGT] that requires two shots."

**Amended Complaint and
Demand For Jury Trial-- 30**

96

171.    Defendants directed that November 25, 2021 was the deadline for Plaintiffs to "report [their VBGT] status to the Company."

172.    FSI, whose sole business and source of revenue is through Atlas contracts, quickly followed suit and in early September 2021, FSI President Joni French sent an e-mail to Plaintiffs that made brazenly explicit the disparate treatment and hostility toward Plaintiffs. She wrote:

> The health and safety of all our Cabin Crewmembers remains a top priority for FSI. To support your well-being, as well as that of your work colleagues, we encourage everyone to pursue the [VBGT]. Cabin Crewmembers who have proof of [VBGT] will increasingly be able to operate with more flexibility under less restrictive quarantine rules.
>
> We are pleased to let you know that we will now provide 5 hours of additional compensation to every FSI Flight Attendant who receives [a VBGT] and submits a copy of their vaccination card.

173.    The lives of Plaintiffs were effectively put on hold after October 2021 with constant threats of unpaid leave and termination by Defendants against Plaintiffs.

174.    Most Plaintiffs applied for medical and/or religious accommodation from the vaccine mandate prior to October 22, 2021.

175.    On January 13, 2022, The Supreme Court of the United States blocked the OSHA mandate requiring businesses with over 100 employees to impose vaccine and testing requirements.

**Amended Complaint and
Demand For Jury Trial-- 31**

97

176.    On or about January 25, 2022, in light of the Supreme Court's ruling, OSHA announced it was withdrawing its vaccine and testing requirements that were at issue. However, Biden called upon businesses to voluntarily impose the mandates themselves.[34]

177.    Because Defendants (and the Biden Administration) no longer had the cover of EO 14042– and despite their previous statements that they believed in personal choice when it came to the VBGT mandate issues and were only reluctantly following federal law – Defendants immediately obeyed the commands of the Biden Administration and announced, through electronic communications to Plaintiffs, that they would do the President's bidding.

178.    On January 25, 2022, Goodwin-Peters sent out a communication stating:

> Earlier today, you received notice that all U.S. employees who must travel as an essential function of their position must be fully vaccinated by May 1, 2022. *This policy applies to you*. We recognize that you previously sought an accommodation from the COVID-19 [VBGT] mandates the company previously implemented to comply with [EO 14042] (applicable to federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees).

(Emphasis added).

---

[34] *See* https://khn.org/morning-breakout/biden-disappointed-by-courts-decision-urges-employers-to-require-covid-shot/

**Amended Complaint and
Demand For Jury Trial-- 32**

98

179.    Goodwin-Peters in the same communication indicated that Plaintiffs would not be allowed to submit new medical or religious accommodation requests.  Only those previously filed by October 22, 2021, would be processed:

> Given your requests for accommodation from the Company's previous COVID-19 vaccination mandates, the Company is assuming you are seeking a request for accommodation from the vaccine policy that will take effect May 1, unless you respond to this email and indicate otherwise by Friday, January 28, 2022. If you do not respond by January 28, the Company will process your new request for accommodation based on the information already in its possession and follow-up with you thereafter to identify any reasonable accommodations the Company can offer without undue hardship.

180.    Plaintiffs who were unvaccinated were left in a continued state of legal, emotional and career limbo.

181.    Plaintiffs who had not previously filed a for religious or medical exemption, and who discovered new information triggering their conscientious objections, were denied the opportunity to file and were left with the impossible choice of taking COVID-19 VBGT at the expense of their deeply held religious beliefs or be terminated.

182.    After the implementation of the VBGT mandate, Plaintiffs were subjected to repeated harassment and disparate treatment within the company for their deeply held religious beliefs.

**Amended Complaint and**
**Demand For Jury Trial-- 33**

183. Defendants required Plaintiffs to wear symbols that distinguishing them from their peer groups and amplified their individually identifiable health information to their peers and to the public.

184. Dietrich openly encouraged harassing behavior by making written and oral statements that employees were unsafe around Plaintiffs whose religious beliefs or medical circumstances barred inoculation. Theoretically, a "vaccinated" employee should have immunity to the disease and therefore bare no risk of the medical choices of another. Thus, this culture of finger pointing was perpetrated by Defendants for the sole purpose of harassing Plaintiffs and providing cover for Defendants rent-seeking activities.

185. For example, Plaintiff Richard Bullock, a pilot who often flew cargo to southeast Asia, found himself subjected to retaliatory discipline after he became known throughout the company for having religious beliefs that barred him from taking VBGT's.

186. Defendants were attempting to get Plaintiff Jimmy Villella to change, alter, or abandon his religious beliefs (evident from his Oct 12th, 2021 religious exemption letter), to

**Amended Complaint and**
**Demand For Jury Trial-- 34**

100

submit to their COVID-19 testing policy. Villella was subjected to an "Article 19" disciplinary hearing in a blatant act of retaliation, harassment and discrimination.[35]

---

[35] A harassment and discrimination complaint filed Villella was handled with extreme prejudice against him. Atlas' claim they could not accommodate Villella's accommodation request due to undue hardship was totally meritless. Contrary to Atlas' assertions, Villella operates on domestic flights, and thus no hotel restrictions or other restrictions that apply to international operations are applicable to him. Further, Villella was the only Atlas employee that notified Atlas that his religious beliefs prevented him from getting vaccinated or tested for COVID-19 or any other vaccine/illness.  Villella's accommodation request was to continue operating and following the same process (screening for COVID-19, as the CDC stated was appropriate for people without symptoms for COVID-19) all Atlas Air employees had been following for the entire COVID-19 pandemic up to May 1st, 2022, when the new Atlas testing "policy" took place.  Since Atlas only had to accommodate this single individual, no undue hardship existed as Atlas claims since only one employee requested this accommodation *seven months* prior to the testing policy being implemented, and *two months* prior to the first communication received by Atlas about a mandatory COVID-19 testing policy. Villella asked on several occasions to be returned to flying status despite his "accommodated non-flying position" when he was made aware of Atlas not following its own mandatory COVID-19 testing for pilots, as well as permitting unvaccinated flight attendants to operate as normal without any COVID-19 testing restrictions, unless the specific country they were flying to had COVID-19 testing requirements.

**Amended Complaint and
Demand For Jury Trial-- 35**

187.     For Plaintiffs whose religious and/or medical exemptions were granted, Defendants continuously harassed Plaintiffs to disregard their conscience and/or health and submit to authoritarian enforcement of VBGT's.

188.     Defendants' promulgation of COVID-19 misinformation created a dangerous and hostile work environment throughout the company for Plaintiffs whose conscience challenged Defendants' ability to fulfill the role of a "learned intermediary," a mandatory medium for every patient/pharmaceutical relationship.

189.     Plaintiffs panic-inducing policies produced instances of vicious shouting and screaming among Plaintiffs and their peers during trans-ocean flights, and occasional unsafe episodes of pilots leaving their cockpits to scream at Plaintiffs for their religious beliefs or for voicing questions or criticisms of Defendants' messaging and political symbolism.

190.     Plaintiffs were interrogated by Defendants before beginning their shifts or flight assignments with demands for answers to questions of personal and protected health information.

191.      Defendants disseminated VBGT status of Plaintiffs in emails that were published showing the last name, employee number, and VBGT status of Plaintiffs, and gave public disclosure of protected health information.

192.     Defendants' employees have openly remarked that they look forward to the day that "[[P]laintiffs] will be terminated from the company, thus allowing vaccinated employees to rise in seniority and pay."

193.     Atlas discriminated against Plaintiffs and denied them bids for higher paying flights to certain destinations despite such destinations having no laws or restrictions against unvaccinated Plaintiffs.

**Amended Complaint and
Demand For Jury Trial-- 36**

102

194.     Both Dietrich and Goodwin-Peters made repeated statements that if Plaintiffs expected to have future employment at Atlas, they would have no choice other than to take the VBGT's. Both Dietrich and Goodwin-Peters also stated that religious and medical exemptions from being "vaccinated" would not be accepted and that "unvaccinated" crews would be placed on unpaid leave or terminated.[36] Defendants' termination threats always came on the heels of Biden Administration publications regarding private employer VBGT mandates.

195.     Defendants created a program to recruit new non-religious hires to replace Plaintiffs if any Plaintiffs were terminated. Atlas and the Teamsters worked together to pay its employees $5,000 per new hire they referred to Atlas to replace Plaintiffs because of their religious beliefs and/or medically exempt status.

196.     On March 8, 2022, after the January 25, 2022 Goodwin-Peters communication, things got worse for the Plaintiffs who worked for FSI, who received a communication from FSI President Joni French stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence regardless of the fact they had previously requested an accommodation:

> Atlas Air, Inc. has advised FSI that **all** FSI employees who work
>
> on Atlas flights must be fully vaccinated by May 1, 2022.

---

[36] It is worth noting that, used in this paragraph, the term "vaccination" is not a singular occurrence or transaction.  Every new Defendant requirement to take a booster to maintain "vaccination" status constitutes a new occurrence or transaction for the purposes of accommodation analysis under Title VII. Each transaction or occurrence rests upon a different set of operative facts.

**Amended Complaint and**
**Demand For Jury Trial-- 37**

(Obviously, Atlas is entitled to determine the terms under which FSI's flight attendants are eligible to work on Atlas flights).

We recognize that you previously requested an accommodation (exemption) from the COVID-19 [VBGT] mandates the Company implemented to comply with [EO 14042]…

Unfortunately, if you are unable or unwilling to obtain COVID-19 [VBGT], you will not be eligible to work on Atlas Air flights. In that event, FSI has no other work, including flights for its flight attendants to crew. If we do not receive evidence that you have been fully vaccinated by April 30, 2022, you will be placed on an unpaid leave of absence (LOA).

(Emphasis in original).

197.    On March 25, 2022, the Defendants attempted to mollify Plaintiffs by purporting to assure them that – despite maintaining a private company-wide VBGT mandate – those who had previously obtained a religious or medical exemption pursuant to EO 14042 would be allowed to return to their regular work duties after the May 1, 2022 company vaccine mandate deadline "so long as they undergo requisite COVID-19 testing at their expense."

198.    Defendants ordered Plaintiffs, even after they had established natural immunity from the disease, to test weekly for COVID-19 unlike employees without religious beliefs who were deemed "vaccinated" by the Defendants.

199.    Plaintiffs were required to take COVID-19 tests numerous times, weekly.

200.    Each COVID-19 test involved the use of ethylene oxide, a known carcinogenic, to sterilize the swabs prior to having them scrubbed on Plaintiffs mouth and nasal cavity.

**Amended Complaint and
Demand For Jury Trial-- 38**

201.    Defendants did not inform the Plaintiffs of the potential hazards of COVID-19 testing.

202.    Plaintiffs were required to pay for COVID-19 testing despite language in the Agreement indicating vaccines and testing is to be provided at no cost by Defendants. Employees deemed "vaccinated" by Defendants were not required to pay for COVID-19 testing.

203.    Some Plaintiffs took the VBGT upon Defendants' misinformation and coercion without informed consent but refused to take the boosters after learning information about the gene-therapy effects of these medical products and lack of liability for a learned intermediary. Absent this new knowledge, objections to VBGT's from Plaintiffs founded on religious beliefs were otherwise dormant.

204.    On March 31, 2022, Goodwin-Peters sent another e-mail underscoring the hostility and disparate treatment that would persist at Atlas. It mandated that Plaintiffs would undergo testing at their own expense and wear individually identifiable political symbols; differentiating them from their peers while simultaneously giving public disclosure to Plaintiffs protected health information.

205.    On April 21, 2022 Goodwin-Peters sent Plaintiffs an updated Atlas Worldwide COVID-19 Vaccination & Testing Policy, along with Atlas Worldwide COVID-19 Vaccine Policy Frequently Asked Questions ("FAQ").  In addition to testing at Plaintiffs expense, Defendants mandated that all COVID-19 testing be videotaped and retained by Defendants, so and that the videos be sent to the company if requested.

206.    The Policy  stated that:

Employees who travel as an essential function of their position

**Amended Complaint and
Demand For Jury Trial-- 39**

> must be fully vaccinated against COVID-19 by May 1, 2022…[e]mployees not in compliance with this Policy may be subject to discipline, up to and including termination pursuant to applicable law…
>
> Essential-travel employees who do not choose to be vaccinated, and who are not in compliance with the Policy as of the effective date of May 1, 2022, may not be permitted to continue traveling and may be placed in an alternate position or subject to an unpaid leave status.

(Emphasis in original).

207.    Defendants had knowledge of reports of vaccine injuries as reported in the VAERS database and purposely omitted information indicating the potentially lethal effects of VBGT's in their communications to Plaintiffs.

208.    On March 25, 2022, Defendants sent an electronic communication to Plaintiffs that made clear that Defendants have not changed their policies of discriminating against Plaintiffs with religious beliefs or medical objections. Specifically, Goodwin-Peters stated:

> As a reminder, employees who travel as an essential function of their position *must* be vaccinated by May 1 pursuant to the Company's Policy…
>
> to protect [already vaccinated] employees…
>
> The Company maintains the right to revise this Policy as appropriate and at its sole discretion, including based on changing

**Amended Complaint and
Demand For Jury Trial-- 40**

106

domestic and global regulations and the state of the pandemic. We

will continue to closely watch the global vaccination and testing

requirements and metrics tied to the pandemic, and communicate

any necessary changes to our policies as appropriate.

(Emphasis added).

209.    Plaintiffs were not offered subsequent opportunities to initiate and/or modify any

request(s) for religious and/or medical exemption.

210.    Further, the FAQ document made unequivocally clear that the prior medical and

religious accommodations obtained by employees – which Defendants indicated on January 25,

2022 would be applicable going forward – would *no longer be recognized*:

If you were previously granted an accommodation from a

Company policy or practice designed to comply with the federal

Executive Order mandating vaccination, *your accommodation is

no longer effective*. The Executive Order has been stayed by a

federal court and is not applicable to us at this time…

(Emphasis added).

## DEFENDANTS' FAILURE TO ACCOMMODATE, DISPARATE TREATMENT AND CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

211.    Defendants' actions against Plaintiffs have violated Title VII's prohibition against

the denial of equal opportunity, discrimination and the perpetuation of a hostile work

environment.

**Amended Complaint and
Demand For Jury Trial-- 41**

107

212.    Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance.  Specifically, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, *religion*, sex, or national origin…[37]

 (Emphasis added).

213.    Regardless of whether the VBGT mandate was held Constitutional (for healthcare workers), employers are still bound to fulfill their obligations to employees pursuant to Title VII.  These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing or retaliatory conduct.

214.    As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work environment or harassment.

215.    Given the foregoing disparate treatment set forth in the facts herein, Defendants' conduct had a disparaging impact on Plaintiffs.

---

[37] 42 U.S.C. § 2000e-2

**Amended Complaint and
Demand For Jury Trial-- 42**

108

216.     Defendants' conduct satisfies the elements for claims of religious discrimination due to disparate treatment, failure to provide accommodations, harassment, and the creation of a hostile work environment.

## CONFLUENCE OF ATLAS, FSI, ECA AND THE UNITED STATES GOVERNMENT

217.     Throughout the entire course of the foregoing events, Atlas, FSI and ECA engaged in conduct orchestrated by the U.S. Government.

218.     Atlas is the largest customer of the Department of Defense ("DOD") Air Mobility Command ("AMC"). Atlas carries more U.S. troops and military material than any other airline in the world.

219.     Atlas receives many millions of dollars from the DOD and AMC.

220.     Atlas flies more revenue freight ton miles internationally than UPS or FedEx. In this respect it is the largest air freight carrier in the world.

221.     Atlas is a behemoth in the air cargo and VIP charter industry.

222.     Atlas intentionally negotiated in bad faith with Teamsters 1224 and 2750, avoiding renewing their contract from 2016 to 2021, enabling the Defendant executives to keep hundreds of millions of dollars. This made Atlas management the highest compensated aviation executives in the world.

**Amended Complaint and
Demand For Jury Trial-- 43**

223.     In 2020, Atlas made eight times the net profit they made from the previous record year in 2019.[38] During this time, CEO John Dietrich applied for and successfully lobbied and received $407,000,000 in COVID-19 bailout monies from American taxpayers.[39]

224.     Atlas has been involved in market manipulations and price-fixing schemes before and in 2016 agreed to pay $100,000,000 to settle an international cargo price fixing scheme to avoid going to trial.[40] They finished paying off the $100,000,000 in 2020, the same year they received the $407,000,000 in taxpayer bailout money from the U.S. Government.

225.     To induce compliance with its VBGT mandate, Defendants even colluded with unions.

226.     On September 10, 2021, Atlas, Teamsters Local 2750 and the International Brotherhood of Teamsters Airline Division negotiated a new Collective Bargaining Agreement (the "Agreement") that was signed and executed by Atlas, the Teamsters, and flight deck crew members.  The final agreement plainly gave the company no authority to impose vaccination mandates upon Plaintiffs (or any other invasions of Plaintiffs medical privacy). The only section specifically addressing vaccinations was Article 27 F,[41] which provides:

> [Atlas]  shall  provide,  at  no  cost  to  Crew  Members,  an

---

[38] *See* https://www.freightwaves.com/news/atlas-air-refuses-to-repay-us-bailout-funds

[39] *See* https://web.archive.org/web/20220318105916/https:/www.businessinsider.com/atlas-air-amazon-air-contractor-receives-coronavirus-bailout-2020-6

[40] *See* https://aircargoeye.com/atlas-air-coughs-100m-price-fixing-settlement/

[41] Article 27 of the CBA is titled "Insurance Benefits."

**Amended Complaint and**
**Demand For Jury Trial-- 44**

immunization plan that includes, at a minimum, the following

vaccinations . . . (Yellow fever, Hepatitis, Typhoid, Tetanus, etc.).

227.     Art. 27 F(10) of the Agreement provides that Atlas shall "provide," a benefit at no cost, along with "[a]ny other [benefits] recommended by the current [CDC]'Advice for International Travel' document." The plain language of Section F's benefits package requires Atlas to "provide" immunizations, not "mandate" them.  Nor does the Agreement deprive Plaintiffs rights to exercise informed consent.[42]

228.     The Agreement date is significant insofar as coincided with Biden's EO 14042, signed on September 9, 2021.

229.     Following the September communication from Goodwin-Peters, on October 5, 2021, Defendant Dietrich sent an email to Plaintiffs saying:

> Biden recently signed [EO 14042] providing for certain mandates
>
> related to COVID-19 for federal contractors and subcontractors,
>
> and the U.S. government has now issued further guidance for
>
> implementing this Order…[t]hrough the course of the pandemic,

---

[42] The referenced "Advice for International Travel" document of the CDC appears to be several documents and/or web pages, none of which mandate COVID-19 vaccinations for U.S. Citizens. Indeed, the CDC's published instructions (https://www.cdc.gov/coronavirus/2019-ncov/travelers/proof-of-vaccination.html) contains a section dedicated to airline crew members. The Technical Instructions applicable to crew members plainly do not mandate airline pilots or crew members to be injected with COVID-19 vaccine treatments; *see also* https://www.cdc.gov/quarantine/order-safe-travel/technical-instructions.html.

**Amended Complaint and**
**Demand For Jury Trial-- 45**

111

we've been very clear in our intention that we would not mandate that our employees be vaccinated. However, as a federal contractor who flies the military and their equipment, we will be *required* to comply with the Order issued by the President…[EO 14042] requires that <u>we determine the vaccination status of all of our U.S.-based employees. Therefore, we are now requiring all of our U.S. workforce to provide us with your vaccination status</u>."

(Emphasis in original).

230.    Dietrich's email went further and announced that Plaintiffs were required to have "electronic proof of [ ] vaccination" and that vaccinated employees would be paid an additional "five hours of compensation" while Plaintiffs would not.

231.    There have been numerous, private meetings between Defendants and the U.S. Government regarding VBGT mandate policies.

232.    Defendants' DOD logistics operations serve a traditionally public function.

233.    Whether by incentive or threat, Defendants conduct was significantly encouraged by the Biden Administration.

234.    Defendants financially benefited when the Biden Administration pumped in $407,000,000 in COVID-19 bailout money to already profitable Defendants. In exchange, Defendants imposed the political ambitions of the Biden Administration onto Plaintiffs.

235.    Defendants were joint participants with the Biden Administration in the universal inoculation of the COVID-19 "vaccines."

**Amended Complaint and
Demand For Jury Trial-- 46**

112

236.    Thus, each Defendant is a "person" and a "state actor" for the purposes of 42 U.S.C. § 1983.[43]

237.    Controlled by the U.S. Government, Defendants became joint participants with the Biden Administration's agenda of masking (compelled wearing of political symbols), social distancing, testing, and ultimately the Biden Administration's ambition of universal inoculation with experimental VBGT's.

238.    The Biden Administration delegated its authority to the private sector and sought Defendants to do its bidding. In turn, Defendants gave its employees an unconscionable ultimatum: choose between their jobs or take an experimental, life-threatening VBGT, for a disease known to have a very high survivability rate and for which effective alternative treatments exist.

239.    The Government has acted in concert with Defendants to publicly support its private employer vaccine mandate.  Defendants are engaged in a *quid pro quo* arrangement whereby Defendants are enforcing the agenda of the government.  In exchange, the Biden Administration is lining the pockets of Defendants at the expense of Plaintiffs' lives.

---

[43] *H.H. v. Garland*, 52 F.4th 8 (C.A.1, 2022) (noting that private party can be treated as "state actor," for purpose of determining whether private party acts under color of law, in § 1983 context, in circumstances falling into three categories: (1) if a private party assumes traditional public function when performing the challenged conduct, (2) if the private party's conduct is coerced or significantly encouraged by the state, or (3) if the private party and state have become so intertwined that they were effectively joint participants in challenged conduct).

**Amended Complaint and
Demand For Jury Trial-- 47**

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S ("EEOC")

## FAILURE TO MITIGATE INJURY AND PLAINTIFFS ONGOING IRREPARABLE

## HARM

240.    All Plaintiffs have exhausted administrative remedies.

241.    The EEOC has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding COVID-19:

> The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services ("HHS") [FDA] for the administration of three COVID-19 vaccines. These three vaccines were granted [EUA] by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of EUA or the FDA approach can visit the FDA's EUA page.[44]

242.    The EEOC has not taken any actions much less made any public statements condemning these patently unlawful employment practices. For these reasons and others set forth below, Plaintiffs have exhausted recourse via the EEOC prior to bringing their discrimination and/or employment claims.

---

[44] *See* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K

**Amended Complaint and**
**Demand For Jury Trial-- 48**

114

243.     Also, irreparable harm has already resulted from the delays associated with exhaustion of administrative remedies. Millions of people have been hurt and thousands have been killed due to the VBGT's that Defendants mandated Plaintiffs take. Not only can these VBGT's cause injury generally, but the gene therapies pose specific harm to Plaintiffs working in the airline industry, which has requirements that Plaintiffs maintain a certain standard of health to perform their jobs. Waiting 180 days for the EEOC process to complete or to receive a right to sue letter is not a viable option as irreparable harm is imminent not only for their jobs, but also for their safety and the safety of consumers.

244.     Additionally, the EEOC lacks the institutional capacity to resolve the particular types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all of the claims. Also, the EEOC does not have the authority to address the Constitutionality of all the claims associated with the employment practices at issue and does not possess the institutional knowledge or authority to redress those matters relating to health, safety and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile, useless and inadequate to redress Plaintiff's employment issues and to prevent the irreparable harm.

**Amended Complaint and
Demand For Jury Trial-- 49**

## CAUSES OF ACTION

#### ---- COUNT I ----

#### Invasion of Privacy - Public Disclosure of Private Facts

#### ALL PLAINTIFFS
#### VS.
#### ALL DEFENDANTS

245.    Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

246.    Defendants gave publicity to Plaintiffs protected health information ("PHI") by publishing the PHI throughout the company and by forcing Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

247.    The publication of Plaintiffs PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

248.    As a proximate result of Defendants' public disclosure of Plaintiffs PHI, Plaintiffs have suffered injury. Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

**Amended Complaint and
Demand For Jury Trial-- 50**

116

---- **COUNT II** ----

**Negligence**

**ALL PLAINTIFFS**

**VS.**

**ALL DEFENDANTS**

249.   Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

250.   Defendants owe a duty of reasonable care during the course of operating their business.

251.   This duty includes protecting Plaintiffs PHI via appropriate means and procedures.

252.   Defendants breached their duty of care when by publishing Plaintiffs PHI throughout the company and by forcing Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

253.   Defendants negligence was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct.

254.   As a proximate cause of Defendants negligence, Plaintiffs have suffered injury.

---- **COUNT III** ----

**Breach of the Collective Bargaining Agreement**

**ESTATE OF LANE CAVINESS, PATRICK AKERLUND,  MICHAEL ALZATI, ERIC W. ANDERSON,  MICHAEL G. BALLARD JR.,  LARRY JAMES BEARCE JR.,  ROBERT BELLMAN,  BENJAMIN BENDIBURG,  DOUGLAS BERRY,  GREGORY BERRY,  LYNETTE BOTHA,  CALEB BUEHRER,  RICHARD  BULLOCK,  JON CARROLL,  VERGIL CASKEY,  JAMES CASTOR, NATHAN CHARBONEAU,  SHAWN CHURCHEL,  JOEL COLON,  MARK CONNOR,  MATTHEW CRONAUER,  FRED CUNNINGHAM,  ROYAL DANZA,  ELLIOT DE SOUSA, ERIC DESANDRO,  STEVE DIXON,  JAMES ERICKSON,  LUIS ESQUIVIA,  LEE ESTES,  ROBERT FRATTI,  JASON FRISBIE,  JONATHAN FUSSLE,  TONY GAMBOA,  DENNIS GEBHARD,  REZA**

**Amended Complaint and**
**Demand For Jury Trial-- 51**

117

**GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, GREG GORDON, DANIEL GREER, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, STEVEN MURATORE, GREGORY MYERS, PETER NAPORA, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, JASON ROGERS, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, FORREST STOWELLS, JOHN SWIFT, NICK TAYLOR, WILLIAM THOMPSON, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**

**VS.**

**ATLAS**

255.    Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

256.    Defendants' actions against Plaintiffs have violated, and continue to violate, several sections of the Collective Bargaining Agreement, including Article 1(A)(4) ("[Atlas] and Union will each comply with all applicable laws prohibiting discrimination against any Crew Member who is now, or may become, subject to the terms of this Agreement including age, race, sex… religion… handicap or disability, or any other characteristic protected by applicable local, state or federal law.")

257.    Under the Agreement, Defendants rights are laid out in Art. 1(G)(1), which provides a long list of rights retained by the Defendants, including to "direct its Crew Member workforce; determine the appropriate number of Crew Members; hire, promote, and discharge Crew Members; establish and enforce rules of conduct; maintain discipline and efficiency; introduce new equipment; determine the location(s) of the work force," etc.  Under the ancient legal maxim *Expressio unius est exclusio alterius* ("the express mention of one thing excludes

**Amended Complaint and
Demand For Jury Trial-- 52**

118

all others"), when a law or agreement includes a list of specific items, that list is presumed to be exclusive.[45]

258.    Art. 26(R) of the Agreement plainly forbids Atlas from exposing Plaintiffs to Unsafe Conditions: "[n]othing in this Agreement will be construed to require a Crew Member to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crew Member or his equipment."

259.    According to the U.S. government's VAERS database, the vaccines have already led to the deaths of 26,000 Americans. Scholarly, peer-reviewed estimates suggest the VAERS database underreports adverse events from vaccines by a ratio of 90%. At trial, Plaintiffs will

---

[45] Nothing in the Agreement's list of Defendants rights allows the Defendants to violate Plaintiffs' bodily integrity and conscience by mandating injections of dangerous experimental VBGT's which do not provide immunity or prevent transmission. Nor can there be any "emergency" exception argument allowing for Defendants to impose a VBGT mandate. Art. 22H even provides a list of natural disasters and acts of God which may constitute exceptions over which "the [Defendant] has no control," including a natural disaster, a labor dispute, grounding of a substantial number of the Defendants aircraft by government agency, war emergency, or acts of terrorism. The Agreement's specification of a "war emergency" evidence that other, contrived "emergencies," such as a "pandemic" that is as lethal, if not less, than the common flu fall outside the scope of this provision; Defendants conduct was fully within their own control.

**Amended Complaint and
Demand For Jury Trial-- 53**

119

show that a number of vaccinated coworkers within the Atlas company have already suffered adverse effects and injuries following VBGT's.

260.    Art. 15(A)(1) of the Agreement plainly states that "The physical standards required of a Crew Member shall be the standards required by the Federal Aviation Administration (as outlined in 14 CFR Part 67 and as may be amended)…" Current FAA standards preclude VBGT's for air crew members.

261.    Art. 15(C)(12) provides that "[m]edical records and other information obtained as a result of a Company required medical examination" or testing shall be "subject to safeguards as to their confidentiality in accordance with applicable law." Yet Atlas has repeatedly violated the medical privacy of Plaintiffs.

262.    Atlas has also violated the JUST CAUSE, DISCIPLINE, DISCHARGE AND PROBATION provisions of Article 19 of the Agreement. Plaintiffs have simply been told that they will be terminated on May 1 unless they submit to the experimental injections.

263.    Further, Atlas and the Defendant Atlas executives have violated Article 22, which requires that "[e]xcept as may otherwise be provided in this Agreement, seniority will govern with respect to upgrade and downgrade, filling of vacancies, displacements, reduction in force (furlough), recall from furlough, Base and aircraft assignments due to expansion or reduction in aircraft and Base staffing, monthly schedules, vacation bidding and when otherwise required by the Agreement*."* Article 22D requires that Atlas employees may lose their seniority ranks only upon proper discharge, retirement, death, resignation, extended absence or other terminal events.

264.    Defendants have paid vaccinated employees more than unvaccinated employees, and have maneuvered to terminate large numbers of seniority-status Plaintiffs.

**Amended Complaint and
Demand For Jury Trial-- 54**

120

265.     Article 25X forbids Defendants from discrimination "against any Crew Member because of race, color, national origin, *religion*, creed, sex, age, *disability,* veteran status, marital status, or sexual orientation." (Emphasis added).

266.     The Atlas Plaintiffs are third-party beneficiaries of the Collective Bargaining Agreement.

267.     Several of the Plaintiffs have either religious or medical objections or exemptions to the COVID-19 treatment injections.  Yet Defendants have continued to demand that they be injected with a dangerous VBGT without an accompanying warnings of potential side effects.

268.     Additionally, the Collective Bargaining Agreement must comply with state and federal law, including Title 7.  Defendants violated the Collective Bargaining Agreement by interpreting it in a manner repugnant to state and federal law, as described above.

---- **COUNT IV** ----

**Violation of Florida Private Whistleblower Act, Section 448.102(3),
*et seq*, Florida Statutes.**

**Defendants Retaliation for Refusal to Participate in a Prohibited Activity**

**ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS), PATRICK AKERLUND,  MICHAEL ALZATI,  ERIC W ANDERSON, MICHAEL G. BALLARD JR. ,  CINDY BARRIONUEVO,  LARRY JAMES BEARCE JR.,  ROBERT BELLMAN, BENJAMIN BENDIBURG,  DOUGLAS BERRY,  GREGORY BERRY, LYNETTE BOTHA,  CALEB BUEHRER,  RICHARD BULLOCK,  JON CARROLL, VERGIL CASKEY,  JAMES CASTOR,  NATHAN CHARBONEAU, SHAWN CHURCHEL,  JOEL COLON, MARK CONNOR,  MATTHEW CRONAUER,  FRED CUNNINGHAM, ROYAL DANZA,  ELLIOT DE SOUSA, ERIC DESANDRO,  STEVE DIXON, JAMES ERICKSON,  LUIS ESQUIVIA, LEE ESTES,  ROBERT FRATTI, TIMOTHY FRYE,  JONATHAN FUSSLE,  DENNIS GEBHARD, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON,  DANIEL GREER,  REXFORD T. HEIVILIN, JASON HENNING,  DAVID HEWSON III,  TODD HONTZ,  DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI,  JOHN KEARINS,  BETH KIRBY, JOSEPH LOSCHIAVO,  ANDREW LUTZ, BLYTHE LUTZ,  RAFAEL MACARIO, DOUGLAS P. MAYO JR., STEVEN MEISSNER,  JEFFREY MICHONSKI, ANDREW MICKLER,  COREY MORRIS,  STEVEN MURATORE, GREGORY MYERS,  PETER**

**Amended Complaint and
Demand For Jury Trial-- 55**

**NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, RICARDO TORRES ABARCA, JAMES VILLELLA, FARSHAD ZARRABIAN**

**VS.**

**ATLAS, FSI, ECA**

269. Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

270. Plaintiffs refused to participate in Defendants VBGT mandate program that violates 14 C.F.R. § 61.53, *et seq*. and other Constitutional, statutory and common law provisions.

271. Defendants retaliated against Plaintiffs for their refusal to participate in a prohibited activity as set forth above, including constructively discharging certain Plaintiffs.

272. As a proximate cause of Defendants retaliation, Plaintiffs have suffered injury.

273. Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

**Amended Complaint and
Demand For Jury Trial-- 56**

---- COUNT V ----

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*

**Defendants' Failure to Accommodate – Religious Discrimination**

**ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS), PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G. BALLARD JR., CINDY BARRIONUEVO, LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, DOUGLAS BERRY, GREGORY BERRY, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, JONATHAN FUSSLE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, GREG GORDON, DANIEL GREER, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR, APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, STEVEN MURATORE, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**

**VS.**

**ATLAS, FSI, ECA.**

274.     Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

275.     Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

**Amended Complaint and
Demand For Jury Trial-- 57**

123

276. Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three COVID-19 VBGT's, at the expense of their religious beliefs, or losing their livelihoods. In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs and failing to engage in the interactive process.

277. Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

278. Plaintiffs are members of a protected class.

279. Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental VBGT's for the multitude of reasons provided for in this Complaint.

280. Plaintiffs were qualified to perform their duties as demanded by their employment.

281. In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

282. Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs as well as the repeated acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

**Amended Complaint and**
**Demand For Jury Trial-- 58**

283.    Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with disdain.

284.    Defendant refused to engage in meaningful discussions regarding their beliefs, to identify any potential accommodations, and undertook tangible employment actions that disparately effected Plaintiffs on the basis of their religious beliefs.

285.    During the course of Plaintiffs' employment with Defendants and since the announcement of Defendants' VBGT mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs.  Disparate treatment for their religious beliefs included, but was not limited to:

(i)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received VBGT's;

(ii)    Harassing statements, threats, humiliation, and constructively stripping Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job duties with Defendants as compared to similarly situated employees who received VBGT's;

(iii)    Consistent denial of Plaintiffs' religious accommodation requests;

(iv)    The arbitrary nature of granting and/or revocation of Plaintiffs' religious accommodation requests without substantive justification;

**Amended Complaint and
Demand For Jury Trial-- 59**

125

(v)     Plaintiffs were arbitrarily forced to wear political symbols, differentiating them from other employees who received one of the three experimental vaccines; and/or

(vi)    Certain Plaintiffs being constructively discharged for not receiving one of the three experimental vaccines, which are against their sincerely held religious beliefs.

286.    Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

287.    Defendants did not engage with Plaintiffs regarding clarification of their requested relief but instead made broad assumptions based on misattributed facts in rendering its conclusions.

288.    Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, Defendants deprived the Plaintiffs of their Constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

289.    Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

**Amended Complaint and
Demand For Jury Trial-- 60**

290.     As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

---- **COUNT VI** ----

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Defendant's Disparate Treatment – Religious Discrimination**

**ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS), PATRICK AKERLUND,  MICHAEL ALZATI,  ERIC W ANDERSON, MICHAEL G. BALLARD JR.,  CINDY BARRIONUEVO,  LARRY JAMES BEARCE JR.,  ROBERT BELLMAN, BENJAMIN BENDIBURG,  DOUGLAS BERRY,  GREGORY BERRY, LYNETTE BOTHA,  CALEB BUEHRER,  RICHARD BULLOCK,  JON CARROLL, VERGIL CASKEY, JAMES CASTOR,  NATHAN CHARBONEAU, SHAWN CHURCHEL,  JOEL COLON, MARK CONNOR,  MATTHEW CRONAUER,  FRED CUNNINGHAM, ROYAL DANZA,  ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON,  LUIS ESQUIVIA, LEE ESTES,  ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE,  JONATHAN FUSSLE,  TONY GAMBOA, DENNIS GEBHARD,  REZA GHODS, MARK GILMAN,  ROBERT GIUDICE, ERIC GORDON,  GREG GORDON,  DANIEL GREER,  REXFORD T. HEIVILIN,  JASON HENNING,  DAVID HEWSON III,  TODD HONTZ,  DANIEL HUDSON,  ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER,  BETH KIRBY,  ANDREAS N. KOUSTAS,  CHAD KRAVETZ,  CARL LINDBERG, JOSEPH LOSCHIAVO,  ANDREW LUTZ, BLYTHE LUTZ,  RAFAEL MACARIO, DOUGLAS P. MAYO JR,  APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER,  COREY MORRIS, STEVEN MURATORE, GREGORY MYERS,  PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK,  CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON,  JASON ROGERS,  KIMBERLY SCHRECK,  WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH,  MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS,  BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR,  MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN,  GERI TONDA, RICARDO TORRES ABARCA, GUSTAVO VERDES,  JAMES VILLELLA, FARSHAD ZARRABIAN**

**VS.**

**Amended Complaint and
Demand For Jury Trial-- 61**

127

**ATLAS, FSI, ECA**

291.     Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

292.     Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

293.     Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three (3) COVID-19 vaccines, at the expense of their religious beliefs, or losing their livelihoods.  In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs and failing to engage in the interactive process.

294.     Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

295.     Plaintiffs are members of a protected class.

296.     Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for a multitude of aforementioned reasons.

297.     Plaintiffs were qualified to perform their duties as demanded by their employment.

298.     In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

299.     Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs

**Amended Complaint and
Demand For Jury Trial-- 62**

128

as well as the repeated acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

300.    Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with disdain.

301.    Defendant refused to engage in meaningful discussions regarding their beliefs, to identify any potential accommodations, and undertook tangible employment actions that disparately effected Plaintiffs on the basis of their religious beliefs.

302.    During the course of Plaintiffs' employment with Defendants and since the announcement of Defendants' VBGT mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs.  Disparate treatment for their religious beliefs included, but was not limited to:

(i)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received one or more of the three VBGT's;

(ii)    Harassing statements, threats, humiliation and constructively stripping Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job duties as compared to similarly situated employees who received one of the three VBGT's;

(iii)    Seeking to replace Plaintiffs' employment positions by individuals who did not seek religious and/or medical accommodation.

**Amended Complaint and
Demand For Jury Trial-- 63**

(iv)     Defendants disproportionately compensated employees who did not seek religious and/or medical accommodation.

(v)      Defendants disclosed medical documentation, medical information, and vaccine status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols, differentiating them from other employees who received one of the three VBGT's; and/or

(vi)     Certain Plaintiffs being constructively discharged for not receiving one of the three VBGT's, which are against their sincerely held religious beliefs as Christians.

303.    Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

304.    Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," were the motivating factor by which defendant engaged in such discriminatory conduct against Plaintiff.

305.    But-for Plaintiffs' religious beliefs, Defendant would not have engaged in such conduct that had a disparaging effect upon Plaintiffs and only individuals similarly situated to Plaintiffs.

306.    Defendants' conduct is evident that Defendants have engaged in a pattern or practice of discriminating against otherwise qualified individuals on the basis of their religion.

307.    This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

**Amended Complaint and
Demand For Jury Trial-- 64**

308.     Defendants' policies are only targeted at Plaintiffs and like-situated persons with conscientious objections to VBGT's.

309.     Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, Defendants deprived the Plaintiffs of their Constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

310.     Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

311.     As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

---- **COUNT VII** ----

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**
**Defendants' Creation of a Hostile Work Environment**

**ESTATE OF LANE CAVINESS (LANDON CAVINESS AND MORGAN CAVINESS), PATRICK AKERLUND,  MICHAEL ALZATI,  ERIC W ANDERSON, MICHAEL G. BALLARD JR.,  CINDY BARRIONUEVO,  LARRY JAMES BEARCE JR.,  ROBERT BELLMAN, BENJAMIN BENDIBURG,  DOUGLAS BERRY,  GREGORY BERRY, LYNETTE BOTHA,  CALEB BUEHRER,  RICHARD BULLOCK,  JON CARROLL, VERGIL CASKEY,  JAMES CASTOR,  NATHAN CHARBONEAU, SHAWN CHURCHEL,  JOEL COLON, MARK CONNOR,  MATTHEW CRONAUER,  FRED CUNNINGHAM, ROYAL DANZA,  ELLIOT DE SOUSA, ERIC DESANDRO,  STEVE DIXON, JAMES ERICKSON,  LUIS ESQUIVIA, LEE ESTES,  ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE,  JONATHAN FUSSLE,  TONY GAMBOA, DENNIS GEBHARD,  REZA GHODS, MARK GILMAN,  ROBERT GIUDICE, ERIC GORDON,  GREG GORDON, DANIEL GREER,  REXFORD T. HEIVILIN, JASON HENNING,  DAVID HEWSON III,  TODD HONTZ,  DANIEL HUDSON,  ROGER**

**Amended Complaint and**
**Demand For Jury Trial-- 65**

131

JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR, APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, STEVEN MEISSNER, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, STEVEN MURATORE, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, MARK THIEN, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN

### VS.

### ATLAS, FSI, ECA

312. Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

313. Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

314. Plaintiffs suffered mistreatment based on their protected religious characteristics.

315. Defendants conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

316. Plaintiffs were qualified to perform their duties as demanded by their employment.

317. In good-faith, Plaintiffs undertook all requisite and applicable procedures to inform Defendant of the harassment and toxicity that was pervasive around the workplace.

318. In an effort to achieve Defendants' political goal in conjunction with the Biden Administration, of total compliance to the vaccine mandate, Defendants' actions perpetuated a

**Amended Complaint and
Demand For Jury Trial-- 66**

work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

319. Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

320. Plaintiffs are members of a protected class.

321. Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for a multitude of aforementioned reasons and the Defendants repeated attempts to coerce Plaintiffs to go against their religious beliefs was unwelcomed harassment.

322. Additionally, after refusal to submit to unwelcomed and offensive actions against Plaintiffs religious beliefs, Plaintiffs were subjected to such consistent discriminatory, harassing, coercing, and intimidating conduct undertaken by Defendants and was based on their sincerely held religious beliefs as a protected class under Title VII.  Plaintiffs were subjected to discriminatory and coercive conduct including but not limited to:

(i) Offensive or derogatory jokes in the office;

(ii) Severe and persistent pressure to take VBGT's;

(iii) Unwelcomed comments about Plaintiffs' religious beliefs;

(iv) Defendants intentional dissemination of Plaintiffs' PHI and vaccination status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols and badges, differentiating them from other employees who received VBGT's;

(v) Abuse of power by Defendants, who compelled managers and supervisors to make unreasonable demands of Plaintiffs during the course of their job

**Amended Complaint and**
**Demand For Jury Trial-- 67**

133

responsibilities;

(vi)   Psychological harassment by excluding Plaintiffs from staff gatherings, blatant rejection of Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate Plaintiffs.

(vii)   Retaliatory conduct in response to Plaintiffs' filing declination of vaccination forms and filing religious accommodation forms;

(viii)   Defendants' creation of inflexible policies that directly target Plaintiffs on the basis of their religion;

(ix)   Defendants' inability to train its agents, employees,  managers, or supervisors concerning Title VII of the Civil Rights Act of 1964;

(x)   Failing to participate in a meaningful manner or otherwise engage with Plaintiffs regarding their religious accommodation; and/or

(xi)   Certain Plaintiffs being constructively discharged for not receiving one of the three VBGT's, which are against their sincerely held religious beliefs as Christians.

323.   Plaintiffs' subjugation to such conduct was motivated on religious grounds that were authorized, ratified, encouraged, and condoned by Defendants.

324.   Defendants egregious conduct toward Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

325.   Defendants are responsible for the creation of a hostile work environment under a theory of vicarious liability or direct liability.

**Amended Complaint and
Demand For Jury Trial-- 68**

134

326.     Defendants' were directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

327.     Accordingly, Defendants had actual knowledge of the actions of its managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by Defendants.

328.     Over the course of their employment, Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Defendants' conduct toward Plaintiffs and their disparate treatment.

329.     Defendants, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

330.     Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

331.     The systematic discrimination, as previously set forth, further adversely affected the Plaintiffs through Defendants' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "Anti-Vaxxer."

332.     Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

333.     Defendants' egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work environment.

334.     The actions of Defendants, as set out herein, violate Title VII.

**Amended Complaint and
Demand For Jury Trial-- 69**

135

335.     As a result of Defendants conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.

336.     Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the Plaintiffs

337.     Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

## ----  COUNT VIII  ----

### Violation of Title 42 U.S.C. § 2000ff-1(a)(1) and (a)(2)
### Defendants' Discrimination Based on Genetic Information

**ALL PLAINTIFFS**

**VS.**

**ATLAS, FSI, ECA**

338.     Plaintiffs reallege and incorporates all the above paragraphs as if fully set forth herein.

339.     The Genetic Information Non-Discrimination Act ("GINA") prohibits discrimination based on genetic information. Specifically, it is an unlawful employment practices for an employer to fail to refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee because of genetic information.

**Amended Complaint and
Demand For Jury Trial-- 70**

136

340.     GINA also prohibits employers from limiting, segregating, or classifying the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee because of genetic information.

341.     Defendants Atlas, FSI, and ECA are employers within the meaning of GINA and at all times relevant hereto were engaged in an industry affecting commerce and has at all times had fifteen or more employees.

342.     Plaintiffs are employees as defined by GINA.

343.     Defendants have and continue to violate GINA by discriminating against Plaintiffs and other employees based on whether they have taken a VBGT.

344.     Defendants unlawfully discriminated and violated GINA when they took adverse employment actions against Plaintiffs because of their refusal to receive VBGT's.

345.     Defendants unlawfully discriminated and violated GINA when they afforded better opportunities (i.e., routes, schedules and benefits) and greater compensation to those who received VBGT's than Plaintiffs who did not, and requiring Plaintiffs to wear political symbols.

346.     Defendants engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

347.     Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

**Amended Complaint and
Demand For Jury Trial-- 71**

137

348.    Defendants discrimination has harmed and will continue to harm Plaintiffs.

349.    Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so and the remainder are in the process of doing so.

---- **COUNT IX** ----

**Violation of Title 42 U.S.C. § 2000ff-1(b)**
**Defendants' Acquisition of Genetic Information**

**ALL PLAINTIFFS**

**VS.**

**ATLAS, FSI, ECA**

350.    Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

351.    GINA makes it unlawful for an employer to request, require or purchase genetic information with respect to an employee or a family member of the employee.

352.    Polymerase Chain Reaction ("PCR") tests are used to amplify small segments of DNA which is genetic material. This is the same sort of test used for forensics, cloning, genome projects for mapping genes and DNA sequencing. Genetic test means a test that analyzes DNA, RNA or chromosomes for purposes of such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis.

353.    For genetic tests, the first step is extraction of genetic material from a human specimen either through blood, hair, or oral swab. This is the exact same process used in the PCR test required and requested by Defendants to detect the genetic material of COVID-19.

354.    Defendants have and continue to violate GINA when requesting and requiring the genetic information from their employees by mandating they take the PCR test. Defendants violated GINA by requiring Plaintiffs to have their genetic information collected via

**Amended Complaint and**
**Demand For Jury Trial-- 72**

138

nasopharyngeal or nasal swab (the swab scrapes the cells from inside the nasal cavity which has the genetic material from the person for whom the specimen is collected).

355.    Defendants violated GINA when they requested Plaintiffs VBGT status because they are asking for their genetic information.

356.    Defendants limited, segregated, discriminated or classified Plaintiffs based on their genetic information.

357.    Defendants have engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

358.    Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

359.    Defendants discrimination has harmed and will continue to harm Plaintiffs.

360.    Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

---- **COUNT X** ----

**Amended Complaint and**
**Demand For Jury Trial-- 73**

**Violation of Title 42 U.S.C. § 1983, *et seq.***
**Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

**ALL PLAINTIFFS**

**VS.**

**ATLAS, FSI, ECA**

361.    Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

362.    Plaintiffs are citizens of the United States.

363.    At all times relevant hereto, Defendants were a government actor and a person acting under the color of law. That is, Defendants have taken decisive employment actions that have caused Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling Defendants actions whether through incentive or threat.

364.    Defendants are also acting under color of law as they have conspired with Government officials to leverage Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire Plaintiffs personal, genetic information.  Defendants and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, Defendants have acted in concert with the federal government at the expense of their employees including Plaintiffs.

365.    First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold

**Amended Complaint and**
**Demand For Jury Trial-- 74**

140

that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

366. Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States

367. Applied here, Plaintiffs fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by Defendants by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

368. This privacy right also includes Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, Defendants violated Plaintiffs' privacy rights when they broadcast their private information in memos, and published Plaintiffs PHI by forcing them to wear symbols.

369. Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

**Amended Complaint and
Demand For Jury Trial-- 75**

370.     After the announcement of EO 14042, vaccinated employees received preferential treatment compared to Plaintiffs who had not been vaccinated, which included increase in pay, preferential scheduling, additional benefits and privileges.

371.     Defendants knowingly and willfully discriminated against Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

372.     Defendants, by allowing similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

373.     While the vaccine mandate appeared neutral on its face, in practice it denies Plaintiffs equal protection under the law.

374.     Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by Defendants conduct.

375.     Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

376.     Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that

**Amended Complaint and
Demand For Jury Trial-- 76**

142

informed consent is a substantive component of due process and is generally required for medical treatment.

377. The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes Defendants as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

378. Here, Defendants actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, Defendants lack a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

379. Assuming the VBGT's could be said to satisfy the interest of preserving public health, Defendants mandate is not narrowly tailored since it is not the least restrictive means necessary as numerous, less restrictive means exist that serve the public interest of protecting the public's health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to provide greater protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc and ivermectin.

380. As a direct and proximate result of Defendants policies, practices, regulations and conduct, Plaintiffs have suffered harm.

381. The conduct of Defendants as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and

**Amended Complaint and
Demand For Jury Trial-- 77**

their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

382.	Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

**----  COUNT XI  ----**

**Violation of Title 42 U.S.C. § 12101, *et seq*. and 29 U.S.C. § 794
Americans With Disabilities Act and Rehabilitation Act**

**MICHAEL ALZATI, MICHAEL G. BALLARD JR., GREGORY BERRY, ROYAL DANZA, LEE ESTES, DENNIS GEBHARD, LANCE PHILLIPS, JASON ROGERS**

**VS.**

**ATLAS**

383.	Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

384.	Defendant Atlas engaged in unlawful business practices in violation of Title 42 U.S.C. § 12101, *et seq*. and 29 U.S.C. § 794.

385.	Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three COVID-19 VBGT's, contrary to medical advice, or losing their livelihoods.  In doing so, Defendants have violated the American Disabilities Act and Rehabilitation Act by taking a tangible employment action against Plaintiffs based on their medical conditions and failing to engage in the interactive process.

386.	Plaintiffs are members of a protected class.

**Amended Complaint and
Demand For Jury Trial-- 78**

387.    Plaintiffs medical conditions that precluded them from receiving any of the experimental VBGT's.

388.    Plaintiffs were qualified to perform their duties as demanded by their employment.

389.    In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

390.    Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their medical conditions.

391.    Plaintiffs informed Defendants of their medical conditions and requested medical exemptions from the vaccine mandate that is applicable to them but were met with disdain.

392.    Defendant refused to engage in meaningful discussions regarding medical conditions.

393.    During the course of Plaintiffs' employment with Defendants and since the announcement of Defendants' VBGT mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their medical conditions.  Disparate treatment for their religious beliefs included, but was not limited to:

    (i)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received VBGT's;

    (ii)    Harassing statements, threats, humiliation, and constructively stripping Plaintiffs of their important responsibilities, which were extended to other

**Amended Complaint and
Demand For Jury Trial-- 79**

145

employees, and undermined their ability to effectively perform their job duties with Defendants as compared to similarly situated employees who received VBGT's;

(iii)    Consistent denial of Plaintiffs' medical accommodation requests;

(iv)    The arbitrary nature of granting and/or revocation of Plaintiffs' medical accommodation requests without substantive justification;

(v)    Plaintiffs were arbitrarily forced to wear political symbols, differentiating them from other employees who received one of the three experimental vaccines; and/or

(vi)    Certain Plaintiffs being constructively discharged for not receiving one of the three experimental vaccines, which are contrary to medical advice they received from doctors.

394.    Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their medical accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' medical conditions.

395.    Defendants did not engage with Plaintiffs regarding clarification of their requested relief but instead made broad assumptions based on misattributed facts in rendering its conclusions.

396.    Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, Defendants deprived the Plaintiffs of their rights under the Americans With Disabilities Act and Rehabilitation Act.  Moreover, this deprivation was done intentionally, purposefully, and willfully.

**Amended Complaint and
Demand For Jury Trial-- 80**

397. Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

398. As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

#### ---- COUNT XII ----

#### Intentional Infliction of Emotional Distress

#### ALL PLAINTIFFS
#### VS.
#### ALL DEFENDANTS

399. Plaintiffs reallege and incorporates the paragraphs above as if fully set forth herein.

400. Defendants acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

401. Defendants conduct has been and continues to be extreme and outrageous.

402. As a proximate result of Defendants' actions, Plaintiffs have suffered severe emotional distress.

403. The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants conduct.

**Amended Complaint and
Demand For Jury Trial-- 81**

404.     Defendants are liable to Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- COUNT XIII ----

**Negligent Infliction of Emotional Distress**

**ALL PLAINTIFFS**
**VS.**
**ALL DEFENDANTS**

405.     Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

406.     Defendants acted negligently and with "reckless and/or wanton disregard of the interests of Plaintiffs" with respect to the conduct set forth in this Complaint.

407.     As a proximate result of Defendants' conduct, Plaintiffs have suffered serious and/or severe emotional distress.

408.     The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants conduct.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

**Amended Complaint and**
**Demand For Jury Trial-- 82**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

   (i)     An award of compensatory damages in appropriate amounts to be established at trial;

  (ii)     Punitive damages in a maximum amount as permitted by law and as determined by the jury;

 (iii)     Preliminary and permanent injunctive relief enjoining Defendants from any further COVID-19 related mandates or restrictions on Plaintiffs or any prospective future employees;

 (iv)     Awards of damages tailored to make vaccine-injured plaintiffs whole with regard to their manifest and likely future long-term injuries and disabilities;

  (v)     An award of attorneys' fees and costs associated with this action;

Dated: March 2, 2023.             Respectfully submitted,

**John Pierce Law P.C.**

By: _/s/ John Pierce_

     John M. Pierce

     jpierce@johnpiercelaw.com

     21550 Oxnard St., 3rd Fl PMB 172

     Woodland Hills, CA 91367

     Telephone: (213) 349-0054

**Amended Complaint and
Demand For Jury Trial-- 83**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ESTATE OF LANE CAVINESS, *et al.*,

    Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

    Defendants.

Case No. 1:22-cv-23519-KMM-LFL

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF**
**INCORPORATED MOTIONS TO DISMISS PURSUANT TO**
**<u>RULES 12(B)(1), 12(B)(2), AND 12(B)(6)</u>**

150

**TABLE OF CONTENTS**

**Page**

I.   The Vast Majority of Plaintiffs' Claims Against Atlas and All the Claims Against FSI and Encompass Should Be Dismissed for Lack of Personal Jurisdiction. .................. 5

    A.   Atlas Is Not Subject to General Jurisdiction in Florida. ....................................... 6

    B.   Atlas Is Not Subject to Specific Jurisdiction As to Claims of Plaintiffs Who Work Outside of Florida................................................................................. 9

II.  FSI Is Not Subject to Personal Jurisdiction As to Any Claims. ...................................... 11

    A.   FSI Is Not Subject to General Personal Jurisdiction in Florida. .......................... 11

    B.   FSI Is Not Subject to Specific Personal Jurisdiction in Florida .......................... 12

III. Encompass Is Not Subject to Personal Jurisdiction As to Any Claims........................... 12

IV.  All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause............................................................................................................................. 13

    A.   Texas Law Governs the Enforceability of FSI's Arbitration Clause. .................. 14

    B.   Under Texas Law, FSI's Arbitration Clause is Enforceable and Precludes the Six FSI Plaintiffs From Pursuing Claims Against FSI in This Forum ........... 14

V.   The Scattershot FAC, with Claims on Behalf of Nearly 100 Individual Plaintiffs, Fails to State Any Claim Upon Which Relief Can Be Granted. ...................................... 16

    A.   Plaintiffs' Third Complaint Remains a "Shotgun" Pleading................................ 16

    B.   Count I: Plaintiffs Cannot State Any Invasion of Privacy Claim. ....................... 17

    C.   Count II: Plaintiffs Lack Any Actionable Negligence Claim. .............................. 19

    D.   Count III: The Court Lacks Subject Matter Jurisdiction Over the Atlas Pilot Employees' Claims for Breach of Their Collective Bargaining Agreement. ........................................................................................................... 19

    E.   Count IV: No Valid Florida Private Whistleblower Act Claim. .......................... 20

    F.   Counts V, VI, VII, VIII, IX, and XI: Plaintiffs Do Not Allege They Exhausted Administrative Remedies. ................................................................. 22

    G.   Plaintiffs Fail to State Title VII, GINA, ADA or Rehabilitation Act Claims. ............................................................................................................... 25

        1.   Counts V and VI: No Plausible Religious Accommodations or Disparate Treatment Claim. ....................................................................... 25

        2.   Count VII: No Plausible Hostile Work Environment Claim ................... 30

        3.   Count VIII and IX: No Valid GINA Claims........................................... 31

        4.   Count XI: No Valid ADA or Rehabilitation Act Claims. ........................ 32

    H.   Count X: Plaintiffs' Constitutional Claims Fail.................................................. 34

151

**TABLE OF CONTENTS**
(continued)

**Page**

1.    Plaintiffs' Claims Do Not State Any Constitutional Violations.............. 34

2.    Defendants Are Not State Actors That Could Violate the
Constitution ............................................................................................ 36

I.    Count XII: No Valid Intentional Infliction of Emotional Distress ("IIED")
Claim. ............................................................................................................. 38

1.    Defendants' Actions Were Not Outrageous as a Matter of Law............. 38

2.    The FAC Does Not Plausibly Allege Intent or Severe Suffering............. 39

J.    Count XIII: Plaintiffs' Allegations Are Not Cognizable As a Florida
Negligent Infliction of Emotional Distress ("NIED") Claim.............................. 40

# TABLE OF AUTHORITIES

**Page**

CASES

*AFL-CIO v. City of Miami*,
   637 F.3d 1178 (11th Cir. 2011)........................................................................ 5

*Agher v. Envoy Air Inc.*,
   2018 WL 6444888 (C.D. Cal. Oct. 12, 2018).........................................................7

*Ananias v. St. Vincent Med. Grp., Inc.*,
   2022 WL 17752208 (S.D. Ind. Dec. 19, 2022)..................................................... 27

*Anderson v. United Airlines, Inc.*,
   577 F. Supp. 3d 1324 (M.D. Fla. 2021)....................................................16, 24, 36

*Arnold v. United Parcel Serv., Inc.*,
   2012 WL 1035441 (M.D. Ga. Mar. 27, 2012)..................................................... 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................... 4, 18, 38

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986)..................................................................................... 15

*Banks v. Am. Airlines*,
   2019 WL 5579479 (N.D. Cal. Oct. 29, 2019).........................................................10

*Barmapov v. Amuial*,
   986 F.3d 1321 (11th Cir. 2021)................................................................. 16, 17

*Beckerich v. St. Elizabeth Med. Ctr.*,
   563 F. Supp. 3d 633 (E.D. Ky. 2021) ............................................................... 36

*BNSF Ry. Co. v. Tyrrell*,
   581 U.S. 402 (2017)................................................................................. 7, 9

*Briggs v. QuantiTech Inc.*,
   2022 WL 1308494 (11th Cir. 2022)................................................................. 21

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
   582 U.S. 255 (2017)................................................................................. 9, 11

*Brown v. Royal Carib. Cruises, Ltd.*,
   2017 WL 3773709 (S.D. Fla. Mar. 17, 2017)............................................................38

*Burrows v. Purchasing Power, LLC*,
   2012 WL 9391827 (S.D. Fla. Oct. 18, 2012)............................................................19

*Butterfield v. JetBlue Airways Corp.*,
   2020 WL 5627389 (S.D. Fla. Aug. 17, 2020)............................................................21

*Cala v. Moorings Park Cmty. Health, Inc.*,
   2022 WL 17405581 (M.D. Fla. Dec. 2, 2022)...................................................... 38, 39

*Cape Publications, Inc. v. Hitchner*,
   549 So.2d 1374 (Fla. 1989)............................................................................. 17, 18

*Caravello v. Am. Airlines, Inc.*,
   315 F. Supp. 2d 1346 (S.D. Fla. 2004) ....................................................................20

*Carlisi v. Sprintcom, Inc.*,
   2006 WL 8432613 (S.D. Fla. 2006)..........................................................................19

*Carmouche v. Tamborlee Mgmt., Inc.*,
   789 F.3d 1201 (11th Cir. 2015)..................................................................................9

*Carter v. Cellco P'ship*,
   2016 WL 8981056 (M.D. Fla. Mar. 23, 2016)..........................................................30

*Cash v. Smith*,
   231 F.3d 1301 (11th Cir. 2000)................................................................................33

*Children's Health Def. v. Facebook Inc.*,
   546 F. Supp. 3d 909 (N.D. Cal. 2021) ......................................................................36

*Ciraci v. J.M. Smucker Co.*,
   -- F. 4th --, 2023 WL 2486075 (6th Cir. Mar. 14, 2023) ........................................ 36, 37, 38

*Ciraci v. J. M. Smucker Co.*,
   2021 WL 6064748 (N.D. Ohio Dec. 22, 2021)..................................................... 36, 37

*Coffey v. Mesa Airlines Inc.*,
   2019 WL 4492952 (C.D. Cal. Apr. 15, 2019) ...........................................................10

*Complaint of Hornbeck Offshore (1984) Corp.*,
   981 F.2d 752 (5th Cir. 1993)....................................................................................15

*Cousins v. United Healthcare, Inc.*,
   2020 WL 1666628 (S.D. Fla. Apr. 3, 2020) ................................................................ 23

*Cox v. Nobles*,
   15 F.4th 1350 (11th Cir. 2021)............................................................................................. 5

*D'Cunha v. Northwell Health Sys.*,
   2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023)............................................................ 30

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ............................................................................................... *passim*

*Dixon v. DTA Sec. Servs.*,
   2021 WL 5320987 (11th Cir. 2021)............................................................................... 30

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ..................................................................................................... 35

*Doe v. Univision Television Grp., Inc.*,
   717 So. 2d 63 (Fla. Ct. App. 1998) .............................................................................. 18

*Dos Santos v. AIDS Healthcare Found., Inc.*,
   2021 WL 4972993 (S.D. Fla. Jan. 5, 2021) .............................................................. 21

*Duberry v. Postmaster Gen.*,
   652 F. App'x 770 (11th Cir. 2016) ............................................................................... 23

*Echols v. R.J. Reynolds Tobacco Co.*,
   2014 WL 12199984 (S.D. Fla. Feb. 18, 2014)............................................................. 4

*Ertle v. Cont'l Airlines, Inc.*,
   136 F.3d 690 (10th Cir. 1998)......................................................................................... 20

*Estate of McCall ex rel. McCall v. United States*,
   642 F.3d 944 (11th Cir. 2011)......................................................................................... 35

*Finkbeiner v. Geisinger Clinic*,
   2022 WL 3702004 (M.D. Penn. Aug. 26, 2022) ..................................................... 38

*Florida v. Dep't of Health & Hum. Servs.*,
   19 F.4th 1271 (11th Cir. 2021)....................................................................................... 34

*Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ................................................................................................ 9, 10

*Fraser v. Smith*,
   594 F. 3d 842 (11th Cir. 2010)................................................................................12

*Fresenius Med. Care Holdings, Inc. v. Tucker*,
   704 F.3d 935 (11th Cir. 2013)................................................................................35

*Garcia v. Carnival Corp.*,
   838 F. Supp. 2d 1334 (S.D. Fla. 2012) ............................................................ 38, 39

*Garcia v. Goodwill Indus. of S. Fla., Inc.*,
   2019 WL 6052814 (S.D. Fla. Nov. 15, 2019)........................................................33

*Geddes v. Am. Airlines, Inc.*,
   321 F.3d 1349 (11th Cir. 2003)..............................................................................20

*Gonzalez v. Brand Energy & Infra. Servs., Inc.*,
   2013 WL 1188136 (S.D. Tex. Mar. 20, 2013).......................................................14

*Grimes v. CSX Transp., Inc.*,
   338 F. App'x 522 (7th Cir. 2009) ..........................................................................20

*Gross v. N.D. Univ. Sys.*,
   2022 WL 2612121 (D.N.D. Jan. 10, 2022).............................................................32

*Gustino v. Stoneybrook W. Master Assoc., Inc.*,
   842 F. App'x 323 (11th Cir. 2021) .........................................................................36

*Habitat for Human. Int'l v. Morris*,
   2020 WL 1677304 (M.D. Fla. Apr. 6, 2020).........................................................26

*Hale v. King*,
   642 F.3d 492 (5th Cir. 2011)..................................................................................33

*Halstead v. Espinoza*,
   2023 WL 2399288 (11th Cir. 2023)........................................................................17

*Hard Candy, LLC v. Hard Candy Fitness, LLC*,
   106 F. Supp. 3d 1231 (S.D. Fla. 2015) .............................................................. 6, 11

*Hart v. United States*,
   894 F.2d 1539 (11th Cir. 1990)..............................................................................39

*Harvey v. Harvey*,
   949 F.2d 1127 (11th Cir. 1992)........................................................................ 36, 37

*Haw. Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994) ................................................................................... 20

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) .............................................................................. 11, 13

*Hencey v. United Airlines, Inc.*,
    2021 WL 3634630 (S.D. Fla. Aug. 17, 2021) ........................................... 16

*Henry v. DeSantis*,
    461 F. Supp. 3d 1244 (S.D. Fla. 2020) .................................................... 35

*Hepburn-Belizaire v. Iowa College Acquisition Corp.*,
    2009 WL 10699576 (S.D. Fla. Nov. 9, 2009) ...................................... 28, 29

*Hiers v. Bordt*,
    2016 WL 9506039 (N.D. Fla. July 6, 2016) .............................................. 19

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
    603 F. Supp. 3d 1183 (S.D. Fla. 2022) .................................................... 19

*Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*,
    2020 WL 3078531 (S.D. Fla. June 10, 2020) ........................................3, 10

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) .................................................................................... 34

*Jensen v. Delta Airlines, Inc.*,
    2019 WL 922509 (6th Cir. Feb. 12, 2019) ................................................ 20

*Johnson v. Golfcrest Healthcare Ctr.*,
    2019 WL 1900968 (S.D. Fla. Apr. 29, 2019) ............................................ 23

*Johnson v. Tyson Foods, Inc.*,
    2022 WL 2161520 (W.D. Tenn. June 15, 2022) ........................................36

*Khanthapixay v. Loyola Marymount Univ.*,
    2021 WL 4025796 (C.D. Cal. Aug. 9, 2021) .............................................36

*Klaassen v. Trs. of Ind. Univ.*,
    7 F.4th 592 (7th Cir. 2021) ................................................................. 34, 35

*Knezevich v. United States*,
    2019 WL 1093449 (M.D. Fla. Jan. 15, 2019) ........................................... 40

*Lane v. Piedmont Healthcare*,
 2021 WL 5074494 (N.D. Ga. Oct. 13, 2021)........................................................36

*Laura A. v. Limestone Cty Bd. of Educ.*,
 610 F. App'x 835 (11th Cir. 2015) .......................................................................23

*Leake v. Raytheon Tech. Corp.*,
 2023 WL 2242857 (D. Ariz. Feb. 27, 2023)........................................................30

*Lloyd v. Sch. Bd. of Palm Beach Cnty.*,
 570 F. Supp. 3d 1165 (S.D. Fla. 2021) ....................................................... 1, 35, 39

*Louisiana v. Biden*,
 55 F. 4th 1017 (5th Cir. 2022).............................................................................37

*Loza v. Kimpton Hotel & Rest. Grp., LLC*,
 2020 WL 13389302 (S.D. Fla. June 17, 2020) ....................................................31

*Manhattan Cmty. Access Corp. v. Halleck*,
 139 S. Ct. 1921 (2019).....................................................................................37, 38

*Maniccia v. Brown*,
 171 F.3d 1364 (11th Cir. 1999)............................................................................26

*Martz v. Munroe Reg'l Med. Ctr., Inc.*,
 2007 WL 2044247 (M.D. Fla. July 10, 2007).......................................................39

*McCormack v. Aircraft Mechs. Frat. Ass'n*,
 340 F.3d 642 (8th Cir. 2003)................................................................................20

*Miller v. SLT Dealer Grp. Ltd.*,
 2008 WL 11389413 (S.D. Tex. Aug. 8, 2008)..................................................14, 15

*Moore v. Pederson*,
 806 F.3d 1036 (11th Cir. 2015)............................................................................38

*Morrissette-Brown v. Mobile Infirmary Med. Ctr.*,
 506 F.3d 1317 (11th Cir. 2007)....................................................................... 26, 27

*Mullins v. Crowell*,
 228 F.3d 1305 (11th Cir. 2000)............................................................................33

*N.N.J. v. Broward Cnty. Sch. Bd.*,
 2007 WL 3120299 (S.D. Fla. Oct. 23, 2007)..........................................................4

*Nat'l Broad. Co. v. Commc'ns Workers of Am.*,
860 F.2d 1022 (11th Cir. 1988)................................................................. 38

*Negron v. CitiMortg. Inc.*,
2016 WL 10953267 (S.D. Fla. Oct. 19, 2016)..........................................40

*Parker v. Town of Palm Beach*,
2017 WL 11537901 (S.D. Fla. Aug. 16, 2017)......................................... 18

*Parr v. Stevens Transp., Inc.*,
2020 WL 2200858 (N.D. Tex. May 5, 2020) ..................................... 14, 15

*Phillips v. Harbor Venice Mgmt., LLC*,
2020 WL 495224 (M.D. Fla. Jan. 30, 2020)............................................26

*Pierre v. AIDS Healthcare Found., Inc.*,
2020 WL 6381557 (S.D. Fla. Oct. 30, 2020)......................................20, 22

*Pilkington v. United Airlines, Inc.*,
112 F.3d 1532 (11th Cir. 1997)................................................................ 20

*Pipino v. Delta Air Lines, Inc.*,
196 F. Supp. 3d 1306 (S.D. Fla. 2016) .................................................... 40

*Post-Newsweek Stations Orlando, Inc. v. Guetzloe*,
968 So. 2d 608 (Fla. Ct. App. 2007) ....................................................... 18

*Price v. M & H Valve Co.*,
177 F. App'x 1 (11th Cir. 2006) ..............................................................25

*Pyles v. United Air Lines, Inc.*,
79 F.3d 1046 (11th Cir. 1996).................................................................. 20

*Rayburn ex rel. Rayburn v. Hogue*,
241 F.3d 1341 (11th Cir. 2001)................................................................ 34

*Regions Bank v. Kaplan*,
2021 WL 4852268 (11th Cir. 2021)............................................. 17, 18, 22

*Regueiro v. Am. Airlines, Inc.*,
2022 WL 2352414 (S.D. Fla. June 30, 2022) ............................................7

*Response Oncology, Inc. v. MetraHealth Ins. Co.*,
978 F. Supp. 1052 (S.D. Fla. 1997) .........................................................23

*Rodriguez v. John Eagle Sport City Motors, LLP*,
2014 WL 2587599 (N.D. Tex. June 10, 2014) .......................................................15

*Roof & Rack Prods., Inc. v. GYB Invs., LLC*,
2014 WL 3116413 (S.D. Fla. July 8, 2014) ..........................................................12

*Ross v. Blake*,
578 U.S. 632 (2016) ................................................................................................24

*Safer v. Nelson Fin. Grp., Inc.*,
422 F.3d 289 (5th Cir. 2005) ..................................................................................15

*Sambrano v. United Airlines, Inc.*,
2021 WL 5178829 (N.D. Tex. Nov. 8, 2021) ....................................................7, 10

*Sanchez v. Marathon Oil Co.*,
2021 WL 1201677 (S.D. Tex. Jan. 21, 2021) .........................................................14

*Santasiero v. Martin*,
2021 WL 2856622 (M.D. Fla. July 8, 2021) ..........................................................39

*Sculptchair, Inc. v. Century Arts, Ltd.*,
94 F.3d 623 (11th Cir. 1996) ....................................................................................3

*Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*,
82 So. 3d 73 (Fla. 2012) .........................................................................................14

*Shah v. Orange Park Med. Ctr., Inc.*,
2016 WL 4943925 (M.D. Fla. Sept. 16, 2016) ......................................................31

*Shannon v. Bellsouth Telecomm., Inc.*,
292 F.3d 712 (11th Cir. 2002) ................................................................................29

*Shea v. BBVA Compass Bancshares, Inc.*,
2013 WL 869526 (S.D. Fla. Mar. 7, 2013) (Moore, J.) ..................................... 4, 13

*Shotz v. American Airlines, Inc.*,
420 F.3d 1332 (11th Cir. 2005) ..............................................................................33

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) ..................................................................................................4

*Staple v. Sch. Bd. of Broward Cnty.*,
2021 WL 2000373 (S.D. Fla. Apr. 30, 2021) .........................................................28

*Stewart v. Spirit Airlines, Inc.*,
  503 F. App'x 814 (11th Cir. 2013) ................................................................. 4, 19, 20

*Surtain v. Hamlin Terrace Found.*,
  789 F.3d 1239 (11th Cir. 2015)........................................................................... 33, 34

*Thompson v. Carnival Corp.*,
  174 F. Supp. 3d 1327 (S.D. Fla. 2016) ..................................................................... 6

*Thompson v. Fla. Bar*,
  526 F. Supp. 2d 1264 (S.D. Fla. 2007) ................................................................... 23

*Thompson v. Spears*,
  336 F. Supp. 2d 1224 (S.D. Fla. 2004) ................................................................... 40

*Townsend v. Staples, Inc.*,
  2016 WL 3344579 (N.D. Ga. June 15, 2016)........................................................... 33

*United Techs. Corp. v. Mazer*,
  556 F.3d 1260 (11th Cir. 2009)......................................................................... 3, 10

*Urdaneta v. J.P. Morgan Chase Bank, N.A.*,
  2010 WL 11504729 (S.D. Fla. Jan. 22, 2010) ....................................................... 26

*Vallarta v. United Airlines, Inc.*,
  497 F. Supp. 3d 790 (N.D. Cal. 2020) ......................................................................7

*Vandesande v. Miami-Dade Cnty.*,
  431 F. Supp. 2d 1245 (S.D. Fla. 2006) ................................................................... 27

*Victor Elias Photography, LLC v. Leonardo Worldwide Corp.*,
  2019 WL 3713724 (S.D. Tex. Jan. 25, 2019) ........................................................... 7

*Viridis Corp. v. TCA Glob. Credit Master Fund, LP*,
  721 F. App'x 865 (11th Cir. 2018) ......................................................................... 14

*Wagner v. Demo Sales, Inc.*,
  2020 WL 2527230 (M.D. Fla. Apr. 28, 2020)..................................................... 29, 34

*Waite v. All Acquisition Corp.*,
  901 F.3d 1307 (11th Cir. 2018)......................................................................... 7, 10

*Walden v. Fiore*,
  571 U.S. 277 (2014).......................................................................................... 5, 10

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ............................................................................................35

*Washington v. Sears Logis. Servs., Inc.*,
   2014 WL 2159253 (N.D. Tex. May 23, 2014) .................................................. 14, 15

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ...............................................................................35

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
   792 F.3d 1313 (11th Cir. 2015) ..........................................................................16

*Williams v. City of Minneola*,
   575 So.2d 683 (Fla. Ct. App. 1991) ....................................................................17

*Willis v. Gami Golden Glades, LLC*,
   967 So.2d 846 (Fla. 2007) ..................................................................................40

## FEDERAL STATUTES

29 U.S.C. § 626 ...........................................................................................................25

29 U.S.C. § 794 .................................................................................................... 23, 33

42 U.S.C. § 1983 .................................................................................................. 34, 36

42 U.S.C. § 2000e-2 .....................................................................................................29

42 U.S.C. § 2000e-5 .....................................................................................................22

42 U.S.C. § 2000ff ........................................................................................................31

42 U.S.C. § 2000ff-1 ....................................................................................................32

42 U.S.C. § 2000ff-6 ....................................................................................................22

42 U.S.C. § 12102 .........................................................................................................33

42 U.S.C. § 12112 .........................................................................................................33

42 U.S.C. § 12117 .........................................................................................................23

45 U.S.C. § 151 .............................................................................................................19

162

**FLORIDA STATUTES**

Fla. Stat. § 448.102 ................................................................................................ 20, 21

**OTHER AUTHORITIES**

14 C.F.R. § 61.53 ................................................................................................... 21, 22

29 C.F.R. § 1635.3 ...................................................................................................... 32

Federal Rule of Civil Procedure 12 .......................................................................... *passim*

Defendants Atlas Air, Inc. ("Atlas") and John W. Dietrich, Patricia Goodwin-Peters, and Jeffrey Carlson (the "Atlas Executive Defendants" and, collectively, with Atlas, the "Atlas Defendants"); EncompassAir, LLC ("Encompass"); and Flight Services International, LLC ("FSI") (collectively, "Defendants") move to dismiss the First Amended Complaint ("FAC," ECF No. 39) with prejudice under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).

**INTRODUCTION**

Plaintiffs have filed three complaints in this litigation, each asserting a dizzying and shifting array of state, federal, and constitutional claims.[1] Their latest, the FAC, submitted in response to Defendants' prior motions to dismiss (ECF No. 31), shuffles Plaintiffs' legal claims—adding seven new counts and dropping two—and adds overall length, now consisting of 408 paragraphs. The FAC suffers from the same defects as Plaintiffs' earlier complaints, and the case should be dismissed as a matter of law, with prejudice.

The nearly 100 Plaintiffs are Atlas and FSI employees and an independent contractor of Encompass, each of whom individually asserts up to 13 causes of action. They object to the nation's overall response to the pandemic, ranging from the FDA's approval of COVID-19 vaccines, lockdown orders, public health authorities' encouragement of vaccination, masking and testing, to grievances with the Federal Aviation Administration. Rejecting another challenge to the wisdom of COVID-19 policy, this Court explained such questions are "best left to the scientific community and participants in the democratic process" and that courts should not "short circuit that debate." *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1185 (S.D. Fla. 2021)

---

[1] *See US Freedom Flyers, et al.* v. *Atlas Air, Inc., et al.*, Case No. 1:22-cv-21477, ECF No. 1 (S.D. Fla.) (Altonaga, C.J.); *Estate of Lane Caviness, et al. v. Atlas Air, Inc., et al.*, Case No. 1:22-cv-23519, ECF Nos. 1, 39 (Moore, J.).

164

(Moore, J.). Despite that, as part of a public-relations gambit,[2] Plaintiffs filed this lawsuit challenging Defendants' COVID-19 vaccine, masking, and testing policies under federal employment statutes, the U.S. Constitution, and a host of state-law theories.

Perhaps because of their ideological aims, Plaintiffs continue to advance a legally infirm case. They bring suit in a court that lacks personal jurisdiction over the bulk of Plaintiffs' claims, in breach of binding arbitration clauses they signed with FSI, and without exhausting mandatory administrative remedies. Plaintiffs also recycle claims against private employers' COVID-19 vaccine policies that courts nationwide routinely reject. They likewise fail to assert valid legal theories or to allege sufficient facts to justify any of their wide-ranging legal claims, despite having now substantively amended their pleadings twice. To illustrate, for a case about "religious or medical objections" to a "vaccine mandate" (FAC ¶¶ 3, 267), absent from the 83-page FAC are:

- Facts identifying any Plaintiff who requested and was denied an exemption from vaccination for religious or medical reasons under any Defendant's COVID-19 policy;

- Facts identifying any Plaintiff who purportedly suffered an adverse employment action (*i.e.*, disciplined, discharged, or placed on a leave) for not taking a COVID-19 vaccine; or

- Facts explaining the specific individual circumstances of the nearly 100 Plaintiffs with respect to Defendants' COVID-19 policies.

This Court should dismiss the FAC with prejudice on numerous grounds. ***First***, Plaintiffs' claims against Atlas, FSI, and Encompass that do not arise in or relate to Florida must be dismissed for lack of personal jurisdiction, and all claims against FSI should be dismissed in light of binding

---

[2] *See* Enrico Trigoso, *18 Major Airlines, FAA and DOT to be Sued Over COVID Vaccine Mandates*, EPOCH TIMES (May 28, 2022), https://www.theepochtimes.com/mkt_app/18-major-airlines-faa-and-dot-to-be-sued-over-covid-vaccine-mandates_4484295.html (quoting Plaintiffs' lead attorney that "[i]t's going to require a big fix ultimately. And that's probably going to require legislation and kind of getting all the stakeholders at the table, but the first step is civil litigation.")

arbitration agreements. **Second**, the FAC remains an impermissible shotgun pleading. **Third**, Plaintiffs have not alleged a disclosure to the general public of offensive facts unworthy of public concern. **Fourth**, Plaintiffs' negligence claims improperly repackage their invasion of privacy claims. **Fifth**, blackletter law divests courts of subject matter jurisdiction over claims alleging breach of a collective bargaining agreement subject to the Railway Labor Act. **Sixth**, Plaintiffs' Title VII, Genetic Information Nondiscrimination Act, Americans with Disabilities Act ("ADA"), and Rehabilitation Act claims fail because: (i) Plaintiffs have not adequately alleged that they each exhausted administrative remedies before pursuing these claims, and (ii) Plaintiffs otherwise fail to state a plausible claim for relief, especially given that Plaintiffs bring nearly 100 individual claims under these four statutes without alleging *any* adverse employment action or specific individual circumstances. Further, Plaintiffs' ADA and Rehabilitation Act claims fail because none of the eight plaintiffs who assert them alleges a qualifying "disability." **Seventh**, private companies' COVID-19 vaccine requirements infringe no constitutional rights. **Eighth**, Plaintiffs' intentional infliction of emotional distress claims fail plausibly to allege outrageousness, intent, or severe suffering. **And finally**, Plaintiffs' negligent infliction of emotional distress claim is fundamentally mismatched to the facts of this case.

## LEGAL STANDARDS

Rule 12(b)(2) and Rule 12(b)(1). Plaintiffs bear the burden of demonstrating personal jurisdiction in response to a Rule 12(b)(2) motion. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). If the defendant submits evidence against jurisdiction, the burden "shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.*; *accord Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). "[W]hen the plaintiff offers no competent evidence to the contrary, [the] court may find that the defendant's unrebutted denials [are] sufficient to negate plaintiff's jurisdictional allegations." *Interim Healthcare, Inc. v. Interim*

166

*Healthcare of Se. La., Inc.*, 2020 WL 3078531, at *7 (S.D. Fla. June 10, 2020).

Motions to compel arbitration "are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to [Rule] 12(b)(1)." *Shea v. BBVA Compass Bancshares, Inc.*, 2013 WL 869526, at *2 n.3 (S.D. Fla. Mar. 7, 2013) (Moore, J.). In addition, because "federal courts lack subject matter jurisdiction" over claims preempted by the Railway Labor Act, that objection "warrant[s] dismissal under Rule 12(b)(1)." *Stewart v. Spirit Airlines, Inc.*, 503 F. App'x 814, 817 (11th Cir. 2013). Although "jurisdictional questions ordinarily must precede merits determinations in dispositional order," the Supreme Court "recognize[s] that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).[3]

Rule 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings need "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *N.N.J. v. Broward Cnty. Sch. Bd.*, 2007 WL 3120299, at *1 (S.D. Fla. Oct. 23, 2007) (Moore, J.). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Echols v. R.J. Reynolds Tobacco Co.*, 2014 WL 12199984, at *3 (S.D. Fla. Feb. 18, 2014) (Moore, J.). Thus, a plaintiff must plead factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. For each claim, the plaintiff must set forth plausible

---

[3] As to FSI, regardless of which jurisdictional ground for dismissal the Court resolves first, it should dismiss in full—and not retain jurisdiction—as all claims against FSI are subject to arbitration, and no claims against FSI are subject to personal jurisdiction in this Court. FSI requests the Court, prior to considering FSI's personal jurisdiction argument, first resolve its jurisdictional argument that Plaintiffs' claims against it should be dismissed with prejudice for lack of subject matter jurisdiction, as these Plaintiffs' claims are subject to mandatory arbitration.

factual allegations that establish all "the material elements of a cause of action." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011). A court should "dismiss a complaint if it rests only on conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts." *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).

## ARGUMENT

This is *not* a putative class action; rather, each of the nearly 100 Plaintiffs seeks to pursue separate individual claims pursuant to some (or all) of 13 causes of action. According to the FAC, 90 Plaintiffs are Atlas employees, 6 are FSI employees of FSI, and 1 worked for Encompass.[4] All of Plaintiffs' many claims fail.

**I.      The Vast Majority of Plaintiffs' Claims Against Atlas and All the Claims Against FSI and Encompass Should Be Dismissed for Lack of Personal Jurisdiction.**

Plaintiffs cannot establish general personal jurisdiction under the Due Process Clause over Atlas, FSI, or Encompass under the demanding test set forth in *Daimler AG v. Bauman*, 571 U.S. 117 (2014). As to specific personal jurisdiction, for constitutionally sufficient "minimum contacts," "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014); *see also id.* at 284 (explaining that "the relationship must arise out of contacts that the defendant *himself* creates with the forum State"). Here, the FAC—despite having been amended in response to Defendants' personal jurisdiction arguments—fails to allege *any* suit-related contacts Atlas, FSI, or Encompass created with Florida. Plaintiffs' theory of specific jurisdiction appears to be that "acts outside the state of Florida . . . caused harm to numerous plaintiffs in the state of Florida." FAC ¶ 120. But, as

---

[4] Two other Plaintiffs assert claims on behalf of former Atlas employee Lane Caviness's estate. FAC ¶¶ 9–10.

168

described below, that "injury-only theory" is not only flawed, but it cannot support specific personal jurisdiction for the vast majority of the Plaintiffs in any event, who neither work nor live in Florida—and, therefore, lack even a Florida-based injury. The Court therefore should dismiss the vast majority of claims against Atlas, and all of the claims against FSI and Encompass.

### A.      Atlas Is Not Subject to General Jurisdiction in Florida.

Absent an "exceptional case," a corporation is "at home"—and thus subject to general personal jurisdiction consistent with due process—*only* in the states where it is incorporated or where it has its principal place of business. *Daimler*, 571 U.S. at 138–39, 139 n.19. Here, as Plaintiffs admit, Atlas's "paradigm forum[s]" for "the exercise of general jurisdiction" are Delaware and New York. *Id.* at 137; *see* FAC ¶ 108 (alleging Atlas is "a Delaware corporation with its principal place of business in Purchase, New York"); Ybarra Decl. ¶ 3, Ex. A.

"The Due Process Clause imposes a high standard" for a corporation to "be subject to the exercise of general jurisdiction [outside these paradigm forums]." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1250 (S.D. Fla. 2015). "[T]he inquiry is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic, it is whether that corporation's affiliations with the State *are so continuous and systematic as to render it essentially at home in the forum State*." *Id.* (emphasis added). It is, therefore, "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1336 n.7 (S.D. Fla. 2016) (Moore, J.). The facts of *Daimler* reinforce this. There, the Supreme Court held that a California federal court lacked general jurisdiction over Mercedes-Benz USA despite it being "the largest supplier of luxury vehicles to the California market" and having "multiple California-based facilities," including a "regional office," "a Vehicle Preparation Center," and "a Classic Center." *Daimler*, 571 U.S. at 123, 136–37, 139.

169

Plaintiffs cannot carry their "heavy burden" to establish Atlas is "at home" in Florida. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317 (11th Cir. 2018). Only "14.5% of Atlas's U.S. workforce has a Florida duty station." Ybarra Decl. ¶ 6. In the relevant period, take offs and landings in Florida *never* represented more than 9% of Atlas's total monthly flights. *Id.* Atlas maintains operational centers at airports across the United States, including in Alaska, California, Illinois, Kentucky, Florida, and New York. *Id.* ¶ 5. These facts cannot support general personal jurisdiction. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017); *Victor Elias Photography, LLC v. Leonardo Worldwide Corp.*, 2019 WL 3713724, at *2 (S.D. Tex. Jan. 25, 2019).

In cases involving airlines with ties to forum states equal-or-greater than those of Atlas to Florida, courts have found those ties fall short of establishing general jurisdiction under *Daimler*. *See, e.g.*, *Regueiro v. Am. Airlines, Inc.*, 2022 WL 2352414, at *2 (S.D. Fla. June 30, 2022) (rejecting general jurisdiction despite American's "significant business operations in Florida" and collecting authorities that "have declined to exercise general jurisdiction over airlines with a hub in the state"); *Sambrano v. United Airlines, Inc.*, 2021 WL 5178829, at *4 (N.D. Tex. Nov. 8, 2021) (*Daimler* "compel[led] the Court to conclude [United was] Texas's guest"—not subject to general jurisdiction—despite it "maintain[ing] a constant and significant presence in Texas" including (i) an in-state hub airport, (ii) nearly 25% of its daily flights taking off or landing in Texas, and (iii) 16% of its employees working in Texas); *Vallarta v. United Airlines, Inc.*, 497 F. Supp. 3d 790, 799 (N.D. Cal. 2020) (no general jurisdiction with two in-state hubs); *Agher v. Envoy Air Inc.*, 2018 WL 6444888, at *2 (C.D. Cal. Oct. 12, 2018) (8,500 employees insufficient).

Plaintiffs cannot establish general jurisdiction in Florida based on Atlas having "a hub, its training center and other operations" within the state. FAC ¶ 110. Concluding these in-state activities are sufficiently "exceptional" to confer general jurisdiction would violate the Supreme

170

Court's admonition in *Daimler* that "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20. To illustrate, Plaintiffs allege that Atlas's Miami training center has "30,000 square feet of administrative and instructional space." FAC ¶ 110. Yet, Atlas has over 150,000 square feet of space in Kentucky, over 100,000 square feet in California, and over 65,000 square feet in New York, as well as significant physical plants at locations across the country and the world. Ybarra Decl. ¶ 8. Atlas has twice as many employees in Kentucky (*i.e.*, 1,365 employees) as in Florida, along with 731 employees in New York, 538 in California, 537 in Alaska, 206 in Illinois, 163 in Texas, and other employees based in 14 other states and various foreign countries. *Id.* ¶ 9. By contrast to its Florida operations that Plaintiffs incorrectly characterize as "home," it is New York—Atlas's "principal place of business" (FAC ¶ 108)—where Atlas's Ground Operations Support and Facilities, Accounting, Finance, Financial Planning and Analysis, Safety, Administration, Systems Operations, Defense & Government Programs, Sales & Marketing, Communications, Legal, and Human Resources functions are based. Ybarra Decl. ¶ 10. New York also houses Atlas's principal executive offices. *Id.* ¶ 11. Atlas's Flight Operations are based in New York and Kentucky. *Id.* ¶ 10. And Atlas's board meetings, including the most recent, are often held in New York. *Id.* ¶ 12.

Nor do Plaintiffs clear the high bar imposed by *Daimler* with the FAC's assertion that "if Atlas were to cease all operations [in Miami], it would cause significant impact on the operations of Atlas world-wide" or that "several very important departments are based in Miami," including the Vice President of Ground Operations Training. FAC ¶¶ 111–12. Taking every jurisdictional allegation in the FAC as true, and based on the uncontested facts Atlas submits here, Plaintiffs' general jurisdiction argument falls short. In *Daimler*, the Supreme Court expressly rejected the argument that general jurisdiction can be based on "important" operations being housed in the

171

forum state. 571 U.S. at 118 (rejecting an "importance" standard for general jurisdiction and observing "if 'importan[ce]' in this sense were sufficient to justify jurisdictional attribution, foreign corporations would be amenable to suit on any or all claims wherever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the "sprawling view of general jurisdiction" rejected in *Goodyear*.) *See BNSF*, 581 U.S. at 414 (reiterating that to "focus solely on the magnitude of the defendant's in-state contacts" is improper).

Simply put, this is not an "exceptional case" where Atlas is "at home" outside of the states where it is incorporated and headquartered, meaning Atlas is not subject to general jurisdiction in Florida. *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015).

**B.      Atlas Is Not Subject to Specific Jurisdiction As to Claims of Plaintiffs Who Work Outside of Florida.**

For a court to have specific personal jurisdiction over a plaintiff's claim, the claim must "arise out of or relate to" the defendant's forum-state contacts. *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). Plaintiffs cannot satisfy this basic prerequisite for the substantial majority of the Plaintiffs' claims. And, the Supreme Court has made clear that—in a mass action like this—specific jurisdiction over the defendant must be judged *as to each individual Plaintiff's claims*. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 265 (2017) ("[M]ere fact that other plaintiffs . . . allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims."). Here, Plaintiffs contest Atlas's vaccination policies for employees nationwide, making clear the underlying controversy arises from their employment relationship. The FAC seeks to premise specific jurisdiction on the allegation that Defendants "caused harm to numerous plaintiffs in the state of Florida." FAC ¶ 120. Yet Plaintiffs fail to disclose the state where *any* individual Plaintiff *works*. Instead, Plaintiffs *selectively* disclose that certain Plaintiffs allegedly "reside[] in

172

the state of Florida." *See, e.g., id.* ¶¶ 23, 28, 35, 38.

The full facts are that 53 Plaintiff employees of Atlas *both work and live outside of Florida.* Ybarra Decl. ¶ 14. *See Interim Healthcare, Inc.*, 2020 WL 3078531, at *7 (court may rely on unrebutted facts by defendant in resolving personal jurisdiction); *United Techs. Corp.*, 556 F.3d at 1283 (same). These 53 Plaintiffs do not—and cannot—demonstrate that their injuries occurred in Florida, nor do they allege any Florida-specific conduct by Atlas underlying their claims. *See* Ybarra Decl. ¶ 4 (Atlas's vaccine policy was "developed and executed primarily by employees based in New York and, during pandemic conditions, working from other states in the Northeast"). Their claims do not "arise out of or relate" to any Florida contacts by Atlas and must be dismissed. *Ford Motor Co.*, 141 S. Ct. at 1026; *see also Waite*, 901 F.3d at 1314 (specific jurisdiction focuses on the suit-related "activity or occurrence" in the forum state, ignoring "defendant's unconnected activities in the State"); *Sambrano*, 2021 WL 5178829, at *7 (dismissing COVID-19 claims of pilot based in and resident in Illinois as "not relate[d] to the forum state" of Texas).

Furthermore, 14 additional Atlas Plaintiffs are not based in Florida for their work with Atlas, but merely reside in Florida. Ybarra Decl. ¶ 14. A plaintiff who only resides in the forum state, however, cannot establish specific personal jurisdiction over claims involving his or her employment *outside* the forum state. *See Walden*, 571 U.S. at 285 ("the plaintiff cannot be the only link between the defendant and the forum"); *Banks v. Am. Airlines*, 2019 WL 5579479, at *4 (N.D. Cal. Oct. 29, 2019) (discrimination claims of flight attendant resident in California but based in Arizona did not arise from airline's contacts with California); *Coffey v. Mesa Airlines Inc.*, 2019 WL 4492952, at *3, 6 (C.D. Cal. Apr. 15, 2019) (airline not subject to specific jurisdiction in California for claims of pilot resident in California but based in Texas regarding out-of-state employment decisions). Thus, personal jurisdiction is also absent as to these 14 Atlas Plaintiffs.

In sum, this Court should dismiss every Atlas Plaintiff's claim that lacks a legally relevant connection to Florida: this includes the claims of the 53 Atlas Plaintiffs who *neither* live *nor* work in Florida, plus the claims of the 14 Atlas Plaintiffs who live in Florida but work elsewhere. *See Bristol-Myers Squibb Co.*, 582 U.S. at 265 ; *id.* at 278 (Sotomayor, J., dissenting) ("[E]ffect of the Court's opinion [in *Bristol-Myers Squibb*] is to eliminate nationwide mass actions in any State other than those in which a defendant is 'essentially at home'").

**II.      FSI Is Not Subject to Personal Jurisdiction As to Any Claims.**

**A.      FSI Is Not Subject to General Personal Jurisdiction in Florida.**

As Plaintiffs admit, FSI "is a Texas limited liability company with its principal place of business in Houston, Texas." FAC ¶ 113. Plaintiffs cannot carry their "heavy burden" to establish FSI is "at home" in Florida, so it not subject to general personal jurisdiction in this forum.

Here, the only allegations in the FAC connecting FSI to Florida are the general allegations that (1) "[a]ll [FSI's] employees receive all their training at the Atlas training facility in Miami"; (2) "[a]ll FSI flight attendants are trained [in Miami]"; and (3) "[t]here is always a significant presence of FSI personnel in Miami." *Id.* These allegations, however, are insufficient to subject FSI to general jurisdiction in Florida. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411, 418–19 (1984) (no general jurisdiction when defendant purchased 80 percent of its helicopter fleet in forum state and sent its employees there for training).

The exercise of general jurisdiction in Florida over FSI would violate due process, as FSI does not maintain "affiliations with the State [that] are so continuous and systematic as to render [it] essentially at home" here. *Daimler*, 571 U.S. at 127; *Hard Candy*, 106 F. Supp. 3d at 1250. FSI is a Texas limited liability company with its principal (and only) place of business in Houston, Texas. Ffrench Decl. ¶ 5, Ex. B. Alongside being a registered LLC and having its principal place of business being in Texas, FSI's offices and business records are located in Texas, all of FSI's

financial, accounting, and operational decisions are made in Texas, and FSI has never owned, leased/rented, possessed, or maintained real property in Florida; never maintained an office in Florida; and never maintained a financial account in Florida. Ffrench Decl. ¶¶ 5–10, Ex. B; *see Roof & Rack Prods., Inc. v. GYB Invs., LLC*, 2014 WL 3116413, at *4 (S.D. Fla. July 8, 2014) (under *Daimler*, exercise of general jurisdiction over a defendant with its principal place of business in Texas would violate due process despite defendant sending employees to Florida to train); *Fraser v. Smith*, 594 F. 3d 842, 846–47 (11th Cir. 2010) (even pre-*Daimler*, no general jurisdiction though defendant sent employees and representatives to Florida for training).

### B.     FSI Is Not Subject to Specific Personal Jurisdiction in Florida.

The FAC seeks to premise specific jurisdiction on the allegation that Defendants "caused harm to numerous plaintiffs in the state of Florida." FAC ¶ 120. Yet Plaintiffs do not allege that any FSI Plaintiff resides *or* works in the state of Florida. In fact, "[s]ince FSI's formation, none of the [six] Plaintiffs who are or were employed by FSI were or are based in Florida. Correspondingly, all FSI flight attendants, as a condition of employment, must relocate to within seventy-five (75) miles of Houston, Texas." Ffrench Decl. ¶ 13. These Plaintiffs do not—and cannot—point to any injuries that occurred in Florida, nor do they allege Florida-specific conduct by FSI to support their claims. Thus, the Court lacks personal jurisdiction over their claims.

### III.     Encompass Is Not Subject to Personal Jurisdiction As to Any Claims.

No General Jurisdiction. Encompass is not "at home" in Florida, either. As Plaintiffs admit, "Defendant Encompass, LLC [ ] is an Alaska limited liability company with its principal place of business in Anchorage, Alaska." FAC ¶ 114. Encompass's administrative offices, corporate records, executive officers, and financial, accounting, and operational decision-making are all in Alaska, too. Weber Decl. ¶ 2, Ex. C. And Encompass has never been incorporated, had a bank account, or owned real property in Florida. *Id*. ¶ 3. For their part, Plaintiffs make no allegations

175

connecting Encompass to Florida. Rather, they assert only that Encompass does business throughout the country and is contractually tied to Atlas, *id*. ¶¶ 132, 205, allegations which cannot support general jurisdiction over Encompass in Florida. *See Helicopteros*, 466 U.S. at 416–19.

No Specific Jurisdiction. Plaintiffs fail to disclose the state where the lone Encompass Plaintiff works—likely because he was not based in Florida. Weber Decl. ¶ 4. Nor does this Plaintiff allege a Florida residence, and Encompass understands that he does not live in Florida and has not throughout the time of his contract with Encompass. *Id*. Thus, all claims against Encompass should be dismissed for lack of personal jurisdiction.

**IV.     All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause.**

All six Plaintiffs asserting claims against FSI acknowledged receipt of FSI's Employee Handbook, via electronic signature, which includes an unambiguous mandatory arbitration clause. Therefore, these Plaintiffs were required to submit their claims against FSI to mandatory and binding arbitration. Specifically, each of these Plaintiffs acknowledged receipt of FSI's Employee Handbook and agreed to the following provision: [5]

> Further, I acknowledge and agree that (i) my employment with Company is an "at-will" relationship that has no specific duration and that is terminable by either me or FSI at any time, with or without advance notice, (ii) unless otherwise provided by law, all disputes, claims and controversies which I may have with FSI, whether individual, joint or as part of a class, shall be arbitrated in Harris County, Texas as administered by and pursuant to the rules of the American Arbitration Association (www.adr.org; 800.778.7879) and any decision or award shall be final, binding and enforceable in a court of law. The arbitration shall be governed by the laws of the State of Texas and the U.S. Arbitration Act, 9 USC Sections 1-16 to the exclusion of provisions of state law inconsistent with the Federal Act.

Accordingly, the Court should dismiss their claims—the only claims against FSI—with prejudice "for lack of subject matter jurisdiction." *Shea*, 2013 WL 869526, at *2 n.3 (motions to compel arbitration are treated as motions to dismiss under Rule 12(b)(1)).

---

[5] *See* Composite Ex. G; *and* Ex. H.

176

A.      **Texas Law Governs the Enforceability of FSI's Arbitration Clause.**

To address FSI's arbitration argument, this Court must first decide what law governs. Here, the arbitration clause provides that Texas law applies. A contractual choice-of-law provision is valid under Florida law: "An agreement between parties to be bound by the substantive laws of another jurisdiction is presumptively valid, and this Court will enforce a choice-of-law provision unless applying the chosen forum's law would contravene a strong public policy of this State." *Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*, 82 So. 3d 73, 80 (Fla. 2012); *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 873 (11th Cir. 2018). Applying Texas law does not contravene Florida public policy and it governs the enforceability of FSI's arbitration clause.

B.      **Under Texas Law, FSI's Arbitration Clause is Enforceable and Precludes the Six FSI Plaintiffs From Pursuing Claims Against FSI in This Forum.**

To determine whether the FSI Plaintiffs' claims are subject to arbitration, this Court must consider: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Washington v. Sears Logis. Servs., Inc.*, 2014 WL 2159253, at *3 (N.D. Tex. May 23, 2014). "When faced with such an agreement, courts have no discretion but to compel arbitration unless the [arbitration] clause's validity is challenged on legal or public policy grounds." *Parr v. Stevens Transp., Inc.*, 2020 WL 2200858, at *4 (N.D. Tex. May 5, 2020) (applying Texas law).

"[I]t is state law that controls the determination of whether parties have agreed to arbitrate." *Sanchez v. Marathon Oil Co.*, 2021 WL 1201677, at *4 (S.D. Tex. Jan. 21, 2021). To that end, this Court should "resolve all doubts concerning the arbitrability" of the six FSI Plaintiffs' claims "in favor of arbitration." *Gonzalez v. Brand Energy & Infra. Servs., Inc.*, 2013 WL 1188136, at *2 (S.D. Tex. Mar. 20, 2013). First, FSI has submitted signed arbitration agreements between FSI and each of the six FSI Plaintiffs. *See Miller v. SLT Dealer Grp. Ltd.*, 2008 WL 11389413, at *3 (S.D.

177

Tex. Aug. 8, 2008) ("It is a widely-accepted principle of contract that one who signs or accepts a written instrument will normally be bound in accordance with its written terms."); *Washington*, 2014 WL 2159253, at *4 ("Under Texas law, an employer may enforce an arbitration agreement . . . if the employee received notice of the employer's arbitration policy and accepted it."). These agreements provide that all disputes, claims and controversies which the FSI Plaintiffs may have with FSI shall be arbitrated in Harris County, Texas and shall be governed by the laws of Texas and the Federal Arbitration Act. *See Rodriguez v. John Eagle Sport City Motors, LLP*, 2014 WL 2587599, at *2 (N.D. Tex. June 10, 2014) (similar arbitration clause enforceable); *Parr*, 2020 WL 2200858, at *4 (signatures by plaintiffs "evidence of a valid and enforceable agreement").

Second, the claims in question all fall within the scope of the arbitration agreements. As a general principle, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Safer v. Nelson Fin. Grp., Inc.,* 422 F.3d 289, 294 (5th Cir. 2005). To that end, the agreements embracing "[a]ny dispute or difference between the parties" should be referred to arbitration. *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993); *see also Rodriguez*, 2014 WL 2587599, at *2 (enforcing arbitration agreement that contained "any dispute" language); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("In the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."). Here, the arbitration agreement that each of the six FSI Plaintiffs signed subjects "all disputes, claims and controversies" that they may have with FSI to arbitration. Thus, all six FSI Plaintiffs' claims fall within the scope of the arbitration agreement and, thus, must be dismissed. *Parr*, 2020 WL 2200858, at *1–4 (arbitration agreement stating "resolution of all claims or controversies [] between the parties" required claims be arbitrated).

178

**V.     The Scattershot FAC, with Claims on Behalf of Nearly 100 Individual Plaintiffs, Fails to State Any Claim Upon Which Relief Can Be Granted.**

**A.     Plaintiffs' Third Complaint Remains a "Shotgun" Pleading.**

Despite Plaintiffs now having filed three separate complaints in this litigation, the FAC remains an impermissible "shotgun" pleading. *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021). First, it commits the "mortal sin" of "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). Indeed, the FAC does so *13 times*—despite asserting a wide variety of claims, from contractual to constitutional, against 6 Defendants by nearly 100 Plaintiffs. *See generally* FAC ¶¶ 245-408; *Anderson v. United Airlines, Inc.*, 577 F. Supp. 3d 1324, 1329 (M.D. Fla. 2021) (COVID-19 complaint "an impermissible shotgun pleading [as] each count incorporate[d] each of the preceding counts"). This is especially egregious given that various counts in the FAC are entirely devoid of facts. *See, e.g.*, FAC ¶¶ 399–404 (Count XII); *id.* ¶¶ 405–408 (Count XIII). Second, the FAC has other features of a shotgun pleading. The FAC asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Weiland*, 792 F.3d at 1323. *See also Hencey v. United Airlines, Inc.*, 2021 WL 3634630, at *2 (S.D. Fla. Aug. 17, 2021) (filing "read[] like a shotgun pleading" that "reference[d] their rights under the Constitution and several federal statutes without explaining with any level of particularity their claims or how each Defendant ha[d] violated Plaintiffs' rights"). It is also "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322.

Plaintiffs amended their Complaint when this Court "afford[ed] [them] an opportunity to cure the purported pleading defects", ECF No. 33, including the shotgun pleading issue, raised in

179

Defendants' earlier motions to dismiss, ECF No. 31. Eleventh Circuit law is clear: the case now should be dismissed with prejudice. *See Halstead v. Espinoza*, 2023 WL 2399288, at *2 (11th Cir. 2023) (explaining that "[o]nce a district court gives a plaintiff fair notice of the specific defects in the complaint and a meaningful chance to fix them, dismissal with prejudice on shotgun pleading grounds is proper"); *Barmapov*, 986 F.3d at 1324–26 (same).

### B.   Count I: Plaintiffs Cannot State Any Invasion of Privacy Claim.

Plaintiffs claim Defendants invaded their privacy by "g[iving] publicity to Plaintiffs protected health information ("PHI") by publishing the PHI throughout the company and by forcing Plaintiffs to wear political symbols [*i.e.*, masks]; effectively amplifying and broadcasting their PHI to other employees and consumers." FAC ¶¶ 246, 337. Invasion of privacy by publication requires plausibly alleging: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." *Cape Publications, Inc. v. Hitchner*, 549 So.2d 1374, 1377 (Fla. 1989). The FAC fails the publication, offensiveness, and lack of public concern elements.

First, as to publication, Florida law requires that "the publicity given to private facts must be to the public at large or to so many people that the matter must be regarded as substantially certain to become public knowledge." *Williams v. City of Minneola*, 575 So.2d 683, 689 (Fla. Ct. App. 1991). To that end, the Eleventh Circuit has dismissed invasion of privacy claims where the plaintiff did not plausibly allege the information reached the public at large. *See, e.g.*, *Regions Bank v. Kaplan*, 2021 WL 4852268, at *13 (11th Cir. 2021) (affirming dismissal where information was disseminated in online database consisting of "banks, credit unions and law enforcement agencies" as too limited to be "a disclosure to the public at large"). Thus, Plaintiffs' allegation that their PHI was "broadcast[]" to fellow employees and consumers of their employers—a group far smaller than "the public at large"—does not plausibly allege that it was "substantially certain to become public knowledge." *Id*.

180

Second, Plaintiffs do not support their allegation that disclosure of their vaccination status would be "highly offensive to a reasonable person." *Cape Prods.*, 549 So.2d at 1377. Disclosure of even private medical records does not establish offensiveness. *See Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 610–13 (Fla. Ct. App. 2007) (publication of "medical records of [plaintiff] and his family" was not highly offensive). Nor does the disclosure of other sensitive personal information. *Kaplan*, 2021 WL 4852268, at *13 ("Although private, publication of a social security number is not offensive.").

Finally, as to the public concern element, Plaintiffs' conclusory assertion that their vaccination status "is of no legitimate public concern," FAC ¶ 247, is a legal conclusion that this Court need not accept. *See Iqbal*, 556 U.S. at 678. And, it is an incorrect legal conclusion. The Florida Supreme Court has observed that "the requirement of lack of public concern is a formidable obstacle." *Cape Publications*, 549 So.2d at 1378. "[T]he right of privacy does not forbid the publication of information that is of public benefit, and the right does not exist as to persons and events in which the public has a rightful interest." *Id*. An individual's vaccination status—and the accompanying risk of increased severity and spread of COVID-19—is a quintessential example of "information that is of public benefit." *Id*. Indeed, Florida courts have found far less socially valuable information to fall under the broad umbrella of public concern. *See, e.g., Doe v. Univision Television Grp., Inc.*, 717 So. 2d 63, 65 (Fla. Ct. App. 1998) ("We agree that the subject of the broadcast—problems which some local residents had experienced with foreign plastic surgery— is a topic of legitimate public concern."); *Parker v. Town of Palm Beach*, 2017 WL 11537901, at *6 (S.D. Fla. Aug. 16, 2017) (holding that photographs of the inside of the plaintiff's apartment showing unlawful renovations was a matter of public concern).

C.      **Count II: Plaintiffs Lack Any Actionable Negligence Claim.**

Plaintiffs assert a negligence claim alleging that Defendants' vaccine policies breached a duty of care by "publishing Plaintiffs PHI throughout the company" and "broadcasting their PHI to other employees and consumers." FAC ¶¶ 250–52. This claim should be dismissed. First, it improperly repackages Count I's intentional invasion of privacy claim into a negligence claim, by alleging the very same allegedly intentional conduct at issue in Count I. Florida courts prohibit this practice. *Hiers v. Bordt*, 2016 WL 9506039, at *1 (N.D. Fla. July 6, 2016) ("Such a theory of negligence—namely, that an intentional act may be actionable as negligence—has been rejected by Florida courts."). Second, even if Count II properly alleged negligent conduct, Florida does not recognize a negligent invasion of privacy cause of action. *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1225–26 (S.D. Fla. 2022) (explaining "courts routinely dismiss invasion-of-privacy claims" based on theories of negligence); *accord Burrows v. Purchasing Power, LLC*, 2012 WL 9391827, at *7 (S.D. Fla. Oct. 18, 2012); *see also Carlisi v. Sprintcom, Inc.*, 2006 WL 8432613, at *2 (S.D. Fla. 2006). Finally, even if Count II were otherwise cognizable, Plaintiffs still cannot plead the necessary publication, offensiveness, and public concern elements fatal to Count I. *Id.* at *3.

D.      **Count III: The Court Lacks Subject Matter Jurisdiction Over the Atlas Pilot Employees' Claims for Breach of Their Collective Bargaining Agreement.**

Count III alleges that Atlas "violated, and continue[s] to violate," various provisions of the Collective Bargaining Agreement ("CBA") between Atlas and the union that represents Atlas's pilots. FAC ¶¶ 255–68. Under governing law, such claims against airlines are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, and must be dismissed for lack of subject matter jurisdiction. "The RLA was designed to avoid interruptions to commerce or to the operation of the railway or airline industries caused by labor management disputes." *Stewart*, 503 F. App'x

at 817. As such, the RLA establishes a mandatory framework for disputes involving the interpretation or application of CBAs—referred to as "minor" disputes—which must be resolved through arbitration before the appropriate board of adjustment. *Haw. Airlines, Inc. v. Norris*, 512 U.S. 246, 252–53 (1994); *see also Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1354 (11th Cir. 2003); *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1050 (11th Cir. 1996). When a plaintiff's claim involves a minor dispute, the Court must dismiss it for lack of jurisdiction. *See Stewart*, 503 F. App'x at 819; *Caravello v. Am. Airlines, Inc.*, 315 F. Supp. 2d 1346, 1351 (S.D. Fla. 2004).

Because Count III alleges that Atlas violated the CBA in various ways (e.g., FAC ¶¶ 256–63), its resolution plainly requires interpretation of the CBA, rendering it a non-justiciable minor dispute. *See Pyles*, 79 F.3d at 1050 (holding that claim for violation of a letter of agreement that modified the CBA between the airline and its pilot union was "rooted in the CBA itself," and thus a minor dispute preempted by the RLA). *See also Pilkington v. United Airlines, Inc.*, 112 F.3d 1532, 1539–40 (11th Cir. 1997) (contract claims preempted because they required interpretation of CBA). Numerous courts have dismissed claims on this basis as well.[6] RLA preemption therefore deprives the Court of subject matter jurisdiction over the claims asserted in Count III.

### E.     Count IV: No Valid Florida Private Whistleblower Act Claim.

Plaintiffs assert claims against Atlas, FSI, and Encompass under the Florida Private Whistleblower Act, Fla. Stat. § 448.102. Under this Act, each Plaintiff must allege that "(1) she engaged in a statutorily protected activity; [and] (2) she suffered an adverse employment action." *Pierre v. AIDS Healthcare Found., Inc.*, 2020 WL 6381557, at *4 (S.D. Fla. Oct. 30, 2020).

---

[6] *See, e.g.*, *Jensen v. Delta Airlines, Inc.*, 2019 WL 922509, at *2 (6th Cir. Feb. 12, 2019); *Grimes v. CSX Transp., Inc.*, 338 F. App'x 522, 524 (7th Cir. 2009); *McCormack v. Aircraft Mechs. Frat. Ass'n*, 340 F.3d 642, 646 (8th Cir. 2003); *Ertle v. Cont'l Airlines, Inc.*, 136 F.3d 690, 694 (10th Cir. 1998).

First, regarding statutorily protected activity, Plaintiffs allege that that they "refused to participate in Defendants' [COVID-19 vaccine] mandate program that violates 14 C.F.R. § 61.53, *et seq.* and other Constitutional, statutory, and common law provisions." FAC ¶ 270. The Florida Whistleblower Act protect employees who "object[] to, or refus[e] to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). But this Court holds that a Florida Whistleblower Act plaintiff must plausibly allege an actual violation of the law to state a claim. *See, e.g.*, *Dos Santos v. AIDS Healthcare Found., Inc.*, 2021 WL 4972993, at *10 (S.D. Fla. Jan. 5, 2021) ("The FWA does not provide protection to employees for 'alleged' or 'suspected' violations of the law."); *Butterfield v. JetBlue Airways Corp.*, 2020 WL 5627389, at *2 (S.D. Fla. Aug. 17, 2020). Further, governing law is clear that the Court need not accept Plaintiffs' legal conclusion that Atlas, FSI, and Encompass's vaccine mandates were unlawful, even at the motion-to-dismiss stage. *Briggs v. QuantiTech Inc.*, 2022 WL 1308494, at *4 (11th Cir. 2022) (dismissing Whistleblower Act claim for failing to plead violation of law because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Butterfield*, 2020 WL 5627389, at *2.

Accordingly, Plaintiffs must establish the "protected activity" element of their whistleblower claim with factual allegations. They cannot. The only specific legal provision Plaintiffs cite is 14 C.F.R. § 61.53. FAC ¶ 270. That FAA regulation prohibits an individual from "acting as a pilot in command, or in any other capacity as a required pilot flight crewmember while that person" either (1) "knows or has reason to know of any medical condition" or (2) "[i]s taking medication or receiving other treatment for a medical condition," causing that individual to be "unable to meet the requirements for the medical certificate necessary for the pilot operation." 14 C.F.R. § 61.53. Plaintiffs cannot plausibly allege that they "knew or had reason to know" that

taking the vaccine would render them "unable to meet the requirements for the medical certificate" under 14 C.F.R. § 61.53.[7] Citing this regulation, Plaintiffs claim that, legally, the FAA was required to "revoke or deny issuance of the flight physical certificate until the FAA rule[d] on the safety of" the COVID-19 vaccines. FAC ¶ 158. Illustrating Plaintiff's erroneous legal conclusion about what Section 61.53 required, however, is that the FAA did "rule[] on the safety" of COVID-19 vaccinations several months before any of the conduct at issue in this case occurred. Indeed, in an announcement the Court can take judicial notice of, the FAA expressly authorized "holders of FAA-issued Airman Medical Certificates" to receive the Pfizer, Moderna, and Johnson & Johnson COVID-19 vaccinations in public press releases issued on December 12, 2020, December 19, 2020, and February 27, 2021, respectively.[8]

Second, as explained below, the whistleblower clams independently fail because Plaintiffs did not "suffer[] an adverse employment action" *Pierre*, 2020 WL 6381557, at *4. Part V.G.1.

F.      **Counts V, VI, VII, VIII, IX, and XI: Plaintiffs Do Not Allege They Exhausted Administrative Remedies.**

Under Title VII, GINA, the ADA, and the Rehabilitation Act, a plaintiff *must* exhaust administrative remedies *before* filing a lawsuit by (i) filing a charge of discrimination with the EEOC *and* (ii) receiving a right-to-sue notice from the EEOC. 42 U.S.C. § 2000e-5(b), (e)–(f) (Title VII); 42 U.S.C. § 2000ff-6(a)(1) (GINA); 42 U.S.C. § 12117(a) (ADA); 29 U.S.C. §

---

[7] As described below, Plaintiffs otherwise fail to show that Atlas, FSI, or Encompass's vaccine policies otherwise violated any rule, regulation, law, or constitutional provision.

[8] *See Novel Coronavirus (COVID-19) Update*: *Use of COVID-19 Vaccines by Pilots and Air Traffic Controllers*, Federal Aviation Administration, https://www.faa.gov/newsroom/novel-coronavirus-covid-19-update-0 (last visited March 15, 2023). *See Kaplan*, 2021 WL 4852268, at *13 n.4 (on 12(b)(6) motion "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

794a(a)(1) (Rehabilitation Act). A claim under any of these statutes must be dismissed when the plaintiff fails to exhaust. *Duberry v. Postmaster Gen.*, 652 F. App'x 770, 772 (11th Cir. 2016) (Title VII); *Johnson v. Golfcrest Healthcare Ctr.*, 2019 WL 1900968, at *4 (S.D. Fla. Apr. 29, 2019) (GINA); *Laura A. v. Limestone Cty Bd. of Educ.*, 610 F. App'x 835, 837 (11th Cir. 2015) (ADA and Rehabilitation Act). Despite having a third opportunity (and Defendants' prior motion to dismiss putting them on notice), Plaintiffs still fail to adequately plead exhaustion. Indeed, the FAC fails to specifically allege that ***any*** of the nearly 100 Plaintiffs has filed charges with the EEOC *and* received the required right-to-sue notice. And while the FAC baldly asserts that "[a]ll Plaintiffs have exhausted administrative remedies," FAC ¶ 240, in the general allegations section, it later contradicts this allegation. *See id.* ¶¶ 337, 349, 360 ("Filing . . . charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so."). The Court should not accept this contradictory general allegation. *Thompson v. Fla. Bar*, 526 F. Supp. 2d 1264, 1278 (S.D. Fla. 2007) ("[G]eneral allegations . . . need not be accepted as true [when] they are contradicted by more specific allegations in the complaint.").

Further, even if it not contradictory, the FAC's single sentence assertion that all Plaintiffs have exhausted administrative remedies is insufficient to plead exhaustion. *Cousins v. United Healthcare, Inc.*, 2020 WL 1666628, at *3 (S.D. Fla. Apr. 3, 2020) ("In order to satisfy applicable pleading requirements, Plaintiff must set forth the claims for which he has exhausted his administrative remedies, *and how he has done so*." (emphasis added)). Indeed, this Court has recognized that detail is necessary in a case involving multiple causes of action against multiple defendants. *Response Oncology, Inc. v. MetraHealth Ins. Co.*, 978 F. Supp. 1052, 1064 (S.D. Fla. 1997) ("In light of the fact that Plaintiff brings this suit as an assignee of 67 patients, under 46 plans, Plaintiff's allegation fails to meet even the admittedly low requirements of notice pleading.

186

It is unclear to the Court which plans, if any, the Plaintiff has attempted to exhaust its administrative remedies."). The Court should dismiss the individual Title VII, GINA, ADA, and Rehabilitation Act claims of each Plaintiff on this basis alone. As described below, this is not an academic issue: Defendants are prejudiced by Plaintiffs' obfuscation because it conceals potential time-bars or bars based on the scope of their EEOC charges, which is especially concerning given this case involves nearly 100 Plaintiffs asserting up to 4 federal employment claims each.

Plaintiffs' failure to specifically plead exhaustion of administrative remedies appears deliberate. Plaintiffs allege that "[w]aiting 180 days for the EEOC process to complete or to receive a right to sue letter is not a viable option" because of "imminent harm" and because "the EEOC lacks the institutional capacity" to process their charges. FAC ¶¶ 243–44. Just as with Plaintiffs' previous Complaint, these grievances with the administrative process set by Congress do not justify their failure to exhaust. *See Anderson*, 577 F. Supp. 3d at 1332 ("Presumption of failure does not excuse any attempt to exhaust required administrative remedies when required by law."); *Ross v. Blake*, 578 U.S. 632, 633 (2016) (a federal statute's "mandatory language means a court may not excuse a failure to exhaust, even to take special circumstances into account").

Further, even for Plaintiffs who may have obtained right-to-sue notices, Plaintiffs' failure to allege facts regarding exhaustion unfairly prevents Defendants raising applicable legal defenses. For example, one Plaintiff who did file a charge of discrimination with the EEOC is Joshua Roberts. In his November 2, 2022 charge, Roberts (a) admits he did not seek an accommodation from Defendants' COVID-19 policy, (b) admits he received a COVID-19 vaccination, (c) alleges no acts of discrimination or harassment that occurred after October 29, 2021, and (d) pursues claims only under the ADA. Ex. D, J. Roberts Charge of Discrimination. On January 3, 2023, the EEOC dismissed Roberts's charge "because [it] was not filed within the time limits under the law."

187

Ex. E, J. Roberts Dismissal and Notice of Rights.

Roberts's charge of discrimination provides the corporate Defendants (*i.e.*, Atlas, FSI, and Encompass) with multiple defenses to claims in the FAC that are purportedly brought by Roberts. First, Roberts's claims under Title VII (Counts V, VI, and VII) and GINA (Count VIII and Count IX) must be dismissed because they are beyond the scope of Roberts's EEOC charge, which only alleged an ADA claim—a cause of action, remarkably, that Roberts does not even pursue in this lawsuit. FAC p. 78, Count XI. *See Price v. M & H Valve Co.*, 177 F. App'x 1, 14 (11th Cir. 2006). Second, those same claims also must be dismissed because the statute of limitations has run.[9] *See Arnold v. United Parcel Serv., Inc.*, 2012 WL 1035441, at *2 (M.D. Ga. Mar. 27, 2012) (granting motion to dismiss Title VII claims for untimely charge). There is no reason to believe other Plaintiffs' claims are not similarly barred, which properly pleaded facts would reveal. Thus, the Court can dismiss all such claims (Counts V, VI, VII, VIII, IX, and XI) on exhaustion grounds.

### G.  Plaintiffs Fail to State Title VII, GINA, ADA or Rehabilitation Act Claims.

#### 1.  Counts V and VI: No Plausible Religious Accommodations or Disparate Treatment Claim.

Like the previous Complaint, Counts V and VI of the FAC assert nearly 100 Title VII religious discrimination claims—with the FAC now asserting a disparate treatment cause of action in addition to failure to accommodate. *See* FAC ¶¶ 274–311. Yet, the end result is no different: The FAC's threadbare allegations are inadequate to plausibly plead a Title VII failure-to-accommodate or disparate-treatment claim for any Plaintiff. *See, e.g., Urdaneta v. J.P. Morgan*

---

[9] An EEOC charge must be filed within 300 days if the discriminatory act occurred in a "deferral state." 29 U.S.C. § 626(d)(1)(A)–(B). Roberts filed his EEOC charge on November 2, 2022, complaining of supposedly discriminatory conduct that occurred before October 29, 2021, which is 369 days before he filed his charge.

188

*Chase Bank, N.A.*, 2010 WL 11504729, at \*1 (S.D. Fla. Jan. 22, 2010) (plausibility requires "a plaintiff [to] plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

For Count V's failure-to-accommodate claim, each Plaintiff must plausibly allege that "(1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007). Similarly, Count VI's disparate treatment claim requires each Plaintiff plausibly to allege (1) he is a member of a protected class; (2) he was subjected to adverse employment action; and (3) that his employer treated similarly situated employees outside his protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

The FAC fails to plead either claim for *any* Plaintiff. First, Plaintiffs provide no factual allegations supporting any of their nearly 100 individual experiences with the corporate Defendants' vaccine policies. Indeed, essential facts are missing from the FAC, including which of the nearly 100 Plaintiffs requested accommodations (on what grounds), how each Plaintiff's respective religious beliefs conflict with their respective employer's COVID-19 vaccine policy, or even an allegation that any accommodation request was denied. *See Habitat for Human. Int'l v. Morris*, 2020 WL 1677304, at \*2 (M.D. Fla. Apr. 6, 2020) (dismissing discrimination claim as "conclusory and insufficient" where complaint "fail[ed] to cite specific dates or circumstances in which the allegedly discriminatory acts occurred"); *Phillips v. Harbor Venice Mgmt., LLC*, 2020 WL 495224, at \*5 (M.D. Fla. Jan. 30, 2020) (dismissing failure-to-accommodate claim where plaintiff failed to "articulate when, where, or to whom [she] requested reasonable accommodations or what reasonable accommodations she requested").

189

Pleading in sufficient detail to state a plausible claim is crucial to survive dismissal in any case, but even more so here, where Plaintiffs' conclusory allegations show they are not all similarly situated. For instance, the FAC alleges that "[m]ost Plaintiffs applied for medical and/or religious accommodation from the vaccine mandate," FAC ¶ 174, some of which the FAC acknowledges were granted. *See id.* ¶ 187. Other unidentified Plaintiffs "took the [vaccine]" (*id.* ¶ 203), and presumably needed no accommodation. Without factual allegations regarding each individual, the Court cannot determine if any (and if so which) of the nearly 100 Plaintiffs have a plausible Title VII claim. *Morrissette-Brown*, 506 F.3d at 1321.

Second, Plaintiffs lack any plausible legal theory of a failure-to-accommodate or disparate-treatment claim under Title VII for any of the "categories" of Plaintiffs they vaguely sketch. The FAC does not explain how Plaintiffs who, admittedly, received an accommodation exempting them from vaccination without consequence to their employment, or who never applied for an accommodation, or who "took the [vaccine]" could possibly have a claim. *See Ananias v. St. Vincent Med. Grp., Inc.*, 2022 WL 17752208, at *5 (S.D. Ind. Dec. 19, 2022) (dismissing for lack of Article III standing Plaintiffs who could not demonstrate their employer's COVID-19 vaccine mandate caused a redressable Title VII injury). Moreover, Plaintiffs admit to harboring objections to COVID-19 vaccination that clearly are not protected by Title VII, such as those Plaintiffs who have "medical objections." *See, e.g.*, FAC ¶¶ 208, 267.

Third, the Court should dismiss Plaintiffs' Title VII claims because they fail plausibly to allege actionable adverse actions taken against any Plaintiff by Defendants Atlas, FSI, or Encompass. *Vandesande v. Miami-Dade Cnty.*, 431 F. Supp. 2d 1245, 1253 (S.D. Fla. 2006) (adverse employment action concerns "ultimate employment decisions" and other "serious and material change[s] in the terms, conditions or privileges of employment"). Indeed, for all but two

190

of the nearly 100 Plaintiffs—each of whom presses an individual claim in this non-class action—the FAC never identifies any employment actions taken by Defendants. Instead, those Title VII claims rest solely on supposed *threats* of future consequences for unvaccinated employees they admit never materialized. FAC ¶¶ 173–74. *Staple v. Sch. Bd. of Broward Cnty.*, 2021 WL 2000373, at *4 (S.D. Fla. Apr. 30, 2021) ("[T]he Eleventh Circuit has made clear the third element of [the] prima facie case for failure to accommodate [requires] discharge or discipline").

While the FAC claims that certain Atlas Executive Defendants threatened that "'unvaccinated' crews would be placed on unpaid leave or terminated," FAC ¶ 194, no Plaintiffs allege they actually suffered those consequences. To the contrary, the FAC acknowledges that, on March 25, 2022, Atlas informed employees that "those who previously obtained a religious or medical exemption" would "be allowed to return to their regular work duties after the May 1, 2022 company vaccine mandate deadline so long as they undergo requisite COVID testing." *Id.* ¶ 197. And while the FAC also claims Plaintiffs were "constructively discharged," this legal conclusion is not supported by *any* necessary facts. *Hepburn-Belizaire v. Iowa College Acquisition Corp.*, 2009 WL 10699576, at *2 (S.D. Fla. Nov. 9, 2009) (dismissing Title VII claim "alleg[ing] only a legal conclusion—that [Defendant] constructively discharged or terminated her").

Again, despite Defendants' spotlighting this issue in their prior motions to dismiss, the only Plaintiffs whom the FAC discusses at all are Richard Bullock and Jimmy Villella. FAC ¶¶ 185–86. It alleges that Bullock "found himself subjected to retaliatory discipline after he became known throughout the company for having religious beliefs that barred him from taking" the COVID-19 vaccine. *Id.* ¶ 185. But no detail as to what this "retaliatory discipline" might have been is offered, and such conclusory pleading cannot satisfy an adverse action. *Hepburn-Belizaire*, 2009 WL 10699576, at *2. Moreover, Plaintiffs assert no retaliation claim, as that is one of the counts they

dropped. *Compare* ECF No. 1 ¶¶ 290–299, *with* ECF No. 39. As for Villella, he says he "was subjected to an 'Article 19' disciplinary hearing in a blatant act of retaliation, harassment and discrimination" *Id.* ¶ 186. But Atlas's compliance with a hearing requirement of the collective bargaining agreement applicable to Villella is not an adverse employment action. He also concedes that as "the only Atlas employee that notified Atlas that his religious beliefs prevented him from [being] tested for COVID-19," Atlas provided him an "accommodated non-flying position" exempting him from both vaccination and testing. *Id.* n.35. This resolution apparently dissatisfied him but "[n]ot everything that makes an employee unhappy is an actionable adverse employment action under Title VII." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Similarly, the FAC fails to allege any facts showing that Defendants took any employment action "because of [any] individual's . . . religion." 42 U.S.C. § 2000e-2. Rather, the FAC demonstrates that employees were treated differently *based on vaccination status*. Plaintiffs allege that they received "disparaging and unfavorable treatment . . . as compared to similarly situated employees who received [a COVID-19 vaccine]"; that they were subjected to "harassing statements, threats, humiliation, and constructive[] stripping" of "their important responsibilities . . . as compared to similarly situated employees who received [a COVID-19 vaccine]"; that they "were arbitrarily forced to wear political symbols, differentiating them from other employees who received [a COVID-19 vaccine]"; and that they were "constructively discharged for not receiving [a COVID-19 vaccine]. FAC ¶ 285; *see also id.* ¶ 302 (offering identical allegations in support of Plaintiffs' disparate treatment claim). Each of these facts fail to allege action "because of [any] individual's . . . religion," 42 U.S.C. § 2000e-2, and thus fail to state a Title VII claim. *See Wagner v. Demo Sales, Inc.*, 2020 WL 2527230, at *3 (M.D. Fla. Apr. 28, 2020) (claimant must allege plausible facts showing that his membership of a protected class was a "determinative factor" in

192

the adverse employment action); *D'Cunha v. Northwell Health Sys.*, 2023 WL 2266520, at *2 (S.D.N.Y. Feb. 28, 2023) (dismissing Title VII disparate treatment claim in part because plaintiff does not allege "more favorable treatment of employees not in [her] protected group"); *Leake v. Raytheon Tech. Corp.*, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (dismissing Title VII disparate treatment claim; plaintiffs were not "treated any differently from other vaccination-exempt employees.").

### 2.      Count VII: No Plausible Hostile Work Environment Claim.

A hostile-work-environment claim requires that the plaintiff show (1) they belonged to a protected group; (2) they suffered unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) that a basis exists for holding the employer liable. *Dixon v. DTA Sec. Servs.*, 2021 WL 5320987, at *4 (11th Cir. 2021). Two defects are most apparent. First, "the FAC fails to allege facts that suggest [any] Plaintiff was subjected to severe or pervasive harassment by the Defendant[s]." *Carter v. Cellco P'ship*, 2016 WL 8981056, at *5 (M.D. Fla. Mar. 23, 2016). These nearly 100 Plaintiffs cannot plead their claims as if this were a class action: each needs—but lacks—"well-pled factual allegations of severe or pervasive harassment" to survive a 12(6)(6) motion. *Id. See also Leake*, 2023 WL 2242857, at *5 (dismissing Title VII hostile work environment claim).

Second, even the impermissible group pleading fails to allege any "harassment was based on a protected characteristic" and that it was "sufficient severe or pervasive to alter the terms and conditions of [their] employment." *Dixon*, 2021 WL 5320987, at *4. Instead, like their other claims, Plaintiffs' allegations either relate to "vaccine status" (not to religion or any other Title VII protected ground) or conclusorily parrot the "severe or pervasive" element without facts. FAC ¶ 322(iv). Courts routinely grant motions to dismiss harassment claims of this sort. *See Loza v.*

*Kimpton Hotel & Rest. Grp., LLC*, 2020 WL 13389302, at *6 (S.D. Fla. June 17, 2020) ("Plaintiffs' Complaint includes no additional factual allegations to establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment."); *Shah v. Orange Park Med. Ctr., Inc.*, 2016 WL 4943925, at *8 (M.D. Fla. Sept. 16, 2016) ("[A]bsent any non-conclusory facts to support Shah's belief that he was treated unequally due to his race, the Court finds that these allegations are insufficient to state a claim for relief.").

### 3.    Count VIII and IX: No Valid GINA Claims.

Count VIII, as newly fashioned in the FAC, alleges that Defendants "violate GINA by discriminating against Plaintiffs . . . based on whether they have taken a" COVID-19 vaccine. FAC. ¶ 343. Plaintiffs claim the vaccines "inject[] genetic information into a person to change or manipulate the person's genetic information," meaning that "those who have been injected with a COVID-19 [vaccine] necessarily possess different genetic material or genetic information from those who were not injected." *Id.* ¶¶ 150, 156. Even accepting these allegations as true (they are not), the FAC comes no closer to implicating GINA's definition of "genetic information" than the previous Complaint. GINA expressly defines "genetic information" to "mean[], with respect to any individual, information about" (i) "such individual's genetic tests," (ii) "the genetic tests of family members," and (iii) "the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4)(A). "Genetic test," in turn, means "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." 42 U.S.C. § 2000ff(7)(A). Consistent with GINA's definition, the EEOC determined that administering a COVID-19 vaccine does not involve the use of the employee's genetic information to make employment decisions or the acquisition or disclosure of genetic information

194

and, therefore, does not implicate Title II of GINA.[10] Thus, Count IV fails because the COVID-19 vaccine does not involve "genetic information" under GINA.

Similarly, Count IX re-asserts the same fatally flawed GINA claim from Plaintiffs' previous Complaint that testing for COVID-19 and requests for vaccination status of employees constitutes "genetic" testing. *See* FAC ¶ 354. But, as the GINA regulations reflect, "[a] medical examination that tests for the presence of a virus that is not composed of human DNA, RNA, chromosomes, proteins, or metabolites" is "not [a] genetic test." 29 C.F.R. § 1635.3(f)(3)(ii). Just as with their previous Complaint, Plaintiffs do not (and cannot) allege that SARS-CoV-2 is composed of human DNA or RNA, and, thus, testing for that virus is not "genetic testing." *See Gross v. N.D. Univ. Sys.*, 2022 WL 2612121, at *3 (D.N.D. Jan. 10, 2022) (dismissing GINA claim based, in part, on the principle that "detection . . . of the COVID-19 virus would [not] constitute genetic information for purposes of GINA"). As for Plaintiffs' allegation that Defendants violate GINA when they request their employees' vaccination status, FAC ¶ 355, this fails to state a claim because GINA only bars adverse actions "*because of genetic information* with respect to the employee," 42 U.S.C. § 2000ff-1(a)(1), (2) (emphasis added). Plaintiffs admit that the actions they complain of were based on COVID-19 *vaccination status, e.g.*, FAC ¶¶ 344, 355, rather than "genetic information" as defined by GINA. Plaintiffs also fail to allege an adverse action.

### 4.      Count XI: No Valid ADA or Rehabilitation Act Claims.

Eight of the Plaintiffs press violations of the ADA and Rehabilitation Act, "based on their [supposed] medical conditions." FAC ¶ 385. "Discrimination claims under the Rehabilitation Act

---

[10] *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, E.E.O.C., § K.14 , https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (updated July 12, 2022).

195

are governed by the same standards used in ADA cases." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). The ADA's protections extend to individuals who have a "disability." 42 U.S.C. § 12112. Thus, "a plaintiff must allege sufficient facts to plausibly suggest . . . that he suffers from a disability." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). And the ADA defines a disability as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A); *id.* § 12102(4)(A) ("major life activity" refers to activities such as "seeing, hearing, eating, sleeping, [or] walking").

None of the Plaintiffs comes close to this showing, and their claims must be dismissed for this fundamental reason.[11] Plaintiffs fail to even identify what, if any, "physical or mental impairment" each (or any) of them assert. Instead, in a conclusory fashion, Plaintiffs seek to sue "based on their [unspecified] medical conditions." FAC ¶¶ 385, 387, 390–94. But, even if they specified any purported medical conditions, "[u]nder the ADA, even a serious illness" or medical condition "does not equate with a disability." *Hale v. King*, 642 F.3d 492, 501 n.30 (5th Cir. 2011). Rather, to fall within the ADA's definition of a disability, the "complaint must allege factual matter explaining how the alleged ailment substantially limits a major life activity." *Garcia v. Goodwill Indus. of S. Fla., Inc.*, 2019 WL 6052814, at *2 (S.D. Fla. Nov. 15, 2019); *Townsend v. Staples, Inc.*, 2016 WL 3344579, at *6 (N.D. Ga. June 15, 2016) (ADA claim failed because Plaintiff failed to allege a "specific disability, defined by the ADA"); *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (a substantial limit on major life activity required for ADA-disability).

---

[11] The FAC cites Section 504 of the Rehabilitation Act, which prohibits discrimination against individuals with disabilities "under any program or activity receiving Federal financial assistance". 29 U.S.C. § 794. Plaintiffs have not alleged that Defendants received "'federal financial assistance' [that] [would] subject[] the [Defendants] to the Rehabilitation Act". *See Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1336 (11th Cir. 2005) ("Congress clearly did not intend for the Rehabilitation Act to apply to airline carriers.").

Even if they had pled (or could plead) a disability, Plaintiffs' ADA claims would fail because they cannot allege facts showing that they were discriminated against "on account of [their] disability." *Surtain*, 789 F.3d at 1246. As with their Title VII and GINA claims, Plaintiffs' non-conclusory factual allegations describes disparate treatment "compared to similarly situated employees who received [COVID-19 vaccines]." FAC ¶ 393(i), (ii), (v), (vi). In other words, they contend vaccination status (not "disability") was the "determinative factor." *Wagner*, 2020 WL 2527230, at *3 (no ADA claim where plaintiff failed to allege "plausible facts showing how her alleged disabilities were a 'determinative factor'" in the complained-of employer conduct.) And, again, Plaintiffs have not alleged adverse employment actions that would support these claims.

### H.      Count X: Plaintiffs' Constitutional Claims Fail.

Plaintiffs bring assorted claims against Atlas, FSI and Encompass under 42 U.S.C. § 1983, claiming that these private businesses violated Plaintiffs' rights to due process, privacy, and equal protection under the U.S. Constitution. FAC ¶¶ 361–82. To survive dismissal, Plaintiffs must plausibly (i) state their constitutional claims, *and* (ii) allege Defendants are state actors subject to the Constitution. *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). The FAC does neither and, thus, the Court can dismiss these claims on either basis.

#### 1.      Plaintiffs' Claims Do Not State Any Constitutional Violations.

Plaintiffs cannot state constitutional claims. First, the Supreme Court has rejected arguments that vaccination violates the Constitution. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). As Judge Easterbrook explained, "[g]iven [*Jacobson*], which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2." *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021); *accord Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021).

Second, even without *Jacobson*, Plaintiffs' claims fail. Plaintiffs allege that they have a

197

*fundamental* right to privacy that includes a right to avoid the COVID-19 vaccine "as a condition of employment" and "the right to control the extent to which their medical information is shared and released." FAC ¶¶ 367–68. There are no such fundamental constitutional rights. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021); *Klaassen*, 7 F.4th at 593. Because of this, these claims are judged under rational basis review,[12] which the COVID-19 vaccination policy at issue here clearly satisfies. *See Henry v. DeSantis*, 461 F. Supp. 3d 1244, 1255 (S.D. Fla. 2020) (government's interest in "public health and slowing the spread of COVID-19" upheld under rational basis test) *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1183 (S.D. Fla. 2021) (Moore, J.) ("[T]here is no dispute that Defendants have a legitimate interest in combatting the spread of COVID-19."). Likewise, here, this Court "cannot find that Defendants are irrational for following the recommendations of the CDC." *Id.* at 1185.

This reasoning controls and defeats Plaintiffs' equal protection, privacy and substantive due process claims under the Fourteenth Amendment. *See Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) (courts review laws not infringing on fundamental rights for a rational basis); *Lloyd*, 2021 WL 5353879, at *11. Freedom from COVID-19 vaccines, testing, or masking, FAC ¶ 367, 371, 376, is not "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected" by substantive due process. *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997); *accord Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246–2248 (2022) (applying *Glucksberg*).

---

[12] Rational basis review requires courts to uphold an action as constitutional "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011).

**2.        Defendants Are Not State Actors That Could Violate the Constitution.**

Plaintiffs' Section 1983 constitutional claims fail for the independent reason that Plaintiffs cannot plausibly allege that Defendants are state actors. *See Gustino v. Stoneybrook W. Master Assoc., Inc.*, 842 F. App'x 323, 329 (11th Cir. 2021). Courts use three tests to determine whether a private entity has been plausibly alleged to be a state actor: (1) public function, (2) state compulsion, and (3) the nexus/joint action. *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). *Every* court to consider the question has held that private businesses are not transformed into state actors by implementing COVID-19 workplace safety measures.[13] Indeed, the Sixth Circuit recently affirmed the dismissal of a similar constitutional claims against the J.M. Smucker Company, a private employer and federal contractor under President Biden's Federal Contractor Executive Order ("Contractor E.O."). *See Ciraci v. J.M. Smucker Co.*, -- F. 4th --, 2023 WL 2486075, at *1–2 (6th Cir. Mar. 14, 2023) (Sutton, C.J.) (published) (holding that this private company did not become a state-actor liable for constitutional claims "when it imposed [a] vaccine mandate because the federal government required it to do so as a federal contractor").

This Court should reach the same conclusion as these many courts across the county.

Public Function Test. Plaintiffs cannot plausibly allege that imposing an employee vaccination policy is a power *exclusively* reserved to the State. *Ciraci*, 2023 WL 2486075, at *2 ("A vaccine mandate does not count as a public function traditionally handled just by the State."); *accord Johnson v. Tyson Foods, Inc.*, 2022 WL 2161520, at *4 (W.D. Tenn. June 15, 2022).

---

[13] *See Anderson*, 577 F. Supp. 3d at 1330; *Ciraci v. J. M. Smucker Co.*, 2021 WL 6064748, at *2 (N.D. Ohio Dec. 22, 2021); *Lane v. Piedmont Healthcare*, 2021 WL 5074494, at *3 (N.D. Ga. Oct. 13, 2021); *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 639–40 (E.D. Ky. 2021); *Khanthapixay v. Loyola Marymount Univ.*, 2021 WL 4025796, at *3 (C.D. Cal. Aug. 9, 2021); *Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 928-32 (N.D. Cal. 2021).

Indeed, "[f]ew activities are 'exclusively reserved to the states.'" *Harvey*, 949 F.2d at 1131.

    *State Compulsion Test*. Plaintiffs attempt to satisfy this test by relying on the Contractor E.O. and the OSHA COVID-19 Vaccine and Testing Emergency Temporary Standard ("OSHA ETS") concerning COVID-19 vaccines. FAC ¶¶ 129, 175–178. But, as the Sixth Circuit held, "[w]hen a private company complies with federal law, that does not by itself make the company a government actor. Else, every regulated company would be a public entity." *Ciraci*, 2023 WL 2486075, at *5. Plaintiffs' contrary argument "would alter heaps of foundational precedents going back to the founding," as "a large swath of private entities in America would suddenly be turned into state actors." *Id.* Indeed, "one-fifth of all employees in the United States" were impacted by the Contractor E.O. *Louisiana v. Biden*, 55 F. 4th 1017, 1019 (5th Cir. 2022); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (rejecting, as unquestionably "not the law," argument that would make "a large swath of private entities in America . . . state actors"). Moreover, the FAC alleges Defendants *continued* to require vaccines after courts invalidated the Contractor E.O and OSHA ETS. *See, e.g.*, FAC ¶¶ 197, 206. Indeed, it states, "*after the Biden Administration's mandate was enjoined* by various federal courts around the country, Atlas immediately *reverted to a company-directed mandate*." *Id.* ¶ 161 n.33 (emphasis added). A "company-directed mandate" is not "state action."[14]

    *Nexus/Joint Action Test*. Plaintiffs primarily rely on three allegations: (1) Defendants and the government had similar goals regarding vaccination, FAC ¶¶ 233, 235, 238-39, 308; (2) some Defendant-executives met the Administration to discuss COVID-19, *id.* ¶¶ 231, 364; and (3)

---

    [14] Relatedly, because Plaintiffs challenge a May 1, 2022 COVID-19 policy (FAC ¶ 206) implemented after the OSHA ETS and Contractor E.O. were invalidated and enjoined—and which differs from the contours of those federal policies—Plaintiffs cannot establish state action under the compulsion test. *E.g.*, *Ciraci*, 2023 WL 2486075, at *5; *and Ciraci*, 2021 WL 6064748, at *2.

Atlas received relief funding, *id.* ¶¶ 223, 234. But "mere approval of or acquiescence" by the government in a private actor's decision "is insufficient to constitute state action." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1028 (11th Cir. 1988). Nor does accepting funding suffice. *See Halleck*, 139 S. Ct. at 1932; *Ciraci*, 2023 WL 2486075, at \*4 ("federal contracts by themselves do not create the requisite entwinement" for the nexus test). In sum, even if Plaintiffs had viable constitutional claims, they would fail against these private enterprises.

## I.   Count XII: No Valid Intentional Infliction of Emotional Distress ("IIED") Claim.

Count XII contains only four sentences. *See* FAC ¶¶ 400–03. It is thus a prime example of a "threadbare recital[] of the elements of a cause of action" deserving of dismissal under *Iqbal*, 556 U.S. at 678. Indeed, these four sentences merely recite the elements of an IIED claim. *See Garcia v. Carnival Corp.*, 838 F. Supp. 2d 1334, 1339 (S.D. Fla. 2012) (IIED claim requires that: (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous; that is, as to go beyond all bounds of decency, (3) the conduct caused emotional distress, and (4) the emotional distress was severe). Even sifting through the FAC for potential facts reveals that these claims must be dismissed, just as similar IIED claims have been. *See Cala v. Moorings Park Cmty. Health, Inc.*, 2022 WL 17405581, at \*4–5 (M.D. Fla. Dec. 2, 2022); *Finkbeiner v. Geisinger Clinic*, 2022 WL 3702004, at \*7 (M.D. Penn. Aug. 26, 2022).

### 1.   Defendants' Actions Were Not Outrageous as a Matter of Law.

To sustain an IIED claim, the tortfeasor's conduct must be "*so outrageous* in character, and *so extreme* in degree, as to *go beyond all possible bounds of decency*, and to be regarded as *atrocious*, and *utterly intolerable* in *a civilized community*." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015) (emphasis added). Thus, "[a] plaintiff alleging IIED faces an extremely high burden." *Brown v. Royal Carib. Cruises, Ltd.*, 2017 WL 3773709, at \*3 (S.D. Fla. Mar. 17, 2017).

Outrageousness is a question of law, not fact. *Garcia*, 838 F. Supp. 2d at 1339. "Conduct such as mere insults, indignities, threats, or false accusations will not result in liability." *Martz v. Munroe Reg'l Med. Ctr., Inc.*, 2007 WL 2044247, at *3 (M.D. Fla. July 10, 2007). Even if the Court looks past Plaintiffs' shotgun-approach, Part V.A, the FAC does not come close to alleging the outrageousness required for an IIED claim. Plaintiffs assert that Defendants:

- Sought to comply with federal requirements and CDC advice, FAC ¶¶ 128–130, 160–61;

- Revised vaccine policies in light of dynamic regulatory landscapes, *id.* ¶¶ 176–179;

- Modified vaccine policy deadlines for employees, *id.* ¶¶ 166–171, 178;

- Permitted (and granted) vaccine exemptions, *id.* ¶¶ 165, 166, 181, 186, 187; and

- Required COVID-19 testing or masking, *id.* ¶¶ 197, 202, 237.

In sum, the supposedly "*outrageous*" conduct consists of employers complying with health and safety laws and guidance, and implementing workplace precautions against COVID-19, including following the CDC's recommendations, which *is objectively reasonable*. *See Lloyd*, 570 F. Supp. 3d at 1183–84 (noting the legitimacy of following CDC guidance).

Further, Plaintiffs' alleged "derogatory jokes," "pressure to take" the vaccine, "memoranda threatening to terminate Plaintiffs" and similar, FAC ¶ 322, are not outrageous. Indeed, abuse, yelling, harassment, and even threats to feel "pain" are *insufficient* for an IIED claim. *Santasiero v. Martin*, 2021 WL 2856622, at *6 (M.D. Fla. July 8, 2021); *Cala*, 2022 WL 17405581 at *5.

### 2. The FAC Does Not Plausibly Allege Intent or Severe Suffering.

To establish intent, Plaintiffs must plausibly allege that Defendants enforced vaccine policies knowing "that severe distress [was] certain, or substantially certain to result." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990). Plaintiffs, however, fail to plausibly allege that Defendants had reason to doubt the safety of COVID-19 vaccines, which the FAC

acknowledges (i) were approved by the FDA, FAC ¶ 159, (ii) mandated in various settings by the federal government, *id.* ¶ 213, and (iii) recommended by the CDC, *id.* ¶ 241. As such, Plaintiffs do not (and cannot) allege that Defendants adopted their vaccination policies knowing that "severe distress [was] certain or substantially certain to result." *Knezevich v. United States*, 2019 WL 1093449, at *5 (M.D. Fla. Jan. 15, 2019). Plaintiffs similarly fail to plausibly allege severe suffering, mentioning only worry, workplace bullying, threats of job loss, and invasions of privacy. FAC ¶¶ 3, 221, 313, 386–87. *See Negron v. CitiMortg. Inc.*, 2016 WL 10953267, at *12 (S.D. Fla. Oct. 19, 2016) (no severe suffering due to sleeplessness, anxiety, and fear of home loss).

### J.       Count XIII: Plaintiffs' Allegations Are Not Cognizable As a Florida Negligent Infliction of Emotional Distress ("NIED") Claim.

Plaintiffs fail to state a cognizable NIED claim under Florida law. In Florida, there are two potential avenues for a Plaintiffs to state an NIED claim: (1) one where the Plaintiff himself suffers a physical impact from the Defendant's negligent act and (2) one where the Plaintiff witnesses severe injury or death to a relative from the Defendants' negligent act. *See Willis v. Gami Golden Glades, LLC*, 967 So.2d 846, 850 (Fla. 2007). Here, Plaintiffs do not allege that they suffered any physical impact—*i.e.*, literal contact with their person—from Defendants, foreclosing relief for personal injuries. *Pipino v. Delta Air Lines, Inc.*, 196 F. Supp. 3d 1306, 1315–16 (S.D. Fla. 2016) (dismissing an NIED claim where plaintiff failed to show that "[Defendants] touched her"). That leaves only the second avenue, which involves a claim brought "when a family member suffers psychic trauma after witnessing at close range the death or serious injury of a relative." *Thompson v. Spears*, 336 F. Supp. 2d 1224, 1237 (S.D. Fla. 2004). This theory plainly does not apply here.

### CONCLUSION

The Court should dismiss the FAC with prejudice. Plaintiffs should not be afforded the opportunity to replead, having done so twice, most recently after Defendants moved to dismiss.

Dated: March 15, 2023

/s/ Michelle Hogan
Eliot Pedrosa
Florida Bar No. 182443
epedrosa@jonesday.com
Michelle Hogan
Florida Bar No. 1010992
mhogan@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700
Facsimile:  (305) 714-9799

Jonathan M. Linas (*pro hac vice*)
jlinas@jonesday.com
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Alexander V. Maugeri (*pro hac vice*)
amaugeri@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**Attorneys for Atlas Defendants**

Respectfully submitted,

/s/ Michael A. Grisham
Michael A. Grisham (*pro hac vice forthcoming*)
grisham.michael@dorsey.com
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, Alaska 99501
Telephone:  (907) 257-7829
Facsimile:  (907) 276-4152

**Attorney for EncompassAir, LLC**

/s/ Matthew A. Green
Matthew A. Green
Florida Bar No. 1019717
matthew.green@csklegal.com
S. Jonathan Vine
Florida Bar No. 10966
jonathan.vine@csklegal.com
COLE SCOTT KISSANE, PA
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone:  (561) 383-9200
Facsimile:  (561) 683-8977

**Attorneys for Flight Services International LLC**

204

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

|  |  |
|---|---|
| **ESTATE OF LANE CAVINESS *et al.*,** individuals, | |
| Plaintiffs, | Case No. 22-cv-23519-KMM-LFL |
| v. | |
| **ATLAS AIR INC., *et al.*** | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' INCORPORATED MOTIONS TO DISMISS PURSUANT TO
<u>RULES 12(B)(1), 12(B)(2), AND 12(B)(6)</u>**

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION........................................................................................................1

LEGAL STANDARDS..............................................................................................5

    I. Rule 12(b)(2)................................................................................................5

    II. Rule 12(b)(1) ............................................................................................. 7

    III. Rule 12(b)(6) ...........................................................................................8

ARGUMENT ...........................................................................................................10

    I.     Florida Has Personal Jurisdiction Over Plaintiffs' Claims Against Defendants and Should Not Be Dismissed...................................................................10

            A.     Atlas Is Subject To Personal Jurisdiction In Flordia..................................11

            B.     FSI Is Subject To Personal Jurisdiction in Flordia....................................13

            C.     Encompass Is Subject To Personal Jurisdiction In Flordia .......................15

    II.    FSI's Arbitration Clause Does Not Give Rise to Dismissal Due to Unlawful Acts By The Defendant And Their Infringement On Plaintiffs' Rights .................16

            A.     Glover Exception…..................................................................................... 17

    III.   Plaintiffs' FAC Provides Sufficient Facts That Satisfy The Requirements To State Claim ................................................................................................... 18

            A.     Plaintiffs' FAC is Not a Shotgun Pleading… ............................................18

            B.     Count I: Plaintiffs Satisfy the Invasion of Privacy Claim Requirement With a Plausible and Meritorious Claim............................ 20

                 1.     Plaintiffs have established the publication element ...................... 20

                 2.     Plaintiffs have established the disclosure of their private health information was highly offensive ......................................22

                 3.     Plaintiffs have established the element of public concern............ 22

C.    Count II: Plaintiffs Have Provided Sufficient Facts And Details To Satisfy Their Negligence Claims Against The Defendants.................. 23

D.    Count III: There Is  No Lack Of Subject Matter Jurisdiction Regarding The Breach Of The Collective Bargaining Agreement ........... 25

E.    Count IV: Plaintiffs Have Made A Valid Florida Whistleblower Act Claim ...................................................................................... 26

F.    Plaintiffs' Have Proven That They Have Exhausted Administrative Remedies ...................................................................................... 26

G.    Plaintiffs Have Sufficiently And Meritoriously Plead Title VII, GINA, ADA or Rehabilitation Act Claims ................................................ 30

    1.    Plaintiffs have plead sufficient and plausible facts to show that Defendants are liable for Plaintiffs' religious accommodations and disparate treatment claims under Title VII .............................30

    2.    Plaintiffs have plead sufficient facts to allow the court to make a reasonable inference that Defendants are liable for Plaintiffs' hostile work environment claim................................... 33

    3.    Plaintiffs have plead sufficient facts to allow the court to make a reasonable inference that Defendants are liable for Plaintiffs' discrimination based on genetic information claim ...... 34

    4.    Plaintiffs have made plausible and meritorious allegations of Americans with disabilities and rehabilitation act ...........................................................................35

H.    Plaintiffs' Constitutional Claims Do Not Fail............................................ 36

I.    Plaintiffs Have Adequately Alleged An Intentional Infliction of Emotional Distress Claim Against The Defendants .................................37

J.    Plaintiffs' Plausibly Assert A Negligent Infliction Of Emotional Distress Claim ...................................................................................... 39

CONCLUSION .................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*AcryliCon USA, LLC v. Silikal GmbH,*
985 F. 3d 1350 (11th Cir. 2021)..................................................................................5

*Aery v. Wallace Lincoln-Mercury, LLC,*
118 So.3d 904 (Fla. Dist. Ct. App. 2013) ..............................................................26

*Alexander Proudfoot Co.,*
877 F.2d at 919................................................................................................6, 7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...................................................................................... 9

*Allis v. United Airlines, Inc.,*
201 F.3d 668 (7th Cir. 2000).................................................................................17

*Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas,*
134 S. Ct. 568 (2013) ...................................................................................... 8

*Auto. Mech. Local 701 v. Vanguard Car Rental,*
502 F.3d 740 (7th Cir. 2007).................................................................................8

*Bartsch v. Costello,*
170 So. 3d 83 (Fla. Dist. Ct. App. 2015 ...............................................................24

*Bejjani v. Manhattan Sheraton Corp.,*
567 F. App'x 60 (2d Cir. 2014...............................................................................24

*Bell Atlantic Corporation v. Twombly,*
550 U.S. 544 (2007)............................................................................... 9, 18, 36

*Bollea v. Clem,*
No. 12012447-CI-011 (Fla. Cir. Ct. Dec. 28, 2012) ........................................... 39

*Brown v. Trans World Airlines, Inc.,*
746 F.2d 1354 (8th Cir. 1984)...............................................................................17

*Bryant v. Avado Brands, Inc.,*
187 F.3d 1271 (11th Cir. 1999)...............................................................................9

*Byron v. University of Florida,*
403 F. Supp. 49 (ND Fla. 1975)...........................................................................27

*Carey v. United of Omaha Life Ins. Co.,*
633 Fed.Appx. 478 (9th Cir. 2016) ...................................................................... 29

*Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*,
    635 So.2d 79 (Fla. 1st DCA 1994)...........................................................................7

*City of Benkelman, Nebraska v. Baseline Eng'g Corp.,*
    867 F.3d 875 (8th Cir. 2017)................................................................................7

*Consolidated Dev. Corp. v. Sherritt, Inc.,*
    216 F.3d 1286 (11th Cir. 2000)...........................................................................6

*Cuevas v. American Express Travel Related Services, Inc.,*
    2006 WL 8432287, at *5 (S.D. Fla. 2006).........................................................31

*Cuvillier v. Taylor*,
    503 F.3d 397 (5th Cir. 2007)...............................................................................9

*De La Campa v. Grifols Am.*,
    819 So. 2d 940 (Fla. Dist. Ct. App. 2002) ........................................................40

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
    840 F.2d 843 (11th Cir.1988)...........................................................................5, 6

*Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*,
    593 F.3d 1249 (11th Cir. 2010)...........................................................................5

*Dixon v. DTA Security Services,*
    2021 WL 5320987, at * 4 (11th Cir. 2021)........................................................33

*Doe v. Hillsboro Indep. Sch. Dist.*,
    81 F.3d 1395 (5th Cir. 1996)…..........................................................................9

*Doe v. OberweisDairy,*
    456 F.3d 704, 708 (7th Cir. 2006).....................................................................28

*Dominguez v. Equitable Life Assur. Soc. of U.S.*,
    438 So. 2d 58 (Fla. 3d DCA 1983) ...................................................................38

*E. Airlines, Inc. v. King,*
    557 So. 2d 574 (Fla. 1990)................................................................................39

*Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
    752 So.2d 582 (Fla.2000)....................................................................................6

*Francis v. City of N.Y.*,
    235 F.3d 763, 768 (2d Cir. 2000)…...................................................................28

*Glover v. St. Louis-San Francisco Railway Co.,*
   393 U.S. 324 (1969)..................................................................... 17, 25

*Gregg v. Ham*,
   678 F.3d 333 (4th Cir. 2012)..................................................................37

*Griffin v. Benefytt Techs., Inc.,*
   2022 U.S. Dist. LEXIS 33461, at *4 (S.D. Fla. 2022) .......................................... 19

*Guarino v. Mandel*,
   327 So.3d 853 (Fla. Ct. App. 2021) ........................................................ 20

*Gulf Restoration Network, Inc. v. Salazar*
   683 F.3d 176 (5th Cir. 2012)….............................................................29

*Hatlestad v. Conrail,*
   75 Ohio App. 3d at 187 ...................................................................... 17

*Hawaiian Airlines, Inc. v. Norris*,
   512 U.S. 246 (1994)........................................................................ 8

*Hawthorne v. Mac Adjustment, Inc.*,
   140 F.3d 1367 (11th Cir. 1998)............................................................9

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007)...........................................................9, 10

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945)...................................................................... 7, 11

*Instrumentacion, Ltda. v. Philips Electronics North America Corp.*,
   951 So.2d 1001 (Fla. 3d DCA 2007) ...................................................... 6

*Jones v. Calvert Grp., Ltd.,*
   551 F.3d 297, 300 (4thCir.2009)...........................................................28

*Jones v. United States VA,*
   2022 U.S. App. LEXIS 30699, at *1 ....................................................18

*Jordan by Jordan v. Jackson,*
   15 F.3d 333 (4th Cir. 1994)................................................................10

*Jorge v. Rumsfeld*,
   404 F.3d 556, 564 (1st Cir. 2005) ...................................................... 28

*Joshua v. City of Gainesville,*

768 So. 2d 432 (Fla. 2000).................................................................................10

*Kilgo v. Bowman Transp*., Inc.,
789 F.2d 859.................................................................................................. 10

*K Kyle K. v. Chapman*,
208 F.3d 940 (11th Cir. 2000)........................................................................19

*Kush v. Lloyd*,
616 So. 2d 415 (Fla. 1992)…...........................................................................39

*Lee v. City of Los Angeles*,
250 F.3d 668 (9thCir.2001)............................................................................27

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 1982) ....................................................................................... 37

*Mapp v. Merrick Industrial Management Corporation*,
2023 WL 2388280, at *9 (S.D. Fla. 2023)...................................................33

*McCann v. Alaska Airlines, Inc.*,
758 F. Supp. at 561..................................................................................17, 25

*Meier v. Sun Int'l Hotels, Ltd.*,
288 F.3d 1264 (11th Cir. 2002)........................................................................7

*Miller v. Berman*,
289 F.Supp.2d 1327, 1331 (M.D.Fla. 2003) ................................................ 6

*Milliken v. Meyer*,
311 U.S. 457(1940).......................................................................................... 7

*Minn. Supply Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*,
822 F.Supp.2d 896 (D. Minn. 2011) .............................................................. 8

*Morris v. SSE, Inc.*,
843 F.2d 489 (11th Cir.1988)........................................................................5, 6

*Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*,
142 S.Ct. 661 (2022) ...................................................................................... 2

*Northwestern Aircraft Capital Corp. v. Stewart*,
842 So.2d 190 (Fla. 5th DCA 2003) .............................................................. 6

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987)...................................................................................... 6, 7

*Paraohao v. Bankers Club, Inc.*,
  225 F. Supp. 2d 1353 (S.D. Fla. 2002) ................................................................38

*Patsy v. Florida Board of Regents*,
  457 U.S. 496 (1982)… ........................................................................................ 29

*Pavilon v. Kaferly*,
  561 N.E.2d 1245 (Ill. App. Ct. 1990)… ..............................................................38

*Performance Contracting, Inc. v. Seaboard Sur. Co.*,
  163 F.3d 366 (6th Cir. 1998) ..............................................................................28

*Perla v. United Airlines, Inc.*,
  2019 U.S. Dist. LEXIS 105171, at *5 (S.D. Tex. 2019) ................................16, 25

*Pennsylvania v. Board of Dirs.*,
  353 U.S. 230 (1957) ............................................................................................ 37

*PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*,
  598 F.3d 802 (11th Cir. 2010) ..............................................................................5

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
  795 F.2d 90 (D.C. Cir. 1986) ............................................................................. 29

*Robel v. Roundup Corp.*,
  59 P.3d 611 Wash. 2002) .................................................................................... 38

*Robinson v. Dalton*,
  107 F.3d 1018 (3d. Cir. 1997) ............................................................................28

*Roland v. Florida East Coast Railway, LLC*,
  873 So.2d 1271 (Fla. 3d DCA 2004) .................................................................... 8

*Rowell v. Holt*,
  850 So. 2d 474 (Fla. 2003) ..................................................................................40

*Sculptchair, Inc. v. Century Arts, Ltd.*,
  94 F.3d 623 (11th Cir.1996) ................................................................................7

*State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs.*,
  389 F. Supp. 3d 1137 (S.D. Fla. 2019) ............................................................... 19

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ............................................................................................ 29

*Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*,
    447 F.3d 1357 (11th Cir.2006)................................................................6, 7

*Strick Corp. v. Cravens Homalloy* (Sheffield) Ltd., 3
    52 F.Supp. 844 (E.D.Pa 1972) ............................................................... 8

*Sun Trust Bank v. Sun Int'l Hotels, Ltd.*,
    184 F.Supp.2d 1246 (S.D.Fla. 2001)....................................................... 7

*Tolbert v. United States*,
    916 F.2d 245, 247 (5th Cir. 1990)..........................................................28

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the University of the Dist. of Columbia*,
    56 F.3d 1469, 1475 (D.C. Cir. 1995) ..................................................... 29

*United States v. Price*,
    383 U.S................................................................................................37

*Venetian Salami Co. v. Parthenais*,
    554 So.2d 499, 502 (Fla.1989)..................................................................6

*Waters v. Home Depot U.S.A., Inc.*,
    2005 WL 3455797, at *944 (11th Cir. 2005).........................................31

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015)............................................................. 19

*Williams v. Graphic Packaging International, Inc.*,
    790 Fed. Appx. 745 (6th Cir. 2019) ..................................................... 34

*Williams Electric Co. v. Honeywell, Inc.*,
    854 F.2d 389 (11th Cir.1988)...............................................................6, 7

*Woodard v. Sunbeam Television Corp.*,
    616 So. 2d 501 (Fla. Dist. Ct. App. 1993) ........................................... 24

*Woodham v. Blue Cross & Blue Shield of Fla.*,
    829 So.2d 891 (Fla. 2002)....................................................................10

*Yeager v. FirstEnergy Generation Corp.*,
    777 F.3d 362, 363 (6th Cir. 2015).........................................................31

*Zipes v. Trans World Airlines, Inc.*,
    455 U.S. 385 (1982)............................................................................. 28

213

**Statutes**

§ 48.193 ...............................................................................................6, 10, 11, 13

Fla. Stat. § 448.102(3)… ...............................................................................26

42 U.S.C.A. §2000ff-1 ................................................................................. 34

**Rules**

Fed. R. Civ. P. 12 .................................................... 1, 5, 7, 8, 9, 13, 16, 18, 27

**Other Authorities**

Marcia L. McCormick, *The Truth is Out There: Revamping Federal Antidiscrimination Enforcement for the Twenty-First Century*,
    (2009)… ....................................................................................... 28

*Statements of Members of Congress and Other Interested Individuals and Organizations: Hearing on Commerce, Justice, Science, and Related Agencies Appropriations for 2010 Before the Subcomm. of the Comm. On Appropriations*,
    111th Cong. 38 (2009) ...................................................................... 30

Plaintiffs[1] move the Court to deny Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("MTD," ECF No. 43), based on the lack of merit exhibited by Defendants' 12(b)(1), 12(b)(2), and 12(b)(6) arguments. As such, Plaintiffs, respectfully request to have their day in court to testify in front of a jury of their peers, to redress their grievances, and have the opportunity to conduct discovery, which will enable them to present more facts and evidence.

**INTRODUCTION**

Plaintiffs have filed two successive complaints ("FAC," ECF No. 39 and ECF No.1) in this litigation and their latest (FAC No. 39) was made in response to the same redundant and meritless arguments made by Defendants in their prior motion to dismiss (ECF No 31). In response to Defendants assertions that three "dizzying" complaints have been filed, the first lawsuit was withdrawn without prejudice because there was no other way to remove certain Plaintiffs. (MTD ECF No. 43 at 15). Then, the latest complaint was refiled based on new information about the vaccines, mandates, masking, etc. that needed to be incorporated to reflect the recent changes and rise in litigation on the subject. The Defendants latest motion to dismiss is practically indistinguishable from the prior one ("MTD" No. 43). Nevertheless, they incorrectly allege that the Plaintiffs filed suit solely because they were upset and disagreed with the "nation's overall response to the pandemic..." (MTD at 15). However, despite Defendants' efforts to stop it, the Plaintiffs filed suit in order to defend their rights and call attention to Defendants' unlawful acts of discrimination and retaliation.

The Defendants improperly cite to *Lloyd v. Sch. Bd. of Palm Beach Cnty* case and emphasize that courts should not get involved in a debate between the "scientific community and participants in the democratic process." (MTD at 15). The Plaintiffs, by choosing not to take part

---

[1] Listed in FAC at 5-11 including Elliott de Sousa and removing Greg Gordon.

215

in an injection that goes against their religious beliefs, are simply exercising their right to religious freedom, they are not waging a war against science or politics and the Defendants continuously refuse to acknowledge or understand that. The U.S. Supreme Court even disagreed with the court's opinion in *Lloyd*, when they struck down OSHA's Emergency Temporary Standard (ETS) on January 13, 2022, which required all employers with at least 100 employees to be vaccinated or show a negative test once a week. *See Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.,* 142 S.Ct. 661 (2022) (where the Court described the rule for individuals to submit religious or medical accommodation requests as, "a significant encroachment into the lives – and health – of a vast number of employees"). Not to mention the fact that cases have emerged, with the Plaintiffs receiving favorable decisions that invalidate the vaccination requirements and condemn the coercive measures being used by employers. As a result, this completely contradicts Atlas' claims that courts are refusing to engage in scientific debate and instead provides further evidence of Atlas's discrimination and retaliation.[2]

The Defendants then, intentionally refer to the Plaintiffs' complaint as a "public-relations gambit," and frame this as a battle against statewide COVID-19 measures in an effort to downplay their claims, exercise further power and control over the Plaintiffs, and have one last opportunity to silence their voices. (MTD at 16). Defendants are following the lead of the Biden Administration's, the CDC's, and HHC's efforts to launch campaigns that promote and politicize the vaccine through the entertainment industry.[3] Plaintiffs are in fact the victims of the

---

[2] *See e.g., Maher v. Workers' Comp. Appeals Bd*. (1983) 33 Cal. 3d 729, 734-735; *G.F. et al. v. LAUSD,* Case No. 21STCP03381, https://ca.childrenshealthdefense.org/legal-updates/; *Anthony Marciano v. Eric Adams, Mayor of the City of New York*, et al. (22-570); *Medical Professionals for Informed Consent et al. v. New York State Dept. of Health et al.,* 008575, https://childrenshealthdefense.org/press-release/breaking-chd-defeats-ny-state-healthcare-workers-covid-mandate/; *Louisiana v. Biden*, No. 22-30019, Doc. 00516582132 (5th Cir. Dec. 19, 2022); *Kentucky v. Biden*, No. 21-6147, Doc. 23a0006p.06 (6th Cir. Jan. 12, 2023); *Doe 1 et al v. Northshore University Healthsystem*, No. 1:2021cv05683 - Document 52 (N.D. Ill. 2021)

[3] Dmitry, Baxter, Biden's HHS and CDC Paid Screen Writers and Comedians To Mock the Unvaccinated, https://newspunch.com/bidens-hhs-and-cdc-paid-screen-writers-and-comedians-to-mock-the-unvaccinated/

Defendants' public relations gambit. This is not a fight against COVID-19 lockdowns, masking policies, political ideologies, etc. This is an action for the Plaintiffs to obtain relief that would redress the harms caused by Defendants' unlawful acts that were predicated on their discrimination, harassment, and retaliation against Plaintiffs based on their sincerely held religious beliefs. Additionally, the Defendants' arguments in favor of dismissal lack merit, are unconvincing, unsupported by legal reasoning, and are simply conclusory. First, they argue that there is a lack of personal jurisdiction, but jurisdiction will be exercised over the Defendants due to their relationship with Florida and minimum contacts with the state due to their continuing presence in Miami, Florida. (MTD at 2). Then, arbitration agreements will not extend to unlawful acts committed by the employer that deprive employees of their rights. Despite their allegations, Plaintiffs complaint is not a shot gun pleading, because it is clear that they incurred harm as a result of the Defendants' discrimination and retaliation due to the Plaintiffs' religious decision not to participate in the COVID-19 vaccine. Plaintiffs did sufficiently establish a disclosure to the public of offensive facts when the Defendants invaded their privacy and aired Plaintiffs' private and sensitive medical information in company-wide communications and to customers without their consent. Subsequently, Plaintiffs have not "repackaged their invasion of privacy claims," under a negligence cause of action. (MTD at 17).

Next, the Defendants ignore the fact that subject matter jurisdiction will not simply be passed to the Railway Labor Act when an unlawful action is involved that affects an employee's rights. Sixth, Defendants also improperly declare that Plaintiffs have not adequately exhausted administrative remedies before pursuing their claims, that Plaintiffs fail to state a plausible claim for relief, and they fail to show any adverse action. Those are just more conclusory arguments to try and silence the Plaintiffs' claims, because the Plaintiffs have proof of their charges filed with

217

the EEOC or state/local agencies and can provide more than enough facts and evidence to state a plausible claim. Furthermore, Plaintiffs have provided and are willing to provide more evidence, if necessary, of the adverse actions by the company against them ranging from discrimination, harassment, hostility, reduction of pay and hours, emotional and physical distress, coercive treatment, and medical complications. Defendants improperly claim they are a private company and vaccine requirements do not infringe on any constitutional rights, but Defendants have already proven that they are state actors who discriminated against Plaintiffs due to their religious beliefs. Then, Plaintiffs have provided evidence and claims that plausibly give rise to outrageousness and intent on the part of the Defendants. However, due to the need to confine to the page limit requirements and the numerosity of Plaintiffs, they cannot provide specific facts for each Plaintiff without exceeding that limit. The Plaintiffs can present mental, emotional, and physical symptoms of the effects the emotional distress has had on them, which will be accessible during discovery. Finally, for their last argument the Defendants state, "Plaintiffs' negligent infliction of emotional distress claim is fundamentally mismatched to the facts of this case," which is another meritless argument. (MTD at 17).

Mandated vaccinations, masks and repeated PCR testing are substantial burdens that were only put on unvaccinated employees that had religious exemptions, which resulted in differential treatment among all employees. It has been proven based on the constantly changing COVID-19 policies from health agencies and scientific studies that these employment practices do not have any significant health or safety benefit; thus, there is no legitimate interest to be promoted. To the contrary, the COVID-19 vaccine and subsequent boosters can actually cause death, permanent injury, and adverse consequences which is a direct contradiction to the health and safety of employees. Additionally, natural immunity has been shown to be more effective and

218

ultimately lasts longer than a vaccine, all while protecting individuals' freedom of religion in the process. Thus, due to the lack of merit, conclusory arguments, absence of legal reasoning, and bad faith attempt to silence the Plaintiffs this Court should deny Defendants' Motion to Dismiss.

## LEGAL STANDARDS

I.   Rule 12(b)(2):

A federal court sitting in diversity conducts a two-step inquiry to determine whether personal jurisdiction exists: "(1) it must be appropriate under the state's long-arm statute and (2) must not violate the Due Process Clause of the Fourteenth Amendment to the Constitution." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F. 3d 1350, 1363–1364 (11th Cir. 2021) (quoting *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010)). However, if a Defendant asserts a "Rule 12(b)(2) motion to dismiss challenging personal jurisdiction," the district court must consider and decide the issue before trial unless the judge orders it postponed until trial. *Id*. at 1364. If the question of personal jurisdiction will be resolved during the pretrial stage, the court then applies the preponderance of the evidence standard and looks at the credibility of the witnesses while weighing the evidence and assessing the relevant jurisdictional facts to determine jurisdiction. *Id.* (citing *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010)).

To determine personal jurisdiction over the Defendants during trial, the Plaintiffs must establish a prima facie case over non-resident Defendants. *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir.1988); *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir.1988). Once the Plaintiffs provides evidence that would be sufficient to defeat a motion for a directed verdict, then a "prima facie case is established." *Morris*, 843 F.2d at 492. After, the burden on the Defendant will shift to the Plaintiff to disprove the Defendant's evidence with

219

additional facts or evidence. *Instrumentacion, Ltda. v. Philips Electronics North America Corp.*, 951 So.2d 1001, 1002 (Fla. 3d DCA 2007) (citing *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla.1989)). However, if both parties' evidence and facts conflict, then the "district court must construe all reasonable inferences in favor of the Plaintiff." *Morris*, 843 F.2d at 492; *Delong Equip. Co.*, 840 F.2d at 845. Next, the determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts. *Alexander Proudfoot Co.*, 877 F.2d at 919; *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104–05, 108 S.Ct. 404, 409–10, 98 L.Ed.2d 415 (1987); *Williams Electric Co. v. Honeywell, Inc.*, 854 F.2d 389, 391 (11th Cir.1988) (per curiam); *Delong Equip. Co.*, 840 F.2d at 847.

Resolution of the first issue requires a statutory analysis of Florida's long-arm statute found in section 48.193, which bestows broad jurisdiction on Florida courts. *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So.2d 582 (Fla.2000); *Venetian Salami Co. v. Parthenais*, 554 So.2d 499 (Fla.1989). The long-arm statute then provides for two diverse categories of personal jurisdiction, either of which can be satisfied by the Plaintiff: "specific jurisdiction conferred under § 48.193(1) or general jurisdiction conferred under § 48.193(2)." *Miller v. Berman*, 289 F.Supp.2d 1327, 1331 (M.D.Fla.2003) (citing *Northwestern Aircraft Capital Corp. v. Stewart*, 842 So.2d 190, 193 (Fla. 5th DCA 2003)); *see also Alexander Proudfoot Co.*, 877 F.2d at 919. When the Plaintiff's cause of action arises from or is directly connected to the Defendant's contacts with the forum state may a court satisfy the long-arm's specific jurisdiction category and exercise jurisdiction over a nonresident defendant. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n. 3 (11th Cir.2006) (citing *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir.2000)). A showing of some "direct affiliation, nexus, or substantial connection between the cause of action

220

and the defendant's activities within the state," satisfies this requirement. *Sun Trust Bank v. Sun Int'l Hotels, Ltd.*, 184 F.Supp.2d 1246, 1269 (S.D.Fla.2001) (quoting *Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*, 635 So.2d 79, 81 (Fla. 1st DCA 1994)) (internal quotation marks omitted). In contrast, a court may "exercise general jurisdiction when the lawsuit does not arise from the nonresident's actions in the forum state," provided that the nonresident is involved in substantial and not sporadic or isolated activities in the state. *Stubbs*, 447 F.3d at 1360 n. 3 (citing *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002)).

Second, the Court uses a constitutional analysis to ascertain whether or not sufficient "minimum contacts" exist to satisfy the Due Process Clause so that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)); *Alexander Proudfoot Co.,* at 919; see *Omni Capital Int'l*, at 104, *Williams Electric Co.*, at 391. A minimum contacts analysis involves three criteria: (1) the contacts must be related to the plaintiff's cause of action or have given rise to it; (2) the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws; (3) the Defendant's contacts within the forum state must be such that they should reasonably foresee being haled into court there. See *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631 (11th Cir.1996).

II.     Rule 12(b)(1):

In *City of Benkelman, Nebraska v. Baseline Eng'g Corp,* the court held that an arbitration agreement alone does not deprive "the federal courts of subject matter jurisdiction—independent of statutory or other binding jurisdictional limitations." *City of Benkelman, Nebraska v. Baseline*

*Eng'g Corp* 867 F.3d 875, 880 (8th Cir. 2017). The court's holding in the prior case was determined by the Supreme Court's reasoning in *Atlantic Marine*, which the court reasoned that, the same logic that applies to federal venue laws under Rule 12(b)(3) also applies to enforcement of an arbitration agreements under 12(b)(1). *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 571 (2013); *See also Auto. Mech. Local 701 v. Vanguard Car Rental*, 502 F.3d 740, 743 (7th Cir. 2007) ("enforcement of a forum selection clause (including an arbitration clause) is not jurisdictional ").

To provide further support that this case should not be dismissed under Rule 12(b)(1), a rule was developed out of a line of cases which assert, "that a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994); *see also Roland v. Florida East Coast Railway, LLC*, 873 So.2d 1271 (Fla. 3d DCA 2004) (the court concluded that the whistleblower claim was not preempted partially based on the holding of the *Hawaiian Airlines* case and partially based on the fact that federal law allows a railroad whistleblower to elect remedies, including those provided under state law). Furthermore, the fact that the parties have agreed to settle a particular dispute through arbitration says nothing about whether or not that dispute meets the requirements of "federal question, diversity, or any other basis of subject-matter jurisdiction." *Minn. Supply Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 822 F.Supp.2d 896, 904 n.10 (D. Minn. 2011); *See Strick Corp. v. Cravens Homalloy (Sheffield) Ltd.*, 352 F.Supp. 844, 847-8 (E.D. Pa. 1972) (contract clause requiring arbitration does not strip court of jurisdiction).

III.    Rule 12(b)(6):

In order to prevail on a 12(b)(6) motion for failure to state a claim, a complaint

222

only needs to "plausibly" allege sufficient facts, "accepted as true, to state a claim to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555).

*Twombly* and *Iqbal* have emphasized that "[w]e do not require heightened pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570 *(emphasis added)*. Under a motion to dismiss pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) "The issue is not whether a plaintiff will ultimately prevail on the merits but whether he is entitled to offer evidence to support his claims." *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996). The *Twombly* and *Iqbal* precedents require that the allegations not be mere speculation, but nevertheless, the rule remains settled that most litigation requires that further details be filled out through discovery after a complaint is filed. Similarly, not every detail of evidence to be presented at trial will fit in the opening complaint. *Id.* Accordingly, during the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)); *See In re Katrina Canal Breaches*

223

*Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

Furthermore, the Florida Civil Rights Act's liberal construction was modeled after the Title VII of the Civil Rights Act of 1964. *See* § 760.01(3); *Woodham v. Blue Cross & Blue Shield of Fla.*, 829 So.2d 891, 894 (Fla. 2002) (the court specifically declared that the Act "shall be liberally construed to further the general purposes stated in this section.") (Citing to *Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000). Whereas the primary purposes of Title VII are "to prevent discrimination, achieve equal employment opportunity in future, and to make victims of discrimination whole," as well as to "remedy individual wrongs, not to punish employers, [and] intended to make victims of discrimination whole." *See Kilgo v. Bowman Transp.*, Inc., 789 F.2d 859, 40 Empl. Prac. Dec. (CCH) ¶ 36155; *see also Jordan by Jordan v. Jackson* 15 F.3d 333, 338 (4th Cir. 1994). As a result, the Florida Supreme Court declares that the purpose of the Act is to "promote access to the remedy intended by the legislature" and to "secur[e] freedom from discrimination for all individuals and preserv[e] the general welfare of all." *Woodham* at 894. Accordingly, the Court states that if any section of the Act "purports to abridge an individual's right of access to the courts [it] must be narrowly construed in a manner that favors access." *Id.* at 897.

## **ARGUMENT**

I. **Florida Has Personal Jurisdiction Over Plaintiffs' Claims Against Defendants and Should Not Be Dismissed**

Personal jurisdiction is appropriate under Florida's long-arm statute, 48.193, because Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida as well as acts outside the state of Florida that caused harm to numerous Plaintiffs in the state of Florida. § 48.193(1)(a)(6). Defendants and their agents also engaged in business in the State, engaged in the commission of a tortious act within the state, and

224

other enumerated acts that gave rise to Plaintiffs' claim of Discrimination. §48.193(1)(a)(1), (2), (6) Additionally, the Courts are able to exercise personal jurisdiction over the Defendants based on their substantial (not isolated) activities and presence with the forum state whether or not the claim arises from that particular activity. §48.193(2).

### A. Atlas is Subject to Personal Jurisdiction in Florida

The standard for personal jurisdiction's due process requirements in the case of *International Shoe* applies to this case and as such the exercise of jurisdiction over the Defendants is proper. It is established that the Defendants have at least minimum contacts with Florida such that "traditional notions of fair play and substantial justice would not be offended by the exercise of jurisdiction." While, Defendant Atlas Air, Inc. ("Atlas") is a Delaware corporation with its principal place of business in Purchase, New York, it is also a cargo airline, passenger charter airline, aircraft lessor, and Atlas is a common carrier as defined under federal law. Next, despite the fact that Atlas is incorporated in Delaware and maintains headquarters in New York, they still have a massive presence in Florida. Thus, the minimum contacts standard is satisfied due to Atlas maintaining and running a hub, training center and many other operations including but not limited to flights, offices, human resources, etc.

Defendants' training center is located at 5600 NW 36th St., Miami, Florida, consisting of 30,000 square feet of administrative and instructional space and operates six flight simulation training devices in the same area. The training center also provides advanced training for pilots and teaches/trains more than 10,000 employees every year including: pilots, flight engineers, flight attendants, and other aviation professionals. (FAC, ECF No. 39 at 12). Due to their use of real property inside the forum, the Defendants' occupancy of the training facility site establishes the specific jurisdiction requirements necessary and complies with "traditional notions of fair

225

play and substantial justice." Furthermore, all Atlas pilots and FSI flight attendants are trained at the Miami training center ("MTC"). They all have to go through annual or biannual recurrent training, resulting in a substantial and ongoing presence of Atlas pilots, crew, and other personnel in Miami. (FAC No. 39 at 12).

Nevertheless, Atlas' flight training has always been stationed in Miami since its establishment, indicating constant activity and, at the very least, minimum contacts with the State of Florida. *Id.* At Atlas' Purchase, New York location or even their Delaware location, Pilots do not spend nearly as much time as they do in Miami. More significantly, the Vice President of Ground Operations has his main office at the MTC because he is in charge of the divisions that are stationed there (Dangerous Goods, Special Loads and Ground Operations Training). *Id.* CEO John Dietrich also has an office in the training center building. *Id.* at 13. Even the Atlas Air Tailwinds article April 25, 2022, states, "…. As pilots get their Atlas career off the ground their first stop is Miami, home to the Atlas Air's world class Training Center."[4] Note that their first stop is not Purchase, NY or a post office box in Delaware, but the first stop to pilots is the Home of Atlas Air training center.

Next, in an attempt to challenge Florida's personal jurisdiction, the Defendants make a baseless comparison of the square footage of various facilities throughout the United States. (MTD at 22). However, whether or not other states have larger buildings or more personnel, the significant and substantial presence of Atlas in Miami due to their training facility cannot be negated. Despite Defendants' denial of their substantial activities in Florida and rejecting that it is an exceptional case, the meeting with Apollo Management, who just acquired Atlas, took place a few weeks ago and was coincidentally held at the Marriott Miami Airport when it could

---

[4] *See* Atlas Air Training Center webpage at: https://www.atlasairtrainingcenter.com; https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/

226

have taken place in either the New York or Delaware locations. Finally, Defendants mistakenly ignore Florida's long-arm statute's requirements to establish specific jurisdiction. According to § 48.193(2) specific jurisdiction is satisfied by, "A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." As a result, regardless of whether the majority of the Plaintiffs reside in or work in Florida, it does not preclude the court from exercising its jurisdiction over the Defendants due to their substantial activities with the forum state. (MTD at 24).

Overall, Plaintiffs have established that Atlas meets the requirements necessary for the Court to exercise personal jurisdiction over the Defendants, because there is significant and continuous activity within the state of Florida and if Atlas were to cease all operations with Florida, such as the MTC, there would be a significant and detrimental impact to the company as a whole. (FAC at 12). Thus, the court should reject the Defendants' motion to dismiss, because their 12(b)(2) argument does not apply to Atlas and there is sufficient information along with enough facts and evidence to establish personal jurisdiction over them.

### B. FSI is Subject to Personal Jurisdiction in Florida

Defendant Flight Services International, LLC ("FSI") is a Texas limited liability company with its principal place of business in Houston, Texas. *Id*. It is a company that provides flight attendants to Atlas Air. Since all the flight attendants who are staffed on Atlas Air flights are contracted through FSI and FSI has a business relationship with Atlas, all of FSI's employees receive their training at the MTC as well. *Id*. As such, there is also always a significant presence of FSI personnel in Miami primarily based on the annual and sometimes bi-annual training of FSI's flight attendants. *Id.* The business relationship between Atlas and FSI where FSI contracts

227

their employees to work at Atlas as flight attendants and FSI's employees training in Miami is enough to satisfy Florida's standards for personal jurisdiction. Additionally, FSI is subject to personal jurisdiction based on the unlawful acts of religious discrimination they displayed following Atlas's lead. (FAC at 37). Evidence of their discrimination and retaliation stems from a March 8, 2021, e-mail by FSI President, Joni French, which relayed that: "Unfortunately, if you are unable or unwilling to obtain COVID-19 [VBGT], you will not be eligible to work on Atlas Air flights. In that event, FSI has no other work, including flights for its flight attendants to crew. If we do not receive evidence that you have been fully vaccinated by April 30, 2022, you will be placed on an unpaid leave of absence (LOA)." *Id.* at 38.

According to Florida's long arm statute, personal jurisdiction can extend to Defendants if they are engaged in substantial activity within the state and if:

> "A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection...
> 1.   Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
> 2.   Committing a tortious act within this state....
> 6.   Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state..."

Here, in this case, personal jurisdiction will most likely be granted to FSI "whether or not they are citizens or residents" of Florida due to the unlawful activities in which they individually participated and the unlawful conduct they exhibited through Atlas as their agent and contractor. Due to FSI's business relationship with Atlas and the fact that 100% of their flight attendants undergo training at Atlas' facility in Miami, they have engaged in and/or operated a business in Florida, which is enough to satisfy Florida's jurisdiction requirements. Next, by subjecting their employees to discriminatory treatment, instances of coercive behavior, and retaliation based on their sincerely held religious beliefs, FSI committed a tortious act in the state of Florida. Thus,

228

Plaintiffs have provided enough facts to show that personal jurisdiction should be extended to Defendants.

### C.  Encompass is Subject to Personal Jurisdiction in Florida

Defendant Encompass Air, LLC ("ECA") is an Alaska limited liability company with its principal place of business in Anchorage, Alaska. (FAC at 13). It is a company whose business is to contract mechanics to Atlas Air and other airlines. *Id*. They provided flight mechanics to cover the South America runs prior to atlas hiring their own flight mechanics. Plaintiff Mark Thein, an employee of Encompass even did flights out of Miami to South America when Covid restrictions were still ongoing. Additionally, there are enough minimum contacts with Atlas to grant personal jurisdiction over ECA and due to the business relationship among Atlas and Encompass. Furthermore, it is exhibited by employees of ECA who also had their individual rights violated. Based on Florida's long-arm statute, personal jurisdiction in Florida extends to Defendant ECA due to the tortious actions and injuries caused by them to the Plaintiffs, as well as their connection to Atlas through business ventures.

Lastly, Defendant John W. Dietrich ("Dietrich") is an individual and is President and Chief Executive Officer for Atlas and is a Board Member of Atlas. (FAC at 13). He keeps an executive office in Miami, FL at the MTC which satisfies personal jurisdiction over the Defendant, due to the real property involved, location of the office, and substantial activities with Florida. *Id.*  Defendant Jeffrey Carlson is an individual and is Senior Vice President for Flight Operations for Atlas, who keeps an executive office in Miami, FL, permitting the court to exercise personal jurisdiction over the Defendant. *Id.* Defendant Patricia Goodwin-Peters is an individual and Senior Vice President for Human Resources for Atlas and also keeps an executive

office in Miami, FL. *Id.* The fact that these Defendants maintain offices in Miami, satisfies the requirements needed to exercise personal jurisdiction over them.

In conclusion, the Defendants meet the requirements necessary to establish personal jurisdiction over them because of the aforementioned facts regarding their presence in the state, the fact that Atlas, its affiliates, and leadership conduct a substantial portion of their business in Florida, a significant portion of their flights in and around southern Florida and the Miami International Airport, and their use and maintenance of real property in the forum state (MTC). As a result, the Court should deny Defendants' motion to dismiss for lack of personal jurisdiction.

## II. FSI's Arbitration Clause Does Not Give Rise to Dismissal Due to Unlawful Acts by the Defendants and Their Infringement on Plaintiffs' Rights.

The Plaintiff asserts that this case should not be dismissed under Rule 12(b)(1), as dismissing the action would be an erroneous misinterpretation of the law. Moreover, the Defendants' assertion that this matter should be considered a "minor dispute" and addressed through the mandatory framework of the RLA is incorrect and inconsistent with case precedent.

First, the RLA only preempts state law claims that are "minor disputes" arising from the interpretation or application of a CBA. *Perla v. United Airlines, Inc.*, Civil Action No. H-18-4626, 2019 U.S. Dist. LEXIS 105171, at *5 (S.D. Tex. May 31, 2019). Generally, RLA disputes are either classified as major or minor, if courts find that the dispute is minor the RLA preempts, and the parties must defer to the CBA. However, if courts find that the dispute is major the courts will have subject to matter jurisdiction under Rule 12(b)(1) to hear the claim. Presently, the dispute is major because it arises out of an independent legal duty of the Defendants, to not discriminate on the grounds of religion and falls outside the realm of traditionally "minor disputes". Thus, the courts will ultimately have subject matter jurisdiction to adjudicate this

230

matter. Minor disputes are typically defined by the RLA as "…disputes between an employee and a rail carrier that arise "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions…" *Hatlestad v. Conrail,* 75 Ohio App. 3d at 187, 598 N.E.2d at 1304. "A dispute … is "minor" if it can be resolved solely on the basis of the collective bargaining agreement (CBA)." *McCann v. Alaska Airlines, Inc.*, 758 F. Supp. at 561. Plaintiffs are not asserting a right under the CBA, rather, they are asserting a claim for discrimination on the grounds of religion and harassment.

Furthermore, if the claim is based on an independent legal duty separate from the CBA, such as a violation of federal law or a tort claim, like Title VII it would not be a minor issue and would not then be preempted by the RLA. *Allis v. United Airlines, Inc*., 201 F.3d 668, 675 (7th Cir. 2000). Therefore, since this court has subject matter jurisdiction to adjudicate this matter the motion to dismiss must be denied, and the case should proceed as scheduled.

### A. Glover Exception

However, if the courts find that this matter is subject to the RLA, then the Glover exception should apply in this case. The Glover exception is a limited exception to the preemption of state law claims by the Railway Labor Act (RLA) and arises from the Supreme Court's decision *in Glover v. St. Louis-San Francisco Railway Co.*, 393 U.S. 324 (1969). In that case, the Court held that state law claims may be brought in court by an employee against an employer, even if the dispute arises from a CBA, if the claim is based on a separate and independent legal duty that is not created by the CBA. *Id.* Furthermore, claims based on an employer's alleged violation of federal antidiscrimination laws, such as Title VII of the Civil Rights Act of 1964, have been found to be separate and independent from a CBA and, therefore, not preempted by the RLA. *See Brown v. Trans World Airlines, Inc., 746 F.2d 1354 (8th Cir.*

231

*1984)* (where the Eighth Circuit held that an employee's Title VII claim for sex discrimination was not preempted by the RLA). Here, the Plaintiffs filed religious exemptions which authorized their exemption from receiving the COVID-19 Vaccination. (FAC at 214). As a result, they faced religious discrimination in numerous ways including being subjected to a hostile work environment and harassment. Since, this discrimination falls outside of the realm of the CBA by creating an independent cause of action that is not addressed in the CBA, the Glover exception may apply, and this court shall have subject matter jurisdiction over this matter.

**III.     Plaintiffs' FAC Provides Sufficient Facts That Satisfy the Requirements to State a Claim**

Plaintiffs' have provided sufficient and concise facts and evidence that at the very least state a plausible claim and satisfy the minimum requirements to overcome a 12(b)(6) motion to dismiss challenge. *Twombly,* 550 U.S. at 556 (a claim is plausible when "the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged"). However, if the Court disagrees Plaintiffs respectfully ask the Court to allow access to discovery such that they can satisfy their burden.

**A.  Plaintiffs' FAC is Not a "Shotgun" Pleading.**

Defendants claim that this is a shotgun pleading falls short. "A shotgun pleading is one where it is virtually impossible for the court and opposing parties to identify what facts support each legal theory because of the way the complaint was written." *Jones v. United States VA*, 2022 U.S. App. LEXIS 30699, at *1. The FAC asserts a wide variety of claims against multiple Defendants by nearly 100 Plaintiffs, and it is therefore reasonable to expect some degree of overlap and repetition in the allegations. Additionally, the argument made by the Defendants that Plaintiffs failed to cure the defects in their allegations, is false. As a response to the Court order, the complaint was amended to include relevant and factual allegations to comply with Rule 8, "a

232

short and plain statement of the claim showing that the pleader is entitled to relief. See generally FAC ¶¶ 245-408.

Furthermore, the Defendants have not been prejudiced by the alleged shotgun pleading, because there is nothing confusing regarding the allegations made in the FAC. Courts have ruled that matters that allege multiple defendants should not be immediately dismissed as shotgun pleadings. *Griffin v. Benefytt Techs., Inc*., No. 20-62371-CIV-SINGHAL, 2022 U.S. Dist. LEXIS 33461, at *4 (S.D. Fla. Feb. 24, 2022). Here, each allegation is so detailed and adequately describes the Defendants' unlawful conduct. Furthermore, courts have held that if there are multiple defendants and they can read the FAC and deduce the alleged conduct, then it is not a shotgun pleading. *See State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs*., 389 F. Supp. 3d 1137, 1147 (S.D. Fla. 2019). *See also K Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) (the court held that "the complaint can be fairly read to aver that all defendants are responsible for the alleged conduct"). The allegations in this complaint are presented in a clear and straightforward manner, making them easily comprehensible to any reader regardless of their level of education or background.

Lastly, dismissing this action as a shotgun pleading would prejudice the Plaintiffs as it would be unfair for the Court not to hear this matter. However, if this court finds that the FAC, still follows the format of a shotgun pleading, Plaintiffs should be ordered to provide a more definite statement rather than dismissing this complaint with prejudice. *Weiland v. Palm Beach Cnty. Sheriff's Off.,* 792 F.3d 1313, 1321 n.10 (11th Cir. 2015) (holding that District courts "have an inherent authority to strike so-called "shotgun" pleadings and order a plaintiff to provide a more definite statement"). Dismissing the case at this stage with prejudice would unjustly strip the plaintiffs of their day in court and would be a miscarriage of justice. The Defendants have

233

argued that the complaint is a "shotgun pleading" because it does not separate out each specific instance into discrete claims. However, Plaintiffs have provided a clear statement of allegations and specific examples to support those claims as reasonably possible, despite the page limits and numerosity of Plaintiffs. *See generally* FAC ¶¶ 245-408. Plaintiffs' have also adequately stated the legal theories on which they rely, and dismissal prior to discovery would preclude them from presenting additional evidence in support of their assertions. It would also undermine the purpose of the Federal Rules of Civil Procedure, which are designed to facilitate the resolution of disputes on their merits, rather than on technicalities. Thus, in the interests of justice, Plaintiffs' urge the court to deny the Defendants' motion to dismiss and allow them to move forward in establishing their claims further.

### B. Count I: Plaintiffs have Presented a Plausible Invasion of Privacy Claim

To state a claim for invasion of privacy, Plaintiffs need to establish a public disclosure of private facts – "the dissemination of truthful private information which a reasonable person would find objectionable." (internal quotations and citation omitted). *Guarino v. Mandel*, 327 So.3d 853, 863 (Fla. Ct. App. 2021). "Claims based on this tort generally must be made to the public at large or to so many persons that the matter is substantially certain to become public knowledge." *Id.*

### 1. Plaintiffs have established the publication element.

Defendants argue that Plaintiffs' PHI being broadcast to fellow employees and consumers of their employers does not suffice, because it was only broadcast to "a group far smaller than the public at large." (MTD at 31). However, Defendants are mistaken, the term "public" should be interpreted broadly to include any dissemination of the information beyond the intended recipient. *Guarino*, 327 So.3d at 863. As such, it could be argued than even a

234

relatively small group of people can constitute a "public" for the purposes of this claim, particularly when the disclosure is widespread or reaches an audience beyond the intended recipient. In the present case, where health information is broadcast to consumers and other employees within the company, the dissemination of this information to multiple individuals, including those outside the intended recipient group, could constitute a public disclosure of private facts. This is especially true when the employer did not obtain the employee's consent to share their health information and when that disclosure causes the employee harm, harassment, discrimination, or embarrassment. *See* FAC ¶¶ 182-187, 189-194, 196, 198-199, 202, 204-206. Also, with the prevalence of social media and the ease of sharing information, it is becoming increasingly difficult to draw a clear line between what constitutes a private versus public disclosure of information. The fact that health information is shared within a company setting does not necessarily mean that it is private, as it may be disseminated more widely or shared with others without both the employer and employee's knowledge or consent.

Furthermore, Plaintiffs encounter hundreds of new people per flight on a daily basis.. It can be argued that passengers on a flight can be considered part of the public for the purposes of a public disclosure of private facts claim. This is because during a flight, Plaintiffs encounter hundreds of new faces and are essentially in a public space, where they have no reasonable expectation of privacy, which can increase the potential harm caused by disclosure of private facts. The more people who are exposed to the private information, the greater the potential for embarrassment, harassment, or discrimination. This can have a significant impact on the Plaintiffs' mental and emotional well-being and can also affect their reputation. Therefore, broadcasting an employee's health information within the workplace to consumers and other employees satisfies the public element of this claim, as it involves a dissemination of the

information beyond the intended recipient and can cause harm or embarrassment to the employee.

**2.      Disclosure of Plaintiffs' private health information was highly offensive.**

Disclosing an individual's health information to consumers and employees within a company without their consent is highly offensive to a reasonable person for several reasons. An individual's health information is highly sensitive and personal in nature. It is information that one would ordinarily not share with strangers and is therefore deserving of a high degree of privacy protection. When this information is disclosed without an individual's consent, it can be deeply embarrassing, intrusive, and can have negative consequences for their employment and personal life. Here, this is evidenced when Plaintiffs faced unfavorable treatment from their colleagues and customers because their private health information was made public. It also affected Plaintiffs' career prospects, as their refusal to be vaccinated negatively impacted the trajectory of their careers. In light of these reasons, it is clear that disclosing an individual's health information to consumers and employees within a company without their consent is highly offensive to a reasonable person. Therefore, such conduct should be considered highly offensive and deserving of legal action to protect the individual's rights.

**3.      Plaintiffs have established the element of public concern.**

An employee's vaccination status is a private and personal matter that is of no legitimate public concern. The decision to get vaccinated is a personal religious choice that is protected under an individual's right to privacy. An individual's vaccination status has no bearing on their ability to perform their job duties. An employee's vaccination status does not affect their work performance, nor does it pose a direct threat to the health and safety of their colleagues or customers, since anybody can contract the virus whether they are vaccinated or not. While

236

vaccinations may provide protection against certain illnesses, an individual has the right to make their own medical decisions based on their personal beliefs and religious values. Employers should not be allowed to force employees to disclose their vaccination status or pressure them to get vaccinated against their will. Disclosure of employees' vaccination status led to discrimination, harassment, and stigmatization of unvaccinated employees based on their beliefs. It also resulted in unnecessary scrutiny and stigma from coworkers or customers. Therefore, it is not a legitimate concern of the public, nor their employer.

In conclusion, an employee's vaccination status is a private matter that should be protected under an individual's right to privacy. It has no legitimate public concern, does not affect an employee's ability to perform their job duties, and is a personal religious choice that should be respected. Therefore, employers should not be allowed to disseminate an employee's vaccination status without their consent, and any such disclosure should be considered a violation of the individual's right to privacy. Since, Plaintiffs have plead this claim with sufficiency, the Defendants' Motion to Dismiss should not be granted.

### C. Count II: Plaintiffs Provided Sufficient Facts to Satisfy their Negligence Claims.

Plaintiffs' negligence claim alleges a distinct cause of action, based on the duty of care that Defendants owed Plaintiffs to protect their personal health information (PHI). Here, the negligence claim alleges that the Defendants had a duty of reasonable care, which includes protecting Plaintiffs PHI by appropriate means and procedures. This assertion vastly differs from Count I's claim of invasion of privacy, which was established by the Defendants publishing the PHI throughout the company effectively amplifying and broadcasting their PHI to other employees and consumers. See FAC ¶¶ 246. The claims are significantly distinct, because unlike the intentional invasion of privacy claim, the negligence claim does not require a showing of

237

intentional conduct by Defendants. Rather, it alleges that Defendants breached their duty of care to Plaintiffs by failing to take reasonable steps to protect their PHI. As such, the elements for the invasion of privacy claim are the following: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 503 (Fla. Dist. Ct. App. 1993). They are thus distinct from the elements of negligence: "(1) a duty by defendant to conform to a certain standard of conduct; (2) a breach by defendant of that duty; (3) a causal connection between the breach and injury to plaintiff; and (4) loss or damage to plaintiff." *Bartsch v. Costello*, 170 So. 3d 83, 84 (Fla. Dist. Ct. App. 2015).

Second, the cases cited by Defendants are not applicable to the present case since, Plaintiffs' negligence claim is based on a distinct cause of action, not the intentional invasion of privacy claim. Additionally, the cases cited by Defendants in support of their argument that Florida does not recognize a negligent invasion of privacy cause of action are distinguishable from the present case, because the Plaintiffs never alleged negligent invasion of privacy. Finally, Defendants' argument that Plaintiffs cannot plead the necessary elements for their negligence claim is premature at this stage of the proceeding. At this stage, Plaintiffs are only required to plead a plausible claim. *Bejjani v. Manhattan Sheraton Corp.*, 567 F. App'x 60, 62 (2d Cir. 2014) (the court held that "allegations must nudge claims across the line from conceivable to plausible in order to survive motion to dismiss"). In their allegations Plaintiffs have adequately plead that Defendants breached their duty of care by publishing their PHI throughout the company and broadcasting it to other employees and consumers. These allegations are sufficient to survive a motion to dismiss, and the ultimate determination of whether the necessary elements have been established should be made at a later stage of the proceedings. Therefore, the claim for negligence should not be dismissed.

238

**D. Count III: There is No Lack of Subject Matter Jurisdiction Regarding the Breach of the Collective Bargaining Agreement.**

The argument that Count III should be dismissed due to preemption by the Railway Labor Act (RLA) is unfounded. While the RLA establishes a mandatory framework for disputes arising from the interpretation or application of Collective Bargaining Agreements (CBAs) between airlines and their unions, not all claims related to CBAs are preempted by the RLA. This was affirmed in *Perla v. United Airlines, Inc., Civil Action,* No. H-18-4626, 2019 U.S. Dist. LEXIS 105171, at 5 (S.D. Tex. May 31, 2019).

Count III alleges that Atlas violated several provisions of the CBA between Atlas and its pilots' union. However, these violations are major disputes that involve issues of contractual and statutory rights outside the scope of the CBA, rather than minor disputes that require interpretation of the CBA. As stated in *McCann v. Alaska Airlines, Inc*., 758 F. Supp. at 561, "a dispute … is 'minor' if it can be resolved solely on the basis of the collective bargaining agreement (CBA)." In this case, the dispute concerns several allegations of breach that go beyond the terms of the CBA and should be considered a major dispute. Additionally, this issue may fall under the *Glover* exception, if the dispute arises from a CBA but the claim is based on an independent legal duty not created by the CBA. *See Glover*, 393 U.S. 324 (1969). Here, the Plaintiffs claim for breach of several articles in the CBA (Art. (A)(4), Art. 1(G)(1), Art. 26(R), Art. 15(A)(1), Art. 15(C)(12), and Article 25X) all create an independent legal duty, which the Defendants breached as described in FAC ¶¶ 255-268. Thus, the argument that Count III should be dismissed due to preemption by the Railway Labor Act (RLA) lacks merit. The alleged violations of the CBA are major disputes that fall outside the CBA and Plaintiffs' claim for breach creates an independent legal duty not created by the CBA. Therefore, the court should deny the Defendant's motion to dismiss Count III.

**E. Count IV: Plaintiffs Have a Valid Private Florida Whistleblower Act Claim**

Under the Florida Whistleblower Act, employees who "objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation" are protected against the retaliatory actions of their employers. Fla. Stat. § 448.102(3); *see Aery v. Wallace Lincoln-Mercury, LLC*, 118 So.3d 904, 912 (Fla. Dist. Ct. App. 2013) ("the FWA should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent"). "When a Florida statute is patterned after a federal law on the same subject, the Florida law will be accorded the same construction as given to the federal act in federal courts." *Id.*

To establish a claim under the Whistleblower Act, Plaintiffs need to establish that they 1) engaged in protected activity; and (2) suffered an adverse employment action. *Id*. Defendants entire argument that Plaintiffs plausibly failed to state a claim under the Florida Whistleblower Act, hinges solely on the first element. However, Plaintiffs sufficiently set forth the fact that they were retaliated against for refusing to "participate in Defendants' VBGT mandate program which violated 14. C.F.R. § 61.53, et seq. and other Constitutional, statutory, and common law provisions." FAC ¶ 270-272. Even if Defendants do not want to accept Plaintiffs allegations as an "actual violation," some courts have held that a good faith, objectively reasonable belief that the objected to activity was illegal will suffice. *See Avery,* 118 So.3d at 916 (the court held that Plaintiff was not required to provide "statutory and case law citations to support his claim of illegal conduct"). As for the second element, Plaintiffs did in fact suffer adverse employment action as illustrated in Plaintiffs' FAC ¶¶ 184, 185, 186, 190, 193, and 284-285. Therefore, Defendants' Motion to Dismiss should not be granted.

**F. Plaintiffs Have Proven That They Have Exhausted Administrative Remedies**

240

Defendants continue to make erroneous accusations and cite to case law which does not apply to the specific facts of this case. The Plaintiffs are aware of the need to file a claim either with the EEOC or a state agency about the discrimination. Due to the EEOC's lack of involvement and lack of action, Plaintiffs believe that filing their claim with the EEOC is inadequate, futile, and discouraging. Yet, more than 90% of the Plaintiffs have filed claims with the EEOC or their local state agency. Specifically, at least 41 of them have been provided with a Right to Sue Letter, a significant number of Plaintiffs are still waiting on the EEOC to respond to their initial complaint, some are still waiting to schedule an interview, and a very small number filed their claims but was rejected by the EEOC without getting an interview.[5] Despite the absurd claims made by the Defendants in an attempt to discredit the Plaintiffs and undermine their credibility, the Plaintiffs have only acted in good faith by making every effort to obtain interviews with the EEOC. They worked so hard to get interviews that they even discovered how the EEOC website offers additional interview slots after midnight Eastern time. Many of them also had to dedicate several nights and sacrifice valuable time just to get an interview.

Since this pleading is based on a motion to dismiss, the Court will "accept as true the factual allegations in petitioner's amended complaint." *Byron v. University of Florida*, 403 F. Supp. 49 (ND Fla. 1975). Title VII Plaintiffs may survive a motion to dismiss if during the very early stages of litigation every aspect of administrative exhaustion are treated like affirmative defenses under 12(b)(6). *Lee v. City of Los Angeles*, 250F.3d 668,688 (9thCir.2001) (the court held that factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." As a result, the Defendants cannot prevail by raising factual challenges to exhausting administrative remedies. *See Performance Contracting, Inc. v.*

---

[5] See Exhibit A

241

*Seaboard Sur. Co.*, 163 F.3d 366, 369 n.3 (6th Cir. 1998) (stating that whether administrative remedies have been exhausted is a question of fact). Furthermore, the Supreme Court ruled that Title VII's timely charge requirement "is not a jurisdictional pre-requisite to [filing] suit in federal court," but like the statute of limitations, is "subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982). Here, providing detailed facts about how each of the numerous Plaintiffs exhausted their administrative remedies is merely a question of fact, in which the court must accept the factual allegations made by the Plaintiffs' as true, given the restrictions on page limits as well.

Next, given the agency's current workload, it makes it difficult to understand why Plaintiffs must exhaust administrative remedies given the EEOC's present understaffing and the process used to pursue the initial filed charges. *Jones v. Calvert Grp., Ltd.,* 551F.3d 297, 300 (4thCir.2009); *Doe v.OberweisDairy*,456 F.3d 704, 708 (7th Cir. 2006); *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005); *Francis v. City of N.Y.*, 235 F.3d 763, 768 (2d Cir. 2000); *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d. Cir. 1997); *Tolbert v. United States*, 916 F.2d 245, 247 (5th Cir. 1990). Additionally, in private sector disputes the EEOC is prohibited from, "awarding damages, reinstating employees, or granting back pay," which the Plaintiffs are requesting in this case. *See* Marcia L. McCormick, *The Truth is Out There: Revamping Federal Antidiscrimination Enforcement for the Twenty-First Century*, 30 BERKELEY J. EMP. & LAB. L. 193, 202 n.53 (2009) ("the EEOC also has the power to adjudicate federal claims, but not adjudicate private sector disputes.") The EEOC's powers are further limited, not only by statute but also by the agency's own lack of resources and inability to carry out their duties within the time frame provided by statute. *Id.* To protect a Plaintiff's rights and provide relief for claims of retaliation by their employers, the federal courts should follow the approach taken under § 1983.

242

*See Patsy v. Florida Board of Regents*, 457 U.S. 496, 499 (1982). *See Steffel v. Thompson*, 415 U.S. 452, 472-473 (1974) (when federal claims are premised on [§ 1983] they have not required exhaustion as a pre-requisite...recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights"). Here, if Plaintiffs waited around for the EEOC to take action on their claims they would suffer irreparable harm due to the delay in moving their claim forward towards litigation.

According to the *Gulf Restoration* case, exceptions to administrative exhaustion do apply, but "only in extraordinary circumstances with limited bases for excusing administrative exhaustion." *Gulf Restoration Network, Inc. v. Salazar* 683 F.3d 176 (5th Cir. 2012). Besides irreparable harm, Futility can serve as an exceptional circumstance, "where an agency has articulated a very clear position on the issue, which it has demonstrated it would be unwilling to reconsider." *See UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the University of the Dist. of Columbia*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 105 (D.C. Cir. 1986)). The Doctrine of Futility applies to Plaintiffs when an agency's internal administrative remedies would be "futile, pointless and doomed to fail." *Carey v. United of Omaha Life Ins. Co*., 633 Fed.Appx. 478 (9th Cir. 2016). Thus, given the fact that the EEOC failed to support Plaintiffs in their claims of discrimination, the remaining Plaintiffs have a valid claim of futility, despite Defendants insistence on dismissal. There are exceptional circumstances surrounding this case, due to the EEOC's dismissal or denial of all covid related religious discrimination cases, asserting that the Plaintiffs do not have a valid claim for relief. (FAC at 48).

Furthermore, the EEOC has publicly expressed their position in deciding not to get involved or interfere with employer's decision to implement the CDC guidelines or health

mandates by stating it is, "beyond the EEOC's jurisdiction to discuss the legal implications of

EUA or the FDA approach." *Id.* In order to provide further evidence of their claims of Futility,

Plaintiffs cite to statements made on April 2, 2009, by Gabrielle Martin (president of the union

representing EEOC employees) regarding the proposed 2010 budget for the EEOC.[6] She made

the following assertions:

> "The EEOC has only 600 available investigators, who, in 2008, "received 95,402
> new charges of discrimination, the highest number [at the time]; Each EEOC
> investigator has an inventory "as high as 250 cases which does not allow
> investigators to do an effective job of interviewing witness[es], reviewing
> documents, attempting conciliation"; the amount of time it takes to process a case
> [from initial charge to the issuance of a right-to-sue letter] increased to 229 days;
> in 2008, EEOC scrapped its requirement that 72% of its charges be processed
> within 180 days" instead requiring "only 48% of charges be processed within 180
> days"; in 2009, the EEOC "beg[an] enforcement of two new laws, the Genetic
> Information Non Discrimination Act (GINA) and the Americans with Disabilities
> Amendments Act"; additional staff have not been hired to assist with the new
> work, existing staff have not been trained on the complexities of the new laws."

Therefore, given the challenges with the EEOC and the decisions given to other

Plaintiffs, the remaining ones that did not completely exhaust administrative remedies,

should establish futility. Thus, due to Plaintiffs' good faith the cause of action should not

be dismissed.

### G.  Plaintiffs Have Adequately Plead Title VII, GINA, or ADA Claims

1. **Plaintiffs Have Plead Plausible Facts to Show Defendants Liability for their
   Religious Accommodations and Disparate Treatment Claims under Title VII.**

Stating a claim under Title VII for failure to accommodate requires that Plaintiffs "(1)

hold a sincere religious belief that conflicts with an employment requirement; (2) informed the

employer about the conflicts; and (3) was discharged or disciplined for failing to comply with the

---

[6] *See Statements of Members of Congress and Other Interested Individuals and Organizations: Hearing on
Commerce, Justice, Science, and Related Agencies Appropriations for 2010 Before the Subcomm. of the Comm. On
Appropriations*, 111th Cong. 38 (2009) (statement of Gabrielle Martin, President, National Council of EEOC).

employment requirement." (internal quotations and citation omitted). *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015). Once Plaintiffs establish their claim, the burden then shifts to the employer "to show that it could not reasonably accommodate" Plaintiffs' religious beliefs "without undue hardship." *Id.* To establish a prima facie case of disparate treatment under Title VII, Plaintiffs must show that they: (1) were a member of a protected class; (2) were subjected to adverse employment action; (3) their employer treated similarly situated employees more favorably; and (4) they were qualified to do the job." *Cuevas v. American Express Travel Related Services, Inc.*, 2006 WL 8432287, at *5 (S.D. Fla. 2006). "Demonstrating a prima facie case...only that the plaintiff establishes facts adequate to permit an inference of discrimination." *Id.* "The Supreme Court has stated that an employment discrimination complaint...must contain only a short and plain statement of the claim showing that the pleader is entitled to relief." *Waters v. Home Depot U.S.A., Inc.*, 2005 WL 3455797, at *944 (11th Cir. 2005).

In the present case, Plaintiffs have undoubtedly established that they held "sincere religious beliefs," and that those beliefs "conflicted with an employment requirement." see FAC ¶¶ 136-139,159, 278-279. Plaintiffs' religious beliefs prevented them from being fully vaccinated as was required of all employees. Plaintiffs established that they informed Defendants of this conflict by applying for the medical and/or religious accommodation from the vaccine. FAC ¶¶ 174, and 282- 283. However, those Plaintiffs who were not able to apply for the accommodation prior to October 22, 2021, were denied the opportunity to do so. FAC ¶181. Finally, Plaintiffs established that while they were not discharged, they still suffered adverse treatment based on reduction of hours and benefits, coercion from the Defendant, and a hostile work environment between employees leading to fights, harassment, contempt, and ridicule.

245

FAC ¶¶ 185-186, 193, 285. Similarly, Plaintiffs have also established the elements for their Title VII disparate treatment claim. First, Plaintiffs established that they are members of a protected class. FAC ¶¶ 295-296. Second, Plaintiffs established they were subjected to adverse employment action. FAC ¶¶ 184, 185, 186, 190, 193, and 302. Third, Plaintiffs established that their employer treated them less favorably than similarly situated employees. FAC ¶¶ 183, 190, 198, 202, 204, 230, and 302. Finally, Plaintiffs established that they were qualified to perform their job duties.  FAC ¶ 297.

Defendants erroneously state that Plaintiffs' Title VII claims never identifies any employment actions taken by Defendants" and that Plaintiffs claims "rest solely on supposed threats for unvaccinated employees." (MTD at 42). Yet, a plethora of instances above and in the FAC set forth employment action taken by Defendants that would amount to disparate treatment. ¶ 302. Furthermore, based on the decline of pilots in the company and the huge drop in percentage of new employees, the only reason the Defendants did not fire any of the Plaintiffs was due to their need of pilots to work for the company. Then, Defendants attempt to make the argument that Plaintiffs were treated differently based on their vaccination status rather than religious beliefs. However, Defendants are choosing to disregard the fact that Plaintiffs are not vaccinated due to their religious beliefs. As a result, Plaintiffs were treated differently than those employees who did not hold the same religious beliefs and were vaccinated.

Furthermore, Defendants assert the argument that because Plaintiffs kept their complaint as short and plain as possible, Plaintiffs failed to meet their burden. They also suggest that Plaintiffs were required to assert specific facts for every Plaintiffs' personal experience. However, there are nearly one hundred (100) Plaintiffs, and the FAC would have been obnoxiously long had Plaintiffs included specific details for each one. There is a discovery

246

process for that. Plaintiffs FAC was only required to contain "a short and plain statement," which it did. Therefore, Plaintiffs have established every element of their Title VII claims and the court should deny Defendants' Motion to Dismiss.

### 2.  Plaintiffs have plead sufficient facts to make a reasonable inference that Defendants are liable for Plaintiffs' Hostile Work Environment Claim.

In order for Plaintiffs to establish their case for a hostile-work-environment claim, they must show that: (1) Plaintiffs belonged to a protected group; (2) Plaintiffs suffered unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis exists for holding the employer liable. *Dixon v. DTA Security Services*, 2021 WL 5320987, at *4 (11th Cir. 2021). Defendants assert two defects with Plaintiffs claim. First, Defendants state that Plaintiffs claim failed because they did not allege "facts that suggest [any] Plaintiff was subjected to severe or pervasive harassment by the Defendant[s]" and second that Plaintiffs failed to allege that "any harassment was based on a protected characteristic." (MTD at 44).

Yet, Plaintiffs have alleged various instances of severe or pervasive conduct that created a hostile work environment, that interfered with Plaintiffs' ability to do their job. FAC ¶ 322-24. "To show that harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment, an employee must prove that his work environment was both subjectively and objectively hostile." *Mapp v. Merrick Industrial Management Corporation*, 2023 WL 2388280, at *9 (S.D. Fla. 2023). Objective hostility is shown by analyzing four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "The evidence must be viewed cumulatively

247

and in the totality of the circumstances." *Id.* On the contrary, Plaintiffs have satisfied this burden and established that they were subjected to severe or pervasive harassment on the job. *See* FAC. Second, Defendants continue to ignore the fact that the basis of the harassment, and disparate treatment of Plaintiffs was the fact that their religious beliefs prevented them from having a vaccination status to begin with. Furthermore, Plaintiffs FAC sets forth facts of harassment based on Plaintiffs' sincerely held religious beliefs. (¶ 322-324). Thus, Plaintiffs have alleged facts that a state a hostile work environment claim and therefore Defendants' Motion to Dismiss should not be granted.

3. **Plaintiffs have plead sufficient facts to allow the court to make a reasonable inference that Defendants Discriminated under GINA.**

Under the Genetic Information Non-Discrimination Act ("GINA"), it is unlawful employment practice for an employer:

> "1) to refuse to hire, or discharge, any employee, or otherwise to discriminate against any employee... because of genetic information; or 2) "to limit, segregate, or classify the employees in any way that would deprive or tend to deprive them of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of their genetic information..." 42 U.S.C.A. §2000ff-1.

GINA defines "genetic information" as information about a "genetic test" or the "manifestation of a disease or disorder in family members." *Id.* A "genetic test" means "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes*." Williams v. Graphic Packaging International, Inc.*, 790 Fed. Appx. 745, 754 (6th Cir. 2019). Plaintiffs have pleaded that they were discriminated against because of their genetic differences due to not being vaccinated. FAC ¶¶ 156 & 344. Plaintiffs were deprived of opportunities for better routes, schedules, and benefits because of their genetic differences from vaccinated employees who did not possess the same religious beliefs. FAC ¶ 345. Plaintiffs were

248

also required wear political symbols which differentiated them from other employees, some were disproportionately compensated, and adversely affected in their status as an employee. FAC ¶ 302. Furthermore, Plaintiffs plead that they were denied bids for higher paying flights to certain destinations despite seniority levels. FAC ¶ 193. All these denials were based on the fact that Plaintiffs' religious beliefs prevented them from being vaccinated, which caused a genetic difference between Plaintiffs and other employees.

Likewise, Plaintiffs plead facts which adequately described how the Covid-19 vaccine altered an individual's genetic composition. Therefore, those who received the vaccine necessarily possess different genetic information than those who did not receive the vaccine. FAC ¶ 150-156. Plaintiffs further illustrated how the required PCR tests they were subjected to extracted genetic material from them in violation of GINA. FAC ¶ 352-354.  Finally, Plaintiffs asserted that requesting their vaccination status violated GINA, because it requested their genetic information. FAC ¶ 355. Nonetheless, employees that were vaccinated contained the same genetic information, compared to unvaccinated Plaintiffs and as a result, Plaintiffs were treated unfavorably. Thus, Plaintiffs have adequately plead counts VII and IX based on genetic information and therefore, Defendants' Motion to Dismiss should not be granted.

    **4.  Plaintiffs have made plausible and meritorious allegations of Americans with disabilities act and Rehabilitation act.**

Throughout these Title VII claims, one thing remains consistent, the Defendants assertion that the disparate treatment Plaintiffs complain of is based on vaccination status. However, as stated multiple times, vaccination status represented a way to identify which employees possessed genetic differences, held religious beliefs, or had a medical condition. As a result, Plaintiffs have sufficient plead their claims under Title 42 U.S.C. § 12101, et seq. and 29 U.S.C. § 794 as seen in the FAC. Therefore, Defendants' Motion to Dismiss should not be granted.

### H.  Plaintiffs' Constitutional Claims Do Not Fail

The Defendants improperly asserted that Plaintiffs constitutional claims failed, because they did not plausibly state their claim and because the Defendants were not state actors. However, Plaintiffs have at the very least satisfied the minimum pleading requirements by asserting factual allegations that give rise to a claim of relief. As per *Twombly*, Plaintiffs' claims will be construed liberally, not under a heightened standard. Plaintiffs are confident that access to discovery would further support and strengthen their claims against the Defendants. Thus, the Plaintiffs have stated a plausible claim to privacy when their sensitive information was passed around the company in memos and communications and they were required to wear symbols to identify their vaccination status, all without their consent. FAC at 74. Plaintiffs also plead that their fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence. *Id.* Additionally, the Plaintiffs' constitutional rights were violated because the Defendants infringed on their rights to privacy and treated them differently based on their religious beliefs, violating the First Amendment and Equal Protection. Despite the Defendants' claims that there were no longer any threats or coercion for employees to obtain the vaccine, current employees and potential employees are still being coerced to get vaccinated. Therefore, Plaintiffs have satisfied the minimum pleading requirements to state a claim.

Regarding the Defendants' arguments that they are not state actors fail, because "Atlas is the largest customer of the Department of Defense ("DOD") Air Mobility Command ("AMC"); Atlas carries more U.S. troops and military material than any other airline in the world; Atlas receives many millions of dollars from the DOD and AMC... and are the largest air freight carrier in the world." FAC at 43. Additionally, an individual can satisfy the requirements to become a state actor, "if the defendant has acted together with or has obtained significant aid

250

from state officials." *Gregg v. Ham*, 678 F.3d 333, 336 (4th Cir. 2012). Here, in an e-mail Atlas stated: "However, as a federal contractor who flies the military and their equipment, we will be required to comply with the Order issued by the President" (FAC at 46). Furthermore, they are state actors, based on jointly participating with "the Biden Administration in the universal inoculation of the COVID-19 vaccinations, as shown by the $407,000,000 in COVID-19 bailout money provided by the government." *Id*. Private persons, who are "jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 941 (1982).  Acting under color of law, does not require the accused to be an officer of the State... "it is enough that he is a willful participant in joint activity with the State or its agents... or if a nominally private entity . . . is controlled by an 'agency of the State,'" *Id.* (quoting *United States v. Price*, 383 U.S. at 383 U. S. 794); *Pennsylvania v. Board of Dirs*., 353 U.S. 230, 231, 1 L. Ed. 2d 792, 77 S. Ct. 806 (1957).

The Defendants cannot switch between being a state actor whenever they want in an attempt to take advantage of both positions. Nevertheless, the Defendants acting together with the Government to vaccinate their employees and the substantial amount of money they have received from the Government is sufficient to prove they state actors for purposes of this complaint. Thus, Plaintiffs' constitutional claims do not fail and should not be dismissed.

## I.   Plaintiffs' Have Adequately Alleged an IIED Claim Against the Defendants.

While Defendants' claim that Plaintiffs did not satisfy the pleading requirements, the Plaintiffs' have plead numerous factual allegations to prove an intentional infliction of emotional distress claim (IIED). Intent was exhibited due to their concerted efforts to impose the vaccine on all employees in accordance with the Biden Administration's order.  As a direct and proximate result of Defendants' policies, regulations, discrimination, and conduct, Plaintiffs have suffered,

251

and continue to suffer harm, humiliation, emotional distress, loss of liberty, loss of salary and benefits, loss of promotion and other career opportunities, mental anguish, loss of enjoyment of life, depression, substance abuse, headaches, anxiety, nightmares, inability to sleep, some of whom have experienced physical symptoms, and there are others who have experienced complications as a result of getting the vaccine. *See generally* FAC.

The conduct exhibited by Defendants including the coercion and misinformation regarding the vaccine and COVID-19 communicated to the Plaintiffs, represents a willful and conscious disregard for the treatment and safety of their employees. A cause of action for IIED, is referred to as "outrageous conduct causing severe emotional distress." *Dominguez v. Equitable Life Assur. Soc.* of U.S., 438 So. 2d 58, 59 (Fla. 3d DCA 1983). In the employment context, while it is more difficult to establish outrageous conduct, there are exceptions when individual rights are violated, physical symptoms are associated with the alleged conduct, and an active role of the employer in the infliction of distress. *Paraohao v. Bankers Club, Inc.*, 225 F. Supp. 2d 1353, 1361 (S.D. Fla. 2002); *See Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002) (the employee was called extremely vulgar names in her workplace); *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1251 (Ill. App. Ct. 1990) (noting that "[t]he impact of such outrageous conduct is exacerbated where, as here, the offender was also the employer of the victim.")

The actions exhibited by the Defendants due to their discrimination and the requirements only Plaintiffs were required to adhere to, the levels of coercion exhibited, and the misrepresentation involved are outrageous and constitute an abuse of power that was malicious and purposeful. The Defendants at one point required Plaintiffs to film themselves taking a COVID test, singled them out based on their vaccination status (they were the only ones required to wear masks and take precautions), were put at risk being surrounded by maskless vaccinated

252

employees, who could spread covid just as easily. (FAC at 39). Furthermore, there were individuals that were so scared due to Defendants' threat of leave without pay that they got the vaccine and suffered complications and physical symptoms associated with their emotional distress.

In addition, emotional distress damages are available not only for IIED, but also for invasion of privacy torts and applies in Florida, which was the position taken in *Bollea*. *Bollea v. Clem*, No. 12012447-CI-011 (Fla. Cir. Ct. Dec. 28, 2012); *See Kush v. Lloyd*, 616 So. 2d 415,422 (Fla. 1992) (observing that "it is well settled that mental suffering constitutes recoverable damages in cases of . . . invasion of privacy"). The disclosure and invasion into Plaintiff's private medical information resulted in severe emotional distress among the Plaintiffs', exhibited through the threats from co-workers, harassment, ridicule, loss of sleep, loss of appetite, headaches, etc. However, due to the numerosity surrounding the Plaintiffs' the Defendants will gain access during discovery to each Plaintiff's individual harms and/or physical symptoms suffered as a result of Defendants' actions. Thus, at this stage in litigation Plaintiffs have satisfied the pleading requirements to state a plausible claim for IIED.

**J.   Plaintiffs' Plausibly Assert a Negligent Infliction of Emotional Distress Claim.**

While it is true that Florida recognizes a narrow exception to the impact rule for NIED claims, there is also an exception for cases where the enormity of the outrage carries conviction that there has been severe emotional distress. *E. Airlines, Inc. v. King*, 557 So. 2d 574, 579 (Fla. 1990) (court held bodily harm is not required for severe cases). The conduct alleged by the plaintiffs as alleged in FAC ¶¶ 245-408, are so extreme and egregious that it rises to the level of being unconscionable and morally repugnant, thereby justifying the plaintiffs' claim for NIED. "Outrageous conduct... is defined as conduct that is so outrageous in character, and so extreme in

253

degree, as to go beyond all possible bounds of decency." *De La Campa v. Grifols Am.*, 819 So. 2d 940, 941 (Fla. Dist. Ct. App. 2002). Furthermore, the Supreme Court of Florida has recognized the inconsistencies across this jurisdiction in applying the exception to the impact rule by saying "[This] is not . . . an inflexible, unyielding rule of law, so sacred that it must be blindly followed without regard to context." *Rowell v. Holt*, 850 So. 2d 474, 478 (Fla. 2003). Thus, it can be implied that courts have discretion on when and how to apply this rule. Thus, if the courts find that the actions of the Defendant's rise to this level, this claim should not be dismissed and decided in our favor.

## CONCLUSION

In the interests of fairness and justice and individual's rights at stake, the Plaintiffs should be given an opportunity for their allegations to be heard in front of a jury of their peers. Additionally, if the Court determines that any of the claims fail to state a claim, Plaintiffs respectfully request the Court to allow their case to move forward into discovery. Thus, the court should reject the Defendants' motion to dismiss Plaintiffs' FAC at this stage in the lawsuit and proceed with a liberal interpretation of the Plaintiffs' allegations.

Dated: April 17, 2023                    Respectfully Submitted,

/s/ *John M. Pierce*
John M. Pierce
John Pierce Law
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054
jpierce@johnpiercelaw.com

*Attorney for Plaintiffs*

254

## CERTIFICATE OF SERVICE

I hereby certify that, on April 17, 2023, this motion was filed via the Court's

electronic filing system, which constitutes service upon all counsel of record.


<u>/s/ John M. Pierce</u>
John M. Pierce

255

# EXHIBIT A

| Name | | | | Employer | EEOC Status | Have you received a response from the EEOC? |
|---|---|---|---|---|---|---|
| Patrick Akerlund | Akerlund, Patric | Patrick | Akerlund | Atlas | RTS ISSUED | RTS issued 11/10/2022 |
| Michael Alzati | **Alzati, Michael** | Michael | Alzati | Atlas | WAITING ON EEOC | Waiting response from EEOC. |
| Eric W Anderson | Anderson, Eric | Eric W | Anderson | Atlas | WAITING ON EEOC | Waiting response from EEOC. |
| Michael G. Ballard Jr. | Ballard Jr. , Michael G. | Michael G. | Ballard Jr. | Atlas | RTS ISSUED | RTS issued 3/10/2023 |
| Cindy Barrionuevo | Barrionuevo, Cindy | Cindy | Barrionuevo | FSI | EEOC CLOSE CASE WITHOUT INTERVIEW OR ISSUING RTS | 2-27-2023 Update - Complaint filed with the Texas Workforce Commission was denied since they claim no discriminatio was found. |
| Larry James Bearce Jr. | Bearce Jr., Larr James | Larry James | Bearce Jr. | Atlas | RTS ISSUED | RTS issued 12/7/2022 |
| Robert Bellma | **Bellman, Robe** | Robert | Bellman | Atlas | RTS ISSUED | RTS issued 9-22-2023 |
| Benjamin Bendiburg | Bendiburg, Benjamin | Benjamin | Bendiburg | Atlas | WAITING ON EEOC | February 2023 update - Waiting respons from EEOC. |
| Douglas Berry | Berry, Douglas | Douglas | Berry | Atlas | WAITING ON EEOC | February 2023 - EEOC website says its still under investigation as of Feb 10, 2023 |
| Gregory Berry | Berry, Gregory | Gregory | Berry | Atlas | WAITING ON EEOC | Waiting response from EEOC. |
| Lynette Botha | Botha, Lynette | Lynette | Botha | Atlas | WAITING ON EEOC | 3-14-2023 update - Waiting to hear from the AZ EEOC office |
| Caleb Buehrer | **Buehrer, Caleb** | Caleb | Buehrer | Atlas | EEOC CLOSE CASE WITHOUT INTERVIEW OR ISSUING RTS | 3-6-2023 update - After unsuccesfully trying to schedule an interview for months, got response from EEOC stating case was closed. |
| Richard Bullock | **Bullock, Richard** | Richard | Bullock | Atlas | EEOC DENIE RTS LETTER | EEOC RTS letter denied. |
| Jon Carroll | Carroll, Jon | Jon | Carroll | Atlas | EEOC CLOSE CASE WITHOUT INTERVIEW OR ISSUING RTS | 2-23-2023 - I never received an intervie It shows closed.- |
| Vergil Caskey | Caskey, Vergil | Vergil | Caskey | Atlas | EEOC DENIE RTS LETTER | 2-25-2023 update - EEOC denied RTS letter stating he was still employed |
| James Castor | Castor, James | James | Castor | Atlas | RTS ISSUED | RTS issued 3-22-2023 |
| Estate of Lane Caviness | **Caviness, Estat of Lane** | Estate of La | Caviness | Atlas | DID NOT FILE | Has not filed yet. |
| Nathan Charboneau | Charboneau, Nathan | Nathan | Charboneau | Atlas | WAITING ON EEOC | 2-23-2023 update - EEOC website says i still under investigation as of Feb 9, 202 |
| Shawn Church | **Churchel, Shawn** | Shawn | Churchel | Atlas | RTS ISSUED | RTS California issued 9-12-2022 / EEO RTS issued 10/31/2022 |
| Joel Colon | **Colon, Joel** | Joel | Colon | Atlas | EEOC DENIE RTS LETTER | EEOC RTS letter denied. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mark Connor | Connor, Mark | Mark | Connor | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-25-2023 Tried scheduling multiple times. No slots. |
| Matthew Cronauer | Cronauer, Matthew | Matthew | Cronauer | Atlas | WAITING ON EEOC | 2-23-2023 Waiting for a change to be made before filing. I've reached out to th EEOC employee who drafted it to see when the change should be made. |
| Fred Cunningham | Cunningham, Fred | Fred | Cunningham | Atlas | RTS ISSUED | RTS issued 2/15/2023 |
| Royal Danza | Danza, Royal | Royal | Danza | Atlas | RTS ISSUED | RTS issued 3/28/2023 |
| Elliot De Sous | De Sousa, Elliot | Elliot | De Sousa | Atlas | RTS ISSUED | RTS issued 3/24/2023 |
| Eric Desandro | Desandro, Eric | Eric | Desandro | Atlas | UNABLE TO SCHEDULE INTERVIEW WITH EEOC / FL RTS ISSUE | 2-25-2023 - EEOC Cannot schedule an interview / FL FCHR: 1-6-2023 Closed case without finding any violations and did not issue RTS letter. Letter in folder. |
| Steve Dixon | Dixon, Steve | Steve | Dixon | Atlas | WAITING ON EEOC | 2-23-2023 Charge filed 1-23-2023. Waiting response from the EEOC. |
| James Erickso | Erickson, James | James | Erickson | Atlas | DID NOT FILE | Has not filed yet. |
| Luis Esquivia | Esquivia, Luis | Luis | Esquivia | Atlas | DID NOT FILE | Has not filed yet. |
| Lee Estes | Estes, Lee | Lee | Estes | Atlas | RTS ISSUED | RTS issued 12/29/2022 |
| Robert Fratti | Fratti, Robert | Robert | Fratti | Atlas | EEOC DOES NOT RESPON | 4-9-2023 update - EEOC does not answe to his emails. |
| Jason Frisbie | Frisbie, Jason | Jason | Frisbie | Atlas | DID NOT FILE | Has not filed yet. |
| Timothy Frye | Frye, Timothy | Timothy | Frye | Atlas | RTS ISSUED | RTS issued 10/25/2022 |
| Jonathan Fussl | Fussle, Jonathan | Jonathan | Fussle | Atlas | WAITING ON EEOC | Waiting on IN EEOC to say if they will take the case. |
| Tony Gamboa | Gamboa, Tony | Tony | Gamboa | Atlas | DID NOT FILE | Has not filed yet. |
| Dennis Gebhar | Gebhard, Dennis | Dennis | Gebhard | Atlas | RTS ISSUED | RTS issued 12/16/2022 |
| Reza Ghods | Ghods, Reza | Reza | Ghods | Atlas | WAITING ON EEOC | Waiting response from EEOC. |
| Mark Gilman | Gilman, Mark | Mark | Gilman | Atlas | RTS ISSUED | RTS issued 8/10/2022 |
| Robert Giudice | Giudice, Robert | Robert | Giudice | Atlas | WAITING ON EEOC | 2-28-2023 I have the Charge of Discrimination letter but am amending it for content and timeframes. I should hav it signed and returned in the next fees days. |
| Eric Gordon | Gordon, Eric | Eric | Gordon | Atlas | EEOC CLOSE CASE WITHOUT INTERVIEW OR ISSUING RTS | 2-23-2023 - My interview for March 1st 2023 was cancelled on December 29th, 2022 and my inquiry was closed. This i the second time it was closed. The first time it was closed because I missed an email to confirm I would be available fo the interview. I called but have yet to he from them. |
| Greg Gordon | Gordon, Greg | Greg | Gordon | Atlas | DID NOT FILE | Has not filed yet. |
| Daniel Greer | Greer, Daniel | Daniel | Greer | Atlas. Resigned. | RTS ISSUED | RTS California RTS issued 5/17/2022 - RTS EEOC issued 8/17/2022 |
| Rexford T. Heivilin | Heivilin, Rexfor T. | Rexford T. | Heivilin | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Jason Henning | Henning, Jason | Jason | Henning | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |

258

| | | | | | | |
|---|---|---|---|---|---|---|
| David Hewson III | Hewson III, David | David | Hewson III | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Todd Hontz | Hontz, Todd | Todd | Hontz | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-23-2023 Could not schedule an interview with the EEOC. We requested the he save as many records of that as possible to demonstrate our willingness exhaust all measure for the judge. |
| Daniel Hudson | Hudson, Daniel | Daniel | Hudson | Atlas | RTS ISSUED | RTS issued 1/26/2023 |
| Roger Justice | Justice, Roger | Roger | Justice | Atlas | RTS ISSUED | RTS issued 9/8/2022 |
| Venancius Kassandji | Kassandji, Venancius | Venancius | Kassandji | Atlas | UNDER EEOC MEDIATION | In mediation with the EEOC |
| John Kearins | Kearins, John | John | Kearins | Atlas | EEOC DOES NOT RESPON | March 2023 update - In June 2022, EEO Boston office stated claim would not be forwarded for any more consideration. Case handler Danisha Gelin. Has been trying to reach the office to get a RTS letter but with no success. |
| Ricky Kinder | Kinder, Ricky | Ricky | Kinder | Atlas | EEOC DENIE RTS LETTER | EEOC RTS letter denied. |
| Beth Kirby | Kirby, Beth | Beth | Kirby | Atlas | DID NOT FILE | Has not filed yet. |
| Andreas N. Koustas | Koustas, Andre N. | Andreas N. | Koustas | Atlas | RTS ISSUED | RTS issued 2-23-2023 |
| Chad Kravetz | Kravetz, Chad | Chad | Kravetz | Atlas | UNDER EEOC MEDIATION | 3-24-2023 update - Under mediation. Waiting on EEOC to respond to Atlas' response. |
| Carl Lindberg | Lindberg, Carl | Carl | Lindberg | Atlas | DID NOT FILE | Has not filed yet. |
| Joseph Loschiavo | Loschiavo, Joseph | Joseph | Loschiavo | Atlas | RTS ISSUED | RTS issued 9/12/2022 |
| Andrew Lutz | Lutz, Andrew | Andrew | Lutz | Atlas | RTS ISSUED | RTS issued 2/15/2023 |
| Blythe Lutz | Lutz, Blythe | Blythe | Lutz | Atlas | RTS ISSUED | RTS issued 2/23/2023 |
| Rafael Macario | Macario, Rafae | Rafael | Macario | Atlas | RTS ISSUED | RTS issued 11/2/2022 |
| Douglas P. Mayo Jr | Mayo Jr, Douglas P. | Douglas P. | Mayo Jr | Atlas | RTS ISSUED | RTS issued 8/29/2022 |
| April McQuill | McQuillen, April | April | McQuillen | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Christopher McQuillen | McQuillen, Christopher | Christopher | McQuillen | Atlas | RTS ISSUED | RTS issued 4/6/2023 |
| Steven Meissn | Meissner, Stev | Steven | Meissner | Atlas. Resigned. | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Jeffrey Michonski | Michonski, Jeffrey | Jeffrey | Michonski | Atlas | RTS ISSUED | RTS issued 3/22/2022 |
| Andrew Mickl | Mickler, Andre | Andrew | Mickler | Atlas | EEOC DENIE RTS LETTER | 2-22-2023 update - EEOC RTS letter denied. |
| Corey Morris | Morris, Corey | Corey | Morris | Atlas | RTS ISSUED | RTS issued |
| Steven Murato | Muratore, Steven | Steven | Muratore | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Gregory Myers | Myers, Gregory | Gregory | Myers | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Peter Napora | Napora, Peter | Peter | Napora | Atlas | RTS ISSUED | RTS Issued 2/21/2023 |
| Joel Pardo | Pardo, Joel | Joel | Pardo | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-8-2023 Unable to schedule with EEOC |
| Lance Phillips | Phillips, Lance | Lance | Phillips | Atlas | RTS ISSUED | RTS Issued 9/30/2022 |

259

| Name | Last, First | First | Last | Company | Status | Notes |
|---|---|---|---|---|---|---|
| Patrick Phillips | Phillips, Patrick | Patrick | Phillips | Atlas | RTS ISSUED | RTS issued 09/29/2022 |
| Glen Pronk | Pronk, Glen | Glen | Pronk | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-8-2023 Unable to schedule with EEOC |
| Charles Randa | Randall, Charle | Charles | Randall | Atlas | RTS ISSUED | RTS issued 8/18/2022 |
| Peter Raymond | Raymond, Peter | Peter | Raymond | Atlas | DID NOT FILE | Has not filed yet. |
| Joshua Roberts | Roberts, Joshua | Joshua | Roberts | Atlas | RTS ISSUED | RTS issued 1/3/2023 |
| Rebecca Robertson | Robertson, Rebecca | Rebecca | Robertson | FSI | WAITING ON EEOC | 3-9-2023 update - FSI no longer wishes mediate and case has been transferred to the investigation unit. It could be betwee 10 - 15 months before your case is assigned to investigations. |
| Jason Rogers | Rogers, Jason | Jason | Rogers | Atlas | RTS ISSUED | RTS issued 1/10/2023 |
| Kimberly Schreck | Schreck, Kimberly | Kimberly | Schreck | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-8-2023 Unable to schedule with EEOC |
| William Serritella | **Serritella, William** | William | Serritella | Atlas. Resigned. | WAITING ON EEOC | 2-23-2023 - EEOC - I have received you signed charge and it is being processed. Once the Charge is assigned to a specific Investigator we will notify you as soon a possible.... |
| Gentry Shelton | Shelton, Gentry | Gentry | Shelton | Atlas | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Todd Snaza | Snaza, Todd | Todd | Snaza | Atlas | RTS ISSUED | RTS issued 2/27/2023 |
| Donald Sorrentino | Sorrentino, Donald | Donald | Sorrentino | Atlas | RTS ISSUED | RTS issued 3-31-2023 |
| Mark South | South, Mark | Mark | South | Atlas | UNDER EEOC MEDIATION | Florida's FCHR is investigating. |
| Michael Stark | Stark, Michael | Michael | Stark | Atlas | RTS ISSUED | RTS issued 11/4/2022 |
| Elizabeth Stoneking | Stoneking, Elizabeth | Elizabeth | Stoneking | FSI. Resigned b wants to be part. | RTS ISSUED | RTS issued 11/3/2022 |
| Forrest Stowel | Stowells, Forres | Forrest | Stowells | Atlas | RTS ISSUED | RTS issued 8/17/2022 |
| Barbara Janeic Surber | Surber, Barbara Janeice | Barbara Janeice | Surber | FSI | WAITING ON EEOC | 3-10-2023 update - Because 180 days have passed since filed with the Texas Workforce Commission Civil Rights Division, she has the right to get a RTS letter from the TWCCRD. Waiting to be issued. |
| John Swift | Swift, John | John | Swift | Atlas | RTS ISSUED | RTS issued 11/14/2022 |
| Nick Taylor | Taylor, Nick | Nick | Taylor | Atlas | RTS ISSUED | RTS issued 2/1/2023 |
| Mark Thien | Thien, Mark | Mark | Thien | Other | RTS ISSUED | RTS issued 2/23/2023 |
| William Thompson | **Thompson, William** | William | Thompson | Atlas | WAITING ON EEOC | Waiting response from EEOC investigation |
| Brandon Thoroughman | Thoroughman, Brandon | Brandon | Thoroughman | Atlas | EEOC DOES NOT RESPON | 2-23-2023 Website said case was closed Emailed agent to get an answer. |
| Geri Tonda | Tonda, Geri | Geri | Tonda | FSI | WAITING ON EEOC | March 2023 update - Waiting response from EEOC. |
| Ricardo Torres Abarca | Torres Abarca, Ricardo | Ricardo | Torres Abarca | FSI | RTS ISSUED | RTS issued 10/25/2022 |

260

| | | | | | | |
|---|---|---|---|---|---|---|
| Gustavo Verde | Verdes, Gustavo | Gustavo | Verdes | Atlas | UNABLE TO SCHEDULE INTERVIEW | 2-8-2023 Unable to schedule with EEOC |
| James Villella | **Villella, James** | James | Villella | Atlas | RTS ISSUED | RTS issued 7/30/2022 |
| Farshad Zarrabian | **Zarrabian, Farshad** | Farshad | Zarrabian | Atlas | WAITING ON EEOC | February 2023 - EEOC website says its still under investigation as of Feb 18, 2023 |

261

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

ESTATE OF LANE CAVINESS, *et al.*,

     Plaintiffs,

v.

     Case No. 1:22-cv-23519-KMM-LFL

ATLAS AIR, INC., *et al.*,

     Defendants.

**DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF
INCORPORATED MOTIONS TO DISMISS PURSUANT TO
RULES 12(B)(1), 12(B)(2), AND 12(B)(6)**

262

**TABLE OF CONTENTS**

**Page**

I.     Plaintiffs Have Not Satisfied the Constitutional Test for Personal Jurisdiction over FSI and Encompass or over Atlas for the Vast Majority of Claims.................................. 2

II.    All Claims by FSI Plaintiffs Are Subject to Mandatory and Enforceable Arbitration. ........................................................................................................ 7

III.   The Court Has Authority to Dismiss the Shotgun Pleading with Prejudice. ..................... 8

IV.    Count I: Plaintiffs Cannot State Any Invasion of Privacy Claim Based on Masking........................................................................................................... 9

V.     Count II: Plaintiffs' Negligence Claim Is Defective and Duplicative............................ 11

VI.    Count III: The Court Lacks Subject Matter Jurisdiction Over the Atlas Pilot Employees' Claims for Breach of Their Collective Bargaining Agreement.................... 12

VII.   Count IV: No Valid Florida Whistleblower Act Claim. ................................................. 13

VIII.  Counts V, VI, VII, VIII, IX, and XI: Nearly Half of the Plaintiffs' Title VII, GINA, ADA, and Rehabilitation Act Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies. ................................................................... 14

IX.    Counts V, VII, and XI: Plaintiffs Title VII Claims Legally Fail. ................................... 16

X.     Count VIII and IX: No Valid GINA Claims. ................................................................. 21

XI.    Count XI: No Valid Americans with Disabilities Act ("ADA") or Rehabilitation Act Claims.................................................................................................... 21

XII.   Count X: Plaintiffs' Allege No Constitutional Violation or State Action...................... 22

XIII.  Count XII:  No Valid Intentional Infliction of Emotional Distress ("IIED") Claim........ 24

XIV.   Count XIII: No Valid Negligent Infliction of Emotional Distress ("NIED") Claim. ...... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Aery v. Wallace Lincoln-Mercury, LLC*,
   118 So. 3d 904 (Fla. Ct. App. 2013) ................................................................... 14

*Anderson v. United Airlines*,
   577 F. Supp. 3d 1324 (M.D. Fla. 2021) ...............................................................16

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
   582 U.S. 255 (2017) .............................................................................................. 2, 3

*Brown v. Royal Carib. Cruises, Ltd.*,
   2017 WL 3773709 (S.D. Fla. Mar. 17, 2017) ....................................................... 24

*Cape Pubs., Inc. v. Hitchner*,
   549 So.2d 1374 (Fla. 1989) .................................................................................. 10, 11

*Carmouche v. Tamborlee Mgmt., Inc.*,
   789 F.3d 1201 (11th Cir. 2015) .............................................................................. 3

*Chudasama v. Mazda Motor Corp.*,
   123 F.3d 1353 (11th Cir. 1997) .............................................................................. 1, 17

*Ciraci v. J.M. Smucker Co.*,
   62 F.4th 278 (6th Cir. 2023) ................................................................................... 23, 24

*Cousins v. United Healthcare, Inc.*,
   2020 WL 1666628 (S.D. Fla. Apr. 3, 2020) .......................................................... 15

*D'Cunha v. Northwell Health Sys.*,
   2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023) ........................................................ 19

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ................................................................................................ 4, 5, 6

*Doe v. Moore*,
   410 F.3d 1337 (11th Cir. 2005) .............................................................................. 23

*Doe v. Univision Television Grp., Inc.*,
   717 So. 2d 63 (Fla. Ct. App. 1998) ........................................................................ 11

*Dollar v. Goleta Water Dist.*,
    2022 WL 5176904 (C.D. Cal. Oct. 3, 2022) ................................................................19

*Dos Santos v. AIDS Healthcare Found., Inc.*,
    2021 WL 4972993 (S.D. Fla. Jan. 5, 2021) ..............................................................14

*E. Airlines, Inc. v. King*,
    557 So. 2d 574 (Fla. 1990)..........................................................................................25

*Egelkrout v. Aspirus, Inc.*,
    2022 WL 2833961 (W.D. Wis. July 20, 2022) ..........................................................18

*Forehand v. Fla. State Hosp. at Chattahoochee*,
    89 F.3d 1562 (11th Cir. 1996)....................................................................................15

*Glendale Outpatient Surgery Ctr. v. United Healthcare Servs., Inc.*,
    805 F. App'x 530 (9th Cir. 2020) ..............................................................................17

*Glover v. St. Louis-S.F. Ry.*,
    393 U.S. 324 (1969)............................................................................................ 12, 13

*Graddy v. Wal-Mart Stores E., LP*,
    237 F. Supp. 3d 1223 (M.D. Fla. 2017) ....................................................................14

*Gregg v. Ham*,
    678 F.3d 333 (4th Cir. 2012)......................................................................................24

*Guarino v. Mandel*,
    327 So. 3d 853 (Fla. Dist. Ct. App. 2021) ..................................................................9

*Halstead v. Espinoza*,
    2023 WL 2399288 (11th Cir. Mar. 8, 2023) ...............................................................8

*Hart v. United States*,
    894 F.2d 1539 (11th Cir. 1990)..................................................................................25

*Henderson v. McMurray*,
    987 F.3d 997 (11th Cir. 2021)....................................................................................23

*Hiers v. Bordt*,
    2016 WL 9506039 (N.D. Fla. July 6, 2016) .............................................................12

*Lambert v. Austin Ind.*,
    544 F.3d 1192 (11th Cir. 2008)....................................................................................7

*Leake v. Raytheon Techs. Corp.*,
    2023 WL 2242857 (D. Ariz. Feb. 27, 2023) ............................................................ 19, 20

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) .................................................................................................... 24

*Mark South v. Atlas Air, Inc.*,
    2023 WL 3184346 (Fla. Div. Admin. Hrgs. Apr. 24, 2023) ............................................. 17, 19

*Martz v. Munroe Reg'l Med. Ctr., Inc.*,
    2007 WL 2044247 (M.D. Fla. July 10, 2007) ............................................................. 24

*McCullough v. Royal Carib. Cruises, Ltd.*,
    268 F. Supp. 3d 1336 (S.D. Fla. 2017) ...................................................................... 6

*McDowell v. United Servs. Co.*,
    2008 WL 5210018 (M.D. Fla. Dec. 10, 2008) ............................................................. 16

*McKally v. Perez*,
    87 F. Supp. 3d 1310 (S.D. Fla. 2015) ....................................................................... 1, 10

*Moore v. Pederson*,
    806 F.3d 1036 (11th Cir. 2015) ................................................................................ 24, 25

*Newsweek Stations Orlando, Inc. v. Guetzloe*,
    968 So. 2d 608 (Fla. Ct. App. 2007) ......................................................................... 10

*Pennington v. PruittHealth, Inc.*,
    2019 WL 5309117 (M.D. Ga. Oct. 21, 2019) ............................................................. 15

*Perla v. United Airlines, Inc.*,
    2019 WL 2581499 (S.D. Tex. May 31, 2019) ............................................................. 13

*Pro. Airline Flight Control Ass'n v. Spirit Airlines, Inc.*,
    65 F.4th 647 (11th Cir. Mar. 8, 2023) ....................................................................... 12

*Pyles v. United Air Lines, Inc.*,
    79 F.3d 1046 (11th Cir. 1996) .................................................................................. 13

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003) ..................................................................................................... 20

*Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*,
    723 F. App'x 871 (11th Cir. 2018) .......................................................................... 2, 3, 5, 6

266

*Ryder Truck Rental, Inc. v. Coastline Distrib. of Tampa,*
  512 So.2d 1093 (Fla. Ct. App. 1987) ...................................................................11

*Salinero v. Johnson & Johnson,*
  995 F.3d 959 (11th Cir. 2021)...........................................................................10

*Sharikov v. Philips Med. Sys. MR, Inc.,*
  2023 WL 2390360 (N.D.N.Y. Mar. 7, 2023)...................................................10

*Shea v. BBVA Compass Bancshares, Inc.,*
  2013 WL 869526 (S.D. Fla. Mar. 7, 2013) .......................................................7

*Singh v. Royal Carib. Cruises Ltd.,*
  576 F. Supp. 3d 1166 (S.D. Fla. 2021) ...........................................................22

*Thompson v. Carnival Corp.,*
  174 F. Supp. 3d 1327 (S.D. Fla. 2016) ........................................................ 4, 5

*United Techs. Corp. v. Mazer,*
  556 F.3d 1260 (11th Cir. 2009).........................................................................3

*Walden v. Fiore,*
  571 U.S. 277 (2014)...........................................................................................3

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)..........................................................................................23

**STATUTES AND REGULATIONS**

14 C.F.R. § 61.53 ....................................................................................................13

42 U.S.C. § 2000e ...................................................................................................18

42 U.S.C. §§ 2000e-5...............................................................................................16

42 U.S.C. § 2000ff-1...............................................................................................21

42 U.S.C. § 12102....................................................................................................22

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12.................................................................2, 4, 7

Federal Rule of Civil Procedure 23......................................................................17

**INTRODUCTION**

Resolving this Motion ("Mot.") simply requires applying settled law. Plaintiffs have not articulated legally viable claims and wrongly seek to unlock discovery without pleading plausible allegations for nearly 100 Plaintiffs' claims in this non-class case against each Defendant. The Court should thus dismiss the case with prejudice. By "dismiss[ing] [their] nonmeritorous claim[s] before discovery has begun, unnecessary costs to the litigants and to the court system can be avoided." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997).

Even accepting Plaintiffs' improper attempt to amend their First Amended Complaint ("FAC") through "[their] brief[] in opposition to [the] motion to dismiss," *McKally v. Perez*, 87 F. Supp. 3d 1310, 1317 (S.D. Fla. 2015), they still have not established jurisdiction or stated any cognizable claims. In their Opposition ("Opp."), Plaintiffs do not:

- Meet the exacting *Daimler* standard for general jurisdiction, identify any Florida contacts for specific jurisdiction as to FSI or Encompass or for the vast majority of claims against Atlas, or dispute any facts so as to require jurisdictional discovery. (Part I);

- Contest the validity or enforceability of the mandatory arbitration clauses for all of their claims against FSI. (Part II);

- Satisfy the elements to plead negligent or intentional disclosure of protected health information when Defendants required COVID-19 masking. (Parts IV–V);

- Defeat the Railway Labor Act's divestiture of subject matter jurisdiction as to Plaintiffs' collective bargaining agreement claims against Atlas, or articulate any legal theory why COVID-19 vaccines violated FAA regulations. (Parts VI–VII);

- Overcome the admitted failure of nearly half of the Plaintiffs to fully exhaust administrative remedies or of any of the Plaintiffs to allege actionable Title VII, GINA, ADA or Rehabilitation Act claims. (Parts VIII–XI);

- Allege any constitutional violations for COVID-19 vaccines, masks, or tests, or any basis for holding the private employer Defendants liable under the Constitution (Part XII); or

- Provide any basis to disagree with those courts that have rejected IIED and NIED claims based on ordinary workplace issues, such as COVID-19 policy. (Parts XIII–XIV.)

## **ARGUMENT**

I.     **Plaintiffs Have Not Satisfied the Constitutional Test for Personal Jurisdiction over FSI and Encompass or over Atlas for the Vast Majority of Claims.**

Plaintiffs' Opposition as to personal jurisdiction (Opp. 10–16) blurs two important distinctions. First, it conflates the requirements of the Florida long-arm statute (which Defendants have not invoked) and the requirements of the Constitution's Due Process Clause. Second, it jumbles the tests for general (or "all-purpose") jurisdiction and specific (or "suit-related") jurisdiction. Atlas, FSI, and Encompass move to dismiss for lack of personal jurisdiction *solely* under the Constitution, which Florida's long-arm statute cannot exceed. When Defendants' arguments are evaluated under the proper constitutional test, there can be no doubt that all claims against FSI and Encompass and most claims against Atlas should be dismissed.[1]

"A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017). "Specific jurisdiction is very different. In order for a . . . court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Id.* These constitutional minimums set an independent limit on personal jurisdiction: in other words, a plaintiff cannot avoid due process limits by arguing that the terms of the state's long-arm statute are satisfied. *Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 874 (11th Cir. 2018) (personal jurisdiction "must (1) be

---

[1] Plaintiffs also advance irrelevant arguments about personal jurisdiction as to the individual Defendants, (Opp. 15–16), when those individuals solely seek dismissal for failure to state a claim under Rule 12(b)(6), not personal jurisdiction. *See* Mot. 5–13. With respect to specific jurisdiction, Defendants have limited their motions to the "minimum contacts" analysis, rather than the "fair play and substantial justice" factors that a Court only reaches when there are constitutionally sufficient suit-linked contacts. *Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 874 (11th Cir. 2018) (recognizing that without constitutionally sufficient contacts, it is "unnecessary" to analyze fairness factors).

appropriate under the state long-arm statue *and* (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (emphasis added)); *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (to determine whether court has general jurisdiction over a defendant under the Florida long-arm statute, "we need only determine whether the district court's exercise of jurisdiction over [defendant] *would exceed constitutional bounds*" (emphasis added)).

**Specific Jurisdiction as to Atlas.** To establish specific jurisdiction under the Constitution, Plaintiffs bear the burden to show that Atlas, FSI, and Encompass had sufficient contacts with Florida that gave rise to Plaintiffs' claims. *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (explaining that under the "minimum contacts" analysis for specific jurisdiction, "the defendant's suit-related conduct must create a substantial connection with the forum State"); *Rowe*, 723 F. App'x at 875 ("[T]here must be a sufficient nexus between [the defendants' forum-state] contacts and the litigation."). This analysis proceeds Plaintiff-by-Plaintiff, as personal jurisdiction for one Plaintiff's claims does not establish personal jurisdiction for another's. *See Bristol-Myers*, 582 U.S. at 265. Nowhere in their FAC—amended after Defendants moved to dismiss the original complaint for lack of personal jurisdiction—do any of the Plaintiffs allege a single suit-related contact by Defendants with Florida (let alone the substantial suit-related connection required for specific personal jurisdiction). Nor do Plaintiffs dispute that 67 Atlas Plaintiffs *do not work in Florida* (53 of whom *neither live nor work in Florida*), Ybarra Decl. ¶ 14 (ECF No. 43-1), or that *none* of the FSI or Encompass Plaintiffs *live or work in Florida*, Ffrench Decl. ¶ 13 (ECF No. 43-2); Weber Decl. ¶ 4 (ECF No. 43-3). Moreover, Plaintiffs do not argue that jurisdictional discovery would contradict any of the facts Defendants submitted, which the Court therefore must credit. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280 (11th Cir. 2009).

270

Accordingly, without establishing general jurisdiction over Atlas (which they cannot), the claims of these 73 Plaintiffs—67 of the 90 Plaintiffs asserting claims against Atlas and all 7 of the FSI and Encompass Plaintiffs—should be dismissed for lack of personal jurisdiction. *See* Mot. 9–11 (collecting authorities).[2]

**General Jurisdiction as to Atlas.** Although Plaintiffs cite *International Shoe*—a specific jurisdiction case—their primary argument for personal jurisdiction sounds in general jurisdiction. *See* Opp. 11–13. Plaintiffs argue that "despite the fact that Atlas is incorporated in Delaware and maintains headquarters in New York, [Atlas] still [has] a massive presence in Florida" based on "Atlas maintaining and running a hub, training center" and other operations in the State. Opp. 11. None of these allegations have anything to do with the facts underlying Plaintiffs' claims. For example, that "[a]s Pilots gets their Atlas career off the ground their first stop is in Miami" has nothing to do with the claims asserted here and, at most, would be relevant to a claim of general jurisdiction. Opp. 12. That general jurisdiction argument fails, however, because Plaintiffs ignore the sea-change brought about by *Daimler AG v. Bauman*, 571 U.S. 117 (2014)—a case that Defendants extensively relied on, yet Plaintiffs fail to mention. *See Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1336 (S.D. Fla. 2016) (Moore, J.) (describing counsel's failure to cite *Daimler* as "inexplicable and borderline malpractice" because older case law does "not comport with the cabined conception of general jurisdiction that now exists post-*Daimler*.").

---

[2] The remaining Plaintiffs' claims each should be dismissed because of the reasons described in the following sections: Plaintiffs (a) cannot demonstrate personal jurisdiction over FSI or Encompass, (b) are subject to FSI's mandatory arbitration clause and/or (c) their claims fail under Rule 12(b)(6) to state a claim (or under Rule 12(b)(1) for the collective bargaining claims).

271

In *Daimler*, the Supreme Court rejected as "unacceptably grasping" the idea that a defendant corporation could be subject to all-purpose or general jurisdiction "in every State in which [the] corporation 'engages in a substantial, continuous, and systematic course of business.'" *Daimler*, 571 U.S. at 138. Instead, the Court held the proper question is "whether that corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State" and that only in "an exceptional case" could the "corporation's operations in a forum other than its formal place of incorporation or principal place of business" be sufficient. *Id.* 139 & n.19. *See Thompson*, 174 F. Supp. at 1336 n. 7 (quoting that it is "incredibly difficult" to meet this test and that "[w]hile such an exception is theoretically possible, the [Supreme] Court suggests that it will be the rarest of rarities"). And, contrary to Plaintiffs' claim that general jurisdiction does not call for a comparative analysis among the states,[3] *Daimler* requires exactly that. *See Daimler*, 571 U.S. at 139 n.20 ("General jurisdiction . . . calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them."). That is why, crediting all of Plaintiffs' factual assertions in their Opposition and the FAC, the non-suit-related contacts do not come close to meeting this difficult and exceptional showing. It is thus little wonder that Plaintiffs offer no rebuttal to the many post-*Daimler* cases Defendants cited holding that airlines with similar or greater in-state contacts were not subject to general jurisdiction. *See* Mot. 7.

---

[3] Specifically, Plaintiffs incorrectly argue "whether or not other states have larger buildings or more personnel," the Florida presence "cannot be negated" and fault Defendants for an allegedly "baseless comparison of the square footage of various facilities throughout the United States." Opp. 12. As for Plaintiffs' new reference in their Opposition to a single meeting "at the Marriot Miami Airport," (*id.*), this, too, falls far short of the general jurisdiction standard (whether pre- or post-*Daimler*). *See Rowe*, 723 F. App'x at 873–75 (rejecting general jurisdiction under *Daimler* (and specific jurisdiction) despite many in-state contacts by defendants including multiple in-state meetings, phone calls, and emails to plaintiff in forum state and a deposition conducted there).

272

**Personal Jurisdiction as to FSI and Encompass.** Plaintiffs' lead argument for general personal jurisdiction against FSI and Encompass relies on bootstrapping those defendants to Atlas. Opp. 14, 15. First, as just discussed, general personal jurisdiction over Atlas is inappropriate post-*Daimler*. Second, in any event, *Daimler* and its progeny also hold that agency relationships cannot confer jurisdiction even within the same corporate family—as with Mercedes-Benz in that case. *McCullough v. Royal Carib. Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1348–49 (S.D. Fla. 2017) (holding that "*Daimler* rejected the Ninth Circuit's agency theory of jurisdiction" and finding no general jurisdiction because "[w]ithout the agency theory, the [Plaintiffs] [had] provided no evidence or authority to support a finding that [the Defendant]—a British Virgin Islands company with no Florida presence . . . is 'essentially at home' in Florida"). It follows *a fortiori* that personal jurisdiction over each of the separately-owned-and-operated Defendant companies in this case must be evaluated separately. *See id.* And, it is undisputed that neither Encompass nor FSI are incorporated or have their principal place of business in Florida, nor—outside of purported ties to Atlas—have Plaintiffs identified *any* Florida operations by either of those companies.

As to specific jurisdiction, Plaintiffs identify no suit-related contacts by Encompass and thus its motion to dismiss must be granted. *See* Mot. 13. Plaintiffs muster a single supposed contact by FSI's President—an email to FSI employees (Opp. 14)—yet this cannot demonstrate specific jurisdiction. Even if this email were sufficient as a contact—and it is not, *see Rowe*, 723 F. App'x at 873–75—it could not demonstrate a constitutionally adequate tie *with Florida*. As FSI's declaration shows, without rebuttal from Plaintiffs, "all FSI flight attendants, as a condition of employment, must relocate to within seventy-five (75) miles of *Houston, Texas*." Ffrench Decl. ¶ 12 (emphasis added). Simply put, a single email to employees in Texas cannot possibly confer personal jurisdiction over FSI in Florida.

273

**II.**  **All Claims by FSI Plaintiffs Are Subject to Mandatory and Enforceable Arbitration.**

Plaintiffs' Opposition (Opp. 16–17) does not dispute any of the aspects of FSI's motion to dismiss due to the mandatory arbitration clause. Mot. 13–15. Specifically, Plaintiffs do not (because they cannot) contest that each of the six FSI employee Plaintiffs agreed to be bound by mandatory arbitration in Texas and that the scope of this arbitration clause—covering "all disputes, claims and controversies which [Plaintiffs] may have with FSI, whether individual, joint or as part of a class" (Mot. 13 (quoting Composite Ex. G))—unequivocally covers their claims here. Nor do Plaintiffs offer any argument that the public policy of Texas or Florida prohibits enforcement. Thus, regardless of the Court's determination of any other issue presented in this motion, all claims against FSI must be dismissed in favor of arbitration. In the Eleventh Circuit, such motions to compel arbitration "are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to [Rule] 12(b)(1)." *Shea v. BBVA Compass Bancshares, Inc.*, 2013 WL 869526, at *2 n.3 (S.D. Fla. Mar. 7, 2013) (Moore, J.); *accord Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (holding that the Federal Arbitration Act allows the court to "dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement."); *see also* Mot. 4 (requesting that the Court reach arbitrability of the claims against FSI before personal jurisdiction over FSI).

None of Plaintiffs' arguments in their Opposition discussing FSI's arbitration clause (*see* Opp. 16–18) are responsive to anything FSI has argued. Instead, Plaintiffs argue that Rule 12(b)(1) does not require this Court to dismiss the entire case. On that point, Defendants agree. The only subject matter jurisdiction dismissals under Rule 12(b)(1) Defendants seek are (i) all claims against FSI due to arbitrability and (ii) Count III's breach of contract claims under Atlas's collective bargaining agreement ("CBA") because of the Railway Labor Act ("RLA"). As such, Defendants

274

address Plaintiffs' RLA arguments (Opp. 16–18, 25) below in explaining why Count III must be dismissed.[4]

**III.      The Court Has Authority to Dismiss the Shotgun Pleading with Prejudice.**

Plaintiffs' only argument why the Court should not deem the FAC a shotgun pleading is that "there is nothing confusing regarding the allegations made in the FAC" and "the allegations in [the] complaint are presented in a clear and straightforward manner." Opp. 19. Defendants suggest that the FAC speaks for itself in refuting those characterizations.

But, even if that were not true, Plaintiffs do not deny that the FAC has two additional features of a shotgun pleading pointed out in Defendants' Motion: the FAC (1) incorporates "the allegations of all preceding counts" for each of their 13 causes of action; and (2) asserts many claims against many Defendants without adequately specifying "which of the defendants are responsible for which acts." Mot. 16.

If the Court concludes they submitted a shotgun pleading, Plaintiffs ask the Court to rule that Plaintiffs must provide a more definite statement rather than dismissing their claims with prejudice. Opp. 19. Defendants agree that a district court has discretion to require a more definite statement. But recent Eleventh Circuit case law holds that "[o]nce a district gives a plaintiff fair notice of the specific defects in the complaint and a meaningful chance to fix them, dismissal with prejudice on shotgun pleading grounds is proper if a plaintiff files an amended complaint afflicted with the same defects." *Halstead v. Espinoza*, 2023 WL 2399288, at *2 (11th Cir. Mar. 8, 2023). That happened here: this Court gave Plaintiffs the opportunity to amend their original Complaint to respond to each of the issues that formed the basis of Defendants' motion to dismiss that

---

[4] FSI flight attendants are subject to the terms of the FSI/Transportation Workers Union collective bargaining agreement. The FSI Plaintiffs, however, have not asserted any claims against FSI pursuant to that collective bargaining agreement.

Complaint (and that included the shotgun pleading defects). In the event the Court is inclined to give Plaintiffs yet another opportunity to cure their shotgun pleading, Defendants request that the Court instead (i) continue-on to rule on the legal reasons that the FAC fails to state a claim and (ii) enter a with-prejudice dismissal on those legal grounds. This course makes sense because, on those grounds, further amendments would be futile; even if Plaintiffs cure their shotgun pleading—for the reasons set forth in Defendants' Motion and this reply—a further "amended complaint would still fail at the motion-to-dismiss" stage. *Id.*

IV.      **Count I: Plaintiffs Cannot State Any Invasion of Privacy Claim Based on Masking.**

As Defendants explained (Mot. 17–19), the FAC fails to establish any of the elements of a Florida invasion of privacy tort—a claim based solely on the supposed disclosure of Plaintiffs' vaccination status because they wore masks in the workplace. FAC ¶¶ 246, 337; Opp. 20–21. This failure is unsurprising becuase, otherwise, every employer who followed the CDC's COVID-19 guidance violated their employees' privacy rights. Florida law does not require that absurd result.

First, Plaintiffs argue that this Court should unilaterally expand the scope of this Florida tort in ways no Florida court (state or federal) has ever done. Plaintiffs ask that the Court essentially eliminate the requirement of public disclosure altogether by interpreting "the term 'public' . . . broadly to include any dissemination of the information beyond the intended recipient." Opp. 20. The sole case Plaintiffs cite states the opposite, holding that for invasion of privacy, the disclosure "must be made to the 'the public at large ***or to so many persons that the matter is substantially certain to become public knowledge.***'" *Guarino v. Mandel*, 327 So. 3d 853, 863 (Fla. Dist. Ct. App. 2021) (emphasis added). In lieu of authority, Plaintiffs candidly advance a policy argument for changing Florida law, arguing that due to "the prevalence of social media . . . it is becoming increasingly difficult to [distinguish] between what constitutes a private versus public disclosure of information." Opp. 21. These may be arguments for the Florida Legislature or perhaps even its

276

Supreme Court, but this Court must take Florida law as it finds it. *See Salinero v. Johnson & Johnson*, 995 F.3d 959, 969 (11th Cir. 2021) ("When making an *Erie*-guess . . . we must attempt to predict state law, not to create or modify it.").

Second, Plaintiffs offer a new allegation in their Opposition (not found in their FAC), *McKally*, 87 F. Supp. 3d at 1317, which cannot rescue their privacy claim, either. They contend that "Plaintiffs encounter hundreds of new people per flight on a daily basis" and that their mask wearing broadcast their vaccination status to the public. Even if this allegation were plausible for a cargo-airline often operating without passengers, it fails because wearing a mask does *not* broadcast vaccination status—the vaccinated and unvaccinated alike can and do wear masks to protect themselves against COVID-19 and other illnesses. *See Sharikov v. Philips Med. Sys. MR, Inc.*, 2023 WL 2390360, at *17 (N.D.N.Y. Mar. 7, 2023) (dismissing the plaintiff's ADA wrongful disclosure theory because employer's policy that "all employees wear masks, but . . . fully vaccinated employees 'may' remove their masks" in certain areas of the workplace did not disclose vaccination status because, even in the designated areas, both vaccinated and unvaccinated individuals could choose to wear masks). Wearing a mask does not allow any person to deduce the wearer's vaccination status because mask-wearing is not exclusive to unvaccinated persons.

And even if Defendants had broadcast Plaintiffs' vaccination status (which they did not), Plaintiffs' claims still fail because they cannot plead that disclosure of COVID-19 vaccination status is offensive or outside the realm of legitimate public concern. *Cape Pubs., Inc. v. Hitchner*, 549 So.2d 1374, 1377 (Fla. 1989). Starting with offensiveness, Plaintiffs rely entirely on the fact that health information is typically sensitive and private, but this is insufficient under Florida law. *Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 610–13 (Fla. Ct. App. 2007). As for public concern, Plaintiffs freely admit that "vaccination may provide protection against certain

illnesses." Opp. 23. Whether or not getting vaccinated is a "personal religious choice that should be respected" is irrelevant and comes nowhere close to overcoming the "formidable obstacle" to establish that the public has no "rightful interest" in Plaintiffs' vaccination status as airline employees. *Cape Pubs.*, 549 So.2d at 1378. *See, e.g., Doe v. Univision Television Grp., Inc.*, 717 So. 2d 63, 65 (Fla. Ct. App. 1998).

Each of the foregoing legal infirmities requires the dismissal of Plaintiffs' privacy claims.

## V.       Count II: Plaintiffs' Negligence Claim Is Defective and Duplicative.

Plaintiffs argue that their negligence claim is actionable because it "vastly differs from Count I's claim of invasion of privacy." Opp. 23. Yet they admit Count II alleges "that Defendants breached their duty of care *by publishing their PHI throughout the company and broadcasting it to other employees and consumers*." *Id.* at 24. (emphasis added). Plaintiffs' own allegations demonstrate that their negligence claim is simply a repackaged version of their privacy claim, based on the same conduct and the same non-existent injury. As a result, the same arguments justify disposing of this claim because no invasion of privacy—whether intentional or negligent— occurred in this case. *Cape Pubs.*, 549 So. 2d at 1377. Moreover, Florida does not recognize negligent invasion of privacy as a cause of action in the first instance. *See* Mot. 19. Plaintiffs cannot avoid those legal bars by insisting that their negligence claim based on the same facts and which, by their own admission, only differs based on the alleged state of mind of the alleged tortfeasor is a separate and cognizable claim.[5] *See Ryder Truck Rental, Inc. v. Coastline Distrib. of Tampa*, 512 So.2d 1093, 1095 (Fla. Ct. App. 1987) ("A party may not be permitted to recover indirectly that

---

[5] Indeed, the only factual allegations in Counts I and II—that Defendants "publish[ed] Plaintiffs PHI throughout the company" and "forc[ed] Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers"—are repeated *verbatim* in both Counts. *Compare* FAC ¶ 246, *with id.* ¶ 252.

278

which it cannot recover directly by simply changing the label on the cause of action.").

Additionally, as Defendants' Motion explained, Plaintiffs' assertions are exclusively based on an allegedly intentional act—Defendants' requirement that they wear masks (not some type of inadvertence)—and Florida law does not permit negligence claims premised on intentional conduct. *Hiers v. Bordt*, 2016 WL 9506039, at *1 (N.D. Fla. July 6, 2016) (collecting cases).

**VI.    Count III: The Court Lacks Subject Matter Jurisdiction Over the Atlas Pilot Employees' Claims for Breach of Their Collective Bargaining Agreement.**

Plaintiffs' effort to save Count III from dismissal is based on several misstatements about RLA preemption and Atlas's argument based thereon. Opp. 16–23, 32–33.

First, by definition, claims based on alleged violations of a collective bargaining agreement ("CBA") cannot constitute "major disputes" under the RLA, as Plaintiffs assert. *Id.* at 21, 32. As the Eleventh Circuit recently reaffirmed, and as the Supreme Court has long held, "[m]ajor disputes are about 'the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.'" *Pro. Airline Flight Control Ass'n v. Spirit Airlines, Inc.*, 65 F.4th 647, 651 (11th Cir. Mar. 8, 2023) (quoting *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989)). Count III does not involve efforts to form or change the terms of a CBA, but rather the need to interpret its existing terms— a paradigmatic "minor" dispute. *Consol. Rail*, 491 U.S. at 303 (minor disputes concern "a collective agreement already concluded" or "a situation in which no effort is made to bring about a formal change in terms or to create a new one").

Second, Plaintiffs inaccurately characterize *Glover v. St. Louis-S.F. Ry.*, 393 U.S. 324 (1969), as creating an exception to RLA preemption for claims "based on an independent legal duty not created by the CBA." Opp. 17–18, 25, 32. It does not. Rather, as even the case cited by

Plaintiffs holds, *Glover* recognized a "narrow" exception to RLA preemption when arbitration would be futile because the arbitration board is inherently biased, and even then *Glover* requires the employee to attempt to initiate the grievance process. *Perla v. United Airlines, Inc.*, 2019 WL 2581499, *3 (S.D. Tex. May 31, 2019). Plaintiffs have neither alleged they attempted to grieve these purported contractual violations nor that doing so would be futile, making *Glover* inapplicable. *See Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1053 (11th Cir. 1996) (plaintiff's "conclusory and speculative" allegations of futility insufficient to invoke *Glover* exception).

Third, Plaintiffs misapprehend the scope of Atlas's argument by relying on cases holding that the RLA does not preempt statutory claims independent of the CBA. Opp. 17–18, 25. Atlas has not asserted RLA preemption regarding *any* of Plaintiffs' claims *except* Count III, which specifically alleges that Atlas breached the CBA. Resolution of that claim necessitates interpretation of the CBA, and thus it cannot be "independent" of the CBA. *See Pyles*, 79 F.3d at 1050 (dismissing employee's claim that airline breached CBA as it is "rooted in the CBA itself and the alleged breach thereof").

For these reasons, the Court should dismiss Count III for lack of subject matter jurisdiction.

**VII.     Count IV: No Valid Florida Whistleblower Act Claim.**

In support of their Florida Whistleblower Act ("FWA") claims, Plaintiffs' Opposition repeats the conclusory assertion that Defendants' vaccination requirements violated an FAA regulation, 14 C.F.R. § 61.53. But Plaintiffs offer no textual or case law support for that conclusion, and they ignore Defendants' citation to the FAA's public statements expressly authorizing "[h]olders of FAA-issued Airman Medical Certificates" to receive the Pfizer, Moderna, and Johnson & Johnson COVID-19 vaccines. Mot. 22. Plaintiffs' argument appears to rest entirely on their subjective conclusion that the vaccines violated this regulation. That argument fails for two reasons. First, even under the "good faith" standard some courts have followed, such an

idiosyncratic belief is insufficient to support a claim: instead, the employee must have "a good faith, *objectively reasonable belief* that his activity is protected." *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Ct. App. 2013). No *objectively reasonable person* could believe COVID-19 vaccines violate an FAA regulation when, long before the Plaintiffs filed this lawsuit, the FAA publicly declared the opposite conclusion. Second, as judges in this District and the Middle District of Florida have explained, there is a split of authority among Florida's intermediate appellate courts about whether a good faith showing can support a claim under the FWA. As those courts recognize, the better view is that a "FWA whistleblower employee must [allege] that the activity, policy or practice objected to is, in fact, in violation of a law, rule or regulation, *not merely that the employee reasonably believed* that the actions he objected to were [a violation]." *Dos Santos v. AIDS Healthcare Found., Inc.*, 2021 WL 4972993, at *10 (S.D. Fla. Jan. 5, 2021) (Dimitrouleas, J.) (predicting that the Florida Supreme Court would *disagree* with *Aery*); *Graddy v. Wal-Mart Stores E., LP*, 237 F. Supp. 3d 1223, 1227 (M.D. Fla. 2017) (Antoon, J.) (reaching the same conclusion, and noting that even the Florida appellate district that decided *Aery* "has signaled that it may eventually reconsider [it]").

**VIII.**   **Counts V, VI, VII, VIII, IX, and XI: Nearly Half of the Plaintiffs' Title VII, GINA, ADA, and Rehabilitation Act Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies.**

As Defendants explained (Mot. 22–25), Plaintiffs were required to exhaust administrative remedies *before* filing their Title VII, GINA, ADA, and Rehabilitation Act claims. Defendants pointed out the contradictory assertions in the FAC that "[a]ll Plaintiffs have exhausted administrative remedies" (FAC ¶ 240) and "most Plaintiffs" had filed with the EEOC, and the lack of allegations about which Plaintiffs had received a right to sue notice. Mot. 23. In their Opposition, Plaintiffs ultimately conceded the falsity of the FAC's conclusory allegation that "[a]ll Plaintiffs" had exhausted:  as Plaintiffs now admit in their Opposition brief and Plaintiffs' Exhibit A thereto,

48 of the Plaintiffs have "not completely exhaust[ed] administrative remedies" (Opp. 29–30 & Pls' Ex. A).[6] Those 48 Plaintiffs who lack a right to sue letter must be dismissed. *Forehand v. Fla. State Hosp. at Chattahoochee,* 89 F.3d 1562, 1567 (11th Cir. 1996). For the Court's convenience, these 48 Plaintiffs are listed on Exhibit 1 to this reply brief.

Plaintiffs make three arguments in response. The first is that exhaustion is a question of fact that should not be decided at the motion-to-dismiss stage. Even if true, that would not relieve Plaintiffs of their burden to *plead facts* that establish they exhausted their administrative remedies. *Cousins v. United Healthcare, Inc.*, 2020 WL 1666628, at *3 (S.D. Fla. Apr. 3, 2020) ("In order to satisfy applicable pleading requirements, Plaintiff must set forth the claims for which he has exhausted his administrative remedies, *and how he has done so*." (emphasis added)). Defendants are not raising "factual challenges" to whether Plaintiffs have exhausted these remedies; rather, they are challenging the FAC's failure to plausibly ***allege*** exhaustion. Plaintiffs do not plausibly allege (and cannot allege, as Exhibit A to their Opposition reveals) that nearly half of Plaintiffs pressing federal employment claims subject to mandatory exhaustion have actually exhausted, requiring dismissal of those Plaintiffs' Title VII, GINA, ADA, and Rehabilitation Act claims.

Plaintiffs' second argument points out that exhaustion is not a pre-requisite for federal subject matter jurisdiction. Opp. 28. But Defendants have not brought the failure to exhaust as a challenge to subject matter jurisdiction. Rather, Defendants move to dismiss those claims because

---

[6] *See Pennington v. PruittHealth, Inc.*, 2019 WL 5309117, at *2–3 (M.D. Ga. Oct. 21, 2019) (holding that the court can consider documents that "directly address the question of administrative exhaustion . . . without converting a motion to dismiss to a motion for summary judgment"). Enforcing this limit is not a formality. Because Title VII requires filing with the EEOC no more than 300 days after the allegedly discriminatory events in question—and the FAC concerns a May 1, 2022 vaccine policy (FAC ¶¶ 178–79)—new charges may now be time barred. Additionally, as with Plaintiff Roberts, in addition to being time-barred, many of the Plaintiffs' claims asserted here likely exceed the scope of their respective EEOC charges. Mot. 24–25.

"filing a charge of discrimination with the EEOC is a condition precedent to bringing a civil action[.]" *McDowell v. United Servs. Co.*, 2008 WL 5210018, at *2 (M.D. Fla. Dec. 10, 2008).

Third, Plaintiffs again invite this Court to disregard the law, arguing that they should simply be excused from exhausting their administrative remedies based on (i) perceived understaffing or a heavy workload at the EEOC and (ii) their unilateral view that it is "beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach." Opp. 29–30. But, as another court recently recognized, neither of these arguments permit a court to eschew the administrative process Congress prescribed. *See Anderson v. United Airlines*, 577 F. Supp. 3d 1324, 1332 (M.D. Fla. 2021) (declining to excuse plaintiffs' failure to exhaust administrative remedies regarding COVID-19-related Title VII, ADA, and GINA claims based on plaintiffs' contention that "the EEOC's investigative process would take too along and because [the EEOC] lacks the authority to resolve these issues"). Relatedly, Plaintiffs incorrectly state that "in private sector disputes the EEOC is prohibited from, 'awarding damages, reinstating employees, or granting back pay,' which the Plaintiffs are requesting in this case." Opp. 28. In reality, the EEOC can bring a federal court lawsuit in private sector disputes on behalf of a charging party, in which it is entitled to recover the same remedies as plaintiffs, which include backpay, compensatory and punitive damages, and potential reinstatement. *See* 42 U.S.C. §§ 2000e-5(f), (g); 1981a. Accordingly, abiding by federal law as written by Congress works no unfairness.

## IX.  Counts V, VII, and XI: Plaintiffs Title VII Claims Legally Fail.

***Impermissible Group Pleading.*** Each of Plaintiffs' Title VII claims (Counts V, VII, and XI) should be dismissed for a simple reason: they admittedly fail to "includ[e] specific details for each one" of the 100 Plaintiffs seeking to press individual claims. Plaintiffs respond, tellingly, that "*[t]here is a discovery process for that.*" Opp. 32–33 (emphasis added). That reads the rules of civil procedure backward. "Discovery should follow the filing of a well-pleaded complaint. It is

283

not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." *Chudasama*, 123 F.3d at 1367 (citation omitted). Moreover, Plaintiffs have not brought a putative class action. They cannot both avoid the strictures of Rule 23 class certification yet base their case on generic, sweeping allegations, as if they were bringing a representative action. *Cf. Glendale Outpatient Surgery Ctr. v. United Healthcare Servs., Inc.*, 805 F. App'x 530, 531 (9th Cir. 2020) (plaintiff's "decision to lump 44 separate events . . . into a single set of generalized allegations . . . cannot give rise to a reasonable inference that [the defendant] is liable"). Even if the Court excuses this failure, though—as explained below—the FAC does not state legally cognizable Title VII claims for (i) failure to accommodate (Count V); (ii) disparate treatment (Count VI); or (iii) harassment (Count VII).

***No Valid Failure-to-Accommodate Claim.*** In support of their accommodation claim, Plaintiffs argue that "they informed Defendants [of a conflict with the COVID-19 vaccine requirement] by applying for [a] medical and/or religious accommodation from the vaccine." Opp. 31. But Plaintiffs never allege that *any* Plaintiff was denied his/her requested religious or medical accommodation. Instead, the FAC acknowledges that "Defendants granted Plaintiffs['] religious 'accommodation[s].'" (FAC ¶ 6); *see Mark South v. Atlas Air, Inc.*, 2023 WL 3184346, at *11 ¶ 58 (Fla. Div. Admin. Hrgs. Apr. 24, 2023) (Recommended Order) (finding, consistent with the FAC's allegation here, that Plaintiff "South's exemption request was granted, as were the religious exemption requests of all 361 other [Atlas] employees who applied").

At most, Plaintiffs allege a dislike of the accommodations Defendants provided, which as the FAC explains, required "Plaintiffs to wear [a mask]," (*id*. ¶ 6) and undergo COVID-19 testing.[7]

---

[7] *See* FAC ¶ 197 (alleging that Plaintiffs were allowed to perform "their regular work duties after the May 1, 2022 company vaccine mandate deadline 'so long as they undergo requisite COVID-19 test at their expense'").

284

However, these are reasonable accommodations as a matter of law. Indeed, courts and the EEOC recognize masking and testing as legally reasonable accommodations for individuals with religious objections to COVID-19 vaccinations. *See, e.g.*, *Egelkrout v. Aspirus, Inc.*, 2022 WL 2833961, at *3 (W.D. Wis. July 20, 2022) (holding that employer "discharged [its Title VII] obligation by permitting [plaintiff] to submit to biweekly Covid-19 testing . . . Because that option 'eliminate[d] the conflict between [defendant's] employment requirements and [plaintiff's] religious practices,' it was reasonable" (quoting *Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986))); EEOC, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § K.2, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("[A] reasonable accommodation" for "employee[s] who [do] not get vaccinated due to a disability (covered by the ADA) or a sincerely held religious belief . . . (covered by Title VII)," is that they be allowed to "wear a face mask . . . [and] get periodic tests for COVID-19").

As such, none of the Plaintiffs plausibly alleges that Defendants failed "to reasonably accommodate [their] religious observance or practice." 42 U.S.C. § 2000e(j).

### *No Disparate Treatment or Harassment Claim.*

1.  <u>Vaccination Status Not Actionable.</u> A single legal defect dooms each of Plaintiffs' Title VII disparate treatment claims and their harassment claims. The FAC and Plaintiffs' Opposition compare workplace treatment of unvaccinated employees to vaccinated employees as the basis for their federal discrimination claims, arguing that the comparison is proper because Plaintiffs religious beliefs led them to be unvaccinated.[8] However, courts have rejected similar

---

[8] Plaintiffs fail to make any allegation that unvaccinated employees were distinguished from one another at all. Rather, Plaintiffs allege repeatedly that vaccination exemptions were permitted for medical as well as religious reasons. FAC ¶ 187 (discussing "Plaintiffs whose

COVID-19 challenges, recognizing that the proper way to evaluate religious discrimination in this context is to compare the treatment of employees who are unvaccinated for religious reasons with those who are unvaccinated for non-religious reasons. *See, e.g.*, *Leake v. Raytheon Techs. Corp.*, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (plaintiff failed to state a religious discrimination claim because "[a]ll vaccination-exempt employees were treated the same, regardless of the reason for exemption."); *accord Dollar v. Goleta Water Dist.*, 2022 WL 5176904, at *5 (C.D. Cal. Oct. 3, 2022) ("[P]laintiffs have not alleged that employees who receive exemptions on religious grounds are treated any differently from employees who receive exemptions on non-religious grounds."); *D'Cunha v. Northwell Health Sys.*, 2023 WL 2266520, at *2 (S.D.N.Y. Feb. 28, 2023) (similar); *see also Mark South v. Atlas*, 2023 WL 3184346, at *12 ¶ 64 (concluding that "Atlas treated all unvaccinated crew members equally, regardless of their reasons for declining the COVID-19 vaccine. Absent unlawful discrimination because of a protected characteristic, Title VII does not provide legal redress.").

In their Opposition, Plaintiffs insist that by arguing "that Plaintiffs were treated differently based on their vaccination status rather than religious belief" that "Defendants are choosing to disregard the fact that Plaintiffs are not vaccinated due to their religious beliefs." Opp. 32. This argument mistakes intentional discrimination (*i.e.*, Plaintiffs' disparate treatment count) for disparate-impact liability (which the FAC nowhere asserts). "Liability in a disparate-treatment

---

religious and/or medical exemptions were granted"), ¶ 197 ("those who had previously obtained a religious or medical exemption . . . would be allowed to return to their regular work duties"). Further, all relevant workplace distinctions were drawn based solely upon vaccination status, with appropriate safety rationales provided for such action that had no relation to religion or disability. *See, e.g.*, *id.* ¶ 161 (stating Defendants' intent to "reduce the impact and spread of COVID-19"), ¶ 172 ("The health and safety of all our Cabin Crewmembers remains a top priority for FSI."); Opp. 38 (arguing that Defendants "singled [Plaintiffs] out *based on their vaccination status* (they were the only ones required to wear masks and take precautions)" (emphasis added)).

case depends on whether the protected trait *actually motivated* the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (emphasis added). "By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* (internal marks omitted). Plaintiffs agree that Atlas treated unvaccinated employees the same, which included those with medical exemptions (*e.g.*, FAC ¶¶ 302(iv), 393(iv)), but still argue they can pursue violations of Defendants' neutral policies distinguishing the vaccinated and unvaccinated as religious discrimination. A disparate treatment claim does not permit this.

2.      No Adverse Action. Plaintiffs' disparate treatment claim must be dismissed for the additional reason discussed in Defendants' Motion: none of the Plaintiffs (and certainly not *each* of the 100 Plaintiffs) has plausibly alleged an adverse employment action. Mot. 27–30. In fact, in their Opposition, Plaintiffs admit that "the Defendants did not fire any of the Plaintiffs." Opp. 32. Plaintiffs contend the FAC sets out adverse actions (*id.*), yet the only specific allegations in the FAC they reference concern 2 of the 100 Plaintiffs. Defendants explained, without rebuttal, why neither Mr. Bullock nor Mr. Villella experienced an adverse employment action. Mot. 28–29.

3.      No Plausible Severe or Pervasive Conduct. Likewise, Plaintiffs' harassment claim fails for the additional reasons that (i) an "allegation that a hostile work environment was created through the requirement that vaccination-exempt employees wear facial protection and submit to weekly COVID-19 testing" is obviously insufficient, *Leake*, 2023 WL 2242857, at *5, and (ii) Plaintiffs lack any plausible "factual allegations to establish that [any] harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment." *Kimpton Hotel & Rest. Grp., LLC*, 2020 WL 13389302, at *6 (S.D. Fla. June 17, 2020).

287

**X.**   **Count VIII and IX: No Valid GINA Claims.**

In their Opposition, Plaintiffs continue to misunderstand GINA. GINA prohibits discrimination "because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(1), (2). Defendants established that neither the COVID-19 vaccine nor COVID-19 testing—as the EEOC has recognized—satisfies the statutory definition of "genetic information" under GINA. Mot. 31–32. Genetic information is a term of art under GINA, which means "the manifestation of a disease or disorder" or a "genetic test," which, in turn, means an analysis of human DNA "that detects genotypes, mutations, or chromosomal changes." *Id.*

Plaintiffs acknowledge these legal standards (Opp. 34), but continue to claim "they were discriminated against because of their genetic differences due to not being vaccinated." *Id.* But, even accepting the false narrative that the COVID-19 vaccines have modified Plaintiffs' genetic material, they have utterly failed to explain how that brings them within GINA's definitions of "genetic information" or "genetic testing." Nor could they. Consistent with those statutory definitions, the purpose of GINA is to outlaw employment decisions because someone might develop a disease or other medical condition in the future. *See* Pub. L. 110-233 (May. 21, 2008), 122 Stat. 881, 882 (explaining that Congress' objective with GINA was to prohibit "the use of preemployment genetic screening" for disease and situation such as the stigmatization of "carriers of sickle cell anemia, a disease which afflicts African-Americans"). Distinctions based on COVID-19 vaccination do not implicate the text of GINA or purpose for the legislation.

**XI.**   **Count XI: No Valid Americans with Disabilities Act ("ADA") or Rehabilitation Act Claims.**

Plaintiffs essentially abandon their ADA and Rehabilitation Act claims. Opp. 35. Defendants argued (Mot. 32–34) that all such claims must be dismissed because the FAC fails to plead facts showing that *any* Plaintiff suffers from a "disability," which these laws define as "[a]

288

physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A), (4)(A). Plaintiffs' Opposition ignores this requirement. Plaintiffs also provide no argument in response to the inapplicability of the Rehabilitation Act to Defendants. Mot. 33 n.11. The Court need go no further than these fatal defects to dismiss each of Plaintiffs' ADA and Rehabilitation Act claims with prejudice. *See Singh v. Royal Carib. Cruises Ltd.*, 576 F. Supp. 3d 1166, 1192 (S.D. Fla. 2021) (court deems an argument abandoned when "a party fails to respond").

The sole argument Plaintiffs offer is that "vaccination status represented a way to identify which employees . . . had a medical condition." Opp. 35. But differential treatment due to *vaccination status* does not support a claim of disparate treatment based on disability under the ADA and Rehabilitation Act for the same reasons it does not support a claim of disparate treatment based on religion under Title VII. Plaintiffs have not alleged any basis for the Court to conclude Defendants took any action toward Plaintiffs because of a *disability*.

**XII.     Count X: Plaintiffs' Allege No Constitutional Violation or State Action.**

Defendants moved to dismiss the Constitutional claims for three reasons: (1) under *Jacobson*, vaccination requirements do not violate the Constitution; (2) even without *Jacobson*, Plaintiffs fail to identify any constitutionally protected liberty or equal protection interest, and they fail the rational basis test; and (3) in any event, Atlas, FSI and Encompass are private businesses, not "state actors" subject to Constitutional claims. Mot. 34–38.

Plaintiffs provide no response to argument (1) whatsoever, and do not distinguish (or even cite) *Jacobson*. The Court should dismiss with prejudice on that ground alone. Mot. 34.

As to argument (2), Plaintiffs claim they "plead that their fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence." Opp. 36. But the Supreme Court requires "a 'careful description' of the asserted

289

fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997); *see Doe v. Moore*, 410 F.3d 1337, 1344 (11th Cir. 2005) (holding *Glucksberg* requires "a careful description of the fundamental interest at issue" and rejecting the "Appellants' broad framing of their rights"). In other words, a court cannot identify a protected right at the high-level of generality proposed by Plaintiffs (*i.e.*, FAC ¶ 376 (asserting right to "bodily integrity"); Opp. 36 (asserting "to be free from coercion or to be put in a state of undue influence"). To illustrate, in *Doe*, the Plaintiffs asserted the law infringed their "rights to family association . . . to be free of interference with their religious practices," yet the Eleventh Circuit held that, carefully described, "the right at issue [actually was] the right of a person, convicted of 'sexual offenses' to refuse registration of his or her personal information with Florida law enforcement." 410 F.3d at 1344. Thus, here, Plaintiffs would require support for a deeply rooted protection for freedom from vaccination, testing, or masking during a pandemic. Plaintiffs have cited no such authority and, as Defendants explained (Mot. 35 & n.12), the challenged COVID-19 policies easily satisfy rational basis review.[9]

As to argument (3)—lack of state action—neither the FAC nor the Opposition demonstrates that Atlas, FSI, and Encompass are state actors subject to constitutional constraints. Especially after the Sixth Circuit's recent decision in *Ciraci v. J. M. Smucker Co.*, 62 F.4th 278 (6th Cir. 2023)—which echoed the unanimous conclusion of courts across the country—a private

---

[9] Plaintiffs' argument that they suffered a constitutional violation because they were treated "differently based on their religious beliefs, violating the First Amendment and Equal Protection" (Opp. 36) similarly fails. As for the Equal Protection Clause, because Plaintiffs' claims "do not implicate a suspect class," rational basis review applies. *Doe*, 410 F.3d at 1346. As for their First Amendment Free Exercise Clause claim, the Supreme Court holds that neutral generally applicable requirements—such as the vaccine and other COVID-19 precautions here—do not violate the First Amendment's protection for religious exercise. *See Henderson v. McMurray*, 987 F.3d 997, 1005 (11th Cir. 2021) (rejecting constitutional claim "because 'the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability" (quoting *Employment Division v. Smith*, 494 U.S. 872, 879 (1990)).

company does not become a state actor merely by doing business with the federal government or complying with governing law, including COVID-19 mandates. *Id.* at 281–85. *Ciraci* considered and expressly rejected Plaintiffs' argument in their Opposition (Opp. 37) that the President's Federal Contractor Executive Order rendered private companies that followed it state actors. *See id.*[10] This Court should do the same.

All of Plaintiffs' constitutional claims therefore must be dismissed with prejudice.

**XIII.     Count XII:  No Valid Intentional Infliction of Emotional Distress ("IIED") Claim.**

Count XII's four-sentence IIED claim must be dismissed. Though Plaintiffs contend that they have experienced emotional injuries (Opp. 37–38), they fail to plead any facts to satisfy their "extremely high burden," *Brown v. Royal Carib. Cruises, Ltd.*, 2017 WL 3773709, at *3 (S.D. Fla. Mar. 17, 2017), to show that the Defendants' workplace COVID-19 safety measures constituted conduct "*so outrageous* in character, and *so extreme* in degree, as to *go beyond all possible bounds of decency*, and to be regarded as *atrocious*, and *utterly intolerable* in *a civilized community*." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015) (emphasis added).

Nor do the FAC's allegations regarding workplace name calling and social pressure to take the vaccine come anywhere close to meeting the outrageousness standard. *Martz v. Munroe Reg'l Med. Ctr., Inc.*, 2007 WL 2044247, at *3 (M.D. Fla. July 10, 2007) (holding that "[c]onduct such

---

[10] Plaintiffs' citation to *Gregg v. Ham*, 678 F.3d 333, 336 (4th Cir. 2012) (Opp. 36–37), does not change the outcome here. In *Gregg*, the Fourth Circuit quoted the Supreme Court's decision in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 926 (1982), for the basic proposition that private actors may become subject to constitutional claims through excessive entwinement with the government. But such entwinement is the exception, not the rule. Indeed, addressing the very same portion of *Lugar*, the Sixth Circuit's *Ciraci* decision explained that "[e]ntwinement may arise when a private entity partners with, or is controlled by government officials," however, it explained that "nothing of the sort" happened in the COVID-19 context. 62 F.4th at 282. Like Smucker in that case, Atlas, by abiding by federal COVID-19 rules, "has not partnered, conspired, or entered into a 'joint venture' with federal officials." *Id.*

291

as mere insults, indignities, threats, or false accusations, will not result in liability" for IIED). Similarly, Count XII, which merely recites the elements of an IIED claim, pleads no facts showing that Defendants enforced COVID-19 safety measures knowing "that severe distress [was] certain, or substantially certain to result." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990). Indeed, the FAC admits that Defendants' actions complied with CDC guidelines and responded to the dynamic factual and regulatory landscape during the pandemic. The facts alleged in the FAC are plainly insufficient to state a plausible IIED claim.

**XIV.      Count XIII: No Valid Negligent Infliction of Emotional Distress ("NIED") Claim.**

The same goes for Count XIII's NIED claim, which simply recites *verbatim* the legal elements of this tort. Plaintiffs concede that this case does not involve physical injury inflicted by the Defendants but nevertheless argue that their NIED claim should survive dismissal because "the enormity of the outrage" can overcome the usual physical contact requirement in extreme cases. *E. Airlines, Inc. v. King*, 557 So. 2d 574, 579 (Fla. 1990) (Ehrlich, C.J., concurring) (Opp. 39). But even assuming this statement by less than a majority of the Florida Supreme Court accurately reflects Florida law, Plaintiffs ignore that they have failed to plead facts showing any outrageous conduct by Defendants, let alone conduct inducing "enormous" outrage. An employer's good faith attempts to keep employees and travelers safe during a global pandemic is not "utterly intolerable in a civilized community" as a matter of law. *Moore*, 806 F.3d at 1053.

**CONCLUSION**

The Court should dismiss the FAC with prejudice, and Plaintiffs should not be afforded another opportunity to replead.

Date: May 8, 2023                                        Respectfully Submitted,


*/s/ Michelle Hogan*                                     */s/ Michael A. Grisham*

Eliot Pedrosa                                            Michael A. Grisham (*pro hac vice*)
Florida Bar No. 182443                                   grisham.michael@dorsey.com
epedrosa@jonesday.com                                    DORSEY & WHITNEY LLP
Michelle Hogan                                           1031 West Fourth Avenue, Suite 600
Florida Bar No. 1010992                                  Anchorage, Alaska 99501
mhogan@jonesday.com                                      Telephone: (907) 257-7829
JONES DAY                                                Facsimile: (907) 276-4152
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 714-9700                                ***Attorney for EncompassAir, LLC***
Facsimile: (305) 714-9799


Jonathan M. Linas (*pro hac vice*)                       */s/ Matthew A. Green*

jlinas@jonesday.com                                      Matthew A. Green
JONES DAY                                                Florida Bar No. 1019717
110 N. Wacker Drive, Suite 4800                          matthew.green@csklegal.com
Chicago, IL 60606                                        S. Jonathan Vine
Telephone: (312) 782-3939                                Florida Bar No. 10966
Facsimile: (312) 782-8585                                jonathan.vine@csklegal.com
                                                         COLE SCOTT KISSANE, PA
Alexander V. Maugeri (*pro hac vice*)                    222 Lakeview Avenue, Suite 120
amaugeri@jonesday.com                                    West Palm Beach, Florida 33401
JONES DAY                                                Telephone: (561) 383-9200
250 Vesey Street                                         Facsimile: (561) 683-8977
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306                                ***Attorneys for Flight Services International LLC***


***Attorneys for Atlas Defendants***


293

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 8, 2023, I electronically filed a true and correct copy

of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will

send notice of electronic filing to all parties at the email addresses on file with the Clerk of

Court.

/s/ *Michelle Hogan*
Michelle Hogan

294

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-23519-KMM

ESTATE OF LANE CAVINESS, *et al.*,

      Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

      Defendants.

                                            /

## **ORDER**

THIS CAUSE came before the Court upon Defendants' Consolidated Motion to Dismiss. ("Mot." or "Motion") (ECF No. 43). The Motion is now ripe for review. As discussed below, the Motion is granted.

Defendants aver that this cause must be dismissed because, among other things, the Amended Complaint fails to comply with Federal Rule of Civil Procedure 8(a)(2). Mot. at 16–17. Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim" showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Thereunder, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests[.]" *Twombly*, 550 U.S. at 555 (cleaned up).

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). "The typical shotgun complaint contains several counts, each one

295

incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Another type of shotgun pleading is one that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Weiland*, 792 F.3d at 1323. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests. *Id*. Such a shotgun pleading makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs.*, 77 F.3d 364, 366 (11th Cir. 1996). Therefore, "shotgun pleadings are routinely condemned by the Eleventh Circuit." *Real Est. Mortg. Network, Inc. v. Cadrecha*, No. 8:11-cv-474, 2011 WL 2881928, at *2 (M.D. Fla. July 19, 2011) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991)).

The Amended Complaint here is a quintessential shotgun pleading in violation of Rule 8(a)(2). First, the Amended Complaint, which is 408 paragraphs, brings thirteen causes of action. *See generally* Am. Compl. In every single cause of action "Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein." Am. Compl. ¶¶ 245, 249, 255, 269, 274, 291, 312, 338, 350, 361, 383, 399, 405. The Amended Complaint plainly commits the "mortal sin" of incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions. *Weiland*, 792 F.3d at 1321.

Even more, for the claims asserted against more than one Defendant, Plaintiffs wholly fail to specify which of the Defendants are responsible for which acts or omissions. *Weiland*, 792 F.3d

296

at 1323. And, the Amended Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id*. at 1322.

This is precisely the kind of shotgun pleading that the Eleventh Circuit has repeatedly condemned, producing a situation in which all counts are "replete with factual allegations [and legal conclusions] that could not possibly be material to [them]." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (alterations added). Accordingly, the Court is "unwilling to address and decide serious [] issues on the basis of this [C]omplaint." *Id*. (alterations added).

UPON CONSIDERATION of the Amended Complaint (ECF No. 39), the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion to Dismiss (ECF No. 43) is GRANTED IN PART. The Amended Complaint (ECF No. 39) is DISMISSED without prejudice. Plaintiff may submit a second amended complaint addressing the foregoing deficiencies on or before July 13, 2023 at 12:00 pm. The submission of another shotgun pleading will result in the entry of an order of dismissal with prejudice.

DONE AND ORDERED in Chambers at Miami, Florida, this  10th  day of July, 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

297

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G. BALLARD JR., LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, GREGORY BERRY, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR., APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, | Cause No. 1:22-cv-23519-KMM<br><br>Assigned to<br><br>Judge K. Michael Moore<br><br>Magistrate Judge Lauren F. Louis<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**

individuals,

        **Plaintiffs,**

           v.

**ATLAS AIR INC.,** a Delaware corporation,

        **And**

**FLIGHT SERVICES INTERNATIONAL, LLC,**

a Texas limited liability company,

individuals**,**

        **Defendants**

.

## SECOND AMENDED COMPLAINT

## <u>NATURE OF THE CASE</u>

1.      Plaintiffs are pilots, flight attendants and ground staff of Atlas Air, Inc. ("Atlas") and its affiliated company Flight Services International, LLC ("FSI"), whose rights were brazenly violated in connection with Defendants' implementation of mandates, policies and procedures relating to COVID-19 vaccinations.

2.      This is an action for relief to redress Defendants' invasions of privacy, negligence, failure to accommodate, disparate treatment, creation of a hostile work environment, and intentional and negligent infliction of emotional distress. Such wrongful conduct was predicated on Defendants' unlawful discrimination, harassment, and retaliation against Plaintiffs.

3.      This action also seeks relief to redress Defendants' conduct, as federal government-type actors, redressing violations of Plaintiffs' civil rights that are established through the <u>Bivens</u> case and elsewhere, on the basis that Defendants' conduct was indistinguishable from that of the U.S. Government and that Defendants' vaccine and mask mandates, as applied, violates privacy, equal protection, and due process protections secured by both the Constitution of Florida and the

Constitution of the United States.

4.      Defendants used deception, discrimination, psychological and economic coercion, psychological manipulation, and physical isolation to force Plaintiffs, under threat of job termination, to participate in a dangerous social and medical experiment.

5.      Defendants have made Plaintiffs "second-class citizens"—often on the basis of their religious beliefs—within their respective companies and targeted them in a campaign of harassment designed to force Plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy and to submit to mask wearing which was then known to be useless in inhibiting the spread of COVID-19.

6.      Defendants' vaccine mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never wanted to make: take an experimental gene-based therapy at the expense of their religious beliefs and/or health or lose their livelihoods and the means by which they provide for their families.

7.      Defendants purported to grant for a time Plaintiffs' religious 'accommodation' but continuously changed their standards and treatment, with an ever-present possibility of termination and immediately proceeded to deny them benefits and equal opportunities and created a hostile work environment by forcing Plaintiffs to wear individually identifiable symbols (facial masks) distinguishing them from their peers and gave public disclosure of their private and protected health information.

8.      Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the vaccine without any information on the potential risks or benefits. Several Plaintiffs (and other Atlas employees) have suffered adverse side-effects and harm as a result of submitting

to the vaccine. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

9.      This suit is further brought to redress the harms Defendants have dispassionately brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved.

## PARTIES

10.      Plaintiffs are divided in the following 4 categories:

11.      Atlas Plaintiffs are divided into the following 3 categories:

12.      **Plaintiffs Category 1 – 65 Unvaccinated Atlas Pilot Plaintiffs.** These unvaccinated Plaintiffs which are or were employed by Atlas were damaged by Atlas, in the following manner: these Plaintiffs suffered hostile workplace harassment, invasion of privacy, discrimination and threats, including but not limited to continued threatened denial of religious and/or medical exemption from Atlas' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation and they are as follows:

Patrick Akerlund, Michael Alzati, Eric W Anderson, Larry James Bearce Jr., Robert Bellman, Benjamin Bendiburg, Gregory Berry, Lynette Botha, Caleb Buehrer, Richard Bullock, Jon Carroll, Vergil Caskey, James Castor, Nathan Charboneau, Shawn Churchel, Joel Colon, Mark Connor, Matthew Cronauer, Fred Cunningham, Royal Danza, Elliot De Sousa, Eric Desandro, Steve Dixon, James Erickson, Luis Esquivia, Lee Estes, Robert Fratti, Dennis Gebhard, Mark Gilman, Robert Giudice, Eric Gordon, Rexford T. Heivilin, Jason Henning, David Hewson III, Todd Hontz, Daniel Hudson, Roger Justice, Venancius

301

Kassandji, John Kearins, Beth Kirby, Joseph Loschiavo, Andrew Lutz, Blythe Lutz, Rafael Macario, Jeffrey Michonski, Andrew Mickler, Corey Morris, Gregory Myers, Peter Napora, Patrick Phillips, Glen Pronk, Charles Randall, Jason Rogers, William Serritella , Gentry Shelton, Todd Snaza, Donald Sorrentino, Mark South, Michael Stark, Forrest Stowells, John Swift, Nick Taylor, William Thompson, James Villella, Farshad Zarrabian.

13. **Plaintiffs Category 2 – 13 Vaccinated Atlas Pilot Plaintiffs.** These vaccinated Plaintiffs are still employed and were damaged by Atlas in the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, including but not limited to threatened denial of religious exemption from Atlas' vaccination and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, who succumbed to Atlas' forcing them to take the vaccination, and also suffered and/or continue to suffer Vaccine Adverse Effects some reported to the VAERS system and some were not reported, they are as follows:

Michael G. Ballard Jr., Jason Frisbie, Tony Gamboa, Reza Ghods, Ricky Kinder, Andreas N. Koustas, Chad Kravetz, Carl Lindberg, April McQuillen, Christopher McQuillen, Peter Raymond, Joshua Roberts, Gustavo Verdes.

14. **Plaintiffs Category 3 – 6 Atlas ground employees, all 6** ground employee Plaintiffs are unvaccinated and are or were employed by Atlas who were damaged by Atlas including but not limited to, in the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, threatened denial of religious and/or medical exemption from Atlas' vaccination and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, and they are as follows:

Timothy Frye, Douglas P. Mayo Jr., Joel Pardo, Lance Phillips, Kimberly Schreck, Brandon

Thoroughman.

15. **Plaintiffs Category 4 – All 5 FSI plaintiffs. All 5 FSI plaintiffs are unvaccinated** Plaintiffs which are or were employed by FSI who were damaged by Defendants, including but not limited to, in the following manner: they suffered hostile workplace harassment, invasion of privacy, discrimination and threats, continued threatened denial of religious exemption from defendants' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from defendants for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation and they are as follows:

Rebecca Robertson, Elizabeth Stoneking, Barbara Janeice Surber, Geri Tonda, Ricardo Torres Abarca

16. Defendant **Atlas Air, Inc.** ("Atlas") is a Delaware corporation with its principal place of business in Purchase, New York. It is a wholly owned subsidiary of Atlas Air Worldwide Holdings, is a cargo airline, passenger charter airline, and aircraft lessor.[1]

17. Atlas is a common carrier as defined under federal law. Atlas has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists of 30,000 square feet of administrative and instructional space, including the operation of six flight simulation training devices. It "provides a wide range of advanced training solutions,

---

[1] A previous EEOC investigation into Polar Air, a subsidiary of Atlas, found that it had discriminated against female pilots by not allowing them to fly into the Middle East. Polar Air was ordered to pay the individual $50,000 and to modify their discrimination/harassment policy.

specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000 pilots, flight engineers, flight attendants, and other aviation professionals each year."[2] The Atlas Miami Training Center ("MTC") has more pilots in a day than any base or station on the globe. All Atlas pilots are trained at the MTC, including annual or biannual recurrent training. There is always a massive presence of Atlas pilots, crew and other personnel in Miami.

18.     Atlas' flight training has always, since inception, been in Miami. If Atlas were to cease all operations at the MTC, it would cause a significant and detrimental impact on the operations of Atlas world-wide. Pilots do not spend any significant time at Atlas' Purchase, New York location.

19.     Several very important departments are based in Miami. The Vice President of Ground Operations has his primary office at the MTC because he oversees the following departments that are based at the MTC: Dangerous Goods, Special Loads and Ground Operations Training.

20.     Defendant **Flight Services International, LLC** ("FSI") is a Texas limited liability company with its principal place of business in Houston, Texas. It is a company whose exclusive business is to contract flight attendants to Atlas Air. All the flight attendants who are staffed on Atlas Air flights are contracted through FSI. FSI was founded by an Atlas contract attorney and his spouse. All its employees receive all their training at the Atlas training facility in Miami. All FSI flight attendants are trained at the MTC, including annual or biannual recurrent

---

[2] *See*, https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/ (noting that "as pilots get their Atlas career off the ground, their first stop is Miami, home to the Atlas Air's world class Training Center." *(Emphasis added)*.

training. There is always a significant presence of FSI personnel in Miami. FSI contracts its flight attendants to Atlas Air and receives millions in dollars from Atlas Air in return.

## MISNOMER/ ALTER EGO

21.     In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification", "misnomer," and/or such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiffs contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this case under 28 U.S. Code § 1331, because the case arises under the Constitution, laws, or treaties of the United States.

23.     This Court has personal jurisdiction over Defendants because under *International Shoe* and its progeny, they have at least minimum contacts with Florida such that traditional notions of fair play and substantial justice would not be offended by the exercise of jurisdiction. In addition, personal jurisdiction is appropriate under Florida's long-arm statute, 48.193. Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida as well as acts outside the state of Florida that caused harm to numerous plaintiffs in the state of Florida.

24.     Venue is proper in the U.S. Southern District of Florida because Atlas Air and its affiliates, and leadership do a high percentage of their business and stage a high percentage of their flights in and around southern Florida and the Miami International Airport. In addition, the 30,000 square foot Atlas Training Center, that trains 10,000 people per year, is located in this judicial district as set forth above.

## BACKGROUND

305

**A. The COVID-19 Pandemic and Vaccine Response**

25.     The United States Government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus" (SARS-COV-2), commonly known as "COVID-19," that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

26.     Three (3) separate COVID-19 vaccines have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson. None of the products are vaccines in the traditional meaning of the word.  Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the particular condition.  These products do not provide individuals with immunity from contracting COVID-19.  Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

27.     On or about September 11, 2021, the Centers for Disease Control ("CDC") dumbed down its official definition of "vaccination" from the traditional above-described definition "to prevent the disease," to now merely "the act of introducing a vaccine into the body to produce protection from a specific disease." On or around January 18, 2021, Merriam Webster diluted their definition of "vaccine" (after Moderna created their "vaccine") by adding an alternate subparagraph "b." to their definition which describes that the Moderna product codes the body to the produce spike protein which triggers an immune response.

**B. Recent History of Vaccination Mandates & Accompanying Litigation.**

28.     Three realms of employment have been the primary issue in COVID-19 litigation:

(i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

29.     First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors. On January 20, 2021, President Joe Biden signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic.[3]

30.     On September 9, 2021, Biden signed Executive Order 14042 ("EO 14042"),  to "promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."[4]

31.     On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[5]

32.     The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S.  The Eleventh Circuit

---

[3] *See,* 86 Fed. Reg. 7,045-48 (Jan. 20, 2021).

[4] *See,* 86 Fed. Reg. 50,985-88 (Sept. 9, 2021).

[5] *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[6]

33.     Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, NFIB v. OSHA.[7]

34.     On September 9, 2021, Biden announced "a new plan to require more Americans to be vaccinated." This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[8]

35.     The declared purpose of the mandate was to increase vaccination rates at "businesses all across America," forcing eighty-four (84) million Americans to submit to the medical products.[9] Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, and

---

[6] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[7] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[8] *Id.* at 663.

[9] *Id.* (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

308

national origin.[10] The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.[11]

36.    Third, the U.S. Supreme Court on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare and Medicaid funding to require their employees to be vaccinated.[12] However, the Court held that a facility *must recognize* an individual's religious and medical accommodation/exemption *requests* pursuant to the rule, and *must comport with* the obligations prescribed by Title VII.[13]  *(Emphasis added).*

37.    Governments supporting these "vaccine" mandates rely on, and widely mis-cited *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), claiming the government can force vaccination. However, the government never forced smallpox vaccination on Jacobson. He merely paid a five dollar fine, so Jacobson is a *de minimis* precedent for Defendants.

38.    Like EO's# 13991, 14042 and similar edicts being judicially lifted/reversed, there are multiple recent litigation precedents where agencies have been judicially blocked from enforcing COVID mandates, and reversed, due to them exceeding many constitution guardrails, not just those protecting religious freedoms.

---

[10] *See*, Fed. Reg. 61402-551 (Nov. 5, 2021).

[11] *Id.*

[12] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[13] *See,* 86 Fed. Reg. 61571-72.

309

39.     Recent cases in state and federal courts have struck down vaccine mandates under a variety of legal theories.  In New York City, workers fired over COVID mandates received reinstatement and full back pay after a court found the New York City Health Department had violated the separation of powers doctrine, violated the New York State Constitution's equal protection and procedural due process provisions, and held that the mandate was arbitrary and capricious. *See George Garvey, et.al. v. The City of New York, et.al*, Supreme Court State of NY Index # 85163/2022. In *State of Louisiana, et.al. v. Zavier Becerra et.al.* Memorandum Ruling, Case no. 3:21-CV-04370, 24 states sued Biden's Secretary of Health and Human Services to successfully enjoin enforcement of COVID mask and vaccine mandates in federally funded Head Start children's programs. Ultimately, U.S. District Judge Terry A. Doughty found that the Defendants have violated the separation of powers doctrine, and the major questions doctrine, denying Defendants' Motion to Dismiss and/or for Summary Judgment, and instead granting Plaintiffs' Motion for Summary Judgment. In, *Health Freedom Defense Fund v Joseph R. Biden, Jr.,* 599 F. Supp. 3d. 1144 (M.D. Fla. 2022), U.S. District Judge Kathryn Kimball Mizelle lifted the CDC COVID mandates on airlines and on all U.S. public transportation conveyances by air, land or sea comparing such mandates to "detention and quarantine"; then discussing that the mandates were arbitrary, capricious, did nothing to actually prevent spread of the disease, and that the CDC illegally skirted its agency protocol by forgoing the public comment input before enacting the rules.[14]

40.     A common thread underlines all these cases, namely that a government cannot impose a vaccine mandate on citizens without express authorization by the legislature directly

---

[14] *Health Freedom Defense Fund v Joseph R. Biden*, Jr., 599 F. Supp. 3d. 1144 (M.D. Fla. 2022).

310

related to healthcare. The existence of such particular legal authority is why the Medicaid and Medicare mandate was allowed to stand while other mandates without such express authority were overturned.

41. While portions of this case do not rely on the nonexistence of any constitutional authority for Defendants' actions, they are supported by fact that there was a similar lack of authority for Defendants' actions within Atlas' and FSI's Collective Bargaining Agreements with their employees, including the Plaintiffs. Just as a constitution sets forth the rights and responsibilities of citizens of a jurisdiction, a Collective Bargaining Agreement sets forth the rights and responsibilities of employees subject to that Collective Bargaining Agreement.

### C. Interpretation of Religion under Title VII

42. One of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[15] While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

43. In addressing this Title VII issue, Plaintiffs contend that their "sincerely held religious beliefs" must be accorded protection under Title VII. Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[16] Furthermore, this broad definition has been incorporated by the U.S. Equal Employment Opportunity Commission ("EEOC") in regulations pertaining to religious discrimination.

---

[15] *See*, 42 U.S.C. § 2000e et seq.

[16] *See*, 42 U.S.C. § 2000(j).

311

44.     Plaintiffs' sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

45.     Indeed, Plaintiffs contend that the term "religion", as it appears in Title VII, must be interpreted with equal breadth as the term "sex" has been interpreted. Federal court precedents have interpreted the term "sex" to apply broadly to any discrimination that involves gender, including protections for pregnancy status, sexual orientation, and for transgender individuals. As such, the term "religion" must be interpreted equally broadly.

**D.  Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law**

46.     Plaintiffs possess sincerely held religious beliefs that their Creator planned their existence upon their creation, which included the creation and design of their unique genetic code, both DNA and RNA. Plaintiffs' conscience prohibits them from being inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

47.     The "vaccines" in question are mRNA vaccines, which hijack a person's cells in the vicinity of an injection site in order to cause these cells to start making the same protein that is found in the COVID-19 virus.

48.     This type of "vaccine" differs significantly from standard vaccines, which do not hijack the human bodies own cells, but instead contain live or dead viruses.

49.     Plaintiffs' sincerely held religious beliefs are commonly shared by millions of people around the world.

50.     Plaintiffs' religious beliefs are not based upon social, political, economic, or personal philosophies.

312

51.     Plaintiffs' religious beliefs based on the teachings of globally accepted religions that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

52.     Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

## GENERAL ALLEGATIONS

### A.  The COVID-19 Pandemic and Response

53.     By mid-March 2020, even though the untreated mortality rate was below one half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

54.     The three "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to Emergency Use Authorizations (EUA)'s.

55.     Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, available curative and prophylactic alternatives, and of the extent to which such benefits and risks are unknown.[17] "Consent" establishes that all persons must have the option to refuse administration of the product. Punishments or consequences for refusing medical products are strictly prohibited based on the

---

[17] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(II).

313

express wording and intent of the law.[18]

56. As such the FDA's grant of an EUA is still subject to informed consent requirements in order to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product."[19]

57. Plaintiffs are not unique or abhorrent; millions of Americans have also refused to take these experimental medical products for numerous reasons, including for religious reasons.

58. COVID-19 vaccines are Virus-Based Gene Therapies ("VBGT") according to the FDA's own definition.[20] Thus, these medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's own genetic information.

59. These genetic alterations are prohibited by Plaintiffs sincerely held religious beliefs and objections to these alterations. Further, these VBGT's were developed using stem cells harvested from human embryos. Plaintiffs have a conscientious duty to refuse participation in activities repugnant to human life and dignity.

60. The FDA approved the Pfizer Comirnaty vaccine on August 23, 2021, and on September 9, 2021, Biden signed EO 14042. Thus, Defendant Atlas sent an electronic communication to all Atlas employees and announced all Plaintiffs would be required to be "fully vaccinated" with a COVID-19 VBGT pursuant to EO 14042 by December 8, 2021.

**B. Atlas' Vaccine Mandate Due to Government Orders**

---

[18] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III).

[19] *Id.*

[20] *See*, https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy

314

61.     In October 2021, Atlas originally stated:

> As a Company, we support the views of health experts that [the
>
> VBGT] reduce the impact and spread of COVID-19. That said,
>
> we have been consistent in our position that [a VBGT] is a
>
> personal choice and we were not planning to mandate
>
> [VBGT's] for our employees. However, we are now required
>
> to comply with [EO 14042].[21]

62.     Yet, Defendant's' palpably disingenuous concerns about safety overwhelmingly support Plaintiffs' decisions to *not* be injected with a COVID-19 VBGT.

63.     Plaintiffs' reluctance to take the VBGT was supported by Defendants' own actions, since Defendants: (i) did not mandate any passenger flying on its aircraft or interacting with its staff to be vaccinated; (ii) did not mandate VBGT's for employees from other countries, (even though many Plaintiffs worked on the same aircraft and had contact with them); and (iii) did not mandate VBGT's for pilots from other airlines allowed to ride in the "jump seat" of any Atlas aircraft.

64.     On October 5, 2021, Atlas and FSI sent electronic communication to all plaintiffs informing that they would have to comply with the government mandates and all employees would have to be vaccinated. Only a week later, on October 11, Atlas and FSI emailed all plaintiffs with instructions on how to apply for a medical and/or religious exemptions.

65.     On the same electronic communication above, Atlas and FSI informed all

---

[21] After the Biden Administration's mandate was enjoined by various federal courts, Atlas immediately reverted to a company-directed mandate.

Plaintiffs that they must digitally report their vaccination status and that they must file for religious and/or medical exemptions to avoid VBGT inoculation. Pilots and flight attendants were falsely told that the information would be protected. Atlas pilots' and FSI flight attendants' private vaccination status was disseminated to other employees under the supposed need to circulate the information about which crewmembers (vaccinated or unvaccinated) would qualify for certain flights involving company imposed COVID-19 restrictions. For no valid medical reason, **Category 1 unvaccinated Atlas pilots** and **Category 4 FSI flight attendants** received less flight opportunities than vaccinated ones from Atlas and FSI, respectively.

66.     Defendants set October 22, 2021, as the deadline "for [Plaintiffs] to request an exemption due to medical or religious reasons." No due date for a response was given by Defendants.

67.     Then, Defendants directed that November 25, 2021, was the deadline for Plaintiffs who did not apply for a religious or medical exemption to "report [their VBGT] status to the Company."

## C. FSI's Vaccine Mandate

68.     FSI, whose sole business and source of revenue is through Atlas contracts, quickly followed suit and in early September 2021, FSI President Joni French sent an e-mail to Plaintiffs that made brazenly explicit the disparate treatment and hostility toward Plaintiffs. She wrote:

> The health and safety of all our Cabin Crewmembers remains a
> top priority for FSI. To support your well-being, as well as that
> of your work colleagues, we encourage everyone to pursue the
> [VBGT]. Cabin Crewmembers who have proof of [VBGT] will

316

increasingly be able to operate with more flexibility under less

restrictive quarantine rules.

We are pleased to let you know that we will now provide 5

hours of additional compensation to every FSI Flight Attendant

who receives [a VBGT] and submits a copy of their

vaccination card.[22]

69.     Plaintiffs' lives were effectively placed on hold after October 2021 due to Defendants' continuous threats of unpaid leave and termination.

**D.  Atlas' Government-Directed Mandate Turns Into A Company-Directed Mandate**

70.     Plaintiffs applied for religious accommodation from the vaccine mandate prior to October 22, 2021.

71.     On January 13, 2022, The Supreme Court of the United States blocked the OSHA mandate requiring businesses with over 100 employees to impose vaccine and testing requirements.

72.     On or about January 25, 2022, in light of the Supreme Court's ruling, OSHA announced it was withdrawing its vaccine and testing requirements that were at issue. However,

---

[22] It is worth noting that the term "vaccination" does not refer to a single event or transaction. Every new requirement by Atlas to take a booster to maintain "vaccination" status constitutes a new occurrence or transaction for the purposes of accommodation under Title VII. Each transaction or occurrence rests upon a different set of operative facts.

Biden called upon businesses to voluntarily impose the mandates themselves.[23]

73. Despite their previous statements that they believed in personal choice when it came to the VBGT mandate issues and were only reluctantly abiding by federal law, the Defendants nevertheless immediately complied with the new direction issued by the Biden Administration and announced, through electronic communications to Plaintiffs, that they would do as the President "suggested".

74. On January 25, 2022, Atlas sent out a communication stating:

> Earlier today, you received notice that all U.S. employees who must travel as an essential function of their position must be fully vaccinated by May 1, 2022. *This policy applies to you*. We recognize that you previously sought an accommodation from the COVID-19 [VBGT] mandates the company previously implemented to comply with [EO 14042] (applicable to federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees). (Emphasis added).

75. In that same communication, Atlas indicated that Plaintiffs would not be allowed to submit new medical or religious accommodation requests, but that the current exemptions would be reprocessed.

> Given your requests for accommodation from the Company's

---

[23] *See* https://khn.org/morning-breakout/biden-disappointed-by-courts-decision-urgesemployers-to-require-covid-shot/

318

previous COVID-19 vaccination mandates, the Company is assuming you are seeking a request for accommodation from the vaccine policy that will take effect May 1, unless you respond to this email and indicate otherwise by Friday, January 28, 2022. If you do not respond by January 28, the Company will process your new request for accommodation based on the information already in its possession and follow-up with you thereafter to identify any reasonable accommodations the Company can offer without undue hardship.

76.     On March 8, 2022, Atlas Plaintiffs in Categories 1 & 2, received communication from upper management stating that if they were not vaccinated by May 1, 2022, they would be placed on unpaid leave of absence or reassignment regardless of the fact they had previously requested an accommodation. On March 25, 2022, Atlas walked back their statement and decided to allow unvaccinated pilots to continue working past May 1st as long as they submitted to monthly testing and masking. Thus, Atlas Plaintiffs who were unvaccinated were left in a continued state of legal, emotional, and career limbo.

77.     Atlas Plaintiffs were left with the impossible choice of taking COVID-19 VBGT at the expense of their deeply held religious beliefs or be terminated. **Plaintiffs in Category 2** succumbed to the pressure and took the VBGT. After the implementation of the VBGT mandate, all unvaccinated Plaintiffs were then subjected to repeated harassment and disparate treatment due to their deeply held religious beliefs.

78.     Defendants required unvaccinated Plaintiffs to wear the COVID-19 face masks which unlawfully required them to advertise their medical status and their objection to the VBGT,

319

and unlawfully required them to distinguished themselves from their peer groups by and amplifying their personal protected health information to their peers and to the public.

79. Theoretically, a "vaccinated" employee should have immunity to the disease and therefore bare no risk from the medical choices of another. However, Atlas CEO John Dietrich continued to discriminate against Plaintiffs by disseminating recorded video and oral statements that employees were unsafe around Plaintiffs whose religious or medical circumstances barred inoculation.

80. Plaintiff James Villella was damaged in the following manner: As a Boeing 737 Atlas pilot Captain that only flies domestic routes, he requested a religious exemption to both vaccinating and testing but was issued the same blanket exemption that required him to be tested. After trying for 7 months to clarify his situation, Atlas attempted to get Plaintiff to alter or abandon his religious beliefs and to submit to their COVID-19 testing policy. Villella was unjustly subjected to an "Article 19" disciplinary hearing in a blatant act of retaliation, harassment and discrimination. After having to defend himself against accusations of blatant disregard for the vaccination policy, and other libelous accusations, Plaintiff was removed from flight status and put on a desk job for approximately 3 months under the threat of termination for

320

refusing to test due to his sincerely held religious beliefs. [24]

81.    For Plaintiffs whose religious exemptions were granted, Defendants continuously harassed Plaintiffs to disregard their conscience and/or health and submit to vaccination. This includes but is not limited to those plaintiffs listed above in Plaintiffs Categories 1, 3 & 4. Atlas and FSI disseminated the VBGT status of every Plaintiff in emails that were published showing the last name, employee number, and VBGT status of Plaintiffs, and gave public disclosure of protected health information. In addition to that, Atlas discriminated against unvaccinated Plaintiffs in **Plaintiffs Category 1** listed above and denied them bids for higher paying flights to certain destinations despite such destinations having no laws or restrictions against unvaccinated Plaintiffs.

### E.  FSI Changes Religious Accommodations For All Flight Attendants

82.    On March 8, 2022, Plaintiffs who worked for FSI, received a communication from

---

[24] Atlas' claim that they could not accommodate Villella's accommodation request due to undue hardship was totally meritless. Contrary to Atlas' assertions, Villella operates on domestic flights; so no hotel restrictions or other restrictions that apply to international operations applied to him. His accommodation request was to continue operating and following the same process (as the CDC stated was appropriate for people without symptoms for COVID-19) all Atlas Air employees had been following for the entire COVID-19 pandemic up to May 1st, 2022, when the new Atlas testing "policy" took place. Since Atlas only had to accommodate this single individual, no undue hardship existed since only one employee requested this accommodation 7 *months* prior to the testing policy being implemented, and 2 *months* prior to the first communication received by Atlas about a mandatory COVID-19 testing policy.

FSI President Joni French stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence regardless of the fact they had previously requested an accommodation. Twenty-three days later, on March 31, 2022, FSI informs Atlas it would no longer require Flight Attendants to be vaccinated or virus tested and that they can continue working after May 1st. Atlas' testing requirement would become effective May 1, while FSI's ended on that date.

### F. Atlas Changes Religious Accommodations For All Pilots And Ground Employees

83. On March 25, 2022, Atlas attempted to mollify Plaintiffs by purporting to assure them that – despite maintaining a private company-wide VBGT mandate – those who had previously obtained a religious exemption pursuant to EO 14042 would be allowed to return to their regular work duties after the May 1, 2022, company vaccine mandate deadline "so long as they undergo requisite COVID-19 testing at their expense." Atlas´ testing requirement would become effective May 1, 2022, while FSI´s ended on that date.

84. Atlas ordered its unvaccinated employees, even after they had established natural immunity from the disease, to test weekly (ground employees) or monthly (pilots and flight attendants) for COVID-19 unlike employees without religious beliefs who were deemed "vaccinated" by the Defendants.

85. On April 21, 2022, Atlas sent Plaintiffs an updated Atlas COVID-19 Vaccination & Testing Policy now mandating that all COVID-19 **testing to be videotaped** and retained by Plaintiffs so that the videos could be sent to the company if requested.

### G. Defendants' Failure to Accommodate, Disparate Treatment and Creation of A Hostile Work Environment In Violation Of Title VII

86. Defendants' actions against Plaintiffs have violated Title VII's prohibition against

322

the denial of equal opportunity and discrimination and perpetuated a hostile work environment.

87.     Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance. Specifically, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, *religion*, sex, or national origin…[25] *(Emphasis added).*

88.     Regardless of whether the VBGT mandate was held Constitutional (for healthcare workers regulated by a specific statutory scheme), employers are still bound to fulfill their obligations to employees pursuant to Title VII. These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing or retaliatory conduct.

89.     As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination, but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work environment or harassment.

90.     Given the foregoing disparate treatment set forth in the facts herein, Defendants' conduct had a disparaging impact on Plaintiffs.

91.     Defendants' conduct satisfies the elements for claims of religious discrimination

---

[25] *See,* 42 U.S.C. § 2000e-2.

due to disparate treatment, failure to provide accommodations, harassment, and the creation of a hostile work environment.

**H. U.S. Equal Employment Opportunity Commission's ("EEOC") Failure To Mitigate Injury And Plaintiffs Ongoing Irreparable Harm**

92. All Plaintiffs have satisfied the requirement for exhaustion of administrative remedies.

CAUSES OF ACTION 1-5 AGAINST ATLAS

---- COUNT I ----

Invasion of Privacy - Public Disclosure of Private Facts

93. **Count I pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14 above.**

94. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-67, and 70-81 from above as though fully set forth herein.

95. Atlas gave publicity to Atlas Plaintiffs protected private health information ("PHI") by publishing the PHI throughout the company and by forcing Atlas Plaintiffs to wear political symbols, including functionally useless face masks, effectively amplifying and broadcasting their PHI to other employees and consumers.

96. The publication of Atlas Plaintiffs' PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

97. As a proximate result of Atlas' public disclosure of Atlas Plaintiffs' PHI, said Plaintiffs have suffered injury. Atlas is liable to said Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas

Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

---- COUNT II ----

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**

**Defendants' Creation of a Hostile Work Environment**

98.     **Count II pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

99.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-67, 70-81, 83-85, and 86-91 from above as though fully set forth herein.

100.     Atlas engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

101.     Atlas Plaintiffs suffered discrimination and disparate treatment at the hands of Atlas based on said Plaintiffs' protected religious and other protected characteristics and classifications.

102.     Atlas' conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

103.     Atlas' conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of Atlas and Atlas Plaintiffs.

104.     Plaintiffs were qualified to perform their duties as demanded by their employment.

105.     In good-faith, Atlas Plaintiffs undertook all requisite and applicable procedures to inform Atlas of the harassment and toxicity that was pervasive around the workplace.

325

106.    Atlas' actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

107.    Atlas Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

108.    Atlas Plaintiffs are members of several protected classifications.

109.    Unvaccinated Category 1 & 3 Atlas Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines. Atlas' repeated attempts to coerce said Plaintiffs to go against their religious beliefs was unwelcomed harassment.

110.    Additionally, after refusal to submit to unwelcomed and offensive actions against the Atlas Plaintiffs religious beliefs, Atlas subjected unvaccinated Atlas Plaintiffs Categories 1 & 3 to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on such Plaintiffs' sincerely held religious beliefs as a protected class under Title VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

(i)    Atlas' creation of inflexible policies that directly target Atlas Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii)    Severe and persistent pressure to take VBGT's;

(iii)    Disparaging and unfavorable treatment by employees, supervisors, managers,

326

and agents of Atlas against unvaccinated Atlas Categories 1 & 3 Plaintiffs, as compared to similarly situated Atlas Category 2 employees who folded and allowed themselves to be inoculated with one or more of the three VBGT's

(iv)    Unwelcomed comments about Categories 1 & 3 Plaintiffs' religious beliefs;

(v)    By committing the actions complained here, Atlas did openly violate the Collective Bargaining Agreement (CBA) between Teamsters and Atlas, which actions intentionally contributed to the toxic hostile workplace environment. The CBA at Article 1.a.4 (prior clause in effect at all times pertinent herein) and current version Article 26 R.1 both of which reiterate the Title VII prohibitions against discrimination based upon sex, religion, age.  Atlas also violated Article 26 R.1 which assures that employee-crew members will not be required to take any action which may result in any risk of harm, whereas said crew members assert that the required vaccination and masks posed such risk of harm.

(vi)    Atlas' intentional dissemination of Atlas Plaintiffs' PHI and vaccination status to customers, to Atlas employees, agents, and supervisors by forcing said Plaintiffs to wear facial masks which don't work and thus serve no other purpose than identifying "dissident" employees with the masks as political symbols, thus differentiating the masked dissidents from other subdued Category 2 employees who received VBGT's;

(vii)    Abuse of power by Atlas, who compelled managers and supervisors to make unreasonable demands of Atlas Plaintiffs during the course of their job responsibilities;

(viii)    Psychological harassment by blatant rejection of Atlas Plaintiffs' input on

327

matters, and consistent letters and memoranda threatening to terminate Atlas Categories 1 & 3 Plaintiffs.

(ix)     Retaliatory conduct in response to Categories 1 & 3 Plaintiffs' filing declination of vaccination forms and filing religious and/or medical accommodation forms;

(x)     Seeking to replace Atlas Category 1 & 3 Plaintiffs' employment positions with individuals who did not seek religious and/or medical accommodation(s).

(xi)     Atlas Defendants disproportionately higher compensated employees who did not seek religious accommodation, especially rewarding those vaccinated Category 2 Atlas employees with less restrictions, more flexibility in scheduling and greater opportunities all around.

(xii)     Atlas' intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii)     Failing to participate in a meaningful manner or otherwise engage with Atlas Plaintiffs regarding their religious and/or medical accommodation.

111.     Atlas Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by Defendants.

112.      Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which Atlas engaged in such discriminatory conduct against Atlas Categories 1 & 3 Plaintiffs.

113.     Atlas' egregious above-described conduct toward Atlas Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.   Atlas Category 2 Plaintiffs buckled

328

to the pressure and were released from under the discriminatory practices; Categories 1 & 3 Plaintiffs resisted and stood firm enduring the hardships deftly manufactured by Atlas.

114. Atlas is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

115. Atlas is directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

116. Accordingly, Atlas had actual knowledge of the above-described actions of its individual managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by the corporate Atlas entity itself.

117. Over the course of their employment, Atlas Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Atlas' conduct toward the (unfavored) unvaccinated Categories 1 & 3 Plaintiffs and their disparate treatment singling them out from the (favored) vaccinated Category 2 Plaintiffs.

118. Atlas, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

119. Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

120. The systematic discrimination, as previously set forth, further adversely affected the Atlas Plaintiffs through Atlas' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of the hated class of "Anti-Vaxxers."

121. Atlas failed to take any prompt and effective action reasonably calculated to result

in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

122.    This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

123.    Atlas' policies are only targeted at Atlas Plaintiffs Categories 1 & 3 and like-situated persons with conscientious objections to VBGT's.

124.    Atlas' egregious discriminatory conduct, given the totality of circumstances, raises to a level at which an objectively reasonable person could find constitutes a hostile work environment.

125.    The actions of Atlas, as set out herein, violate Title VII.

126.    As a result of Atlas's conduct, the Atlas Categories 1 & 3 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.  The Category 2 vaccinated Atlas Plaintiffs suffer as well with physical disabilities due to adverse vaccine events, grounding at least one pilot from all flying.

127.    Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the said Plaintiffs.

128.    Filing complaints or charges with the EEOC was futile for Plaintiffs, however, all of them have satisfied the requirement for exhaustion of administrative remedies.

---- **COUNT III** ----

330

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

129.     **Count III pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

130.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, and 83-85 from above as though fully set forth herein.

131.     Atlas Plaintiffs are citizens of the United States.

132.     At all times relevant hereto, Atlas was a government actor and a person acting under the color of law. That is, Atlas has taken decisive employment actions that have caused Atlas Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling Atlas' actions whether through incentive or threat.

133.     Atlas is also acting under color of law as it has conspired with Government officials to leverage Atlas Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire said Plaintiffs' personal, genetic information.

134.     Atlas and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Atlas Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, Atlas has acted in concert with the federal government at the expense of their employees including Atlas Plaintiffs.

135.     First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of

331

Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

136. Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

137. Applied here, Atlas Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by Atlas by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

138. This privacy right also includes Atlas Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, Atlas violated Atlas Plaintiffs' privacy rights when they broadcast their private information in memos, and published Plaintiffs PHI by forcing them to wear symbols, especially viciously targeting Atlas unvaccinated Plaintiffs Categories 1 & 3.

139. Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the
>
> privileges or immunities of citizens of the United States; nor shall
>
> any state deprive any person of life, liberty, or property, without
>
> due process of law, nor deny to any person within its jurisdiction
>
> the equal protection of the laws."

332

140.     After the announcement of EO 14042, vaccinated employees received preferential treatment compared to Atlas Plaintiffs who had not been vaccinated, which included increase in pay, preferential scheduling, additional benefits and privileges.

141.     Atlas knowingly and willfully discriminated against Atlas Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

142.     Atlas, by allowing similarly situated Atlas Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

143.     While the vaccine mandate appeared neutral on its face, in practice it denies Atlas Plaintiffs equal protection under the law.

144.     Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by Atlas' conduct.

145.     Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

146.     Atlas Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

333

147. The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes Defendants as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

148. Here, Atlas' actions are those of a federal government-type Actor (parallel to the State actor definition in Title 42 USC 1983 but specifically applied to the federal government within the holding in Bivens vs. Six Unknown Named Agents, 403 U.S. 388 (1971)) and, while courts have recognized a compelling state interest in controlling the spread of infections, Atlas lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

149. Assuming the VBGT's could be said to satisfy the interest of preserving public health, Atlas' mandate is not narrowly tailored since it is not the least restrictive means necessary, and there are numerous less restrictive means to serve the same interest of public health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to provide greater protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin.

150. As a direct and proximate result of Atlas' policies, practices, regulations and conduct, Atlas Plaintiffs have suffered harm.

151. The conduct of Atlas as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their

actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

152. Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- COUNT IV ----

**Infliction of Emotional Distress (intentional or in the alternative negligent)**

153. **Count IV pertains to Atlas Plaintiffs Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

154. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, 83-85, 95-97 and 100-128 from above as though fully set forth herein.

155. Atlas acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

156. Atlas' conduct has been and continues to be extreme and outrageous.

157. As a proximate result of Atlas' actions, Atlas Plaintiffs have suffered severe emotional distress.

158. The harm caused by Atlas was a reasonably foreseeable consequence of Atlas' conduct.

159. Atlas Plaintiffs allege that Atlas acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of Atlas Plaintiffs with respect to the conduct set forth in this Second Amended Complaint. However, if upon proof it is determined

335

such conduct does not to rise to such intentional level, Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

160. As a proximate result of Atlas' conduct, Atlas Plaintiffs have suffered serious and/or severe emotional distress.

161. The harm caused by Atlas was a reasonably foreseeable consequence of the Atlas' conduct.

162. Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Atlas Plaintiffs not limited to but including emotional and mental harm, as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitations, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.). Additionally, there were actual adverse vaccine events and physical harm/complications that affected the vaccinated Atlas Plaintiffs in Category 2.

---- **COUNT V** ----

**Negligence**

163. **Count V pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

164. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-67, 70-81, and 95-97 from above as though fully set forth herein.

165. Atlas owes Atlas Plaintiffs a duty that has been breached.

166. The duty Atlas owes to Atlas Plaintiffs is the standard duty of employer to

336

employee of reasonable care during the regular course of operating their business.

167. This duty includes protecting Atlas Plaintiffs' PHI via appropriate means and procedures.

168. Atlas breached this duty of care by, including but not limited to, publishing Atlas Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear useless facial masks which accomplished nothing more than political advertising which effectively amplified and broadcasted said Plaintiffs' PHI (unnecessarily) to other employees and consumers.

169. Defendants' negligence was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct.

170. As a proximate cause of Defendants negligence, Plaintiffs have suffered injury.

## CAUSES OF ACTION 6-10 AGAINST FSI

## ---- COUNT VI ----

### Invasion of Privacy - Public Disclosure of Private Facts

171. **Count VI pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

172. Category 4 FSI Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, and 82 from above as though fully set forth herein.

173. FSI gave publicity to Category 4 Plaintiffs' protected private health information ("PHI") by publishing the PHI throughout the company and by forcing Category 4 Plaintiffs to wear face masks, effectively amplifying and broadcasting their Protected Health Information (PHI) to other employees and consumers.

174. The publication of Category 4 Plaintiffs' PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

337

175. As a proximate result of FSI's public disclosure of Category 4 Plaintiffs' PHI, Category 4 Plaintiffs have suffered injury. FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

**----  COUNT VII  ----**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***

**Defendants' Creation of a Hostile Work Environment**

176. **Count VII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

177. Category 4 Plaintiffs Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, and 86-91 from above as though fully set forth herein.

178. FSI engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

179. Category 4 Plaintiffs suffered discrimination and disparate treatment at the hands of FSI based on said Plaintiffs' protected religious and other protected characteristics and classifications.

180. FSI's conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

181. FSI's conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of FSI and Category 4 Plaintiffs.

182. Category 4 Plaintiffs were qualified to perform their duties as demanded by their employment.

183. In good-faith, Category 4 Plaintiffs undertook all requisite and applicable procedures to inform FSI of the harassment and toxicity that was pervasive around the workplace.

184. FSI's actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

185. Category 4 Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

186. Category 4 Plaintiffs are members of several protected classifications.

187. Unvaccinated (Category 4) FSI Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccine, and FSI repeated attempts to coerce Category 4 Plaintiffs to go against their religious beliefs was unwelcomed harassment.

188. Additionally, after refusal to submit to unwelcomed and offensive actions against Category 4 Plaintiffs' religious beliefs, FSI subjected said Plaintiffs to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on said Plaintiffs' sincerely held religious beliefs as a protected class under Title VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

    (i)    FSI's creation of inflexible policies that directly target Category 4 Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower

339

Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii) Severe and persistent pressure to take VBGT's;

(iii) Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of FSI as compared to similarly situated employees who received one or more of the three VBGT's

(iv) Unwelcomed comments about Category 4 Plaintiffs' religious beliefs;

(v) FSI's intentional dissemination of Category 4 Plaintiffs' PHI and vaccination status to customers, FSI employees, agents, and supervisors by forcing said Plaintiffs to wear useless face masks which differentiate them from other employees who received VBGT's;

(vi) Abuse of power by FSI, who compelled managers and supervisors to make unreasonable demands of Category 4 Plaintiffs during the course of their job responsibilities;

(vii) Psychological harassment by blatant rejection of Category 4 Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate said Plaintiffs.

(viii) Retaliatory conduct in response to Category 4 Plaintiffs' filing declination of vaccination forms and filing religious accommodation forms;

(ix) Seeking to replace Category 4 Plaintiffs' employment positions by individuals who did not seek religious accommodation.

(x) FSI disproportionately compensated employees who did not seek religious

340

accommodation.

(xi)    Offensive or derogatory jokes in the office;

(xii)    FSI's intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii)    Failing to participate in a meaningful manner or otherwise engage with Category 4 Plaintiffs regarding their religious accommodation; and/or

189.    Category 4 Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by FSI.

190.    Category 4 Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which FSI engaged in such discriminatory conduct against said Plaintiffs.

191.    FSI's egregious conduct toward Category 4 Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

192.    FSI is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

193.    FSI was directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

194.    Accordingly, FSI had actual knowledge of the actions of its managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by FSI and Atlas.

195.    Over the course of their employment, Category 4 Plaintiffs made numerous good-

341

faith oral and written statements and/or complaints to their supervisors regarding FSI's conduct toward said Plaintiffs and their disparate treatment.

196. FSI's supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

197. Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

198. The systematic discrimination, as previously set forth, further adversely affected the Category 4 Plaintiffs through FSI's promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "Anti-Vaxxer."

199. FSI failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

200. This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

201. FSI's policies are only targeted at Category 4 Plaintiffs and like-situated persons with conscientious objections to VBGT's.

202. FSI's egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work environment.

203. The actions of FSI, as set out herein, violate Title VII.

204. As a result of FSI's conduct, Category 4 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and

suffering, and monetary and economic loss.

205.    FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. FSI deliberately acted in either a conscious and intentional disregard of the high probability of injury to said Plaintiffs or, conversely, did deliberately act with indifference to the high probability of injury to the Plaintiffs.

206.    Filing complaints or charges with the EEOC is futile, however, most of the Plaintiffs have done so.

**----  COUNT VIII  ----**

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

207.    **Count VIII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

208.    Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, and 82 from above as though fully set forth herein.

209.    Category 4 Plaintiffs are citizens of the United States.

210.    At all times relevant hereto, FSI was a government actor and a person acting under the color of law. That is, FSI has taken decisive employment actions that have caused Category 4 Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is/was driving FSI action whether through incentive or threat.

211.    FSI is also acting under color of law as they have conspired with Government officials to leverage Category 4 Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to unlawfully acquire said

Plaintiffs' personal, genetic information.

212. FSI and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, FSI has acted in concert with the federal government at the expense of their employees including Plaintiffs.

213. First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

214. Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

215. Applied here, Category 4 Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by FSI by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

216. This privacy right also includes Category 4 Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, FSI violated Category 4 Plaintiffs' privacy rights when they broadcast their private information in memos, and published said Plaintiffs' PHI by forcing them to wear symbols in the form of medically useless face masks.

344

217.     Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the
>
> privileges or immunities of citizens of the United States; nor shall
>
> any state deprive any person of life, liberty, or property, without
>
> due process of law, nor deny to any person within its jurisdiction
>
> the equal protection of the laws."

218.     FSI knowingly and willfully discriminated against Category 4 Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

219.     FSI, by stating they would allow similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more than the unvaccinated Category 4 Plaintiffs, and to have greater privileges/schedules, and not be required to wear political symbols, did engage in a facial deprivation of equal protection.

220.     While the vaccine mandate appeared neutral on its face, in practice it denies Category 4 Plaintiffs equal protection under the law.

221.     Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by FSI's conduct.

222.     Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also

345

includes those fundamental human rights implicit in structured liberty.

223.     Category 4 Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

224.     The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes FSI as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

225.     Here, Defendants actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, FSI lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

226.     Assuming the VBGT's could be said to satisfy the interest of preserving public health, FSI's mandate is not so narrowly tailored since it is not the least restrictive means.  There are less numerous, less restrictive means which adequately serve thst public interest of protecting public health against COVID-19. For instance, it is evident that antibodies acquired through prior infection provide protection, and as stated throughout this Complaint, and that natural immunity has shown to provide superior protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin, thus FSI's conduct fails the strict scrutiny test.

227.     As a direct and proximate result of FSI's policies, practices, regulations and

346

conduct, Category 4 Plaintiffs have suffered harm.

228.    The conduct of FSI as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

229.    FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

#### ---- COUNT IX ---

#### Infliction of Emotional Distress (intentional or in the alternative negligent)

230.    **Count IX pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

231.    Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, 83-85, 173-175 and 178-206 from above as though fully set forth herein.

232.    FSI acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

233.    FSI conduct has been and continues to be extreme and outrageous.

234.    As a proximate result of FSI's actions, Category 4 Plaintiffs have suffered severe emotional distress.

235.    The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

236. Category 4 Plaintiffs allege that FSI acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of said Plaintiffs with respect to the conduct set forth in this Second Amended Complaint. However, if upon proof it is determined such conduct does not to rise to such intentional level, said Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

237. As a proximate result of FSI's conduct, Category 4 Plaintiffs have suffered serious and/or severe emotional distress.

238. The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

239. FSI is liable to Category 4 Plaintiffs for punitive damages if found to have acted with intent, not mere negligence, because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the said Plaintiffs not limited to but including emotional and mental harm as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitation, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.).

#### ---- COUNT X ----

#### Negligence

240. **Count X pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

241. Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, 82, and 173-175 from above as though fully set forth herein.

348

242. FSI owes a duty of reasonable care during the course of operating their business.

243. This duty includes protecting the Category 4 Plaintiffs' PHI via appropriate means and procedures.

244. FSI breached their duty of care when by publishing the Category 4 Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

245. FSI's negligence was in violation of state and federal laws designed to protect Category 4 Plaintiffs against the type of harm caused by the FSI conduct.

246. As a proximate cause of FSI's negligence, Category 4 Plaintiffs have suffered injury.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, The Atlas Plaintiffs pray for judgment against Defendant Atlas as follows:

(i) An award of compensatory damages in appropriate amounts to be established at trial;

(ii) Punitive damages in a maximum amount as permitted by law and as determined by the jury;

(iii) Awards of damages tailored to make vaccine-injured plaintiffs whole with regard to their manifest and likely future long-term injuries and disabilities;

(iv) An award of attorneys' fees and costs associated with this action;

(v) And such other and further relief as the court deems just and proper.

AND WHEREFORE, The FSI Plaintiffs pray for judgment against Defendant FSI as follows:

349

(i)     An award of compensatory damages in appropriate amounts to be established at

trial;

(ii)    Punitive damages in a maximum amount as permitted by law and as determined

by the jury;

(iii)   An award of attorneys' fees and costs associated with this action;

(iv)    And such other and further relief as the court deems just and proper.

Dated: July 18, 2023.

Respectfully submitted,

**John Pierce Law P.C.**

By:         _/s/ John Pierce_
John M. Pierce, Esq.
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054
jpierce@johnpiercelaw.com

350

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| PATRICK AKERLUND, *et al.*, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-23519-KMM-LFL |
| ATLAS AIR, INC., *et al.*, | |
| Defendants. | |

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF**
**INCORPORATED MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**
<u>**PURSUANT TO RULES 12(B)(1), 12(B)(2), AND 12(B)(6)**</u>

**TABLE OF CONTENTS**

                                                                            **Page**

INTRODUCTION .................................................................................................... 1

LEGAL STANDARDS ............................................................................................. 2

ARGUMENT ............................................................................................................ 4

I.   **The Vast Majority of Plaintiffs' Claims Against Atlas and All Claims Against FSI Should Be Dismissed for Lack of Personal Jurisdiction** ........................................ 4

     A.   Atlas Is Not Subject to General Jurisdiction in Florida ............................. 5

     B.   Atlas Is Not Subject to Specific Jurisdiction as to Claims of Plaintiffs Who Work Outside of Florida ................................................................ 9

     C.   FSI Is Not Subject to General Personal Jurisdiction in Florida ............. 11

     D.   FSI Is Not Subject to Specific Personal Jurisdiction in Florida ............ 13

II.  **All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause** ............................................................................................. 14

     A.   Texas Law Governs the Enforceability of FSI's Arbitration Clause ...................................................... 14

     B.   Under Texas Law, FSI's Arbitration Clause is Enforceable and Precludes the Five FSI Plaintiffs From Pursuing Claims Against FSI in This Forum .......... 15

III. **The Scattershot SAC, with Claims on Behalf of 89 Individual Plaintiffs Against Atlas and FSI, Fails to State Any Claim Upon Which Relief Can Be Granted** .......................................................... 17

     A.   Plaintiffs' Fourth Complaint Remains A "Shotgun" Pleading Because of Its Vague and Conclusory Nature Not Obviously Connected to a Cause of Action .................................................... 17

     B.   Counts I and VI: Plaintiffs Cannot State Any Invasion-of-Privacy Claim ........... 20

     C.   Counts II and VII: Plaintiffs Have Not Exhausted Their Administrative Remedies and There is No Futility Exception ......................... 22

     D.   Counts II and VII: Plaintiffs Fail to State a Title VII Claim for Hostile Work Environment (or Any Other Type of Title VII Claim) ................. 25

     E.   Counts III and VIII: Plaintiffs' Constitutional Claims Fail ................... 30

          1.   Plaintiffs' Claims Do Not State Any Constitutional Violations ............... 30

          2.   Defendants Are Not State Actors That Could Violate the Constitution ....................................... 32

          3.   The Constitutional Claims Independently Fail Because Plaintiffs Lack a Cause of Action under Section 1983 or Bivens ............ 34

**TABLE OF CONTENTS**
(continued)

**Page**

F.      Counts IV and IX: No Valid Intentional-Infliction-of-Emotional-Distress ("IIED") Claim ........................................................................................... 35

     1.      Defendants' Actions Were Not Outrageous as a Matter of Law ............... 35

     2.      The SAC Does Not Plausibly Allege Intent or Severe Suffering ............. 37

     3.      Plaintiffs' Allegations Are Not Cognizable as a Florida Negligent-Infliction-of-Emotional-Distress ("NIED") Claim ................................. 37

G.      Counts V and X: Plaintiffs Lack Any Actionable Negligence Claim ................... 38

CONCLUSION ........................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*AFL-CIO v. City of Miami*,
   637 F.3d 1178 (11th Cir. 2011) ...................................................................................... 3, 4

*Agher v. Envoy Air Inc.*,
   2018 WL 6444888 (C.D. Cal. Oct. 12, 2018) ........................................................... 7

*Anderson v. United Airlines, Inc.*,
   577 F. Supp. 3d 1324 (M.D. Fla. 2021) ........................................................18, 25, 32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................3, 22, 35

*Banks v. Am. Airlines*,
   2019 WL 5579479 (N.D. Cal. Oct. 29, 2019) .......................................................... 11

*Barmapov v. Amuial*,
   986 F.3d (11th Cir. 2021) ............................................................................... 20

*Beckerich v. St. Elizabeth Med. Ctr.*,
   563 F. Supp. 3d 633 (E.D. Ky. 2021) ................................................................. 32

*Bivens v. Six Unknown Named Agents*,
   403 U.S. 388 (1971) ....................................................................................2, 34, 35

*BNSF Ry. Co. v. Tyrrell*,
   581 U.S. 402 (2017) ...................................................................................... 6, 8

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
   582 U.S. 255 (2017) ....................................................................................4, 9, 11

*Brown v. Royal Carib. Cruises, Ltd.*,
   2017 WL 3773709 (S.D. Fla. Mar. 17, 2017) ........................................................ 36

*Burrows v. Purchasing Power, LLC*,
   2012 WL 9391827 (S.D. Fla. Oct. 18, 2012) ........................................................38, 39

*Cala v. Moorings Park Cmty. Health, Inc.*,
   2022 WL 17405581 (M.D. Fla. Dec. 2, 2022) ......................................................35, 37

*Cape Publ'ns, Inc. v. Hitchner,*
    549 So. 2d 1374 (Fla. 1989). ......................................................................20, 21, 22

*Carlisi v. Sprintcom, Inc.,*
    2006 WL 8432613 (S.D. Fla. Sept. 6, 2006)................................................................ 39

*Carmouche v. Tamborlee Mgmt., Inc.,*
    789 F.3d 1201 (11th Cir. 2015)................................................................................. 4, 8

*Carter v. Cellco P'ship,*
    2016 WL 8981056 (M.D. Fla. Mar. 23, 2016)....................................................... 26, 27

*Children's Health Def. v. Facebook Inc.,*
    546 F. Supp. 3d 909 (N.D. Cal. 2021) ........................................................................ 32

*Chudasama v. Mazda Motor Corp.,*
    123 F.3d 1353 (11th Cir. 1997)..................................................................................... 1

*Ciraci v. J. M. Smucker Co.,*
    2021 WL 6064748 (N.D. Ohio Dec. 22, 2021)....................................................... 32, 33

*Ciraci v. J.M. Smucker Co.,*
    62 F.4th 278 (6th Cir. 2023).............................................................................32, 33, 34

*Coffey v. Mesa Airlines Inc.,*
    2019 WL 4492952 (C.D. Cal. Apr. 15, 2019).......................................................... 11

*Cousins v. United Healthcare, Inc.,*
    2020 WL 1666628 (S.D. Fla. Apr. 3, 2020) .............................................................. 23

*Cox v. Nobles,*
    15 F.4th 1350 (11th Cir. 2021)..................................................................................... 4

*D'Cunha v. Northwell Health Sys.,*
    2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023).......................................................... 29

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ............................................................................................*passim*

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ................................................................................................ 31

*Doe v. Siemens Med. Sols., USA, Inc.,*
    2023 WL 2600445 (E.D. Ky. March 22, 2023) ...................................................... 6, 9

*Dollar v. Goleta Water Dist.*,
   2022 WL 5176904 (C.D. Cal. Oct. 3, 2022) ................................................................... 29

*Duberry v. Postmaster Gen.*,
   652 F. App'x 770 (11th Cir. 2016) .......................................................................... 22, 23

*Duncan v. Madison County*,
   2007 WL 2874803 (M.D. Ga. Sept. 27, 2007) ............................................................... 29

*Echols v. R.J. Reynolds Tobacco Co.*,
   2014 WL 12199984 (S.D. Fla. Feb. 18, 2014) ................................................................. 3

*Egbert v. Boule*,
   142 S.Ct. 1793 (2022) ................................................................................................... 35

*Estate of McCall ex rel. McCall v. United States*,
   642 F.3d 944 (11th Cir. 2011) ...................................................................................... 31

*Finkbeiner v. Geisinger Clinic*,
   2022 WL 3702004 (M.D. Penn. Aug. 26, 2022) ........................................................... 36

*Florida v. Dep't of Health & Hum. Servs.*,
   19 F.4th 1271 (11th Cir. 2021) ...................................................................................... 30

*Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ............................................................................................... 9, 10

*Fraser v. Smith*,
   594 F. 3d 842 (11th Cir. 2010) ...................................................................................... 12

*Fresenius Med. Care Holdings, Inc. v. Tucker*,
   704 F.3d 935 (11th Cir. 2013) ...................................................................................... 31

*Garcia v. Carnival Corp.*,
   838 F. Supp. 2d 1334 (S.D. Fla. 2012) ....................................................................... 35, 36

*Gonzalez v. Brand Energy & Infra. Servs., Inc.*,
   2013 WL 1188136 (S.D. Tex. Mar. 20, 2013) ............................................................... 15

*Gustino v. Stoneybrook W. Master Assoc., Inc.*,
   842 F. App'x 323 (11th Cir. 2021) ................................................................................. 32

*Halstead v. Espinoza*,
   2023 WL 2399288 (11th Cir. 2023) ............................................................................... 19

*Hard Candy, LLC v. Hard Candy Fitness, LLC,*
    106 F. Supp. 3d 1231 (S.D. Fla. 2015) ................................................................ 12

*Hart v. United States,*
    894 F.2d 1539 (11th Cir. 1990) .......................................................................... 37

*Harvey v. Harvey,*
    949 F.2d 1127 (11th Cir. 1992) ..................................................................... 32, 33

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984) ...................................................................................... 11, 12

*Hencey v. United Airlines, Inc.,*
    2021 WL 3634630 (S.D. Fla. Aug. 17, 2021) ..................................................... 18

*Henry v. DeSantis,*
    461 F. Supp. 3d 1244 (S.D. Fla. 2020) .............................................................. 31

*Hiers v. Bordt,*
    2016 WL 9506039 (N.D. Fla. July 6, 2016) ....................................................... 38

*Hornberger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    2015 WL 13310465 (C.D. Cal. Jan. 22, 2015) ................................................... 24

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.,*
    603 F. Supp. 3d 1183 (S.D. Fla. 2022) .............................................................. 38

*Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.,*
    2020 WL 3078531 (S.D. Fla. June 10, 2020) ...................................................... 3

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ............................................................................................ 30

*Johnson v. Tyson Foods, Inc.,*
    2022 WL 2161520 (W.D. Tenn. June 15, 2022) ................................................ 33

*Kautz v. Residence Inn by Marriott, LLC,*
    2014 WL 4416012 (M.D. Fla. Sept. 5, 2014) ............................................... 21, 35

*Khanthapixay v. Loyola Marymount Univ.,*
    2021 WL 4025796 (C.D. Cal. Aug. 9, 2021) ...................................................... 32

*Klaassen v. Trs. of Ind. Univ.,*
    7 F.4th 592 (7th Cir. 2021) .......................................................................... 30, 31

*Knezevich v. United States*,
2019 WL 1093449 (M.D. Fla. Jan. 15, 2019) ........................................................... 37

*Lane v. Piedmont Healthcare*,
2021 WL 5074494 (N.D. Ga. Oct. 13, 2021) ........................................................... 32

*Leake v. Raytheon Techs. Corp.*,
2023 WL 2242857 (D. Ariz. Feb. 27, 2023) .............................................. 21, 27, 28

*Leggo v. M.C. Dean, Inc.*,
2023 WL 1822383 (E.D. Va. Feb. 7, 2023) ............................................................. 27

*Lloyd v. Sch. Bd. of Palm Beach Cnty.*,
570 F. Supp. 3d 1165 (S.D. Fla. 2021) ............................................................. 31, 36

*Lopez v. City of West Miami*,
2015 WL 12978166 (S.D. Fla. Sept. 16, 2015) ....................................................... 24

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ................................................................................. 33

*Loza v. Kimpton Hotel & Rest. Grp., LLC*,
2020 WL 13389302 (S.D. Fla. June 17, 2020) ....................................................... 27

*Maddox v. ADT Sec. Servs., Inc.*,
2011 WL 43037 (N.D. Ill. Jan. 6, 2011) ................................................................. 24

*Mallory v. Norfolk Southern Railway Co.*,
143 S. Ct. 2028 (2023) .............................................................................................. 5

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ............................................................................................ 33

*Mark South v. Atlas*,
2023 WL 3184346 (Fla. Div. Admin. Hr'gs Apr. 24, 2023) ................................... 29

*Martz v. Munroe Reg'l Med. Ctr., Inc.*,
2007 WL 2044247 (M.D. Fla. July 10, 2007) ........................................................ 36

*McCullough v. Royal Carib. Cruises, Ltd.*,
268 F. Supp. 3d 1336 (S.D. Fla. 2017) ............................................................. 12, 13

*McDowell v. United Servs. Co.*,
2008 WL 5210018 (M.D. Fla. Dec. 10, 2008) ....................................................... 22

*Miller v. SLT Dealer Grp. Ltd.*,
  2008 WL 11389413 (S.D. Tex. Aug. 8, 2008) ......................................................... 15

*Moore v. Pederson*,
  806 F.3d 1036 (11th Cir. 2015) ............................................................................... 35

*N.N.J. v. Broward Cnty. Sch. Bd.*,
  2007 WL 3120299 (S.D. Fla. Oct. 23, 2007) ............................................................. 3

*Nat'l Broad. Co. v. Commc'ns Workers of Am.*,
  860 F.2d 1022 (11th Cir. 1988) ............................................................................... 34

*Negron v. CitiMortg. Inc.*,
  2016 WL 10953267 (S.D. Fla. Oct. 19, 2016) ......................................................... 37

*Norris v. Stanley*,
  -- F.4th --, 2023 WL 4530251 (6th Cir. July 13, 2023) ........................................... 30

*Parker v. Town of Palm Beach*,
  2017 WL 11537901 (S.D. Fla. Aug. 16, 2017) ........................................................ 22

*Parr v. Stevens Transp., Inc.*,
  2020 WL 2200858 (N.D. Tex. May 5, 2020) ....................................................... 15, 16

*Pennington v. PruittHealth, Inc.*,
  2019 WL 5309117 (M.D. Ga. Oct. 21, 2019) ........................................................... 24

*Pipino v. Delta Air Lines, Inc.*,
  196 F. Supp. 3d 1306 (S.D. Fla. 2016) .................................................................... 38

*Post-Newsweek Stations Orlando, Inc. v. Guetzloe*,
  968 So. 2d 608 (Fla. Ct. App. 2007) ................................................................... 21, 22

*Rayburn ex rel. Rayburn v. Hogue*,
  241 F.3d 1341 (11th Cir. 2001) ............................................................................... 30

*Regions Bank v. Kaplan*,
  2021 WL 4852268 (11th Cir. 2021) ..................................................................... 20, 22

*Regueiro v. Am. Airlines, Inc.*,
  2022 WL 2352414 (S.D. Fla. June 30, 2022) ............................................................ 7

*Response Oncology, Inc. v. MetraHealth Ins. Co.*,
  978 F. Supp. 1052 (S.D. Fla. 1997) ........................................................................ 23

*Rodriguez v. John Eagle Sport City Motors, LLP*,
2014 WL 2587599 (N.D. Tex. June 10, 2014) ......................................................... 16

*Roof & Rack Prods., Inc. v. GYB Invs., LLC*,
2014 WL 3116413 (S.D. Fla. July 8, 2014) ............................................................. 12

*Ross v. Blake*,
578 U.S. 632 (2016) ................................................................................................... 25

*Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*,
723 F. App'x 871 (11th Cir. 2018) .............................................................................. 9

*Safer v. Nelson Fin. Grp., Inc.*,
422 F.3d 289 (5th Cir. 2005) ..................................................................................... 16

*Sambrano v. United Airlines, Inc.*,
2021 WL 5178829 (N.D. Tex. Nov. 8, 2021) ....................................................... 7, 10

*Sanchez v. Marathon Oil Co.*,
2021 WL 1201677 (S.D. Tex. Jan. 21, 2021) ........................................................... 15

*Santasiero v. Martin*,
2021 WL 2856622 (M.D. Fla. July 8, 2021) ....................................................... 36, 37

*Savel v. Metrohealth System*,
2023 WL 4490395 (N.D. Ohio July 12, 2023) ......................................................... 29

*Sculptchair, Inc. v. Century Arts, Ltd.*,
94 F.3d 623 (11th Cir. 1996) ....................................................................................... 2

*Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*,
82 So. 3d 73 (Fla. 2012). ........................................................................................... 15

*Shah v. Orange Park Med. Ctr., Inc.*,
2016 WL 4943925 (M.D. Fla. Sept. 16, 2016) ......................................................... 27

*Shannon v. Bellsouth Telecomms., Inc.*,
292 F.3d 712 (11th Cir. 2002) ................................................................................... 27

*Sharikov v. Philips Med. Sys. MR, Inc.*,
2023 WL 2390360 (N.D.N.Y. Mar. 7, 2023) ........................................................... 21

*Shea v. BBVA Compass Bancshares, Inc.*,
2013 WL 869526 (S.D. Fla. Mar. 7, 2013) ........................................................... 3, 14

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) ........................................................................................................ 3

*Taye v. Vectrus Sys. Corp.*,
2023 WL 4492463 (M.D. Ga. July 12, 2023) ........................................................... 34

*Thompson v. Carnival Corp.*,
174 F. Supp. 3d 1327 (S.D. Fla. 2016)......................................................................... 5

*Thompson v. Fla. Bar*,
526 F. Supp. 2d 1264 (S.D. Fla. 2007)......................................................................... 23

*Thompson v. Spears*,
336 F. Supp. 2d 1224 (S.D. Fla. 2004)......................................................................... 38

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
363 U.S. 574 (1960) ...................................................................................................... 16

*United Techs. Corp. v. Mazer*,
556 F.3d 1260 (11th Cir. 2009)................................................................................... 2, 5

*Vallarta v. United Airlines, Inc.*,
497 F. Supp. 3d 790 (N.D. Cal. 2020) ......................................................................... 7

*Victor Elias Photography, LLC v. Leonardo Worldwide Corp.*,
2019 WL 3713724 (S.D. Tex. Jan. 25, 2019) ............................................................. 6

*Viridis Corp. v. TCA Glob. Credit Master Fund, LP*,
721 F. App'x 865 (11th Cir. 2018).............................................................................. 15

*Waite v. All Acquisition Corp.*,
901 F.3d 1307 (11th Cir. 2018)............................................................................... 5, 6, 10

*Walden v. Fiore*,
571 U.S. 277 (2014) .................................................................................................. 9, 10, 11

*Walton v. Johnson & Johnson Servs., Inc.*,
347 F.3d 1272 (11th Cir. 2003).................................................................................... 28

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ...................................................................................................... 31

*Washington v. Sears Logis. Servs., Inc.*,
2014 WL 2159253 (N.D. Tex. May 23, 2014)............................................................ 15

Case 1:22-cv-23519-KMM    Document 66    Entered on FLSD Docket 08/02/2023    Page 12 of 52

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ................................................................................. 31

*Weiland v. Palm Beach Cnty. Sheriff's Off.,*
    792 F.3d 1313 (11th Cir. 2015) ........................................................................... 18

*Williams v. City of Minneola,*
    575 So. 2d 683 (Fla. Ct. App. 1991) ................................................................... 20

*Williams v. Motorola,*
    303 F.3d 1284 (11th Cir. 2002) ........................................................................... 26

*Willis v. Gami Golden Glades, LLC,*
    967 So. 2d 846 (Fla. 2007). ................................................................................. 38

**STATUTES**

42 U.S.C. § 1983 ..............................................................................................2, 32, 34

42 U.S.C. § 2000e-2 .................................................................................................. 28

42 U.S.C. § 2000e-5 .................................................................................................. 22

Defendants Atlas Air, Inc. ("Atlas") and Flight Services International, LLC ("FSI") (collectively, "Defendants") move to dismiss the Second Amended Complaint ("SAC," ECF No. 63) with prejudice under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).

## INTRODUCTION

A shifting cast of now 89 Plaintiffs have filed four complaints against Defendants, first expanding and now contracting their array of state and federal claims.[1] Their latest, the SAC, submitted in response to the Court's Order (ECF No. 59) dismissing their complaint as a shotgun pleading, continues to be devoid of a viable legal theory. Confronted with Defendants' prior motions to dismiss arguments (ECF. Nos. 43, 57), Plaintiffs have decided to drop EncompassAir and the three Atlas executives as Defendants and have abandoned their causes of action under the:

- Florida Whistleblower Act;

- Americans with Disabilities and Rehabilitation Acts;

- Genetic Information Non-Discrimination Act; and

- Defendants' Collective Bargaining Agreements.

What remains fares no better than the legal claims they have (appropriately) discarded. By "dismiss[ing] [their remaining] nonmeritorous claim[s] before discovery has begun, unnecessary costs to the litigants and to the court system can be avoided." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997). The Court should thus dismiss the SAC with prejudice for several reasons:

***Jurisdictional Defects.*** *First*, Plaintiffs—who are scattered across the country—cannot establish personal jurisdiction against FSI or Atlas for their claims. *Second*, all five Plaintiffs who

---

[1] *See US Freedom Flyers, et al.* v. *Atlas Air, Inc., et al.*, Case No. 1:22-cv-21477, ECF No. 1 (S.D. Fla.) (Altonaga, C.J.); *Estate of Lane Caviness, et al. v. Atlas Air, Inc., et al.*, Case No. 1:22-cv-23519, ECF Nos. 1, 39, 63 (Moore, J.).

work for FSI and assert claims against it are barred by mandatory arbitration clauses.

**Failure to State a Claim.** *Third*, the Complaint remains a shotgun pleading the Court can dismiss with prejudice. *Fourth*, Plaintiffs have not alleged a disclosure to the public at large of private offensive facts unworthy of public concern to support their invasion of privacy claims. *Fifth*, Plaintiffs' Title VII claims fail because: (i) numerous Plaintiffs have not exhausted administrative remedies and thus cannot state a claim on that ground alone, and (ii) none of the 89 individual Title VII claims otherwise plausibly state a claim for harassment (or any other theory) based on religion. *Sixth*, Plaintiffs' constitutional claims fail several times over: they lack a cause of action under Section 1983 or *Bivens*; they cannot meet the "state action" test for the private-employer Defendants; and COVID-19 vaccination, masking, and testing infringes no constitutional rights. *Seventh*, Plaintiffs' intentional infliction of emotional distress claims fail to plausibly allege outrageousness, intent, or severe suffering, and their claims for negligent infliction of emotional distress face additional legal obstacles. *And finally*, Plaintiffs' negligence claims do nothing more than repackage their other legally infirm claims.

Accordingly, after eliminating the claims against FSI that must be arbitrated and those Plaintiffs' claims against Atlas and FSI over which the Court lacks personal jurisdiction, the Court should dismiss the SAC with prejudice.

## LEGAL STANDARDS

**Rule 12(b)(2)**. Plaintiffs bear the burden of demonstrating personal jurisdiction in response to a Rule 12(b)(2) motion. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). If the defendant submits evidence against jurisdiction, the burden "shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.*; *accord Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). "[W]hen the plaintiff offers no competent evidence to the contrary, [the] district court may find that the defendant's unrebutted denials are sufficient to

364

negate plaintiff's jurisdictional allegations." *Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*, 2020 WL 3078531, at *7 (S.D. Fla. June 10, 2020).

**Rule 12(b)(1).** Motions to compel arbitration "are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to [Rule] 12(b)(1)." *Shea v. BBVA Compass Bancshares, Inc.*, 2013 WL 869526, at *2 n.3 (S.D. Fla. Mar. 7, 2013) (Moore, J.). Although "jurisdictional questions ordinarily must precede merits determinations in dispositional order," the Supreme Court "recognize[s] that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).[2]

**Rule 12(b)(6).** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings need "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *N.N.J. v. Broward Cnty. Sch. Bd.*, 2007 WL 3120299, at *1 (S.D. Fla. Oct. 23, 2007) (Moore, J.). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Echols v. R.J. Reynolds Tobacco Co.*, 2014 WL 12199984, at *3 (S.D. Fla. Feb. 18, 2014) (Moore, J.). Thus, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. For each claim, the plaintiff must set forth plausible factual allegations that establish all "the material elements of a cause of action." *AFL-CIO v. City of*

---

[2] As to FSI, the Court should dismiss in full—and not retain jurisdiction—as all claims against FSI are subject to arbitration, and no claims against FSI are subject to personal jurisdiction in this Court. FSI requests that the Court, prior to considering FSI's personal jurisdiction argument, first resolve its jurisdictional argument that Plaintiffs' claims against it should be dismissed with prejudice for lack of subject matter jurisdiction, as these Plaintiffs' claims are subject to mandatory arbitration.

*Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011). A court should "dismiss a complaint if it rests only on conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts." *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).

**ARGUMENT**

**I.     The Vast Majority of Plaintiffs' Claims Against Atlas and All Claims Against FSI Should Be Dismissed for Lack of Personal Jurisdiction.**

Despite two rounds of motions to dismiss briefing demonstrating that Plaintiffs could not establish general or specific personal jurisdiction over Atlas or FSI, Plaintiffs' SAC makes no effort to address this defect (except to be less transparent about the state where Plaintiffs live). Therefore, at minimum, the vast majority of Plaintiffs' claims against Atlas and all of Plaintiffs' claims against FSI must be dismissed.

Florida's long-arm statute, Fla. Stat. § 48.193(2), "extends to the limits on personal jurisdiction imposed by the Due Process Clause," meaning this Court "need only determine whether [its] exercise of jurisdiction over [Atlas and FSI] would exceed constitutional bounds." *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015). Only two avenues to establish personal jurisdiction under the Constitution's Due Process Clause exist for a non-consenting corporation—general (or "all-purpose") jurisdiction and specific (or "suit-related") jurisdiction. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017) (original emphasis). "Specific jurisdiction is very different. In order for [a] court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the forum.'" *Id.* (original emphasis). The SAC and the uncontroverted declarations from Defendants demonstrate (i) that general jurisdiction is lacking as to both Atlas and FSI and (ii) specific jurisdiction's limits require dismissal of the claims against

Atlas and FSI. *United Techs. Corp.*, 556 F.3d at 1274–77 (analyzing sworn testimony submitted by defendant in challenge to personal jurisdiction).

    A.    <u>Atlas Is Not Subject to General Jurisdiction in Florida.</u>

Plaintiffs cannot demonstrate general personal jurisdiction over Atlas under the demanding test set forth in *Daimler AG v. Bauman*, 571 U.S. 117 (2014).[3] *Daimler* makes clear that absent an "exceptional case," a corporation is "at home"—and thus subject to general personal jurisdiction consistent with due process—only in the states where it is incorporated or where it has its principal place of business. *Id.* at 138–39, 139 n.19. Here, as Plaintiffs admit, Atlas's "paradigm forum[s]" for the exercise of general jurisdiction" are Delaware and New York. *Id*. at 137; *see* SAC ¶ 16 (alleging Atlas is "a Delaware corporation with its principal place of business in Purchase, New York"); *see* Ex. A., Declaration of Carleen A. Ybarra ¶¶ 2–3.

Applying *Daimler*, this Court has recognized that it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1336 n.7 (S.D. Fla. 2016) (Moore, J.). In *Daimler*, the Supreme Court rejected as "unacceptably grasping" the idea that a defendant

---

[3]     The Supreme Court's recent decision in *Mallory v. Norfolk Southern Railway Co.*, 143 S. Ct. 2028 (2023), plays no role in this case. There, the Court held that Norfolk Southern, a Virginia corporation, became subject to general personal jurisdiction in Pennsylvania by registering to do business in Pennsylvania under a Pennsylvania registration statute that explicitly provided that "qualification as a foreign corporation shall permit [Pennsylvania's] courts to exercise general personal jurisdiction over a registered foreign corporation, just as they [do] over domestic corporations." *Id.* at 2037 (citing Pa. Cons. Stat. § 5301(a)(2)(i)). But, as the Eleventh Circuit has already squarely held, Florida's registration statute for foreign corporations contains no such general-jurisdiction provision. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1322 (11th Cir. 2018) ("[N]either the text of the Florida statutes nor the Florida case law construing them can rationally be held as establishing [a foreign corporation's] agreement to answer in Florida's courts for any purpose. We thus reject [plaintiffs'] argument that the district court could exercise general jurisdiction on that basis.") (citation omitted); *see also Mallory*, 143 S. Ct. at 2039 (explaining that *Daimler* sets out the test for whether a "court may exercise jurisdiction over a corporate defendant that *has not consented* to suit in the forum") (original emphasis).

corporation could be subject to all-purpose or general jurisdiction "in every State in which [the] corporation engages in a substantial, continuous, and systematic course of business." 571 U.S. at 137–38. Instead, the Court held that the proper question is "whether that corporation's affiliations with the State are so continuous and systematic *as to render it essentially at home in the forum State.*" *Id.* at 138–39 (emphasis added). The facts of *Daimler* illustrate the point. There, the Supreme Court held that a California federal court lacked general jurisdiction over Mercedes-Benz USA despite it being "the largest supplier of luxury vehicles to the California market" and having "multiple California-based facilities," including a "regional office," "a Vehicle Preparation Center," and "a Classic Center." *Id.* at 123, 136–37, 139.

Plaintiffs cannot carry their "heavy burden" to establish Atlas is "at home" in Florida. *Waite*, 901 F.3d at 1317. Only "15.2% of Atlas's U.S. workforce has a Florida duty station." Ybarra Decl. ¶ 6. In the relevant period, take offs and landings in Florida *never* represented more than 9% of Atlas's total monthly flights. *Id.* Atlas maintains operational centers at airports across the United States, including in Alaska, California, Illinois, Kentucky, Florida, and New York. *Id.* ¶ 5. These facts cannot support general personal jurisdiction. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017) (railroad not subject to general personal jurisdiction in Montana despite over 2,000 miles of railroad track and 2,000 employees there); *Victor Elias Photography, LLC v. Leonardo Worldwide Corp.*, 2019 WL 3713724, at *2 (S.D. Tex. Jan. 25, 2019) (Marriott not subject to general personal jurisdiction in Texas despite being alleged to "operate[], franchise[], and/or license[] more properties in Texas than any other state" and having, through affiliates, "487 properties in Texas"); *Doe v. Siemens Med. Sols., USA, Inc.*, 2023 WL 2600445, at *3 (E.D. Ky. March 22, 2023) (dismissing claims by 53 plaintiffs related to company's mandatory COVID-19 vaccination policy for lack of personal jurisdiction).

368

In cases involving airlines with ties to forum states equal or greater than those of Atlas to Florida, courts have found those ties fall short of establishing general jurisdiction under *Daimler*. *See, e.g.*, *Regueiro v. Am. Airlines, Inc.*, 2022 WL 2352414, at *2 (S.D. Fla. June 30, 2022) (rejecting general jurisdiction despite American's "significant business operations in Florida" and collecting authorities that "have declined to exercise general jurisdiction over airlines with a hub in the state"); *Sambrano v. United Airlines, Inc.*, 2021 WL 5178829, at *4 (N.D. Tex. Nov. 8, 2021) (*Daimler* "compel[led] the Court to conclude [United was] Texas's guest"—not subject to general jurisdiction—despite it "maintain[ing] a constant and significant presence in Texas" including (i) an in-state hub airport, (ii) nearly 25% of its daily flights taking off or landing in Texas, and (iii) 16% of its employees working in Texas); *Vallarta v. United Airlines, Inc.*, 497 F. Supp. 3d 790, 799 (N.D. Cal. 2020) (no general jurisdiction over airline with two in-state hubs); *Agher v. Envoy Air Inc.*, 2018 WL 6444888, at *2 (C.D. Cal. Oct. 12, 2018) (8,500 employees insufficient).

Plaintiffs cannot establish general jurisdiction in Florida based on Atlas having "a hub, its training center and other operations" within the state. SAC ¶ 17. Concluding these in-state activities are sufficiently "exceptional" to confer general jurisdiction would violate the Supreme Court's admonition in *Daimler* that "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20. To illustrate, Plaintiffs allege that Atlas's Miami training center has "30,000 square feet of administrative and instructional space." SAC ¶ 17. Yet, Atlas has over 150,000 square feet of space in Kentucky, over 100,000 square feet in California, and over 27,000 square feet in New York, as well as significant physical plants at locations across the country and the world. Ybarra Decl. ¶ 8. Atlas has twice as many employees in Kentucky (*i.e.*, 1,347 employees) as in Florida, along with 734 employees in New York, 532 in

California, 515 in Alaska, 206 in Illinois, 175 in Texas, and other employees based in 13 other states and various foreign countries. *Id.* ¶ 9. By contrast to its Florida operations that Plaintiffs incorrectly characterize as "home," it is New York—Atlas's "principal place of business" (SAC ¶ 16)—where Atlas's Ground Operations Support and Facilities, Accounting, Finance, Financial Planning and Analysis, Safety, Administration, Systems Operations, Defense & Government Programs, Sales & Marketing, Communications, Legal, and Human Resources functions are based. Ybarra Decl. ¶ 10. New York also houses Atlas's principal executive offices. *Id.* ¶ 11. Atlas's Flight Operations are based in New York and Kentucky. *Id.* ¶ 10. And Atlas's board meetings are often held in New York or Washington, D.C. *Id.* ¶ 12.

Nor do Plaintiffs clear the high bar imposed by *Daimler* with the SAC's assertion that "if Atlas were to cease all operations [in Miami], it would cause significant impact on the operations of Atlas world-wide" or that "several very important departments are based in Miami," including the Vice President of Ground Operations Training. SAC ¶¶ 18–19. In *Daimler*, the Supreme Court expressly rejected the argument that general jurisdiction can be based on "important" operations being housed in the forum state. 571 U.S. at 118 (rejecting an "importance" standard for general jurisdiction and observing "if 'importance' in this sense were sufficient to justify jurisdictional attribution, foreign corporations would be amenable to suit on any or all claims wherever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the sprawling view of general jurisdiction rejected in *Goodyear*.) *See BNSF*, 581 U.S. at 414 (reiterating that to "focus solely on the magnitude of the defendant's in-state contacts" is improper).

Simply put, this is not an "exceptional case" where Atlas is "at home" outside of the states where it is incorporated and headquartered, meaning Atlas is not subject to general jurisdiction in Florida. *Carmouche*, 789 F.3d at 1204.

370

B.     <u>Atlas Is Not Subject to Specific Jurisdiction as to Claims of Plaintiffs Who Work Outside of Florida.</u>

Failing all-purpose general jurisdiction in Florida, each Plaintiff must show that Atlas is subject to one-time specific jurisdiction in Florida for purposes of their claims. For a court to have specific personal jurisdiction over a plaintiff's claim, the claim must "arise out of or relate to" the defendant's forum-state contacts. *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021); *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (explaining that under the "minimum contacts" analysis for specific jurisdiction, "the defendant's suit-related conduct must create a substantial connection with the forum State"); *Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 874 (11th Cir. 2018) ("[T]here must be a sufficient nexus between [the defendants' forum-state] contacts and the litigation."). And, the Supreme Court has made clear that—in a mass action like this—specific jurisdiction over the defendant must be judged *as to each individual Plaintiff's claims*. *See Bristol-Myers*, 582 U.S. at 265 ("The mere fact that other plaintiffs . . . allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims."). Because, at minimum, the vast majority of the Atlas Plaintiffs cannot establish the necessary suit-related connection with Florida, their claims must be dismissed.

Like the previous two iterations of the Complaint, the SAC fails to actually allege *any suit-related conduct by Atlas in Florida*, let alone explain how Plaintiffs' individual claims arise from those suit-related contacts. *See Seimens Med. Sols.*, 2023 WL 2600445, at *2 (finding lack of specific jurisdiction in connection with claims related to COVID-19 vaccine policy, stating, "[t]he plaintiffs do not explain how their various causes of action—religious discrimination, assault, battery, infliction of emotional distress, etc.—arise from Siemens['] [suit-related contacts] in Kentucky"). Rather, Plaintiffs contest Atlas's vaccination policies for employees nationwide,

371

arguing that the policies "caused harm to numerous plaintiffs in the state of Florida." SAC ¶ 23. Without demonstrating how Plaintiffs' claims *arise out of* Atlas's suit-related contacts with Florida, Plaintiffs cannot demonstrate specific jurisdiction for any Plaintiffs' claims.

Moreover, the underlying jurisdictional facts the Court may properly credit in deciding Atlas's personal jurisdiction motion show that ***47 Atlas Plaintiffs neither live in nor work in Florida.*** Ybarra Decl. ¶ 13.[4] Without question, these 47 Plaintiffs without any Florida ties cannot possibly demonstrate their injuries occurred in Florida; nor do they allege any Florida-specific conduct by Atlas underlying their claims. *See* Ybarra Decl. ¶ 4 (Atlas's vaccine policy was "developed and executed primarily by employees based in New York and, during pandemic conditions, working from other states in the Northeast"). Accordingly, their claims do not "arise out of or relate" to any Florida contacts by Atlas and must be dismissed. *Ford Motor Co.*, 141 S. Ct. at 1026; *see also Waite*, 901 F.3d at 1314 (specific jurisdiction focuses on the suit-related "activity or occurrence" in the forum state, ignoring "defendant's unconnected activities in the State"); *Sambrano*, 2021 WL 5178829, at *7 (dismissing COVID-19 employment claims of pilot who lived and worked in Illinois as "not relate[d] to the forum state" of Texas).

Furthermore, the 13 additional Atlas Plaintiffs who work for Atlas outside of Florida despite living in Florida likewise cannot establish specific personal jurisdiction. Ybarra Decl. ¶ 13. That is because a plaintiff who only resides in the forum state cannot establish specific personal jurisdiction over claims involving his or her employment *outside* the forum state. *See Walden*, 571

---

[4]     Plaintiffs have dropped 8 Atlas Plaintiffs from the litigation—many of whom lacked any ties to Florida. Notably, while Plaintiffs' previous complaint admitted which Atlas Plaintiffs lived in Florida—and thus by extension which Plaintiffs lived elsewhere—the SAC now fails to disclose that information. Nor does the SAC provide any allegations regarding an important factor in the specific jurisdiction analysis in a lawsuit based on workplace injury—where the Plaintiffs work.

372

U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *Banks v. Am. Airlines*, 2019 WL 5579479, at *4 (N.D. Cal. Oct. 29, 2019) (discrimination claims of flight attendant who lived in California but worked in Arizona did not arise from airline's contacts with California); *Coffey v. Mesa Airlines Inc.*, 2019 WL 4492952, at *3, 6 (C.D. Cal. Apr. 15, 2019) (airline not subject to specific jurisdiction in California for claims of pilot who lived in California but worked in Texas regarding out-of-state employment decisions). Thus, personal jurisdiction is also absent as to the 13 Atlas Plaintiffs who work outside of Florida.

In sum, the SAC does nothing to establish specific jurisdiction over any Plaintiff's claims, and certainly cannot do so for the 60 Atlas Plaintiffs who do not even work in Florida. Accordingly, this Court should dismiss these Plaintiffs' claims for lack of personal jurisdiction. *See Bristol-Myers*, 582 U.S. at 278 (Sotomayor, J., dissenting) ("The effect of the Court's opinion [in *Bristol-Myers*] is to eliminate nationwide mass actions in any State other than those in which a defendant is essentially at home").

C.      *FSI Is Not Subject to General Personal Jurisdiction in Florida.*

As Plaintiffs admit, FSI "is a Texas limited liability company with its principal place of business in Houston, Texas." SAC ¶ 20. Because Plaintiffs cannot carry their "heavy burden" to establish FSI is "at home" in Florida (outside of its home state), FSI is not subject to general personal jurisdiction here.

The SAC added nothing to the previous complaints' jurisdictional argument regarding FSI, relying entirely on the facts (1) "[a]ll [FSI's] employees receive all their training at the Atlas training facility in Miami"; (2) "[a]ll FSI flight attendants are trained [in Miami]"; and (3) "[t]here is always a significant presence of FSI personnel in Miami." *Id.* But, as explained in Defendants' previous Motions to Dismiss, these allegations, even accepted as true, are insufficient as a matter of law to subject FSI to general jurisdiction in Florida. *See Helicopteros Nacionales de Colombia,*

*S.A. v. Hall*, 466 U.S. 408, 411, 418–19 (1984) (no general jurisdiction when defendant purchased 80 percent of its helicopter fleet in forum state and sent its employees there for training).

As with Atlas, Florida exercising general jurisdiction over FSI would violate due process, as FSI does not maintain "affiliations with [Florida that] are so continuous and systematic as to render [it] essentially at home" here. *Daimler*, 571 U.S. at 127; *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1250 (S.D. Fla. 2015). FSI is a Texas limited liability company with its principal (and only) place of business in Houston, Texas. ECF No. 43-2, Declaration of Joni D. Ffrench ¶ 5. FSI's offices and business records also are located in Texas, all of FSI's financial, accounting, and operational decisions are made in Texas, and FSI has never owned, leased/rented, possessed, or maintained real property in Florida, never maintained an office in Florida, and never maintained a financial account in Florida. Ffrench Decl. ¶¶ 5–10; *see Roof & Rack Prods., Inc. v. GYB Invs., LLC*, 2014 WL 3116413, at *4 (S.D. Fla. July 8, 2014) (under *Daimler*, exercise of general jurisdiction over a defendant with its principal place of business in Texas would violate due process despite defendant sending employees to Florida to train); *Fraser v. Smith*, 594 F. 3d 842, 846–47 (11th Cir. 2010) (even pre-*Daimler*, no general jurisdiction though defendant sent employees and representatives to Florida for training). These facts foreclose any possibility of Florida exercising general personal jurisdiction over FSI.

The SAC attempts to evade this conclusion by bootstrapping FSI to Atlas, such as by alleging that "[a]ll the flight attendants who are staffed on Atlas Air flights are contracted through FSI." SAC ¶ 20. But, this argument fails for at least two reasons. First, as discussed above, general personal jurisdiction over Atlas is inappropriate post-*Daimler*. Second, *Daimler* and its progeny also hold that agency relationships cannot confer general jurisdiction even within the same corporate family—as with Mercedes-Benz in that case. *McCullough v. Royal Carib. Cruises, Ltd.*,

374

268 F. Supp. 3d 1336, 1348–49 (S.D. Fla. 2017) (holding that "*Daimler* rejected the Ninth Circuit's agency theory of jurisdiction" and finding no general jurisdiction because "[w]ithout the agency theory, the [Plaintiffs] [had] provided no evidence or authority to support a finding that [the Defendant]—a British Virgin Islands company with no Florida presence . . . is essentially at home in Florida"). It follows *a fortiori* that general personal jurisdiction over FSI as a separately-owned-and-operated company in this case must be evaluated separately. *See id.* And, it is undisputed that FSI is incorporated and has its principal place of business in Texas, not Florida. SAC ¶ 20. FSI is accordingly not subject to Florida's general personal jurisdiction.

> D.   <u>FSI Is Not Subject to Specific Personal Jurisdiction in Florida.</u>

Finally, FSI is not subject so specific jurisdiction in Florida for purposes of Plaintiffs' claims. The SAC contains **zero** allegations regarding FSI's Florida contacts related to this lawsuit. Rather, the SAC seeks to premise specific jurisdiction on the allegation that Defendants "caused harm to numerous plaintiffs in the state of Florida." SAC ¶ 23. Yet, as with the previous iterations of the Complaint, Plaintiffs do not establish that any FSI Plaintiff's claims arise out of FSI's contacts with the state of Florida, or even allege that any FSI Plaintiff resides *or* works in Florida. And the uncontested facts provided by FSI through sworn affidavits indicate that "[s]ince FSI's formation, none of the [five] Plaintiffs who are or were employed by FSI were or are based in Florida." Ffrench Decl. ¶ 13. Nor could the allegation that FSI's President sent an email to these Texas-based FSI employees regarding the vaccine policy, (SAC ¶ 68), justify specific jurisdiction in Florida.

Accordingly, **none** of the FSI Plaintiffs can identify any connection between their claims and the state of Florida. Thus, the Court lacks personal jurisdiction over all claims against FSI.

## II.   All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause.

Plaintiffs dropped one of the six FSI Plaintiffs in the SAC, yet failed to address FSI's arguments that the FSI Plaintiffs' claims are all subject to mandatory arbitration.[5] Each of the five remaining FSI Plaintiffs acknowledged receipt of FSI's Employee Handbook, via electronic signature, which includes an unambiguous mandatory arbitration clause for all disputes. Therefore, these Plaintiffs were required to submit their claims against FSI to mandatory and binding arbitration. Specifically, each of these Plaintiffs acknowledged receipt of FSI's Employee Handbook and agreed to the following provision:[6]

> Further, I acknowledge and agree that (i) my employment with Company is an "at-will" relationship that has no specific duration and that is terminable by either me or FSI at any time, with or without advance notice, (ii) unless otherwise provided by law, all disputes, claims and controversies which I may have with FSI, whether individual, joint or as part of a class, shall be arbitrated in Harris County, Texas as administered by and pursuant to the rules of the American Arbitration Association (www.adr.org; 800.778.7879) and any decision or award shall be final, binding and enforceable in a court of law. The arbitration shall be governed by the laws of the State of Texas and the U.S. Arbitration Act, 9 USC Sections 1-16 to the exclusion of provisions of state law inconsistent with the Federal Act.

Accordingly, the Court should dismiss these five Plaintiffs' claims—the only claims against FSI—with prejudice "for lack of subject matter jurisdiction." *Shea*, 2013 WL 869526, at *2 n.3 (motions to compel arbitration are treated as motions to dismiss under Rule 12(b)(1)).

### A.   *Texas Law Governs the Enforceability of FSI's Arbitration Clause.*

To address FSI's arbitration argument, this Court must first decide what law governs. Here, the arbitration clause provides that Texas law applies. A contractual choice-of-law provision is valid under Florida law: "An agreement between parties to be bound by the substantive laws of

---

[5]   The five FSI Plaintiffs are Rebecca Robertson, Elizabeth Stoneking, Barbara Janeice Surber, Geri Tonda, and Ricardo Torres Abarca. SAC ¶ 15. Plaintiffs have abandoned any claims by prior-FSI Plaintiff Cindy Barrionuevo.

[6]   *See* Ex. C, Composite.

another jurisdiction is presumptively valid, and this Court will enforce a choice-of-law provision unless applying the chosen forum's law would contravene a strong public policy of this State." *Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.,* 82 So. 3d 73, 80 (Fla. 2012); *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 873 (11th Cir. 2018). Applying Texas law does not contravene Florida public policy, and it governs the enforceability of FSI's arbitration clause.

      B.      <u>Under Texas Law, FSI's Arbitration Clause is Enforceable and Precludes the Five FSI Plaintiffs From Pursuing Claims Against FSI in This Forum.</u>

To determine whether the FSI Plaintiffs' claims are subject to arbitration, this Court must consider: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Washington v. Sears Logis. Servs., Inc.*, 2014 WL 2159253, at *3 (N.D. Tex. May 23, 2014). "When faced with such an agreement, courts have no discretion but to compel arbitration unless the [arbitration] clause's validity is challenged on legal or public policy grounds." *Parr v. Stevens Transp., Inc.*, 2020 WL 2200858, at *4 (N.D. Tex. May 5, 2020) (applying Texas law).

"[I]t is state law that controls the determination of whether parties have agreed to arbitrate." *Sanchez v. Marathon Oil Co.*, 2021 WL 1201677, at *4 (S.D. Tex. Jan. 21, 2021). To that end, this Court should "resolve all doubts concerning the arbitrability" of the five FSI Plaintiffs' claims "in favor of arbitration." *Gonzalez v. Brand Energy & Infra. Servs., Inc.*, 2013 WL 1188136, at *2 (S.D. Tex. Mar. 20, 2013). First, FSI has submitted signed arbitration agreements between FSI and each of the five FSI Plaintiffs. *See Miller v. SLT Dealer Grp. Ltd.*, 2008 WL 11389413, at *3 (S.D. Tex. Aug. 8, 2008) ("It is a widely-accepted principle of contract that one who signs or accepts a written instrument will normally be bound in accordance with its written terms."); *Washington*, 2014 WL 2159253, at *4 ("Under Texas law, an employer may enforce an arbitration agreement . . . if the employee received notice of the employer's arbitration policy and accepted it."). These

377

agreements provide that all disputes, claims and controversies which the FSI Plaintiffs may have with FSI shall be arbitrated in Harris County, Texas, and shall be governed by the laws of Texas and the Federal Arbitration Act. *See Rodriguez v. John Eagle Sport City Motors, LLP*, 2014 WL 2587599, at *2 (N.D. Tex. June 10, 2014) (similar arbitration clause enforceable); *Parr*, 2020 WL 2200858, at *4 (signatures by plaintiffs were "evidence of a valid and enforceable agreement").

Second, the claims in question all fall within the scope of the arbitration agreements. As a general principle, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Safer v. Nelson Fin. Grp., Inc.,* 422 F.3d 289, 294 (5th Cir. 2005). To that end, the agreements embracing "[a]ny dispute or difference between the parties" should be referred to arbitration. *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993); *see also Rodriguez*, 2014 WL 2587599, at *2 (enforcing arbitration agreement that contained "any dispute" language); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584–85 (1960) (holding that "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail"). Here, the arbitration agreement that each of the five FSI Plaintiffs signed subjects "all disputes, claims and controversies" that they may have with FSI to arbitration. Thus, all five FSI Plaintiffs' claims fall within the scope of the arbitration agreement and, thus, must be dismissed. *Parr*, 2020 WL 2200858, at *1–4 (arbitration agreement covering "all claims or controversies [] between the parties" required claims be arbitrated).

378

III. **The Scattershot SAC, with Claims on Behalf of 89 Individual Plaintiffs Against Atlas and FSI, Fails to State Any Claim Upon Which Relief Can Be Granted.**

A. <u>*Plaintiffs' Fourth Complaint Remains A "Shotgun" Pleading Because of Its Vague and Conclusory Nature Not Obviously Connected to a Cause of Action.*</u>

In its July 10, 2023 dismissal order, this Court held that "[t]he Amended Complaint here [was] a quintessential shotgun pleading in violation of Rule 8(a)(2)." ECF No. 59 at 2. Specifically, the Court pointed to three offending features: **(1)** "[i]n every single cause of action, Plaintiffs reallege[d] and incorporate[d] all paragraphs above"; **(2)** "for the claims asserted against more than one Defendant, Plaintiffs wholly fail[ed] to specify which of the Defendants are responsible for which acts or omissions"; and **(3)** "the Amended Complaint [was] replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 2–3 (citations omitted). The Court explained that "[t]he submission of another shotgun pleading will result in the entry of an order of dismissal ***with prejudice***." *Id.* at 3 (emphasis added). While the SAC makes progress toward addressing the first and second issues, it does not resolve the third, and thus should be dismissed—this time with prejudice.

As to defect (1), the SAC no longer reincorporates and adopts *every* allegation from the preceding count for most of the claims against Defendants, although Counts IV and IX continue to reincorporate and adopt every allegation in Counts II and VII, respectively—over 100 paragraphs.

As to defect (2), the SAC drops all of Plaintiffs' claims against the three Atlas Executive Defendants (the CEO, head of HR, and head of flight operations) and drops EncompassAir as a corporate Defendant. This exposes how frivolous those prior claims were but—through process of elimination—admittedly makes it clearer that the remaining allegations must pertain to either or both of Atlas Air and FSI. While Plaintiffs separate out their counts against those two corporate Defendants—a close examination of the SAC reveals this revision as more stylistic than

substantive. Plaintiffs separately assert each of five causes of action against Atlas in one section of the SAC and then again against FSI, using the same boilerplate allegations. *Compare, e.g.*, SAC ¶ 212 ("FSI and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights."), *with* SAC ¶ 134 ("Atlas and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Atlas Plaintiffs' Constitutional rights."). Further, the SAC groups Atlas and FSI together with respect to the alleged dissemination of Plaintiffs' private health information. *See*, *infra*, at fn. 7.

As to defect (3), the SAC undeniably continues to commit the "sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322 (11th Cir. 2015). This has been characteristic of Plaintiffs' three prior COVID-19 complaints against Defendants, and a complaint in another COVID-19 vaccine case in the Middle District of Florida involving Plaintiffs' counsel. *Anderson v. United Airlines, Inc.*, 577 F. Supp. 3d 1324, 1329 (M.D. Fla. 2021) (Corrigan, J.) ("The TAC does not . . . explain how [plaintiffs] specifically have been harmed by United's policies.     "); *cf. Hencey v. United Airlines, Inc.*, 2021 WL 3634630, at *2 (S.D. Fla. Aug. 17, 2021) (Gayles, J.) (another COVID-19 complaint "read[] like a shotgun pleading" that "reference[d] [the plaintiffs'] rights under the Constitution and several federal statutes without explaining with any level of particularity their claims"). To illustrate the problem here, Counts II and VII seek redress for a supposedly hostile work environment, but provide no particularized facts reflecting any of the Plaintiffs' individual experiences in this non-class-action case. Indeed, Counts II and VII (like most of the SAC) rely almost exclusively on conclusory adjectives, such as "disparaging and unfavorable treatment," "discriminatory, harassing, coercing, and intimating conduct," and "a work environment that an average person of ordinary sensibilities would find

380

discriminatory." *See* SAC ¶¶ 106, 110, 110(iii), 184, 188, 188(iii). Furthermore, these counts, like others in the SAC, deprive Defendants of "adequate notice of the claims against them and the ground upon which each claim rests." ECF No. 59. This is because buried within the hostile-work-environment counts are references to entirely different potential claims under the Florida Whistleblower Act, the Americans with Disabilities Act ("ADA"), and collective bargaining agreements ("CBA") (SAC ¶ 110(i), (v), ¶ 188(i)), as well as other legal theories under Title VII that Plaintiffs elected to drop as causes of action from the SAC. *See* ECF No. 39 (First Amended Complaint) at ¶¶ 274–290 (claim for failure to accommodate under Title VII) & 291–311 (claim for disparate treatment discrimination under Title VII). Plaintiffs also pepper references to such now-eliminated claims across the SAC—for example, Plaintiffs assert that their claims "are supported by [the] fact that there was a [ ] lack of authority for Defendants' actions within Atlas's and FSI's Collective Bargaining Agreements with their employees" (SAC ¶ 41), but there are no claims for breach of any CBA in the SAC. As discussed below (Part II.D), this scattershot pleading technique significantly complicates Defendants' response to the SAC because they must guess about what legal claims and theories remain in the operative pleading.

In sum, Plaintiffs have filed four complaints against Defendants and, throughout that process, the Court has afforded them "[two] opportunit[ies] to cure the purported pleading defects." *See* ECF No. 61 (referencing ECF No. 31, 43); *and* ECF No. 59. They have not done so. Eleventh Circuit law is clear: the shotgun pleading now should be dismissed *with prejudice*, as the Court suggested in its July 10 Order. *See Halstead v. Espinoza*, 2023 WL 2399288, at *2 (11th Cir. 2023) (explaining that "[o]nce a district court gives a plaintiff fair notice of the specific defects in the complaint and a meaningful chance to fix them, dismissal with prejudice on shotgun pleading grounds is proper"); *Barmapov v. Amuial*, 986 F.3d at 1321, 1324–26 (11th Cir. 2021)

381

(same).

      **B.**      *Counts I and VI: Plaintiffs Cannot State Any Invasion-of-Privacy Claim.*

Plaintiffs claim Defendants invaded their privacy by publishing Plaintiffs' protected health information ("PHI") (*i.e.*, vaccination status) to "other employees and consumers" via email and by forcing Plaintiffs to wear face masks, which they refer to as "political symbols." SAC ¶¶ 65, 81, 95, 110(vi), 142, 144, 173, 219, 221. These allegations, however, are insufficient to plausibly state an invasion-of-privacy claim. Invasion of privacy by publication requires plausibly alleging: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." *Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989). The SAC fails to state a claim on each of these elements.

*First*, as to publication, Florida law requires that "the publicity given to private facts must be to the public at large or to so many people that the matter must be regarded as substantially certain to become public knowledge." *Williams v. City of Minneola*, 575 So. 2d 683, 689 (Fla. Ct. App. 1991). To that end, the Eleventh Circuit has dismissed invasion-of-privacy claims where the plaintiff did not plausibly allege the information reached the public at large. *See, e.g.*, *Regions Bank v. Kaplan*, 2021 WL 4852268, at *13 (11th Cir. 2021) (affirming dismissal where information was disseminated in online database consisting of "banks, credit unions and law enforcement agencies" as too limited to be "a disclosure to the public at large"). Thus, Plaintiffs' allegation that their PHI was emailed to "other [Atlas and FSI] employees under the supposed need to circulate the information about which crewmembers (vaccinated or unvaccinated) would qualify for certain flights involving company imposed COVID-19 restrictions" (SAC ¶ 65; *see also id.* ¶ 81)—a group far smaller than "the public at large"—does not plausibly allege that it was "substantially certain to become public knowledge." *Kaplan*, 2021 WL 4852268, at *13. Plaintiffs do not even allege whether any "other employees" viewed the email Defendants allegedly sent—

382

this, alone, is fatal to their invasion of privacy claim. *See Kautz v. Residence Inn by Marriott, LLC*, 2014 WL 4416012, at *3 (M.D. Fla. Sept. 5, 2014) (dismissing claim because plaintiff failed to allege whether any of the employees who learned of the alleged private facts ever, in fact, viewed the note).[7]

Moreover, Plaintiffs' allegations about COVID-19 face masks do not demonstrate disclosure of "private facts" because a mask does not reveal the wearer's vaccination status; both vaccinated and unvaccinated individuals can and do choose to wear masks. *See, e.g.*, *Sharikov v. Philips Med. Sys. MR, Inc.*, 2023 WL 2390360, at *17 (N.D.N.Y. Mar. 7, 2023) (dismissing claim for disclosure of confidential information under the ADA as not "plausibly alleg[ing] that Defendant's masking policy disclosed Plaintiff's vaccination status" because "fully vaccinated employees who choose to wear their masks and unvaccinated employees who must wear their masks are indistinguishable"); *Leake v. Raytheon Techs. Corp.*, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (explaining that "masking requirements for vaccination-exempt employees does not create a 'scarlet letter' effect because the employees could be vaccination-exempt for a multitude of reasons, or the masking employees could be vaccinated but simply want the added facial protection").

*Second*, Plaintiffs do not plausibly support their conclusory allegation that disclosure of their vaccination status would be "highly offensive to a reasonable person." *Cape Publ'ns*, 549 So. 2d at 1377. Disclosure of even private medical records does not establish offensiveness. *See Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 613–14 (Fla. Ct. App. 2007)

---

[7] The SAC also improperly groups Atlas and FSI together with respect to the alleged dissemination of Plaintiffs' private health information. Plaintiffs claim that Defendants disseminated Plaintiffs' vaccine status to other employees via email, (*see* SAC ¶¶ 65, 81), but provide no details concerning which Defendant did so, when, or to whom.

(publication of "medical records of [plaintiff] and his family" was not highly offensive). Nor does the disclosure of other sensitive personal information. *Kaplan*, 2021 WL 4852268, at *13 ("Although private, publication of a social security number is not offensive.").

*Finally*, as to the public concern element, Plaintiffs' conclusory assertion that their vaccination status "is of no legitimate public concern," SAC ¶¶ 96, 174, is a legal conclusion that this Court need not accept. *See Iqbal*, 556 U.S. at 678. And, it is incorrect. The Florida Supreme Court has observed that "the requirement of lack of public concern is a formidable obstacle." *Cape Publ'ns*, 549 So. 2d at 1377. "[T]he right of privacy does not forbid the publication of information that is of public benefit, and the right does not exist as to persons and events in which the public has a rightful interest." *Id*. at 1378. An individual's vaccination status—and the accompanying risk of increased severity and spread of COVID-19—is a quintessential example of "information that is of public benefit." *Id*. Indeed, Florida courts have found far less socially valuable information to fall under the broad umbrella of public concern. *See, e.g.*, *Parker v. Town of Palm Beach*, 2017 WL 11537901, at *6 (S.D. Fla. Aug. 16, 2017) (holding that photographs of the inside of the plaintiff's apartment showing unlawful renovations was a matter of public concern).

C.    *Counts II and VII: Plaintiffs Have Not Exhausted Their Administrative Remedies and There is No Futility Exception.*

Title VII requires a plaintiff to exhaust administrative remedies *before* filing a lawsuit by (i) filing a charge of discrimination with the EEOC and (ii) receiving a right-to-sue notice from the EEOC. 42 U.S.C. § 2000e-5(b), (e)–(f); *McDowell v. United Servs. Co.*, 2008 WL 5210018, at *2 (M.D. Fla. Dec. 10, 2008). When a plaintiff fails to adequately plead exhaustion, their claim must be dismissed for failing to satisfy "a condition precedent to bringing a civil action under Title VII." *McDowell*, 2008 WL 5210018, at *2; *Duberry v. Postmaster Gen.*, 652 F. App'x 770, 772 (11th Cir. 2016).

384

Ignoring the prior round of briefing on this issue entirely, Plaintiffs' SAC recycles the same general allegation that "[a]ll Plaintiffs have satisfied the requirement for exhaustion of administrative remedies." SAC ¶ 92; *compare with* FAC ¶ 240 ("All Plaintiffs have exhausted administrative remedies"). The truth—and what the Court must credit—is that only some of the Plaintiffs have filed charges of discrimination with the EEOC and received a right-to-sue letter. *First*, the SAC admits that not "[a]ll Plaintiffs" exhausted, by elsewhere alleging only that "*most of the Plaintiffs*" have exhausted." *Id.* ¶ 206 (emphasis added). In resolving this motion to dismiss, those more specific allegations must win out. *Thompson v. Fla. Bar*, 526 F. Supp. 2d 1264, 1278 (S.D. Fla. 2007) ("[G]eneral allegations . . . need not be accepted as true [when] they are contradicted by more specific allegations in the complaint."). *Second*, Plaintiffs' group allegation about exhaustion is insufficient on its own terms for a case involving 89 separate employees each asserting their own individual Title VII claim. *See Cousins v. United Healthcare, Inc.*, 2020 WL 1666628, at *3 (S.D. Fla. Apr. 3, 2020) ("In order to satisfy applicable pleading requirements, Plaintiff must set forth the claims for which he has exhausted his administrative remedies, and *how he has done so.*" (emphasis added)); *Response Oncology, Inc. v. MetraHealth Ins. Co.*, 978 F. Supp. 1052, 1064 (S.D. Fla. 1997) ("In light of the fact that Plaintiff brings this suit as an assignee of 67 patients, under 46 plans, Plaintiff's allegation fails to meet even the admittedly low requirements of notice pleading. It is unclear to the Court which plans, if any, the Plaintiff has attempted to exhaust its administrative remedies.").

*Third*, the parties have been down this road before. Last time, in the FAC, the Plaintiffs alleged that "all Plaintiffs" had exhausted, but when this allegation was challenged in Defendants' motion to dismiss (ECF. 43 at 22; No. 57 at 14–16), Plaintiffs attached a chart to their opposition brief admitting that numerous Plaintiffs had failed to both file a charge with the EEOC and receive

a right-to-sue letter. *See* ECF No. 54 at 29–30, 52–57; *see also* ECF No. 57 at 14–15 & Ex. 1. According to that chart, 38 of the Plaintiffs lack a right-to-sue letter either because they **never filed** a discrimination charge with the EEOC **or** have filed a charge but that matter is still pending at the EEOC. *See id.* at 52–57. "As judicial admissions[,] these facts are conclusively binding upon the Plaintiff and may be considered in a motion to dismiss." *Hornberger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2015 WL 13310465, at *3 (C.D. Cal. Jan. 22, 2015); *Maddox v. ADT Sec. Servs., Inc.*, 2011 WL 43037, at *1 (N.D. Ill. Jan. 6, 2011) (dismissing claims based on judicial admission made in plaintiff's brief opposing motion to dismiss).[8] For the Court's convenience, these 38 Plaintiffs and the additional 11 Plaintiffs for whom Atlas lacks any record of a right-to-sue letter are listed on Exhibit 1 to this brief. None of these Plaintiffs without a right-to-sue letter from the EEOC can proceed with their Title VII claims and should be dismissed on this basis alone.[9]

In previous iterations of the complaint, Plaintiffs had argued at some length that their failure to exhaust was excused because filing their claims with the EEOC was futile. *See, e.g.*, FAC ¶¶ 241–244. All that remains of this argument in the SAC is a single assertion that "[f]iling complaints or charges with the EEOC was futile for Plaintiffs." SAC ¶ 128; *see also id.* ¶ 206.

---

[8] *See also Pennington v. PruittHealth, Inc.*, 2019 WL 5309117, at *3 (M.D. Ga. Oct. 21, 2019) (holding that the court can consider documents that "directly address the question of administrative exhaustion . . . without converting the motion to dismiss to one for summary judgment").

[9] Not only is it proper for the Court to rely on Plaintiffs' prior judicial admission for purposes of Defendants' motion to dismiss, this style of pleading is inappropriate. Indeed, courts have imposed Rule 11 sanctions for very similar conduct. S*ee Lopez v. City of West Miami*, 2015 WL 12978166, at *2 (S.D. Fla. Sept. 16, 2015) (imposing Rule 11 sanctions because "[t]he record plainly shows that [p]laintiff's allegation that she exhausted all administrative remedies required of her had no reasonable factual basis. When she filed the Second Amended Complaint, Plaintiff knew she had filed a second EEOC charge that was still pending. Thus, whatever claims arose out of the second charge had clearly not been exhausted.") (citations omitted).

While the Court need not accept this conclusory allegation, it lacks merit in any event. As Defendants previously briefed, (*see* ECF No. 43 at 24), Plaintiffs' prior objections to the speed or expected outcome of the EEOC's administrative process do not allow them to eschew the exhaustion regime established by Congress. *See Anderson v. United Airlines*, 577 F. Supp. 3d 1324, 1332 (M.D. Fla. 2021) (declining to excuse plaintiffs' failure to exhaust administrative remedies regarding COVID-19-related Title VII claims based on plaintiffs' contention that "the EEOC's investigative process would take too along and because [the EEOC] lacks the authority to resolve these issues"); *Ross v. Blake*, 578 U.S. 632, 639 (2016) (a federal statute's "mandatory language means a court may not excuse a failure to exhaust, even to take [special] circumstances into account").

The Title VII claims of all Plaintiffs who have not exhausted administrative remedies should be dismissed, without reaching their merits allegations.

D. *Counts II and VII: Plaintiffs Fail to State a Title VII Claim for Hostile Work Environment (or Any Other Type of Title VII Claim).*

Plaintiffs modified their Title VII claims in the SAC. Where Plaintiffs previously asserted three separate types of Title VII claims—for failure to accommodate, disparate treatment, and hostile work environment—the former two causes of action have been dropped from the SAC, leaving only the hostile work environment cause of action. *Compare* SAC ¶¶ 98–128, *with* FAC ¶¶ 274–337. That cause of action, like their others, is presented in two counts (Counts II and VII)—one against Atlas and another against FSI—on behalf of the 89 individual Plaintiffs. Plaintiffs thus appear to have accepted Defendants' arguments that they have no viable failure-to-accommodate or disparate-treatment claim (*see* ECF No. 43 at 39–44; ECF No. 57 at 22–26), and agreed to forego them. Given the history of this case and the face of the SAC, Defendants' motion to dismiss

387

addresses Counts II and VII solely under a hostile-work-environment theory.[10]

A hostile-work-environment claim requires each of the 89 Plaintiffs individually to show: (1) he belonged to a protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment and create an abusive working environment; and (5) that a basis exists for holding the employer liable. *Williams v. Motorola*, 303 F.3d 1284, 1292–93 (11th Cir. 2002). As with previous iterations of the Complaint, the SAC's hostile work environment claim is fatally flawed with respect to at least the third and fourth elements.

Starting with the fourth element, the SAC fails to "allege facts that suggest [any] Plaintiff was subjected to severe or pervasive harassment by the Defendant[s]." *Carter v. Cellco P'ship*, 2016 WL 8981056, at *5 (M.D. Fla. Mar. 23, 2016). For all the labels that the SAC uses regarding "harassment," "disparate treatment," and "discrimination," it offers next-to-no supporting detail. Indeed, when it comes to concrete factual allegations, the SAC mentions only one Plaintiff, James Villella, by name, alleging that he was "subjected to an Article 19 disciplinary hearing" and "put on a desk job" for three months after refusing to submit to COVID-19 testing as a condition of his religious accommodation from vaccination. SAC ¶ 80 & n.24. But Atlas's compliance with a hearing requirement of the collective bargaining agreement applicable to Villella is not harassment (severe or otherwise). As for being placed on a desk job, Villella admits that this resulted from Villella being the only Atlas employee that claimed that his religious beliefs prevented him from even being ***tested*** for COVID-19. *Id.* Atlas accommodated Villella with a non-flying position,

---

[10] As noted, this is one of the ways Plaintiffs' shotgun pleading deprives the Court and parties of clear notice of the claims. In the event the Court construes their claims as presenting Title VII disparate-treatment or failure-to-accommodate claims, Defendants hereby incorporate their prior motion to dismiss as to those claims and request the opportunity to submit supplemental briefing, if helpful to the Court.

which exempted him from both vaccination *and* testing. *Id.* While this apparently dissatisfied Villella, "[n]ot everything that makes an employee unhappy is . . . actionable . . . under Title VII." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Leggo v. M.C. Dean, Inc.*, 2023 WL 1822383, *7 (E.D. Va. Feb. 7, 2023) (rejecting claim for hostile work environment under Title VII based on company's COVID-19 vaccine mandate, noting that "the allegations fall far short of the requirement that hostility in a work environment be so severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination").

Further, even if the SAC's allegations regarding Villella were sufficient to establish severe and pervasive harassment (they are not), they do nothing to establish the other 88 Plaintiffs' hostile-work-environment claims. Merely pleading legal conclusions like "harassment," "disparate treatment," and "discrimination" is insufficient to state a hostile-work-environment claim as to even a single plaintiff, let alone all Plaintiffs. *See Loza v. Kimpton Hotel & Rest. Grp., LLC*, 2020 WL 13389302, at *6 (S.D. Fla. June 17, 2020) ("Plaintiffs' Complaint includes no additional factual allegations to establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment."); *Shah v. Orange Park Med. Ctr., Inc.*, 2016 WL 4943925, at *8 (M.D. Fla. Sept. 16, 2016) ("[A]bsent any non-conclusory facts to support Shah's belief that he was treated unequally due to his race, the Court finds that these allegations are insufficient to state a claim for relief."). The Plaintiffs cannot plead their claims as if this were a class action: each needs—but lacks—"well-pled factual allegations of severe or pervasive harassment" to survive a 12(6)(6) motion. *Carter*, 2016 WL 8981056, at *5; *see also Leake*, 2023 WL 2242857, at *5 (dismissing a Title VII claim, in part, because "Plaintiffs' allegation that a hostile work environment was created through the requirement that vaccination-exempt employees wear facial protection and submit to weekly COVID-19 testing for a virus that has claimed the

389

lives of over one million Americans, and counting, is shocking to the Court"); SAC ¶¶ 5, 76 (explaining Atlas' COVID-19 policy involved masking and testing). Plaintiffs' hostile-work-environment claims should be dismissed on this ground alone.

As for the third element of a Title VII hostile-work-environment claim, the SAC fails to plausibly allege that any Plaintiff was subjected to "harassment . . . *based on a protected characteristic*." *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003) (emphasis added); *see* 42 U.S.C. § 2000e-2. The sole protected characteristic Plaintiffs identify is religion. But the SAC not only fails to provide any concrete facts plausibly alleging religious discrimination, it affirmatively **refutes that possibility** by claiming that vaccinated Plaintiffs with the very same religious beliefs were "favored" and "reward[ed]." SAC ¶¶ 110(xi), 117. Indeed, the SAC itself alleges that "Atlas's policies are only targeted at Atlas Plaintiffs Categories 1 & 3," (*id.* ¶ 123), defined as those Atlas pilots and ground staff who refused the COVID-19 vaccination. *See id.* ¶¶ 12, 14. By contrast, "Atlas Category 2 Plaintiffs [who allegedly] buckled under the pressure" and got vaccinated, despite allegedly having the same religious beliefs as the Plaintiffs in Categories 1 & 3, "were released from under the discriminatory practices." *Id.* ¶ 113; *see also* SAC ¶ 65 ("Category 1 unvaccinated Atlas pilots and Category 4 FSI flight attendants received less flight opportunities than vaccinated ones from Atlas and FSI, respectively."); SAC ¶ 188(iii) (alleging that the FSI Plaintiffs were subject to "unfavorable treatment . . . as compared to similarly situated employees who received one or more of the three [COVID vaccines]").

These admissions show beyond doubt that any differential treatment was *based on vaccination status*, not religious beliefs. As many courts have held in the COVID-19 context, this defect dooms Plaintiffs' claim. *Leake*, 2023 WL 2242857, at *5 (plaintiff failed to state a religious discrimination claim because "[a]ll vaccination-exempt employees were treated the same,

390

regardless of the reason for exemption"); *accord Dollar v. Goleta Water Dist.*, 2022 WL 5176904, at *5 (C.D. Cal. Oct. 3, 2022) ("[P]laintiffs have not alleged that employees who receive exemptions on religious grounds are treated any differently from employees who receive exemptions on non-religious grounds."); *D'Cunha v. Northwell Health Sys.*, 2023 WL 2266520, at *2 (S.D.N.Y. Feb. 28, 2023) (similar); *see also Mark South v. Atlas*, 2023 WL 3184346, at *12 ¶ 64 (Fla. Div. Admin. Hr'gs Apr. 24, 2023), *adopted as the final order of the Commission* (July 20, 2023) (concluding that "Atlas treated all unvaccinated crew members equally, regardless of their reasons for declining the COVID-19 vaccine. Absent unlawful discrimination because of a protected characteristic, Title VII does not provide legal redress").

The same goes for Plaintiffs' irrelevant allegations sprinkled under their Title VII counts gesturing toward the causes of action Plaintiffs dismissed under CBAs, the Florida Whistleblower Protection Act, the ADA, and the Rehabilitation Act. *See* SAC ¶ 110(i), (v). Where "an employee complains about discrimination, harassment, or retaliation that was motivated by something *other than* race, color, religion, sex, or national origin, that employee has not engaged in activity that is protected under Title VII." *Duncan v. Madison County*, 2007 WL 2874803, at *7 (M.D. Ga. Sept. 27, 2007) (original emphasis). Neither Plaintiffs' status as parties to a collective bargaining agreement, nor their status as whistleblowers, nor any medical conditions they may suffer from fall within the scope of Title VII. *Id.*; *Savel v. Metrohealth System*, 2023 WL 4490395, at *8 (N.D. Ohio July 12, 2023) ("Vaccination status is not a class to which Title VII protections apply."). Plaintiffs' new pleading method is a transparent attempt to shoehorn claims into this case that they decided not to pursue in the SAC. This Court should reject such gamesmanship and reject Plaintiffs' hostile-work-environment claims.

Accordingly, the Court should dismiss Plaintiffs' Counts II and VII for failure to plausibly

allege hostile-work-environment claims.

E.     *Counts III and VIII: Plaintiffs' Constitutional Claims Fail.*

Plaintiffs bring assorted claims against Atlas and FSI, claiming that these private businesses violated Plaintiffs' rights to due process, privacy, and equal protection under the U.S. Constitution. SAC ¶¶ 129–52, 207–29. To survive dismissal, Plaintiffs must (i) identify a valid cause of action to pursue these claims, and plausibly allege (ii) underlying constitutional violations and (iii) that the private-company Defendants are state actors subject to the Constitution. *See Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). As with their prior attempts, the SAC meets none of these three prerequisites.

**1.     Plaintiffs' Claims Do Not State Any Constitutional Violations.**

Plaintiffs cannot state constitutional claims. First, the Supreme Court has rejected arguments that mandatory vaccination violates the Constitution. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). As Judge Easterbrook explained, "[g]iven [*Jacobson*], which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2." *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021); *accord Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021) (recognizing, citing *Jacobson*, that mandatory vaccinations "have long been held valid"); *Norris v. Stanley*, -- F.4th --, 2023 WL 4530251, at *3 (6th Cir. July 13, 2023) (dismissing substantive due process claim, citing *Jacobson* and stating, "Plaintiffs' substantive due process claim fails because MSU's vaccine policy satisfies rational basis scrutiny"). In an effort to overcome this precedent, the SAC asserts that *Jacobson* "is a de minimis precedent for Defendants" because Jacobson "merely paid a five dollar fine." SAC ¶ 37. But that does not change the rationale or holding of that Supreme Court case.

Second, even setting aside *Jacobson*, Plaintiffs' claims fail. Plaintiffs allege that they have

392

a *fundamental* right to privacy that includes a right to avoid the COVID-19 vaccine "as a condition of employment" and "the right to control the extent to which their medical information is shared and released." SAC ¶¶ 137–38, 215–16. There are no such fundamental constitutional rights. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021); *Klaassen*, 7 F.4th at 593. Because of this, these claims are judged under rational basis review,[11] which the COVID-19 vaccination policy at issue here clearly satisfies. *See Henry v. DeSantis*, 461 F. Supp. 3d 1244, 1255 (S.D. Fla. 2020) (government's interest in "public health and slowing the spread of COVID-19" upheld under rational basis test) *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1183 (S.D. Fla. 2021) (Moore, J.) ("[T]here is no dispute that Defendants have a legitimate interest in combatting the spread of COVID-19."). Likewise, here, this Court "cannot find that Defendants are irrational for following the recommendations of the CDC." *Id.* at 1185.

This reasoning controls and defeats Plaintiffs' equal protection, privacy, and substantive due process claims under the Fourteenth Amendment. *See Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) ("When a challenged [action] does not infringe upon a fundamental right, we review substantive due process challenges under the rational basis standard."); *Lloyd*, 2021 WL 5353879, at *11. Freedom from COVID-19 vaccines, testing, or masking, SAC ¶¶ 137, 141, 146, 215, 218, 223, is not "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected" by substantive due process. *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997); *accord Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246–2248 (2022) (applying

---

[11] Rational basis review requires courts to uphold an action as constitutional "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011).

*Glucksberg* to determining availability of unenumerated right).

> **2.      Defendants Are Not State Actors That Could Violate the Constitution.**

Plaintiffs' Section 1983 constitutional claims fail for the independent reason that Plaintiffs cannot plausibly allege that Defendants are state actors. *See Gustino v. Stoneybrook W. Master Assoc., Inc.*, 842 F. App'x 323, 329 (11th Cir. 2021). Courts use three tests to determine whether a private entity has been plausibly alleged to be a state actor: (1) public function, (2) state compulsion, and (3) the nexus/joint action. *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). *Every* court to consider the question has held that private businesses are not transformed into state actors by implementing COVID-19 workplace safety measures. [12] Indeed, the Sixth Circuit recently affirmed the dismissal of similar constitutional claims against The J. M. Smucker Company (a private employer and federal contractor) under President Biden's Federal Contractor Executive Order ("Contractor E.O."). *See Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 279 (6th Cir. 2023) (Sutton, C.J.) (holding that a private company did not become a state actor liable for constitutional claims "when it imposed [a] vaccine mandate because the federal government required it to do so as a federal contractor").

This Court should reach the same conclusion as these many courts across the county.

***Public Function Test.*** Plaintiffs cannot plausibly allege that imposing an employee vaccination policy is a power *exclusively* reserved to the State. *Ciraci*, 62 F.4th at 282 ("A vaccine mandate does not count as a public function traditionally handled just by the State."); *accord*

---

[12]      *See Anderson*, 577 F. Supp. 3d at 1330; *Ciraci v. J. M. Smucker Co.*, 2021 WL 6064748, at *2 (N.D. Ohio Dec. 22, 2021); *Lane v. Piedmont Healthcare*, 2021 WL 5074494, at *3 (N.D. Ga. Oct. 13, 2021); *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 639–40 (E.D. Ky. 2021); *Khanthapixay v. Loyola Marymount Univ.*, 2021 WL 4025796, at *3 (C.D. Cal. Aug. 9, 2021); *Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 928–32 (N.D. Cal. 2021).

*Johnson v. Tyson Foods, Inc.*, 2022 WL 2161520, at *4 (W.D. Tenn. June 15, 2022). Indeed, "[f]ew activities are exclusively reserved to the states." *Harvey*, 949 F.2d at 1131.

***State Compulsion Test.*** Plaintiffs attempt to satisfy this test by relying on the Contractor E.O. and the OSHA COVID-19 Vaccine and Testing Emergency Temporary Standard ("OSHA ETS") concerning COVID-19 vaccines. SAC ¶¶ 29–36, 60, 71–73. But, as the Sixth Circuit held, "[w]hen a private company complies with federal law, that does not by itself make the company a government actor. Else, every regulated company would be a public entity." *Ciraci*, 62 F.4th at 284 (citation omitted). Plaintiffs' contrary argument "would alter heaps of foundational precedents going back to the founding," as "a large swath of private entities in America would suddenly be turned into state actors." *Id.* Indeed, "one-fifth of all employees in the United States" were impacted by the Contractor E.O. *Louisiana v. Biden*, 55 F.4th 1017, 1019 (5th Cir. 2022); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (rejecting, as unquestionably "not the law," argument that would make "a large swath of private entities in America . . . state actors"). Moreover, the SAC alleges Defendants *continued* to require vaccines after courts invalidated the Contractor E.O and OSHA ETS. *See, e.g.*, SAC ¶¶ 72–77. Indeed, it states, "*[a]fter the Biden Administration's mandate was enjoined* by various federal courts around the country, Atlas immediately *reverted to a company-directed mandate*." *Id.* ¶ 61 n.21 (emphasis added). A "company-directed mandate" is not "state action."[13]

***Nexus/Joint Action Test.*** Plaintiffs primarily rely on Defendants' and the government's similar goals regarding vaccination. SAC ¶¶ 72–73. But "[m]ere approval of or acquiescence in

---

[13]    Relatedly, because Plaintiffs challenge a May 1, 2022 COVID-19 policy implemented after the OSHA ETS and Contractor E.O. were invalidated and enjoined (SAC ¶¶ 74–76)—and which differs from the contours of those federal policies—Plaintiffs cannot establish state action under the compulsion test. *See, e.g., Ciraci*, 2021 WL 6064748, at *2.

the initiatives of a private party is not sufficient . . . to constitute state action." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1025, 1028 (11th Cir. 1988). In sum, even if Plaintiffs had viable constitutional claims, they would fail against these private enterprises.

> ### 3. The Constitutional Claims Independently Fail Because Plaintiffs Lack a Cause of Action under Section 1983 or *Bivens*.

Plaintiffs' constitutional claims for damages and other relief fail for an independent reason. They need, but lack, any viable cause of action to assert constitutional violations.

*Section 1983.* Plaintiffs cannot use 42 U.S.C. § 1983 as the vehicle for their constitutional claims because, as explained, the SAC asserts connections between Atlas or FSI and the *federal government*, not any "State." *See Ciraci*, 62 F.4th at 287 (concluding in a similar COVID-19 case that "§ 1983 has no role to play" because "Section 1983 . . . deals with violations by those acting under color of state law"); *Taye v. Vectrus Sys. Corp.*, 2023 WL 4492463, at *3 (M.D. Ga. July 12, 2023) (quoting *Hindman v. Healy*, 278 F. App'x 893, 895 (11th Cir. 2008) (per curiam) ("[Section] 1983 applies to state actors acting under color of state law, not 'federal actors acting under color of federal law.'")).

*Bivens.* Plaintiffs appear to recognize that they have no valid Section 1983 claims because the SAC now advances an "alternative" cause of action alleging that Defendants are "federal government-type Actor[s]" within the purview of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). SAC ¶ 148. However, this claim must also fail. As the *Ciraci* court recognized, "the Supreme Court has rejected *Bivens* claims against private corporations acting under color of federal law.'" 62 F.4th at 287 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001)). Moreover, the Supreme Court has recognized *Bivens* claims only in three specific factual contexts—Fourth Amendment claims against federal agents, a "Fifth Amendment sex-discrimination claim" and "a federal prisoner's inadequate-care claim under the Eighth

Amendment"—and recently said that recognizing *Bivens* in new factual contexts is "a disfavored judicial activity." *Egbert v. Boule*, 142 S.Ct. 1793, 1803 (2022).

F.     *Counts IV and IX: No Valid Intentional-Infliction-of-Emotional-Distress ("IIED") Claim.*

Counts IV and IX are prime examples of "threadbare recitals of the elements of a cause of action" deserving of dismissal under *Iqbal*, 556 U.S. at 678. Indeed, they merely recite the elements of an IIED claim and repeat identical allegations as to Atlas and FSI. *See Garcia v. Carnival Corp.*, 838 F. Supp. 2d 1334, 1339 (S.D. Fla. 2012) (IIED claim requires that: (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous; that is, as to go beyond all bounds of decency, (3) the conduct caused emotional distress, and (4) the emotional distress was severe).

Now instead of incorporating the entire complaint, Plaintiffs incorporate by references roughly half of it—over 100 different paragraphs—into these counts. If the Court is willing to overlook this near-shotgun approach, the claim still must be dismissed, just as similar IIED claims asserting "distress related to employment discrimination cases" have been. *See Cala v. Moorings Park Cmty. Health, Inc.*, 2022 WL 17405581, at \*4 (M.D. Fla. Dec. 2, 2022) ("Claims of intentional infliction of emotional distress related to employment discrimination cases have been consistently rejected as failing to meet the threshold burden."); *Kautz*, 2014 WL 4416012, at \*4 (explaining that "courts have been very resistant to find[ing] a cause of action for [the IIED] tort in the employment setting").

**1.     Defendants' Actions Were Not Outrageous as a Matter of Law.**

To sustain an IIED claim, the defendant's conduct must be "*so outrageous* in character, and *so extreme* in degree, as to *go beyond all possible bounds of decency*, and to be regarded as *atrocious*, and *utterly intolerable* in *a civilized community*." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015) (emphasis added). Thus, "[a] plaintiff alleging IIED faces an extremely high

burden." *Brown v. Royal Carib. Cruises, Ltd.*, 2017 WL 3773709, at *3 (S.D. Fla. Mar. 17, 2017). Outrageousness is a question of **law**, not fact. *Garcia*, 838 F. Supp. 2d at 1339. "Conduct such as mere insults, indignities, threats, or false accusations will not result in liability." *Martz v. Munroe Reg'l Med. Ctr., Inc.*, 2007 WL 2044247, at *3 (M.D. Fla. July 10, 2007). The SAC's paragraphs incorporated by reference into this cause of action do not come close to alleging the outrageousness required for an IIED claim. Plaintiffs assert that Defendants:

- Sought to comply with federal requirements and CDC advice, SAC ¶¶ 28–35, 61, 64–67;

- Revised vaccine policies in light of dynamic regulatory landscapes, *id.* at ¶¶ 60–61, 64, 72–75;

- Modified vaccine policy deadlines for employees, *id.* at ¶¶ 60–61, 66–67, 74–76, 82–83, 85;

- Permitted (and granted) vaccine exemptions, *id.* at ¶¶ 64–67, 70, 75, 80–81; and

- Required COVID-19 testing or masking, *id.* at ¶¶ 76, 80, 82–85.

The supposedly "*outrageous*" conduct Plaintiffs allege consists of employers complying with health and safety laws and guidance and implementing workplace precautions against COVID-19, including following the CDC's recommendations. This conduct *is objectively reasonable*. *See Lloyd*, 570 F. Supp. 3d at 1183–84 (noting the legitimacy of following CDC guidance); *Finkbeiner v. Geisinger Clinic*, 2022 WL 3702004, at *7 (M.D. Penn. Aug. 26, 2022) (dismissing IIED claim with prejudice because "it is not extreme and outrageous for [an employer] to present employees with the choice of a [COVID-19] jab, a swab, or their job").

Further, Plaintiffs' alleged "derogatory jokes," "pressure to take" the vaccine, "memoranda threatening to terminate Plaintiffs," and similar, SAC ¶¶ 110, 188, are not outrageous within the meaning of the IIED tort. Indeed, abuse, yelling, harassment, and even threats to feel "pain" are *insufficient* for an IIED claim. *Santasiero v. Martin*, 2021 WL 2856622, at *7 (M.D. Fla. July 8,

398

2021); *Cala*, 2022 WL 17405581, at *5.

### 2. The SAC Does Not Plausibly Allege Intent or Severe Suffering.

To establish intent, Plaintiffs must plausibly allege that Defendants enforced vaccine policies knowing "that severe distress [was] certain, or substantially certain to result." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990). Plaintiffs, however, fail to plausibly allege that Defendants had reason to doubt the safety of COVID-19 vaccines, which the SAC acknowledges (i) were approved by the FDA, (SAC ¶ 60), and (ii) mandated in various settings by the federal government. *Id.* at ¶¶ 34–35. As such, Plaintiffs do not (and cannot) allege that Defendants adopted their vaccination policies knowing that "severe distress [was] certain or substantially certain to result." *Knezevich v. United States*, 2019 WL 1093449, at *5 (M.D. Fla. Jan. 15, 2019). Plaintiffs similarly fail to plausibly allege severe suffering, mentioning only worry, threats of job loss, invasions of privacy, "unfavorable treatment," and "unwelcomed comments." *See, e.g.*, SAC ¶¶ 4, 8, 12–15, 69, 80, 110, 188; *see also Negron v. CitiMortg. Inc.*, 2016 WL 10953267, at *12 (S.D. Fla. Oct. 19, 2016) (no severe suffering due to sleeplessness, anxiety, and fear of home loss).

### 3. Plaintiffs' Allegations Are Not Cognizable as a Florida Negligent-Infliction-of-Emotional-Distress ("NIED") Claim.

Within their claim for IIED, Plaintiffs reference, in the alternative, a claim for NIED against Atlas and FSI. *See* SAC ¶ 159 ("Plaintiffs plead, in the alternative that said infliction of emotional distress is negligent"); *id.* ¶ 236 (same). Not only does this claim fail the overlapping elements with IIED, Plaintiffs cannot state a cognizable NIED claim under Florida law for additional reasons. In Florida, there are two potential avenues for a Plaintiffs to state an NIED claim: (1) one where the plaintiff himself suffers a physical impact from the defendant's negligent act, and (2) one where the plaintiff witnesses severe injury or death to a relative from the

defendant's negligent act. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007). Here, the SAC does not allege that Plaintiffs suffered any physical impact—*i.e.*, literal contact with their person—from Defendants, foreclosing relief for personal injuries. *Pipino v. Delta Air Lines, Inc.*, 196 F. Supp. 3d 1306, 1315–16 (S.D. Fla. 2016) (dismissing an NIED claim where plaintiff failed to show that "[defendants] touched her"). That leaves only the second avenue, which involves a claim brought "when a family member suffers psychic trauma after witnessing at close range the death or serious injury of a relative." *Thompson v. Spears*, 336 F. Supp. 2d 1224, 1237 (S.D. Fla. 2004). This theory plainly does not apply here.[14]

G.      *Counts V and X: Plaintiffs Lack Any Actionable Negligence Claim.*

Plaintiffs' negligence claim alleges that Defendants' vaccine policies breached a duty of care by "broadcast[ing]" their PHI to other employees and consumers. SAC ¶¶ 168, 244. This claim should be dismissed. *First*, it improperly repackages Counts I and VI's invasion-of-privacy claim into a negligence claim, by alleging the very same allegedly intentional conduct at issue in Counts I and VI. *See* SAC ¶¶ 164, 241 (reincorporating and adopting allegations from Counts I and VI). Florida law prohibits this practice. *Hiers v. Bordt*, 2016 WL 9506039, at *1 (N.D. Fla. July 6, 2016) ("Such a theory of negligence—namely, that an intentional act may be actionable as negligence—has been rejected by Florida courts.").

*Second*, even if Counts V and X properly alleged negligent conduct, Florida does not recognize a negligent invasion of privacy cause of action. *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1225–26 (S.D. Fla. 2022) (explaining "courts routinely dismiss invasion-of-privacy claims" based on theories of negligence); *accord Burrows*

---

[14]      To the extent Plaintiffs assert an NIED claim based on the same facts as their invasion-of-privacy claim, *see* SAC ¶¶ 65, 81, 95–97, 154, 173, 175, 231, it fails for the same reasons as Count I and VI.

400

*v. Purchasing Power, LLC*, 2012 WL 9391827, at *6 (S.D. Fla. Oct. 18, 2012); *see also Carlisi v. Sprintcom, Inc.*, 2006 WL 8432613, at *2 (S.D. Fla. Sept. 6, 2006).

*Third*, even if a negligent invasion-of-privacy claim did exist, Plaintiffs still cannot plead the necessary publication, offensiveness, and public concern elements fatal to Counts I and VI and therefore, cannot plead a breach of duty on those grounds. *Id.* at *3.

*Finally*, Plaintiffs' skeletal allegation that "Defendants' negligence was in violation of state and federal laws designed to protect Plaintiffs" cannot salvage their claims. SAC ¶¶ 169, 245. As explained already, Plaintiffs lack any legally actionable Title VII, constitutional, or state-law claim.

## CONCLUSION

Plaintiffs' SAC should be dismissed with prejudice.

401

Dated: August 2, 2023

Respectfully submitted,

*/s/ Michelle Hogan*
Eliot Pedrosa
Florida Bar No. 182443
epedrosa@jonesday.com
Michelle Hogan
Florida Bar No. 1010992
mhogan@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700
Facsimile:  (305) 714-9799

Jonathan M. Linas (pro hac vice)
jlinas@jonesday.com
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Alexander V. Maugeri (pro hac vice)
amaugeri@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**Attorneys for Defendant Atlas Air, Inc.**

*/s/ Matthew A. Green*
Matthew A. Green
Florida Bar No. 1019717
matthew.green@csklegal.com
S. Jonathan Vine
Florida Bar No. 10966
jonathan.vine@csklegal.com
COLE SCOTT KISSANE, PA
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone:  (561) 383-9200
Facsimile:  (561) 683-8977

**Attorneys for Flight Services International LLC**



# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

PATRICK AKERLUND, *et al.*,

    Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

    Defendants.

Case No. 1:22-cv-23519-KMM-LFL

**DECLARATION OF CARLEEN A. YBARRA ON BEHALF OF**
**DEFENDANT ATLAS AIR, INC.**

I, Carleen A. Ybarra, declare as follows:

1.     I currently serve as Director Employee Relations & Workforce Solutions for Atlas Air, Inc. ("Atlas"). I have held this position since July 19, 2021. I have personal knowledge of the information herein.

2.     Atlas is a Delaware corporation. Its principal place of business and corporate headquarters are located at 2000 Westchester Avenue, Purchase, New York, and its senior leadership team manages Atlas's worldwide operations from there. Atlas employs approximately 4,311 domestic active employees located in airports across the country, Atlas's corporate headquarters, and all of its offices.

3.     Atlas's wholly owned parent company, Atlas Air Worldwide Holdings, Inc. ("AAWW"), is also a Delaware corporation with its principal place of business in Purchase, New York.

404

4.      Atlas's policies concerning the COVID-19 vaccine—including its reasonable accommodations policy—were developed and executed primarily by employees based in New York and, during pandemic conditions, working from other states in the Northeast.

5.      Atlas maintains operational centers at the following airports throughout the continental United States: Anchorage, Chicago-O'Hare, Cincinnati, John F. Kennedy, Los Angeles, and Miami. This means that just one of Atlas's operation centers is located in Florida.

6.      Only 15.2% of Atlas's U.S. workforce has a Florida duty station—657 out of a domestic workforce of 4,311. From January 2021 through October 2022 (when this litigation commenced), take offs and landings in Florida never represented more than 9% of total monthly flights.

7.      Atlas maintains a training center in Miami, Florida and conducts a small percentage of its operations in the state. Flight Crew training takes place at the Miami training center, and certain specialized ground employees based in Miami also receive the training specific to their position in Miami.

8.      In their Second Amended Complaint (¶ 17), Plaintiffs allege that Atlas's Miami training center contains "30,000 square feet of administrative and instructional space." Yet, Atlas maintains far greater space elsewhere—including over 150,000 square feet of space in Kentucky, over 100,000 square feet in California, and over 27,000 square feet of space in New York—as well as significant physical plants at locations across the country (and internationally, including over 22,007 square feet in Hong Kong, 4,800 square feet in Shanghai, and 4,300 square feet in South Korea).

405

9.      Atlas's workforce outside of Florida far outnumbers its workforce inside of Florida.  In Kentucky alone, Atlas has 1,347 employees—more than double the number of employees who work in Florida.  Atlas also has 515 employees in Alaska, 532 employees in California, 734 in New York, 226 in Illinois, 175 in Texas, and other employees based in 13 other states and various foreign countries.

10.     Atlas's Ground Operations Support and Facilities, Accounting, Finance, Financial Planning and Analysis, Safety, Administration, Systems Operations, Defense & Government Programs, Sales & Marketing, Communications, Legal, and Human Resources functions all are based in New York.  Atlas's Flight Operations (including Scheduling and Planning) are based in New York and Kentucky.  Some of these Atlas functions maintain staff in other offices, but are still led from New York.

11.     Atlas's principal executive offices are also located in New York.

12.     AAWW's board meetings historically have taken place in New York or in Washington, D.C.

13.     In my capacity as Director Employee Relations & Workforce Solutions, I am familiar with Atlas's process of maintaining employment records.  It is the regular practice of Atlas for its employees to create and update a record for each Atlas employee that includes (among other things) the location where the employee works (*i.e.*, has his/her base of operation) and where the employee resides.  Atlas keeps these employee records in the course of its regularly conducted business activities.  Based on a review of Atlas's regularly maintained employment records, the Atlas Plaintiffs include current and former pilots and ground operations

personnel.[1]  As set forth in the below table, 47 of the 84 Plaintiffs currently or formerly

employed by Atlas in this action have no tie to Florida, while another 13 do not work in Florida,

but only live there.

| Last Name | First Name | Employee Type | Work Location (State) | Home Location (State) |
|---|---|---|---|---|
| Akerlund | Patrick | Pilot | KY | AK |
| Alzati | Michael | Pilot | AK | FL |
| Anderson | Eric | Pilot | KY | KY |
| Ballard Jr. | Michael | Pilot | KY | KY |
| Bearce Jr. | Larry | Pilot | FL | IA |
| Bellman | Robert | Pilot | FL | FL |
| Bendiburg | Benjamin | Pilot | CA | NH |
| Berry | Gregory | Pilot | AK | GA |
| Botha | Lynette | Pilot | CA | SD |
| Buehrer* | Caleb | Pilot | IL | TX |
| Bullock | Richard | Pilot | FL | FL |
| Carroll | Jon | Pilot | KY | NC |
| Caskey | Vergil | Pilot | TX | OK |
| Castor | James | Pilot | CA | CO |
| Charboneau | Nathan | Pilot | KY | MI |
| Churchel | Shawn | Pilot | CA | FL |
| Colon | Joel | Pilot | KY | FL |
| Connor | Mark | Pilot | TX | TN |
| Cronauer | Matthew | Pilot | CA | VA |
| Cunningham* | Fred | Pilot | CO | CO |
| Danza | Royal | Pilot | CA | AZ |
| De Sousa | Elliot | Pilot | AK | CO |
| Desandro | Eric | Pilot | FL | FL |
| Dixon | Steve | Pilot | KY | TN |
| Erickson | James | Pilot | CA | ID |
| Esquivia | Luis | Pilot | CA | FL |
| Estes | Lee | Pilot | KY | AL |
| Fratti | Robert | Pilot | CA | ID |
| Frisbie | Jason | Pilot | KY | AK |
| Frye | Timothy | Ground Operations | FL | FL |
| Gamboa | Tony | Pilot | FL | FL |

[1] Individuals noted with an asterisk (*) next to their last name in the table are no longer employed with Atlas.

| Last Name | First Name | Employee Type | Work Location (State) | Home Location (State) |
|---|---|---|---|---|
| Gebhard | Dennis | Pilot | FL | FL |
| Ghods | Reza | Pilot | CA | FL |
| Gilman | Mark | Pilot | OR | AR |
| Giudice | Robert | Pilot | CA | UT |
| Gordon | Eric | Pilot | IL | PA |
| Heivilin | Rexford | Pilot | FL | GA |
| Henning | Jason | Pilot | KY | KS |
| Hewson | David | Pilot | FL | FL |
| Hontz | Todd | Pilot | KY | FL |
| Hudson | Daniel | Pilot | CA | TX |
| Justice | Roger | Pilot | KY | IN |
| Kassandji | Venancius | Pilot | FL | FL and Namibia |
| Kearins | John | Pilot | FL | FL |
| Kinder | Ricky | Pilot | KY | IA |
| Kirby | Beth | Pilot | OR | SC |
| Koustas | Andreas | Pilot | FL | NH |
| Kravetz | Chad | Pilot | FL | FL |
| Lindberg | Carl | Pilot | CA | AZ |
| Loschiavo | Joseph | Pilot | KY | AL |
| Lutz | Andrew | Pilot | KY | FL |
| Lutz | Blythe | Pilot | CA | FL |
| Macario | Rafael | Pilot | FL | FL |
| Mayo Jr.* | Douglas | Ground Operations | FL | FL |
| McQuillen | April | Pilot | KY | FL |
| McQuillen | Christopher | Pilot | KY | FL |
| Michonski | Jeffrey | Pilot | OR | VA |
| Mickler | Andrew | Pilot | AK | AK |
| Morris | Corey | Pilot | FL | FL |
| Myers | Gregory | Pilot | CA | CA |
| Napora | Peter | Pilot | CA | AZ |
| Pardo* | Joel | Ground Operations | FL | KY |
| Phillips* | Lance | Ground Operations | FL | CO |
| Phillips | Patrick | Pilot | FL | TX |
| Pronk | Glen | Pilot | KY | KY |
| Randall | Charles | Pilot | KY | PA |
| Raymond | Peter | Pilot | FL | TX |
| Roberts | Joshua | Pilot | FL | OH |
| Rogers | Jason | Pilot | CA | CA |
| Schreck | Kimberly | Ground | KY | KY |

| Last Name | First Name | Employee Type | Work Location (State) | Home Location (State) |
|---|---|---|---|---|
| | | Operations | | |
| Serritella* | William | Pilot | NY | FL |
| Shelton | Gentry | Pilot | TX | TX |
| Snaza | Todd | Pilot | FL | SD |
| Sorrentino | Donald | Pilot | NY | NH |
| South | Mark | Pilot | KY | KY |
| Stark | Michael | Pilot | CA | TX |
| Stowells | Forrest | Pilot | CA | WA |
| Swift | John | Pilot | CA | CA |
| Taylor | Nick | Pilot | CA | AZ |
| Thompson | William | Pilot | FL | FL |
| Thoroughman * | Brandon | Ground Operations | KY | IN |
| Verdes | Gustavo | Pilot | FL | AZ |
| Villella | James | Pilot | KY | FL |
| Zarrabian | Farshad | Pilot | CA | FL |

409

Pu1 uant to 28  . . .'  1746. I declare under penalt  of perjury that the foregoing i  true and  orr  ct.

x   ured  n   ugu t 2, 2023.

Carleen A. Ybarra
Director Employee Relations & Workforce S  iuuuns

410

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

PATRICK AKERLUND *et al.*, individuals,

Plaintiffs,

v.

ATLAS AIR INC., *et al.*

Defendants.

Case No. 22-cv-23519-KMM-LFL

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PURSUANT TO
RULES 12(B)(1), 12(B)(2), AND 12(B)(6)**

## TABLE OF CONTENTS
### Page(s)

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................. 2

    I. Rule 12(b)(2) ........................................................................................... 2

    II. Rule 12(b)(1) ..........................................................................................4

    III. Rule 12(b)(6) ........................................................................................ 6

ARGUMENT.............................................................................................................. 6

    I.     Florida Has Personal Jurisdiction Over Plaintiffs' Claims Against Defendants and Should Not Be Dismissed..................................................6

          A.     Defendants are Subject To General Jurisdiction In Florida.........................7

          B.     Defendants are Subject To Specific Jurisdiction in Florida .........................9

    II.    FSI's Arbitration Clause Does Not Give Rise to Dismissal ...................................10

    III.   Plaintiffs' FAC Provides Sufficient Facts That Satisfy the Requirements To State Claim ...........................................................................11

          A.     Plaintiffs' FAC is No Longer a Shotgun Pleading After Substantial Modifications.................................................................... 12

          B.     Count I: Plaintiffs Satisfy the Invasion of Privacy Claim Requirement With a Plausible and Meritorious Claim..............................13

          C.     Plaintiffs' Have Exhausted Administrative Remedies ..............................13

          D.     Count II and VII: Plaintiffs State a Valid Title VII Claim for Hostile Work Environment (or Any Other Type of Title VII Claim)...........................14

          E.     Counts III and VIII: Plaintiffs' Have Valid Constitutional Claims.............17

          F.     Counts IV and IX: Plaintiffs' Have Valid Intentional or Negligent Emotional Distress ("IIED") Claims...........................................19

          G.     Counts V and X: Plaintiffs Have an Actionable Negligence Claim.......... 19

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*14 Penn Plaza LLC v. Pyett,*
   556 U.S. 247, 273—74 (2009).................................................................................5

*AcryliCon USA, LLC v. Silikal GmbH,*
   985 F. 3d 1350 (11th Cir. 2021)............................................................................. 3

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)....................................17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..............................................................................................6

*Bejjani v. Manhattan Sheraton Corp.,*
   567 F. App'x 60 (2d Cir. 2014…...........................................................................19

*Bell Atlantic Corporation v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................. 6

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971))..................................... 17-19

*Bostock v. Clayton County, Georgia,*
   140 S.Ct. 1731 (2020) ........................................................................................16

*Bryant v. Avado Brands, Inc.,*
   187 F.3d 1271 (11th Cir. 1999)............................................................................. 6

*Cable/Home Communication Corp. v. Network Productions, Inc.,*
   *902 F.2d 829, 855 (11th Cir. 1990)* ......................................................................3

*Carmouche v. Tamborlee Mgmt., Inc.,*
   789 F.3d 1201, 1203–04 (11th Cir. 2015)............................................................. 4

*Ciraci v. J.M. Smucker Co.,*
   62 F.4th 278, 287 (6th Cir. 2023)................................................................... 17, 18

*Correctional Services Corp. v. Malesko,*
534 U.S. 61 (2001) ..............................................................................................18

*Cunningham v. Southlake Ctr. for Mental Health, Inc.,*
924 F.2d 106, 107 (7th Cir. 1991).........................................................................17

*Cuvillier v. Taylor*,
503 F.3d 397 (5th Cir. 2007)...................................................................... 6

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
840 F.2d 843 (11th Cir.1988)..................................................................... 3

*Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*,
593 F.3d 1249 (11th Cir. 2010).............................................................. 3, 9

*Goodwin v. Blu Murray Ins. Agency, Inc.*,
939 So. 2d 1098 (Fla.).............................................................................. 11

*Gainesville Health Care Ctr., Inc. v. Weston*,
857 So. 2d 278, 283 (Fla. 1st DCA 2003)................................................. 5

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) .................................................................................... 5

*Hanania v. Loren – Maltese*,
212 F.3d 353, 356 (7th Cir. 2000).......................................................... 17

*Hawaiian Airlines, Inc. v. Norris*,
512 U.S. 246 (1994) .................................................................................. 4

*Hawthorne v. Mac Adjustment, Inc.*,
140 F.3d 1367 (11th Cir. 1998)................................................................. 6

*In Anderson v. Taylor Morrison of Florida, Inc.*,
No. 2D16-314, 2017 WL 2374404 (Fla. Dist. Ct. App. May 31, 2017)...................5

*In re Katrina Canal Breaches Litig.*,
495 F.3d 191 (5th Cir. 2007)..................................................................... 6

*International Shoe Co. v. Washington*,
326 U.S. 310 (1945) .................................................................................. 4

*Instrumentacion, Ltda. v. Philips Electronics North America Corp.*,
951 So.2d 1001 (Fla. 3d DCA 2007) ........................................................2

*J. I. Case Co. v. Borak*,
377 U. S. 426, 433 (1964).................................................................... 18, 19

*Mallory v. Norfolk Southern Railway Co.*,
No. 21-1168, 2023 WL 4187749, 600 U.S. ___ (2023) ........................... 8

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S.Ct. 1921, 1928 (2019) .,… ..................................................................................... 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614, 637 n.19 (1985) .,.................................................................................. 5

*Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*,
243 U.S. 93 (1917) ........................................................................................................ 8

*Posner v. Essex Ins. Co., Ltd., ,*
178 F.3d 1209, 1218 (11th Cir. 1999).......................................................................... 4

*S & Davis Int'l, Inc. v. Yemen*
218 F.3d 292, 1305 (11th Cir. 2000)............................................................................ 9

*Shotts v. OP Winter Haven, Inc.*,
86 So. 3d 456, 464 (Fla. 2011) .................................................................................... 5

*Sutherland v. SATO Global Solutions, Inc.*,
2018 WL 3109627, *6 (S.D. Fla. Apr. 10, 2018) ........................................................9

*U.S. S.E.C. v. Carrillo*,
*115 F.3d 1540 (11th Cir.1997)* ...................................................................................3

*United Techs. Corp. v. Mazer*,
556 F.3d 1260, 1274 (11th Cir. 2009)......................................................................... 3

*Venetian Salami Co. v. Parthenais*,
554 So.2d 499, 502 (Fla.1989)..................................................................................... 2

*Wilson v. Warren Cnty.*,
830 F.3d 464 (7th Cir. 2016)...................................................................................... 17

**Statutes**
§ 48.193 .................................................................................................................... 3, 4

**Rules**
Fed. R. Civ. P. 8(a)(2) ................................................................................................. 6

**Other Authorities**

Jurisdictional Discovery in United States Federal Courts, 67 WASH. & LEE L. REV.
489, (2010) .................................................................................................................3

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, §1351 (3d
ed.2004) ......................................................................................................................3

Plaintiffs hereby move the Court to deny Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (MTD, ECF No. 66), based on the frivolous, repetitive, conclusory, and meritless arguments presented on behalf of the Defendants'.

**INTRODUCTION**

Plaintiffs have successfully amended their complaint in order to comply with the Court's ruling (ECF No. 59), that labeled their prior amended complaint a shotgun pleading and dismissed it without prejudice. As part of the Court's Order, they allowed the Plaintiffs to submit a Second Amended Complaint ("SAC") to address the deficiencies. *Id.* Thus, despite what the Defendants claim, the Plaintiffs' SAC has made considerable revisions in order to avoid being characterized as a shotgun pleading and to correct the errors outlined in the court's decision. ("SAC," ECF No. 63).

Nor are there any "jurisdictional defects" as alleged by the Defendants. At this pleading stage the Plaintiffs have satisfied their burden to demonstrate that jurisdiction is proper in Florida, as to the Defendants. Unlike the Defendants, who relied on eleven pages of frivolous, redundant, and repetitive arguments concerning personal jurisdiction, the Plaintiffs do not need to rely on lengthy, immaterial pages of case law and convoluted arguments to establish that jurisdiction is proper in Florida courts. Second, the claims filed by the five FSI Plaintiffs are not precluded by mandatory arbitration clauses. Third, the SAC is no longer a shotgun pleading, and the court should permit the matter to proceed forward. Plaintiffs have also satisfied the elements to prove a public disclosure by the Defendants of private offensive facts and invasion of privacy by meeting the plausibility standard at this pleading stage.

Plaintiffs' Title VII claims do not fail because they have satisfied administrative remedies by previously providing an exhibit showing the Plaintiffs that have received notice to sue letters

416

and the ones that have applied and are currently waiting for instructions from the EEOC or the 3% that have an unknown status. Furthermore, all of the remaining 89 individual Plaintiffs have provided sufficient facts to plausibly state a claim for harassment (or any other theory) based on religion under Title VII. Plaintiffs' constitutional claims do not fail under Section 1983 or *Bivens*. Plaintiffs have also reasonably proven that the Defendants are acting under color of law and how their conduct specifically violates the Plaintiffs constitutionally protected right to freedom of religion, the right to be secure in their persons, and other individual rights and liberties. Plaintiffs' intentional and negligent infliction of emotional distress claims have met the plausibility standard at this stage to allege outrageousness, intent, or severe suffering.

Finally, the Defendants' arguments that Plaintiffs' "negligence claims do nothing more than repackage their other legally infirm claims," are unsupported by legal reasoning and are simply conclusory. (ECF No. 66 at 14). Plaintiffs have provided enough facts at this stage to allege a negligence cause of action against the Defendants based on the breach of duty owed to all their employees, not only the vaccinated ones. Accordingly, the Plaintiffs have substantially modified their FAC so that the SAC can no longer be regarded as a shotgun pleading. They have provided sufficient facts at this stage to put the Defendants on notice of each individual claim against them. Thus, the Court should deny Defendants' motion to dismiss Plaintiffs' SAC and instead move forward with the complaint in the interests of fairness and justice.

**LEGAL STANDARDS**

1. Rule 12(b)(2):

In order to decide whether jurisdiction is appropriate in a particular forum, a burden shifting approach is utilized. *See Instrumentacion, Ltda. v. Philips Electronics North America Corp.*, 951 So.2d 1001, 1002 (Fla. 3d DCA 2007) (citing *Venetian Salami Co. v. Parthenais*, 554

417

So.2d 499, 502 (Fla.1989); *see also Delong Equip. Co.*, 840 F.2d at 845. However, if the Defendant has satisfied their burden and made a prima facie evidentiary showing against jurisdiction, in instances "where the plaintiff's complaint and the defendant's affidavits conflict, the court must construe all reasonable inferences in favor of the plaintiff." *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *see also U.S. S.E.C. v. Carrillo*, 115 F.3d 1540 (11th Cir.1997). After both sides have made their arguments and provided their relevant facts and evidence, the court then has three options: it may decide the motion upon the facts and evidence provided, "it may conduct an evidentiary hearing to resolve any [discrepancies] or questions, or it may permit discovery in aid of deciding the motion." *See S.I. Strong, Jurisdictional Discovery in United States Federal Courts,* 67 WASH. & LEE L. REV. 489, 507(2010) (quoting *Hagen v. U-Haul Co. of Tenn.,* 613 F. Supp. 2d 986, 1002 n. 10 (W.D. Tenn. 2009)); *see also* Charles Alan Wright & Arthur R. Miller*, Federal Practice and Procedure*, §1351 (3d ed.2004).

Subsequently, a "A federal court sitting in diversity undertakes a two-step inquiry in order to determine whether personal jurisdiction exists: (1) it must be appropriate under the state long-arm statute and (2) it does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see also AcryliCon USA, LLC v. Silikal GmbH*, 985 F. 3d 1350, 1363–1364 (11th Cir. 2021) (quoting *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010)). Accordingly under Florida's long-arm statute, a defendant can be subject to personal jurisdiction in the following two ways: (1) § 48.193(1)(a) lists various acts "that can subject a defendant to specific personal jurisdiction[1] and (2)

---

[1] (1) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; (2) Committing a tortious act within this state; (3) Owning, using, possessing, or

418

§48.193(2) provides that Florida courts may exercise general personal jurisdiction . . . if the defendant engages in substantial and not isolated activity in Florida[.]" *See Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203–04 (11th Cir. 2015) (the court held that whether or not a Defendant's activities involve activities in Florida, jurisdiction is proper if they engaged in "substantial and not isolated activity" in Florida). Furthermore, Plaintiffs incorporate the argument in their 4/12/23 Opposition to Atlas' MTD that long arm statues allow jurisdiction in Florida per *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). (ECF No. 48 at p. 21).

Additionally, §48.193(1)(a)(7) also provides that a person or entity who "breach[es] a contract in this state by failing to perform acts required by the contract to be performed in this state" is subject to personal jurisdiction of courts in Florida. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (where the court state that "this provision means that there must exist a duty to perform an act in Florida.")

2. Rule 12(b)(1):

As stated in response to Defendants' previous motion to dismiss the Plaintiffs establish that their complaint should not be dismissed under Rule 12(b)(1), since an exception applies where, a "state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA." (ECF No. 57 at 11), *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (where the Supreme Court affirmed that the "petitioners had a state-law obligation not to fire respondent in violation of

---

holding a mortgage or other lien on any real property within this state; (4) Contracting to insure a person, property, or risk located within this state at the time of contracting... (6) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, [] (7) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state... (9) Entering into a contract that complies with s. 685.102.

419

public policy or in retaliation for whistle-blowing and the parties' obligation under the RLA to arbitrate disputes arising out of the...CBA did not relieve petitioners of this duty.")

Furthermore, the Defendants continue to ignore the fact the federal court still has a say in determining jurisdiction despite an arbitration agreement, especially when an agreement is void against public policy, limits a parties' statutory remedies, and to consider traditional contract defenses such as fraud, duress, or unconscionability. *See In Anderson v. Taylor Morrison of Florida, Inc.*, No. 2D16-314, 2017 WL 2374404 (Fla. Dist. Ct. App. May 31, 2017), (in which the Second District Court of Appeal of Florida held an arbitration provision in a homeowner's sales agreement was void as against public policy because it limited the homeowner's statutory remedies)(citing *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 464 (Fla. 2011) (the court held that an arbitration agreement may also be invalidated on public policy grounds); *see also Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 283 (Fla. 1st DCA 2003) (holding that the FAC permits a challenge to the validity of an arbitration agreement based on any state-law contract defense).

In *Shotts*, it was decided that "any arbitration agreement that substantially diminishes or circumvents remedies stands in violation of the public policy of the State of Florida and is unenforceable." 86 So. 3d at 474. The Supreme Court also discussed that a court could invalidate arbitration agreements on the basis of public policy that "operat[e] . . . as a prospective waiver of a party's right to pursue statutory remedies." *Id.; See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n.19 (1985); *see also 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 273—74 (2009) (recognizing the existence of the effective vindication exception, though not applying it to invalidate the arbitration agreement at issue); *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000) (the court stated that when the cost of arbitration is so expensive

420

that it prevents a party from effectively vindicating federal statutory rights, a court may determine that the arbitration agreement is invalid on that ground alone. 531 U.S. at 90.

   3. <u>Rule 12(b)(6)</u>:

As fully explained in Plaintiffs prior arguments to Defendants' motion to dismiss (ECF No. 43 at pp. 22-24): In order to prevail on a 12(b)(6) motion for failure to state a claim, a complaint only needs to "plausibly" allege sufficient facts, "accepted as true, to state a claim to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly,* 550 U.S. at 556).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief..." *See Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). Accordingly, during the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc*., 140 F.3d 1367, 1370 (11th Cir. 1998)); *See In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007).

## **ARGUMENT**

**I.    Florida Has Personal Jurisdiction Over Plaintiffs' Claims Against Defendants and Should Not Be Dismissed.**

If the Defendants' proof raises an issue about the "jurisdictional facts," the burden will shift back to the Plaintiff to disprove the Defendant's evidence with additional facts or evidence. Therefore, in order to establish that Plaintiffs have sufficient facts and evidence to satisfy their burden, EXHIBIT 1 is attached.[2] The attached declaration contains testimony that describes the training facility and operations based in Florida which are both substantial and necessary for the Defendants to conduct their business operations. However, despite the Court preserving the issue for the time being, the Defendants erroneously argue that Plaintiffs could not establish jurisdiction after two rounds of motions. (ECF No. 66 at 16). It is in fact, the Defendants that fail to disprove Plaintiff's claims as the main functioning of the Defendants operations and training department is in Florida, as well as the situs of their tortious conduct, thus, Plaintiffs' claims are aptly litigated in Florida.

A. *Defendants are Subject to General Jurisdiction in Florida.*

Here, Defendants' argument merely consists of useless percentages and statistics, while ignoring Plaintiffs' evidence of their own website explaining how important the Florida facility is since it is the first stop for pilots on their journey with the company. The majority of their argument rests on duty stations, percentages of take offs and landings from Florida, as well as size in square footage, the number of employees, etc. Yet, Plaintiffs have not made arguments representing that Florida is subject to general jurisdiction because they have the most employees, retail space, or the most operations, etc. The fact that other states have higher numbers does not result in an automatic dismissal of general jurisdiction. Also the arguments made by the

---

[2] EXHIBIT 1 is an affidavit by Plaintiff Mark South, who has significant experience and personal knowledge about the Miami training facility through sworn testimony that disproves Defendants' argument against Florida jurisdiction.

422

Defendants are completely unfounded when the employees from other states would still have to visit the Miami training facility at some point to receive the necessary training to do their job.

Also, Defendants improperly attempt to overrule the *Mallory* case, by focusing on the foreign corporation aspect and that *Daimler* case controls. However, they overlook that the *Mallory* case, the Supreme Court ruled that an employee can continue his civil case against a transportation company in Pennsylvania courts, even though the events of his case didn't take place in the state. *See Mallory v. Norfolk Southern Railway Co.,* No. 21-1168, 2023 WL 4187749, 600 U.S. ___ (2023) (the Court upheld in a 5-4 ruling on June 27, a Pennsylvania law that requires companies to face lawsuits in the state when they register to do business there). Specifically, the importance of the *Mallory* case rests in the fact that the U.S. Supreme Court reversed and held that the decision in the *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co*., 243 U.S. 93 (1917) was controlling precedent; (where the Supreme Court held that an analogous Missouri statute did not deny a defendant due process). *See Mallory*, slip op. at 10; *Pa. Fire Ins. Co*., 243 U.S. at 95.

Additionally, in the *Mallory* case Justice Neal Gorsuch wrote in his opinion that the "court's personal jurisdiction cases have never found a due process clause problem grounded in federalism when an out-of-state defendant has agreed to be subject to lawsuits in the state." *Id.* Similarly in the present case, Defendants have already demonstrated that there is no burden litigating in Florida and basically consented to litigating in the forum when they took part in the litigation involving Plaintiff Mark South in a Florida Administrative Hearing dispute. *See Mark South v. Atlas, Air Inc.,* Case No. 22-3659, Agency Case No.: 2022-34267 vs. 15D-2022-00759 (February 14, 2022). Therefore, this is an exceptional case, based on all the factors listed above that render the Defendants essentially at home.

423

B. *Defendants are Subject to Specific Jurisdiction in Florida*.

The Plaintiffs have provided enough facts and evidenced to plausibly allege that specific jurisdiction is proper as to Defendants in Florida. First, the terms of Plaintiffs' employment was put in jeopardy, as well as threats of future consequences on those terms by not being vaccinated or having a religious exemption by the deadline mentioned in company emails. Requiring Plaintiffs to be vaccinated involves performance by those Plaintiffs in Florida whether they are residents, whether they work there, or whether they are required to train there. These instances are sufficient to satisfy the purposeful availment requirement with the forum. *See S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 292, 1305 (11th Cir. 2000) ("Performance logically required contact and interaction with the United States, as discussed in the contract (such as designating a U.S. bank for payment and a point of departure for shipping)"); *See also See Diamond Crystal Brands, Inc*., 593 F.3d at 1269 ("A contract calling for payment and delivery in a forum requires 'contact' with the forum").

Then, the Defendants claim they are burdened by litigating in Florida due to the locations of their principal place of business and their headquarters and since 47 Plaintiffs do not reside or work in Florida. (ECF No. 66 at p. 22). However, Plaintiffs' attached EXHIBIT 1, highlights Atlas' massive presence in Florida, showing there is nothing even close in its Delaware or New York offices. They have also shown that a significant percentage of Plaintiffs are residents of Florida or work in Florida. Additionally, Florida actually does have an interest in the current litigation to ensure that the wrongful acts exhibited by Defendants and to prevent further violations by the Defendants or to prevent harm to their residents from occurring in their state. *See Sutherland v. SATO Global Solutions, Inc*., 2018 WL 3109627, *6 (S.D. Fla. Apr. 10, 2018)

(Dimitrouleas, J.) (jurisdiction complied with due process when non-resident defendant breached contract in Florida since the alleged harm to Plaintiff has been felt in Florida).

The same arguments also apply to FSI due to the contract between the Defendants exercising jurisdiction towards the Plaintiff, the significant, substantial, and continuous contacts between FSI and the forum state, and the presence of FSI employees at the Florida training facility (also outlined in Plaintiffs' EXHIBIT 1 declaration). Thus, Plaintiffs have satisfied the burden shifting standard and provided enough facts at this stage to establish that jurisdiction is proper in Florida.

Furthermore, due to issues with numerosity of Plaintiffs, avoiding exceeding the page limits, and in the interests of fairness and justice, the Plaintiffs request the court conduct either an evidentiary hearing or at the very least for the case to move forward towards discovery in order to establish how jurisdiction is proper in Florida. Therefore, jurisdiction is valid in Florida through their long arm statute, due to the acts of discrimination, harassment, retaliation, and requirement by the Defendants for the Plaintiffs to be vaccinated to keep their job, and the substantial, systemic, and continuous contact with the state of Florida which renders them essentially at home. These wrongful acts predicated by the Defendants applied to Plaintiffs that the vast majority were either residents of Florida, worked in Florida, or trained in Florida.

## II.   FSI's Arbitration Clause Does Not Give Rise to Automatic

Arbitration between FSI and employees is not mandatory, and the flight attendants' handbook (attached to Atlas' MTD) pretends to but in fact foils any such requirement. In its totality the arbitration clause cannot be read to require Texas arbitration. The FSI Employee Handbook dubbed Court document 66-3, titled "Employee Acknowledgement," makes the arbitration clause a suggestion not a contractual mandate by agreeing that: "I understand that this

425

Handbook is not a contract of employment between the Company and me and nothing in this Handbook or the CCPG creates an express or implied contract of employment. " It is not clear that each and every employee specifically understood and agreed to engage exclusively in arbitration in lieu of seeking redress to court. More importantly, the *Goodwin* case stated: "To the extent any ambiguity exists in the interpretation of [a] contract, it will be strictly construed against the drafter." *See Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098 (Fla.). Therefore, the fact that the company required this handbook to be signed as a condition of employment whether or not the employee fully understood what it meant or what they were signing does not result in an automatic dismissal of their claims against the Defendants.

Furthermore, Defendants seem to ignore that public policy mitigates in favor of plaintiffs, since it was drafted by the employer who held a superior bargaining position giving them an opportunity to possibly take advantage of Plaintiffs. Public policy relates to the remedies, damages, and the infringement and violation of Plaintiffs' rights. Here, there are arguments for statutory remedies, and to consider traditional contract defenses such as fraud, duress, or unconscionability based on the level of power and bargaining position between the Defendant FSI and the Plaintiffs. Additionally, a Plaintiff will not automatically be dismissed based on exceptions present such as the religious discrimination, retaliation, and harassment by the Defendants against the Plaintiffs. Here, forced arbitration would infringe on Plaintiffs' individual liberties, would limit their potential damages, and result in increased costs and burdens on those Plaintiffs that were dismissed. Lastly if, as the "Employee Acknowledgement" states, there actually is no such express or implied employment contract, it is then axiomatic that there is also no such express or implied contract for arbitration.

## III. Plaintiffs' FAC Provides Sufficient Facts That Satisfy the Requirements to State a Claim

A.  *Plaintiff's SAC is No Longer a Shotgun Pleading After Substantial Modifications*

Despite Defendants' meritless and conclusory arguments that Plaintiffs' SAC is still a shotgun pleading they fail to acknowledge that this is in the pleading stage and Plaintiffs have satisfied the plausibility standard by far. Thus, the Court should not dismiss the SAC as a shotgun pleading for the following reasons:

First, a shotgun pleading contains multiple counts being alleged, while Plaintiffs' First Amended Complaint (FAC, ECF No. 39) contained thirteen causes of action, the SAC was modified to contain only ten causes of action, with only five causes of action against Atlas and five causes against FSI. (ECF No. 63). Thus, the Plaintiffs have made significant modifications.

Second, since a shotgun pleading contains multiple counts against multiple defendants, and fails to "specify which of the Defendants are responsible for which acts or omissions." (ECF No. 59 at 2). Here, the Plaintiffs have substantially modified their FAC, by separating the causes of action in their SAC to clearly identify which cause of action is being asserted against which Defendant (Atlas or FSI). Therefore, the SAC should not be dismissed as a shotgun pleading when it has been modified to provide Defendants with adequate notice of the claims against them and the grounds upon which each claim rests.

Third, a complaint is likely to be labeled as a shotgun pleading if they "incorporate by reference the allegations of its predecessors, leading to a situation where most of the counts... contain irrelevant factual allegations and legal conclusions." (ECF No. 59 at 2). While in the FAC the Plaintiffs realleged and incorporated "all paragraphs above as fully set forth herein." *Id.* Those errors were fixed in the SAC because each count had its own set of uniquely incorporated paragraphs in order to clearly demonstrate which facts were related to which separate action. Thus, the Plaintiffs have made major substantive upgrades from the FAC to the SAC in order to

427

abide by the court's ruling and The SAC cannot rightly be tagged with the shotgun pleading label.

Lastly, a shotgun pleading is usually "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." (ECF No. 59 at 3). The FAC became labeled a shotgun pleading by not specifically mentioning which fact pertained to which cause of action. However, in the SAC the Plaintiffs mention the specific facts that related to a particular cause of action that would put the Defendants on notice of what is being asserted against them. Furthermore, due to the vast number of individual Plaintiffs it would be virtually impossible at this pleading stage in the litigation to demonstrate how each individual was harmed by each Defendant. Therefore, Plaintiffs SAC has substantial improvements and is no longer a shotgun pleading.

> B. *Plaintiffs Satisfy the Invasion of Privacy Claim Requirements with a Plausible and Meritorious Claim*

The cases cited by Defendants are not applicable to the present case. In *Hiers v. Bordt*, the court rejected a theory of negligence that sought to impose liability for an intentional tort. Here, however, Plaintiffs' negligence claim is based on a distinct cause of action, not the intentional invasion of privacy claim. Additionally, the cases cited by Defendants in support of their argument that Florida does not recognize a negligent invasion of privacy cause of action are distinguishable from the present case because the Plaintiffs never alleged negligent invasion of privacy. Rather, an allegation of Invasion of Privacy- Disclosure of Private Facts, as well as an allegation of negligence.

> C. *Plaintiffs' Have Exhausted All Administrative Remedies*

In prior filings, the Plaintiffs have presented enough evidence to plausibly show that a significant number of Plaintiffs have exhausted their administrative remedies. While some

Plaintiffs have obtained right to sue letters, the fact that the rest of the Plaintiffs have filed claims with the EEOC or their state agency does not negate their participation in exhausting their administrative remedies. Plaintiffs' prior EXHIBIT A in their opposition to Atlas' First MTD already laid out every plaintiff's EEOC claim status. (ECF No. 48). Now again, EXHIBIT 1, shows that of the remaining 89 Plaintiffs only 5 have not exhausted administrative remedies and out of those 5, half of them got the vaccine and were unaware that they needed to file a charge. The three remaining Plaintiffs status with the EEOC is unknown. Therefore, the fact that 97% of Plaintiffs have exhausted their administrative remedies one way or another satisfies the minimum guidelines to move forward with litigation. Whether the EEOC and/or state agencies are taking longer to respond or refusing to timely respond provides further support to Plaintiffs' claim of futility and should not resort to a dismissal with prejudice.

As already rehashed from Plaintiff's prior opposition to MTD, the EEOC has publicly expressed their position in deciding not to get involved or interfere with employer's decision to implement the CDC guidelines or health mandates. (ECF No. 48). They even go so far as to state that it is "beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach." *Id.* Thus, the Court should not punish Plaintiffs for failing to participate in a process that has by choice made itself fundamentally unavailable to handle their claims.

D. <u>Counts II and VII: Plaintiffs Plausibly State a Title VII Claim for Hostile Work Environment (or Any Other Type of Title VII Claim).</u>

Plaintiffs' SAC gives easily discernible tortious allegations supporting a discrimination tort claim against Plaintiffs in violation of Title VII. Plaintiffs have a multitude of substantive evidence detailing the times and dates of corporate decisions to violate their Title VII and other rights alleged in the SAC, as well as Defendants' irrefutable multiple Florida based connections and conduct. The facts and evidence supplied by the Plaintiffs have met the minimum

429

requirements to satisfy the plausibility standard at this stage in the proceedings. Plaintiffs can provide evidence if necessary to demonstrate how each individual Plaintiff was discriminated against, the wrongful acts committed by the Defendants against them, and the individualized harm and distress that resulted from Defendants' conduct. Furthermore, as an example, Plaintiffs' provided Jimmy Vilvella's individualized experience with discrimination, retaliation, and harassment by the Defendant against him. As such, Plaintiff Villella's supporting affidavit is attached as EXHIBIT 3, as further evidence to demonstrate proof that the Plaintiffs have plausibly alleged specific facts related to each Plaintiff, but they are limited by page limit requirements.

Support also exists around the nation for similar plaintiffs' favorable trial court rulings. *See* SAC footnote 12; *see also George Garvey, et.al. v. The City of New York, et.al.*, Supreme Court State of NY Index # 85163/2022, (reinstating employees fired for non-compliance with COVID mandates and reinstated with full back pay. For another plaintiff's claim based on the near identical facts in a ruling against the employer, see PLAINTIFFS EXHIBIT 2 hereto, the attached Opinion letter in *In Re: Kaycee McCoy v. Rector & Visitors UVA/UVA Health System*, —the Charlottesville Circuit Court, cause no.CL21-44, (which stated that: "Because UVA acted in an arbitrary and capricious manner, this court reverses their decision to fire Plaintiff for failing to be vaccinated from Covid-19. They are hereby enjoined from preventing her employment on the basis of vaccination as long as she continues to qualify for a religious accommodation as properly applied. Plaintiff is awarded damages in the amount of her salary from the date of her wrongful firing to today, plus interest")

Lastly, despite the Defendants assertions this is not a complaint in which each plaintiff was discriminated against because of their religious beliefs in a distinctive way. Instead, the SAC

430

involves a situation in which every Plaintiff was discriminated against because of their religious beliefs in the exact same manner, pursuant to company policy that was applicable to all employees regardless of vaccination status. Thus, the SAC provides enough factual assertions at this stage in individualizing the Plaintiffs claims because the company policies were effective against each Plaintiff individually. Similarly, in *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), the Supreme Court found that it would be actionable under Title VII prohibition of sex discrimination if a male employee was treated in a discriminatory manner because he was attracted to men. *Bostock* at 1741; (the Supreme Court held that "an employer cannot escape liability under Title VII by simply pointing to another basis for discriminating against an employee if the discrimination on this other basis itself relates to the employee's sex.").

Here, while the Defendants are correct that the discrimination Plaintiffs complain about relates to their opposition to being vaccinated, they fail to realize that their opposition in turn also relates to their religious beliefs. Consequently, Defendants should not be allowed to escape liability under Title VII by simply claiming that they discriminated against Plaintiffs on another ground (*i.e.* vaccination status), when this other ground was wholly dependent upon Plaintiffs religious beliefs. The flaws in Defendants' meritless argument can be further highlighted by way of an analogy. Such that, if employees cannot eat pork due to their religion, the Defendants are claiming that they only discriminated against those employees because they did not eat the bacon the company wanted them to eat, ignoring the fact that certain employees could not eat bacon without violating their religious beliefs and other employees who might not be as religious can eat bacon if they choose to do so. Accordingly, the arguments made by Defendants against a hostile work environment cause of action must fail, because the SAC contains sufficient and substantial allegations to pass legal muster under a Rule 12(b)(6) analysis.

E. *Counts III and VIII: Plaintiffs' Constitutional Claims Do Not Fail.*

Plaintiffs have plead valid cognizable Constitutional claims. Plaintiffs' have satisfied the requirements for a valid *Bivens* case claim and/or Section 1983 Cause of Action against Atlas. Plaintiffs have alleged and can prove that Atlas' management has been so enmeshed with the federal government that they are undoubtedly either a federal and/or State Actor. Here, the Defendants incorrectly argue against Atlas being a state actor by failing to disclose the standard used for a private actor to act under color of law. This standard simply required that Atlas and the Biden Administration have a "meeting of the minds' and reach an understanding to deny plaintiffs a constitutional right. *See Wilson v. Warren Cnty.*, 830 F.3d 464 (7th Cir. 2016); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hanania v. Loren – Maltese*, 212 F.3d 353, 356 (7th Cir. 2000) (requiring a showing of "a concerted effort between" a private actor and state actor and that a state actor and private actor "reached an understanding to deprive the plaintiff of her constitutional rights"); *see also Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991) ("A requirement of the joint action charge ... is that both public and private actors share a common, unconstitutional goal.").

Here in this case, when high level employees of Atlas sent emails to employees notifying them of the consequences for not taking the vaccine (among other allegations), Defendants shared in the federal government's unconstitutional goal of forcing vaccinations on their employees, qualifying as acting under color of law. These sorts of circumstances are enough at this pleading stage to plausibly allege a valid constitutional claim against the Defendants. Also, in the case of *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 287 (6th Cir. 2023), the court never said that section § 1983 cannot be utilized in covid cases or against private actors; instead, the Court

432

described the situations in which a state actor can be acting under color of law in Covid cases. *See Ciraci* 62 F.4th at 287. Those circumstances include: "(1) when the private entity performs a traditional, exclusive public function; (2) when the government compels the private entity to take a particular action; (3) when the government acts jointly with the private entity." *Id; See Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1928 (2019).

Additionally, the fact that *Bivens* is sometimes disfavored does not equate to an automatic dismissal, rather the Court actually encourages Plaintiffs to rely on a *Bivens* cause of action. See *Ciraci* 62 F.4th at 287 (the court held to the extent the claimants seek damages directly under the First Amendment against a federal official, they must rely on the kind of implied cause of action created by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). Contrary to Defendants' instant motion, even after one SCOTUS ruling *Bivens* is still an unsettled area of law and Plaintiffs' claims can rightly be allowed as under the 4th Amendment, since tampering with DNA/mRNA can be an invasion of an individual's Constitutional right to be secure in their persons.

In the case *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) at 67 it is stated that, "[o]ur authority to imply a new constitutional tort, not expressly authorized by statute, was exercised in *Bivens*, where we held that a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court." Further, the *Correctional Services* case states how, "Bivens acknowledged that Congress had never provided for a private right of action against federal officers," and that "the Fourth Amendment does not in so many words provide for its enforcement by award of money damages for the consequences of its violation." *Id*. (citing *Bivens* 403 U. S., at 396); *see also J. I. Case Co. v. Borak*, 377 U. S. 426, 433 (1964). However, in *Bivens*, Justice Harlan wrote a concurrence acknowledging how

433

the "*Borak* case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization of a federal cause of action," which led to an "implied damages remedy available under the Fourth Amendment." *Id*. As such, Plaintiffs have every right and reason to pursue their *Bivens* claim, and it cannot rightly be dismissed.

### F. Counts IV and IX: No Valid Intentional-Infliction-of-Emotional-Distress ("IIED") Claim.

Plaintiffs have provided facts that plausibly allege a cause of action for IIED or NIED with supporting instances and examples of physical, mental, and emotional symptoms that have occurred as a result of Defendants' misconduct. As evidenced in EXHIBIT 3, which is just one account reiterating the harm that occurred to most of the Plaintiffs in Plaintiff Villella's sworn affidavit. Again, as mentioned above, evidence can be provided to show all of the manifestations that resulted from the distress, as well as the wrongful conduct exhibited by Defendants (which were later contradicted), which are reasonably outrageous when they put their employees in fear of their life and serious bodily harm. Therefore, at this stage in the pleading Plaintiffs have plausibly established a cause of action for IIED or NIED that would allow the case to proceed forward with trial.

### G. Counts V and X: Plaintiffs Lack Any Actionable Negligence Claim.

Defendants' argument that Plaintiffs cannot plead the necessary elements for their negligence claim is premature at this stage of the proceedings. At this stage, Plaintiffs are only required to plead a plausible claim, not to prove it. "Allegations must nudge claims across the line from conceivable to plausible in order to survive motion to dismiss. *See Bejjani v. Manhattan Sheraton Corp*., 567 F. App'x 60, 62 (2d Cir. 2014). The allegations plead in the SAC are now sufficiently robust to overcome a motion to dismiss. Plaintiffs have alleged that

434

Defendants breached their duty of care by publishing their PHI throughout the company and broadcasting it to other employees and consumers. These allegations are sufficient to survive a motion to dismiss, and the ultimate determination of whether the necessary elements have been established should be made at a later stage of the proceedings. Therefore, the claim for negligence should not be dismissed with prejudice.

## CONCLUSION

Plaintiffs' SAC passes legal muster under a Rule 12 (b)(1)(2) & (6) analysis. The Defendants motion should result in denial and the SAC should not be dismissed with prejudice.

Dated: August 16, 2023.                              Respectfully submitted,

**John Pierce Law P.C.**

By:              _/s/ John Pierce_
John M. Pierce, Esq.
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054
jpierce@johnpiercelaw.com

435

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 16, 2023, this motion was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

*/s/ John M. Pierce*

John M. Pierce

437

# Exhibit 1

DECLARATION OF PLAINTIFF MARK SOUTH
PLAINTIFFS' EXHIBIT 1

l.I, Mark South, hereby declare:

1. I am over the age of eighteen (18) years and am fully competent to make this Declaration. The facts set forth within this Declaration are true and correct to the best of my knowledge. As to information I gathered from my fellow employees, I believe that to be true to the best of my knowledge.

2.I am an informed representative of the Atlas/FSI plaintiffs group and am familiar with each of my co-Plaintiffs' domicile, with what they have represented to be their EEOC claims status, with their claims against Defendants and that Florida is the situs of their injuries caused by defendants complained of herein.

**1. Activities inside Florida of defendants' corporations, and that the injuries to plaintiffs happened principally in Florida;**

Atlas has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists of 30,000 square feet of administrative and instructional space, including the operation of six flight simulation training devices. It "provides a wide range of advanced training solutions, specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000 pilots, flight engineers, flight attendants, and other aviation professionals each year."[1]

Nothing close to that exists in Atlas' holdings anywhere else, not New York, not Delaware. So, Atlas' Carleen Ybarra's declaration par. 3 is patently false.

Besides the multiple flight simulation training devices operated at the Atlas Miami Training Center ("MTC") location cited above, Atlas also heavily contracts simulation devices from Boeing, Pan Am, ATI, SouthCoast Simulation and Paramount Aviation Services: All located close to the MTC in Florida.

Their dependency on the above cited companies' resources is such that a shortage of training devices availability in 2022 delayed initial training for new hires up to 4 months at some point.

Florida is the principal state that all employees have in common with Atlas and FSI since their initial training (which lasts around 4 months) happens there. This contradicts defendants' "work location state" allegation in their MTD exhibit A.

The Atlas Miami Training Center ("MTC") has more pilots and flight attendants in a day than any base or station on the globe. All Atlas pilots and FSI flight attendants are trained at the MTC, including annual or biannual recurrent training. **There is always a massive**

---

[1] *"See,* https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/ (noting that "as pilots get their Atlas career off the ground, their first stop is Miami, home to the Atlas Air's world class Training Center." *(Emphasis added)."*

438

**presence of Atlas pilots, FSI flight attendants, as well as management and other personnel in Miami.**

All ground and simulator instructors work in the MTC. All instructor contractors hired by Atlas teach at the MTC.

**Atlas recently announced during its latest Town Hall Meeting with CEO Michael Steen that a new Training Center was going to he built in FL.**

All the flight attendants who are staffed on Atlas Air are contracted through FSI flights **(All of them are. FSI does not do any business with other airlines.).** FSI was founded by an Atlas contract attorney and his spouse. All its employees receive all their training at the Atlas training facility in Miami. All FSI flight attendants are trained at the MTC, including annual or biannual recurrent training. There is always a significant presence of FSI personnel in Miami.

Atlas and FSI flight training has always, since inception, been in Miami. If Atlas were to cease all operations at the MTC, it would cause a significant and detrimental impact on the operations of Atlas world-wide. Pilots do not spend any significant time at Atlas' Purchase, New York location.

Several very important departments are based in Miami. The Training and Standards department *as* well as the fleet managers are located in the MTC. The Vice President of Operations has an office at the MTC as well.

The Vice President of Ground Operations has his primary office at the MTC because he oversees the following departments that are based at the MTC: Dangerous Goods, Special Loads and Ground Operations Training.

The Miami Training Center is a large and vital center for both Atlas and FSI and without it, both companies would have to halt their operations for lack of properly trained crewmembers in accordance with the Federal Aviation Regulations. If the Miami training center would shut down for a week, Atlas would have drastic delays, cancellations, etc.

Defendants' EXHIBIT A to their MTD has declarant Atlas employee Carleen Ybarra claiming at par. 3. That Atlas is "with its principal place of business in Purchase, New York." Nothing could be further from the truth.

439

## 2. EEOC/State Status:

Out of the 89 plaintiffs:

43 have a Right-to-Sue Letter;

22 are waiting a response from the EEOC investigation;

12 had their EEOC case closed without an interview or without the EEOC issuing a right to sue letter. In the majority of these cases, the EEOC has been unresponsive to emails/calls;

5 have filed with the EEOC but are unable to secure an interview with their regional office;

5 did not file with the EEOC or status unknown (2 took vaccine);

1 Florida Commission on Human Relations ("FHCR") found no unlawful discrimination from Atlas. The FCHR did not issue a RTS letter;

1 under EEOC mediation.

Atlas claims on their Exhibit 1, note 1 that: *"For the following additional 11 individuals, Plaintiffs claimed receiving a Notice of Right to Sue in their prior Opposition Brief, but Defendants have no record of such notice: Larry James Bearce Jr., Dennis Gebhard, Joseph Loschiavo, Blythe Lutz, Rafael Macario, Douglas P. Mayo Jr., Corey Morris, Charles Randall, Joshua Roberts, Elizabeth Stoneking, and James Villella.* " All those 11 plaintiffs have RTS letters.

On page 24 of Defendants' MTD, they state"…38 of the Plaintiffs lack a right-to-sue letter either because they **never filed** a discrimination charge with the EEOC or have filed a charge but that matter is still pending at the EEOC." Defendants emphasized "never filed" to imply that the majority of those 38 didn't, when, in reality, only 5 plaintiffs did not file or status is unknown with the EEOC (out of the 5, two didn't because they took the vaccine under duress and believed they did not qualify to file a complaint).

Out of the 89 plaintiffs, we have 84 that filed with the EEOC and either: Got a right-to-sue letter, are waiting on the EEOC to respond to their complaint, had their case closed and were denied a RTS letter by the EEOC, cannot schedule an interview or went or are going through mediation with the EEOC.

Below is a spreadsheet with every plaintiff's status of their EEOC filing:

| | NAME | EMPLOYER | EEOC STATUS |
|---|---|---|---|
| 1 | Patrick Akerlund | Atlas | **RISISSUED** |
| 2 | Michael Alzati | Atlas | **WAITING ON** EEOC |
| 3 | Eric W Anderson | Atlas | **WAITING ON** EEOC |
| 4 | Michael G. Ballard Jr. | Atlas | **RT51SSUE9** |
| 5 | Larry James Bearce Jr. | Atlas | RIS ISSUED |
| 6 | Robert Bellman | Atlas | RTS ISSUfD |
| 7 | Benjamin Bendiburg | Atlas | WAITING ON EEOC |
| 8 | Gre5ory 6erry | Atla:; | WAITING ON EEOC |

| 9 | Lynette Botha | Atlas | WAITING ON EEOC |
|---|---|---|---|
| 10 | Caleb Buehrer | Atlas. Resigned. | EEOC CLOSED CASE WITHOUT INTERVIEW OR ISSUING RTS |
| 11 | Richard Bullock | Atlas | EEOC DENIED RTS LETTER |
| 12 | Jon Carroll | Atlas | EEOC CLOSED CASE WITHOUT INTERVIEW OR ISSUING RTS |
| 13 | Vergil Caskey | Atlas | EEOC DENIED RTS LETTER |
| 14 | James Castor | Atlas | **RTSISSUED** |
| 15 | Nathan Charboneau | Atlas | WAITING ON EEOC |
| 16 | Shawn Churchel | Atlas | RTS ISSUED |
| 17 | Joel Colon | Atlas | EEOC DENIED RTS LETTER |
| 18 | Mark Connor | Atlas | UNABLE TO SCHEDULE INTERVIEW |
| 19 | Matthew Cronauer | Atlas | WAITING ON EEOC |
| 20 | Fred Cunningham | Atlas. Resigned. | **RTSISSUED** |
| 21 | Royal Danza | Atlas | **RTSISSUED** |
| 22 | Elliot De Sousa | Atlas | **RTSISSUED** |
| 23 | Eric Desandro | Atlas | WAITING ON EEOC/ FL AG office closed case without issuing a RTS letter. |
| 24 | Steve Dixon | Atlas | **WAITING ON** EEOC |
| 25 | James Erickson | Atlas | DID NOT FILE or Status Unknown |
| 26 | Luis Esquivia | Atlas | DID NOT FILE or Status Unknown |
| 27 | Lee Estes | Atlas | **RTS ISSUED** |
| **28** | Robert Fratti | Atlas | EEOC DOES NOT RESPOND |
| 29 | Jason Frisbie | Atlas | DID NOT FILE or Status Unknown |
| 30 | Timothy Frye | Atlas | **RTS ISSU!f.iD** |
| 31 | Tony Gamboa | Atlas | **RTS ISSUED** |
| 32 | Dennis Gebhard | Atlas | **RTS ISSUED** |
| 33 | Reza Ghods | Atlas | **WAITING ON** EEOC |
| 34 | Mark Gilman | Atlas | **RTSISSUE,I!)** |
| 35 | Robert Giudice | Atlas | **WAITING ON** EEOC |
| 36 | Eric Gordon | Atlas | EEOC CLOSED CASE WITHOUT INTERVIEW OR ISSUING RTS |
| 37 | Rexford T. Heivilin | Atlas | **WAITING ON** EEOC |
| 38 | Jason Henning | Atlas | **WAITING ON** EEOC |
| 39 | David Hewson lll | Atlas | WAITING ON EEOC |
| 40 | Todd Hontz | Atlas | UNABLE TO SCHEDULE INTERVIEW |
| 41 | Daniel Hudson | Atlas | RTS ISSUED |
| 42 | Roger Justice | Atlas | RTS ISSUED |
| 43 | Venancius Kassandji | Atlas | UNDER EEOC MEDIATION |
| 44 | John Kearins | Atlas | EEOC DENIED RTS LETTER |
| 45 | Ricky Kinder | Atlas | HOC DENIED RTS LETTER |
| 46 | Beth Kirby | Atlas | DID NOT FILE or Status Unknown |
| 47 | Andreas **N.** Koustas | Atlas | **RTSISSIJ.ED** |
| 48 | Chad Kravetz | Atlas | **RTS ISSUED** |
| 49 | Carl Lindberg | Atlas | EEOC DENIED FILING |
| SO | Joseph Loschiavo | Atlas | **RT$ ISSUED** |
| 51 | Andrew Lutz | Atlas | RTS ISSUED |
| 52 | Blythe Lutz | Atlas | **RTS ISSUED** |
| 53 | Rafael Macario | Atlas | **RTSISSUED** |

441

| 54 | Douglas P. Mayo Jr | Atlas. Resigned. | RTSrssurn |
| 55 | April McQuillen | Atlas | **WAITING ON** EEOC |
| 56 | Christopher McQuillen | Atlas | **RtS ISSI.:IED** |
| 57 | Jeffrey Michonski | Atlas | **RTSISS EO** |
| 58 | Andrew Mickler | Atlas | EEOC DENIED RTS LETTER |
| 59 | Corey Morris | Atlas | **,IHSISSUEO** |
| 60 | Gregory Myers | Atlas | **WAITING ON** EEOC |
| 61 | Peter Napora | Atlas | **RTS** ISStJIH;l' |
| 62 | Joel Pardo | Atlas. Resigned. | UNABLE TO SCHEDULE INTERVI,EW |
| 63 | Lance Phillips | Atlas. Resigned. | **RTSISSU O** |
| 64 | Patrick Phillips | Atlas | **R,TSISSUED** |
| 65 | Glen Pronk | Atlas | **RTSISSI:IED** |
| 66 | Charles Randall | Atlas | ars,ssu.1O |
| 67 | Peter Raymond | Atlas | DID NOT FILE or Status Unknown |
| 68 | Joshua Roberts | Atlas | **,R"fSIS&UED** |
| 69 | Rebecca Robertson | FSI | WAITING ON EEOC |
| 70 | Jason Rogers | Atlas | **RTSISSUED** |
| 71 | Kimberly Schreck | Atlas | **UNABLE TO SCHEDULE INTERVIEW** |
| 72 | William Serritella | Atlas. Resigned. | WAITING ON EEOC |
| 73 | Gentry Shelton | Atlas | WAITING ON EEOC |
| 74 | Todd Snaza | Atlas | **RT$1 SIJ W** |
| 75 | Donald Sorrentino | Atlas | **Rts tSiUEE)** |
| 76 | Mark South | Atlas | FL FHCR foun<il no unlawful discrimination from Atlas. Didn't issue RTS letter. |
| 77 | Michael Stark | Atlas | RTS ISiUJEQ |
| 78 | Elizabeth Stoneking | FSI. Resigned. | **IRTSISS1US III** |
| 79 | Forrest Stowells | Atlas | **RTS.IS I!JEt,** |
| 80 | Barbara Janeice Surber | FSI | **WAITING ON** EEOC |
| 81 | John Swift | Atlas | RTS 15illIE.D |
| 82 | Nick Taylor | Atlas | **RTS1$$UED** |
| 83 | William Thompson | Atlas | WAITING ON EEOC |
| 84 | Brandon Thoroughman | Atlas. Resigned. | **EEOC CLOSED CASE WITHOUT INTERVIEW OR ISSUING RTS** |
| 85 | Geri Tonda | FSI | **WAITING ON EEOC** |
| 86 | Ricardo Torres Abarca | FSI | **,IHS1s.,u,ID** |
| 87 | Gustavo Verdes | Atlas | UNABLE TO SCHEDULE INTERVIEW |
| 88 | James Villella | Atlas | **IHSISSUEID** |
| 89 | Farshad Zarrabian | Atlas | **R'TSISSUSED** |

**3. List: of residences of plaintiffs**

As for work location, even though plaintiffs' "Bases" are all over the country, it is not uncommon for a crewmember that is based, for example, in Los Angeles, CA to start their duties in Cincinnati, OH or even at an overseas location. Due to the dynamic nature of our jobs as pilots/flight attendants, "Work location" doesn't bear much weight since we operate to and out of multiple airports in and outside the country at the beginning and throughout our work days. Moreover, a crewmember could change their base every other month, if so desired.

This is a low shot from the defendants trying to state that FL is not the jurisdiction, when, as a matter of fact, Florida is the only place that plaintiffs and defendants have in common. Initial, upgrade (First Officer being promoted to Captain) and recurrent training all occur in Florida.

The Miami Training Center is a large and vital center for both Atlas and FSI and without it, both companies would have to halt their operations for lack of properly trained crewmembers in accordance with the Federal Aviation Regulations. If the Miami training center would shut down for a week, Atlas would have drastic delays, cancellations, etc.

**27 plaintiffs are FL residents.** Also, the following **9 plaintiff pilots are also ground and/or simulator instructors and work at the Miami Training Center** a significant amount of time during the year:

*Jon Carroll, Mark Connor, Luis Esquivia, Mark Gilman, Andrew Lutz, Rafael Macario, Jason Rogers, Mark South and William Thompson.*

The following 10 plaintiffs are based in FL but do not reside there:

*Lany Bearce Jr., Rexford Heivilin, Andreas Koustas, Joel Pardo\*, Lance Phillips\*, Patrick Phillips, Peter Raymond, Joshua Roberts, Todd Snaza and Gustavo Verdes. (\*No longer work at Atlas)*

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury, under the laws of the United States of America, that the for i d correct.

Executed on 8/14/23

Plaintiff Mark South

443

# Exhibit 2

# COMMONWEALTH OF VIRGINIA



Timothy K. Sanner
P.O. Box 799
Louisa, Virginia 23093
(540) 967-5300
(540) 967-5681 (fax}

Cheryl V. Higgins
501 E. Jefferson St., 3rd Floor
CharlottesvUle, Virginia 22902
(434) 972-4015
(434) 972-4071 (fax)

Dale B. Durrer
135 West Cameron Street
Culpeper, Virginia 22701
{540) 727-3440
(540) 727-7535 (fax)

Claude V. Worrell, ll
315 E. High Street
Charlottesville, Virginia 22902
{434) 970-3760
(434) 970-3038 (fax)

David B. Fran.ren
P.O. Box230
Orange, Virginia 22960
(540) 672-2433
{540) 672-2189 {fax)

David M. Barredo
P.O. Box550
Palmyra, Virginia 22963
(434) 591-1974
(434) 591-1971 (fax)

## Sixteenth Judicial Court

Albemarle   Culpeper   Fluvanna   Goochland
Greene   Louisa   Madison   Orange   Charlottesville

July 27, 2023

Rick Boyer, Esq.
Integrity Law Finn, PLLC
PO Box 10953
Lynchburg, Va. 24506

Bret G. Daniel, Eq.
Ogletree, Deakins, Nash, Smoak & Stewart, PC
Riverfront Plaza-West Tower
901 East Byrd St., Suite 1300
Richmond. Va. 23219

David Browne, Esq.
Spiro & Browne
2400 Old Brick Rd.
Glen Allen, Va. 23060

Patrick **M.** McSweeney, Esq.
3358 John Tree Hill Rd.
Powhatan, Va. 23139

Christopher M. Collins. Esq
9200 Church St., Suite 400
Manassas, Va. 20110

In Re: Kaycee McCoy v. Rector & Visitors UVA/UVA Health System-opinion letter-Charlottesville   Circuit   Court--CL21-44

Dear Counsel:

This matter was before the Court in November 2021 before the Hon. Richard E. Moore, who has since retired. Below is my ruling.

### _Statement o(Facts_

The facts of this case are as follows. Kaycee McCoy, Plaintiff, was a cytotechnologist employed by the University of Virginia Health System ("UVA") from January 2011 to November 2021. In this role, Plaintiff performed highly specialized and complex testing that involved the microscopic screening and evaluation of cytologic specimens for the detection of cancer and other pathologic conditions. As such, Plaintiff was categorized as a "Tier 1" employee and was required to be vaccinated against influenza annually. Plaintiff received this vaccine in 2019 and 2020.

PLAINTIFFS' EXHIBIT 2

445

In August 2021, UVA announced that it would be expanding its existing vaccination policy to include COVID-19 vaccinations and gave Tier 1 employees a deadline of November 1, 2021, to become vaccinated or secure an approved accommodation. It was announced that failure to comply with this policy could result in disciplinary action, up to and including termination of employment.

Accommodations, or exemptions, from the vaccination requirement were allowed for medical or religious reasons. Requests for a religious exemption were required to be submitted as a written statement explaining how the vaccination requirement conflicts with the requestor's sincerely-held religious beliefs. Defendants directed all employees wishing to file an exemption to do so by September 13, 2021. Plaintiff applied for a religious exemption through the university's online "Vax.Trax" system on September 12, 2021. In addition to her written statement that explained her religious objections to the vaccine, she also submitted a letter from the pastor of her church attesting to the sincerity of her beliefs.

Requests for religious accommodations were reviewed by a committee comprised of human resources personnel on an individual basis to determine whether the applicant has established a sincerely held religious belief that would permit an accommodation from the vaccination requirement. On September 30, 2021, Plaintiff received an email from Defendants denying her request for a religious exemption. Plaintiff sent a response email on October 4th asking why her exemption request was denied and offered to submit more supporting information. Defendants never responded to this inquiry and Plaintiff's status in the VaxTrax system was registered as "pending."

On October 14, 2021, Plaintiff received an email from Defendants stating that all decisions of the vaccine religious exemption committee were final and that no appeal process would be allowed. Upon returning from vacation the first week of November, Plaintiff was informed that her religious exemption request has been denied, that she was suspended effective immediately, and that she would be terminated in five days.

Plaintiff brought this action to this Court the following day, November 10, 2021, seeking declaratory judgment and injunctive relief. She also brought an action for a temporary injunction and memorandum of law in support of injnnctive relief. There have been several filings since that date arguing for a continued need for injunctive relief. Plaintiff was fired in due course by Defendant and is now working in a similar field in a part-time capacity.

Since the filing of the original complaint, UVA has removed its across-the-board covid vaccination policy pursuant to Governor Youngkin•s executive order. However, the UVA Health System still requires its employees to be vaccinated as required by federal law for Medicare and Medicaid funding recipients. The federal vaccination policy also allows for a religious exemption with language similar to the prior state mandate.

## *Standard of Review*

When reviewing the actions of a govermnental agency, Virginia courts will uphold the decision of such agency acting within its purview unless that decision is arbitrary and capricious. The Court of Appeals has explained this process as:

> "Where ... the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious. [I]n reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted."

Louq9un Hosp. Ctr. v. Stroube  50 Va. App. 47&, 491 (2007). The Court defined arbitrary and capricious decisions as those that are taken "without a detennining principle." *Id* at 504-05. In summary, the court first looks to whether the agency is acting in its area expertise, and if so, it will leave rationally based decisions by that agency untouched. Hiring and firing decisions are those normally undertaken by human resource departments and would therefore generally be left to the discretion of those departments. However, here, we have essentially a religious test that is being applied to determine sincerity of belief, and that is violative of the separation of church and state doctrine enshrined in both the Virginia and federal constitutions. The realm of religion is outside the expert discretion of any government body, and therefore this court will review the decision to fire Plaintiff and determine its legality, which we will now discuss.

## *Analysis*

The First Amendment of the United States Constitution is the basis for doctrine of separation of church and state. There is a great body of case law outlining the contours of this separation, and Defendants correctly point out that religious rights are not absolute and religious practice can be curbed by neutral laws of general applicability. Defendants are also correct that there is no constitutional right to a vaccine exemption. *See, Jacobson v. Massachusetts,* 197 U.S. 11 (1905) (upholding as constitutional a requirement that all inhabitants of the City of Cambridge be vaccinated against smallpox and allowing for medical exceptions only); *Nikolao v. Lyon,* 875 F.3d 310, 316 (6th Cir. 2017) ("[c]onstitutionally, there is no right to a vaccine exemption"). However, we need not consider the constitutionality of this exemptions because medical and religious exemptions have been written into the requirements for the Covid-19 vaccine.

In the present case Plaintiff met the requirements necessary to show that she had sincerely held religious beliefs that allow her to seek an exception to the vaccine requirement. Further her application was sufficient on its face that it should not have been denied. The UVA policy allowed for religious exemptions and failed to grant one to Plaintiff on arbitrary grounds.

Because UVA acted in an arbitrary and capricious manner, this court reverses their decision to fire Plaintiff for failing to be vaccinated from Covid-19. They are hereby enjoined

447

from preventing her employment on the basis of vaccination as long as she continues to qualify for a religious accommodation as properly applied. Plaintiff is awarded damages in the amount of her salary from the date of her wrongful firing to today, plus interest. I direct Mr. Boyer to prepare an order based on my ruling and circulate to counsel before submitting to the Court for entry.

Very truly yours, .. ,,,-,

**v,./t),.**   .-c.(/

Claude V Worrell, II, Judge

448

449

# Exhibit 3

449

PLAINTIFF JIMMY VILLELLA'S SWORN DECLARATION EXHIBIT 3

I, Jimmy Villella, hear by declare I am over the age of 18 and I am fully competent to make this declaration. The facts set forth within this declaration are true and correct to the best of my knowledge.  I am a born-again Christian and follower of Jesus Christ.  I believe the Bible is the inerrant Word of God, read the Bible literally, unless otherwise indicated, and believe faith in Jesus Christ as our Lord and Savior is the only way to heaven.  A small part of my personal experience dealing with infringements of my religious freedoms and first amendment protections by Atlas Air is accounted for below.

The harassment, discrimination, retaliation,  and intimidation by various  representatives  with Atlas Air began after I submitted my religious exemption request and 2021. My original religious exemption request was not accepted due to the fact that Atlas had a specific form for us to fill out.  After this form was available, I filled it out and had it notarized as requested by Atlas.  I made changes to this original letter, and these changes were never questioned by anyone at Atlas Air.  One of the changes that I made had to deal with screening for COVID-19 in lieu of testing for COVID-19.  I was never contacted about this form being unacceptable.

As opposed to simply stating what my religious objections were to the COVID-19 vaccine and testing procedures I and others were required to fill out a specific form from Atlas Air asking several questions about my religious beliefs. And after time spent in prayer, I was lead through the Holy Spirit to object to any COVID-19 vaccines, in fact, all vaccines and testing procedures past, present, and future due to adherence to my religious beliefs.  Some of these objections were included in my original religious exemption letter.

Shortly after my religious exemption letter was submitted, I received in a reply, stating that the exemption has been excepted however, in order for the exemption to be accepted I had to submit to regular testing for Cova 19, despite my objection to testing in my original exemption letter.

Over the course of several months, I sent several emails to the vaccine portal email address, human resources, Patricia Goodwin, Peter's, vice president of human resources, a chief Kyle Fletcher, and finally to John Dietrich CEO.  All of these emails, approximately seven in total, went unanswered, including the email sent to John Dietrich.  The purpose of these emails were to get in writing that my religious exemption letter was approved for both testing and the vaccination and raised concerns for me due to the testing "mandate" for my religious exemption approval.  At no time was I contacted by atlas and advised that my original religious exemption letter was not acceptable, including being restricted from testing for COVID-19.

I and all other employees received countless emails from human resources and atlas management with ever-changing requirements for our religious exemption approval. Some months there were no issues however, other months we were told that these original religious exemption letters would no longer be applicable.  Atlas went as far as to threaten our jobs security by promising possible, disciplinary action, including termination for failing to follow their COVID-19 policy.

Once we were advised that there was a new testing policy going into affect May 1 of 2022. I started getting more concerned about whether I was going to be permitted to continue flying as a

450

pilot for an Atlas Air. Once we were advised that there was a new testing policy going into affect May 1 of 2022, I started getting more concerned about whether I was going to be permitted to continue flying as a pilot for a Atlas Air. Approximately April of the same year I attempted to get from human resources in writing an email stating that my religious exemption letter for testing was also approved. I received several emails stating that there had never been an exemption for testing in my original religious exemption letter, despite the fact that the testing restriction was originally included and excepted by Atlas Air.

Shortly before May 1 of 2022, I received an email from human resources, stating that if I did not test for COVID-19 that I would be removed from filing status and put on leave and the hearing would be conducted. Shortly after I was informed of this, I advised human resources that I was not going to change abandon or alter, my religious beliefs and comply with their COVID-19 testing mandate. I also advised human resources that their demand for me to change abandon or alter, my religious beliefs, constituted, harassment, and discrimination, due to my adherence to my religious beliefs, I also inform human resources that this very policy for the COVID-19 testing mandate, violated the companies own employee handbook and code of conduct regarding protected classes of people as established by title VII of the civil rights act of 1964 and that my religious liberties were being violated. I advised that I was going to file a harassment and discrimination complaint which I did follow through with. The harassment and discrimination investigation was conducted with Atlas's HR and included virtual meetings. At one point the HR representative involved conducted this investigation in her car, while driving, in her military/guard uniform. This goes to show the lack of sincerity and integrity of the harassment and discrimination investigation. Despite me presenting all of the evidence that I had showing that atlas, his own policy was discriminatory in nature, and providing all of the evidence of Atlas's, asking me or demanding me to change abandon or alter my religious beliefs, in order to comply with their testing human resources concluded that no harassment or discrimination took place against me.

I was removed from flying status May 1 of 2022 and put on paid leave while waiting for an update on what was going to take place with me. Sometime later, I received a phone call from a union representative asking me when a good time to discuss the Article 19 hearing that have been scheduled by Atlas Air management against me. I advised the union representative that I had no knowledge of an article 19 hearing that had been scheduled. During the phone conversation I confirmed that I received an email stating that an article 19 hearing had been started against me. This article 19 hearing stated three different charges against me that were libelous and fictitious and nature. These charges were made maliciously and with the intent to cause permanent harm to myself as an individual and as a professional airline captain. What was especially malicious is the fact that Atlas had in their possession, for approximately seven months, my religious exemption letter that outlined the reasons I could not comply with Atlas is COVID-19 vaccination and testing policy. Atlas air management had full knowledge of my religious restrictions to testing for the COVID-19 virus, yet made up charges against me with the intent to harm me as an airline pilot, as many, if not all major airlines would never hire a pilot, with these types of charges, if I lost this article 19 hearing, and was terminated.

Eventually, my phone conversation with the union representatives, which was conducted on speakerphone with my wife present lead to the union representatives laughing, ridiculing, and

mocking me for my religious beliefs and refusing to test.  I was advised by my union representatives that if I did not test for COVID-19, Atlas was going to terminate me.

As a result of this article 19 hearing, I spent weeks preparing myself for the article 19 hearing.  I collected dozens if not, hundreds of pictures, dozens of pages of notes, and thoroughly investigated the last 7 to 8 months in preparing my defense.  Ultimately, I was successful in defending myself during the article 19 hearing and only after two weeks did a decision come back in my favor.  Shortly after the outcome of the article 19 hearing, I was advised that accommodation would be made due to my Covid-19 testing restriction.  I was advised that I would still not be permitted to fly, and that I would be doing desk work of some nature.  I consulted with the union and advised them what the accommodation was going to be it was told by the union it was my decision.

Eventually, I was told that I was going to be doing COVID-19 entry restrictions for the pilots in the flight attendance at Atlas Air for countries around the world.  When I accepted the accommodation what I did not know is that there were dozens if not, hundreds of pilots that were not complying with the COVID-19 testing policy.  Flight attendants were also not required to test for COVID-19 before their flights unless the country where they were flying had a COVID-19 testing policy to enter the country. Once I found this out, I started inquiring about why I was not being permitted to fly while pilots were continuing to fly without testing for COVID-19 and the flight attendant has a hole we're not required to test for COVID-19 at all.  I never received a satisfactory answer from human resources about why the flight attendants were being permitted to fly without testing for COVID-19 but I was not allowed to fly.

Throughout my accommodation, which lasted for about three months, I have emailed human resources on several occasions, asking to be returned to flying status in light of new evidence that continued to be released about the inefficiency and the end accuracy of the COVID-19 tests and continue to inquire about why flight attendants and pilots were not complying with the COVID-19 testing policy.  These emails were always answered by human resources and never addressed any of the points that I presented. I was told continuously that there was no point in getting involved in a discussion and that I was not going to be allowed to return to flying if I continue to hold my religious beliefs against testing.  I continue to maintain that I was not going to change alter or abandon, my religious beliefs and comply with the COVID-19 testing policy in order to go back to flying.

Approximately three months after my accommodation for the COVID-19 testing policy went into affect, the COVID-19 testing policy ended and I was emailed and advised that I needed to go back to flying but first I had to go to Miami to get current.  I then had to do a week of supervised flying with a check airman, which I was advised was excessive by other check airman.  After this week of supervised flying, I passed my line check and was permitted to return to flying as normal as captain.

During this entire period of time, I dealt with continued harassment and discrimination due to my religious beliefs, and for a brief period period of time I kept a journal about the sleepless nights that I endured, the upset, stomach, difficulty eating, and periods of distress between my wife and I due to the fears of possibly losing my job.  I also outlined how I felt things have been changing

with the attitudes of different managers that I had interactions with during flying the line, which was abnormal compared to my previous interactions with these managers. These specific instances were documented in the journal that I was keeping.

Well, this affidavit is just the tip of the iceberg with harassment and discrimination that I experienced I would like to point out that almost all the evidence that I have collected is in writing from the various contacts that I've had with different employees at Atlas Air. There was never any period of time where any employee expressed genuine concern for my situation, or attempted to allude any understanding of why my religious beliefs are so important to me.

Much of the specifics of what occurred to me have been left out due to brevity, but are documented in writing on almost all counts.

Respectfully submitted,

James Villella
Captain 737
8/16/23

453

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

PATRICK AKERLUND, *et al.*,

        Plaintiff,

    v.

ATLAS AIR, INC., *et al.*,

        Defendants.

Case No. 1:22-cv-23519-KMM-LFL

**DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF INCORPORATED**
**MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**
**<u>PURSUANT TO RULES 12(B)(1), 12(B)(2), AND 12(B)(6)</u>**

## TABLE OF CONTENTS

I.    Plaintiffs Have Not Established Personal Jurisdiction for Their Claims.................................... 1

II.   All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause. ............ 4

III.  The Scattershot SAC Fails to State Any Claim Upon Which Relief Can Be Granted ............... 5

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ........................................................................................................ 9

*Bernal v. Beacon-FL, LLC*,
    2011 WL 1559994 (S.D. Fla. Apr. 25, 2011) ................................................................ 5

*Bostock v. Clayton County, Georgia*,
    140 S. Ct. 1731 (2020) ................................................................................................ 8, 9

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
    582 U.S. 255 (2017) ..................................................................................................... 3, 4

*Capezzuto v. Aruba Bay, Inc.*,
    2014 WL 12580519 (S.D. Fla. Jan. 29, 2014) ............................................................. 5

*Carter v. Cellco P'ship*,
    2016 WL 8981056 (M.D. Fla. Mar. 23, 2016)............................................................. 7

*Ciraci v. J.M. Smucker Co.*,
    62 F.4th 278 (6th Cir. 2023)........................................................................................ 9

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ....................................................................................................... 9

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) .................................................................................................. 1, 2

*Forehand v. Fla. State Hosp. at Chattahoochee*,
    89 F.3d 1562 (11th Cir. 1996)...................................................................................... 6

*Gustave v. SBE ENT Holdings, LLC*,
   2020 WL 5819847 (S.D. Fla. Sept. 30, 2020)................................................................5

*Hartford Steam Boiler Inspection & Ins. Co. v. Brickelhouse Condo. Ass'n*,
   2016 WL 5661636 (S.D. Fla. Sept. 30, 2016)..........................................................6, 10

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ...........................................................................................................2

*Herederos De Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*,
  43 F.4th 1303 (11th Cir. 2022) .................................................................................. 2, 3, 4

*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010) .......................................................................................................... 2

*In re Papst Lincensing GMBH & Co. v. KG Litig.*,
  590 F. Supp. 2d 94 (D.D.C. 2008) ................................................................................ 3

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) .......................................................................................................... 9

*Leake v. Raytheon Techs. Corp.*,
  2023 WL 2242857 (D. Ariz. Feb. 27, 2023) .................................................................. 7

*Mallory v. Norfolk Southern Railway Co.*,
  143 S. Ct. 2028 (2023) ................................................................................................... 1

*Marksman Sec. Corp. v. P.G. Sec., Inc.*,
  2020 WL 12188373 (S.D. Fla. June 25, 2020) ........................................................... 10

*McKally v. Perez*,
  87 F. Supp. 3d 1310 (S.D. Fla. 2015) ........................................................................... 1

*Owens v. Brookwood Med. Ctr. of Tampa, Inc.*,
  1996 WL 376772 (M.D. Fla. Mar. 21, 1996) ............................................................... 5

*Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Milling Co.*,
  243 U.S. 93 (1917) ......................................................................................................... 1

*Savel v. MetroHealth Sys.*,
  2023 WL 4490395 (N.D. Ohio July 12, 2023) ............................................................. 7

*Smalley v. Holder*,
  2010 WL 3719288 (S.D. Fla. Sept. 21, 2010) .............................................................. 6

*Thompson v. Carnival Corp.*,
  174 F. Supp. 3d 1327 (S.D. Fla. 2016) ......................................................................... 4

*Turner v. Costa Crociere S.P.A.*,
  2020 WL 9071486 (S.D. Fla. Aug. 23, 2020) .............................................................. 4

*Vero Water, Inc. v. Shymanski*,
  2018 WL 5098980 (S.D. Fla. Aug. 30, 2018) .............................................................. 5

*Waite v. All Acquisition Corp.*,
    901 F.3d 1307 (11th Cir. 2018).................................................................................... 1

*Walton v. Johnson & Johnson Servs., Inc.*,
    347 F.3d 1272 (11th Cir. 2003).................................................................................... 7

Even accepting Plaintiffs' improper submission of declarations with their Opposition ("Opp." (ECF No. 69)) to amend their Second Amended Complaint ("SAC" (ECF No. 63)), *McKally v. Perez*, 87 F. Supp. 3d 1310, 1317 (S.D. Fla. 2015), they still have not established personal jurisdiction, avoided mandatory arbitration of their claims against FSI, articulated legally viable claims, or plausibly alleged facts supporting their 89 individual claims. Therefore, the Court should grant Defendants' Motion to Dismiss ("Mot." (ECF No. 66)) the SAC with prejudice.

## I.     Plaintiffs Have Not Established Personal Jurisdiction for Their Claims.

***No General Jurisdiction.*** Plaintiffs misapply the general jurisdiction test. *First*, Plaintiffs cannot rely on *Mallory v. Norfolk Southern Railway Co.*, 143 S. Ct. 2028 (2023) (Opp. 8). As Defendants explained (Mot. 5 n.3), *Mallory* applies only where a corporation "has consented" to general jurisdiction in the forum through a business registration statute (like the Pennsylvania law in *Mallory*). 143 S. Ct. at 2039. By contrast, where a corporation "*has not consented* to suit in the forum" through such a statute, *id.*, the Court must apply *Daimler AG v. Bauman*, which requires the corporation to be "essentially at home" in the forum state to establish general jurisdiction. 571 U.S. 117, 127 (2014); *see Mallory*, 143 S. Ct. at 2039. Eleventh Circuit precedent holds that Florida's registration statute does not "amount[] to [a corporation's] consent to general jurisdiction in the Florida courts." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1321–22 (11th Cir. 2018).[1]

*Second*, it is not "useless" (Opp. 7) for the Court to compare Atlas's Florida operations with its worldwide operations to evaluate general jurisdiction. On the contrary, it is necessary. "[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-

---

[1] *Mallory* reaffirmed *Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), which held that a registration statute that required consent to general jurisdiction in the forum was constitutional. Unlike courts that interpreted a state's registration statute as not requiring consent to jurisdiction because "*Pennsylvania Fire* ha[d] been implicitly overruled," *Waite* did not rely on that assumption and remains good law. *Waite*, 901 F.3d at 1322 n.5.

state contacts. General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Daimler*, 571 U.S. at 139 n.20. That is why courts have rejected general jurisdiction over airlines in forums where they have a sizeable in-state presence. *See* Mot. 7. It is irrelevant if Atlas's Florida operations are large in absolute terms; what matters for due process is that they are a fraction of Atlas's overall footprint. *See* Mot. 6–8.

*Third*, Plaintiffs argue that Atlas's principal place of business is not in New York because Atlas trains employees in Miami. Opp. Ex. 1 at 3. But this contradicts Plaintiffs' own Complaint. *See* SAC ¶ 16 (alleging Atlas's principal place of business is in New York). And, as Defendants showed (Mot. 8), Atlas's principal place of business in Purchase, New York, is where it houses its principal executive offices, the majority of its department headquarters, and holds many board meetings. *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010) (principal place of business is where "the corporation's high level officers direct, control, and coordinate the corporation's activities"). Relatedly, no authority supports Plaintiffs' argument that general jurisdiction exists because Plaintiffs "visit the Miami training facility at some point to receive the necessary training to do their job." Opp. 8. Training employees in a state is not sufficiently "exceptional" to confer general jurisdiction there. *Daimler*, 571 U.S. at 139 n.19. In fact, the Supreme Court has rejected general jurisdiction based on "sending [pilot] personnel to [the forum state] for training." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416–19 (1984).[2]

**No Specific Jurisdiction.** "To establish a non-resident defendant's minimum contacts with a forum for specific-jurisdiction purposes . . . the plaintiff's claim must arise out of or relate to one of the defendant's contacts in the forum." *Herederos De Roberto Gomez Cabrera, LLC v. Teck*

---

[2] Plaintiffs continue to (mistakenly) bootstrap FSI to Atlas in a flawed attempt to argue general jurisdiction is appropriate over FSI—a separately owned-and-operated company. Plaintiffs have not set forth any factual allegations or authority to establish FSI is "at home" in Florida.

*Resources Ltd.*, 43 F.4th 1303, 1310 (11th Cir. 2022). That is, there must be "a connection between the forum *and the specific claims at issue*." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 265 (2017) (emphasis added). Plaintiffs' claims do not relate to any alleged wrongdoing by Defendants concerning the Miami training center. Instead, their claims relate to COVID-19 vaccination policies that in no way "arise out of or relate to" training. *Herederos*, 43 F.4th at 1310.

Indeed, the reality is that none of the 89 Plaintiffs identify any Florida contacts by Atlas or FSI that relate to this lawsuit, and the Court can dismiss all of Plaintiffs' claims for lack of personal jurisdiction on that basis alone. Mot. 9–11. But, at a minimum, Plaintiffs who neither live nor work in Florida should be dismissed because there can be no suit-related connections between their claims and Florida. Mot. 10. The parties agree that each of the 5 FSI Plaintiffs (ECF 67 ¶ 13)) and 47 of the Atlas Plaintiffs have *both* their *duty station for work* and *residence outside* of Florida.[3]

Plaintiffs' final three arguments for personal jurisdiction also fail. *First*, Plaintiffs argue that Atlas "consented to litigating in the forum when [it] took part in the litigation involving Plaintiff Mark South in a Florida Administrative Hearing dispute." Opp. 8. But this ignores that "consent to personal jurisdiction in one case does not provide personal jurisdiction in another." *In re Papst Lincensing GMBH & Co. v. KG Litig.*, 590 F. Supp. 2d 94, 100–101 (D.D.C. 2008).[4] *Second*, Plaintiffs claim that the South hearing "already demonstrated that there is no burden

---

[3] Atlas does not dispute any of the facts about residency or work location in the South Declaration. *See* Mot. Ex. A ¶ 13, *and* Opp. Ex. 1 at 7. Plaintiffs argue that certain of these 47 Atlas Plaintiffs without either Florida duty stations or residences should be treated as if they work in Florida because they are "ground and/or simulator instructors" who are "at the Miami Training Center a significant amount of time during the year." Opp. Ex. 1 at 7. *First*, Plaintiffs do not claim anything related to this lawsuit occurred while they were in Florida training, as specific jurisdiction demands. *Second*, even if Plaintiffs are correct that this fact legally matters *and* that working in-state is enough, then the 42 Plaintiffs who undisputedly neither live nor work in Florida must still be dismissed for lack of personal jurisdiction. (These 42 Plaintiffs are those listed in Mot. Ex. A ¶ 13 as having no Florida tie, except Carroll, Connor, Gilman, Rogers and South).

[4] FSI was not a party to the South administrative matter.

litigating in Florida." Opp. 8. But, when minimum contacts are missing, as here, the Court must dismiss for lack of personal jurisdiction without considering burden. *See Herederos*, 43 F.4th at 1311. In any event, the burden of a single-day, single-Plaintiff administrative hearing is a far cry from an 89-Plaintiff mass action in federal court. *Third*, Plaintiffs assert that "Florida is the only place that plaintiffs and defendants have in common." Opp. Ex. 1 at 7. Not so. Personal jurisdiction "does not prevent the [Florida] and out-of-state plaintiffs from joining together in a consolidated action in the States that have general jurisdiction over [Atlas]." *Bristol-Myers*, 582 U.S. at 268.

*No Jurisdictional Discovery.* As this Court has explained, a party must "formally move" for jurisdictional discovery, not "bur[y] such requests in its briefs as a proposed alternative to dismissing [a] defendant on the state of the current record." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1339 (S.D. Fla. 2016) (Moore, J.). Plaintiffs have done just that here, requesting jurisdictional discovery in an opposition brief (after *three rounds* of briefing). But "[e]ven if [Plaintiffs] had properly requested jurisdictional discovery, there exists no genuine dispute on a material jurisdictional fact to warrant jurisdictional discovery." *Id.*; *accord Turner v. Costa Crociere S.P.A.*, 2020 WL 9071486, at *6 (S.D. Fla. Aug. 23, 2020) (Moore, J.). South's Declaration does not create such a dispute of fact (*see* n. 3); it only contests legal conclusions.

## II. All Claims Against FSI Must Be Dismissed Due to a Mandatory Arbitration Clause.

It is undisputed that each FSI Plaintiff "acknowledged and agreed" to a mandatory arbitration clause that covers this dispute. Mot. 14–16, Ex. C at 3; Opp. 10–11. Thus, arbitration should be compelled. Plaintiffs' three arguments (Opp. 10–11) to resist this conclusion fail. *First*, while the FSI Employee Handbook is not a contract of *employment*, the FSI Plaintiffs contractually agreed to arbitrate disputes like this one by electronically signing the FSI Employee Handbook

462

acknowledgment.[5] *Second*, Plaintiffs' argument that it "is not clear that each and every employee specifically understood and agreed to engage exclusively in arbitration" is meritless. *Capezzuto v. Aruba Bay, Inc.*, 2014 WL 12580519, at *3 (S.D. Fla. Jan. 29, 2014) ("Although [plaintiff] claims that he was not made aware of the arbitration policy, it remains undisputed that he received the Employee Handbook containing the arbitration policy and that he agreed to [it] by executing the Receipt and Acceptance of Employee Handbook."). *Third*, Plaintiffs' appeal to public policy, asserting that FSI "held a superior bargaining position" in drafting the agreement, is similarly deficient. "[I]nequality in bargaining power is not a sufficient reason" to deny arbitration. *Bernal v. Beacon-FL, LLC*, 2011 WL 1559994, at *2 (S.D. Fla. Apr. 25, 2011).

## III.     The Scattershot SAC Fails to State Any Claim Upon Which Relief Can Be Granted.

***Shotgun Pleading.*** Plaintiffs claim the SAC is no longer a shotgun pleading because: (1) they revised it; and (2) Defendants have sufficient notice of their claims. Opp. 12–13. Although revised, the SAC continues to utilize general, "class-like" pleading for non-class claims by 89 Plaintiffs—a fundamental problem that cuts across all claims. Plaintiffs chose to bring a collection of individual claims, likely to avoid Rule 23's exacting standards. Having made that election, they cannot now argue that it is "virtually impossible at this pleading stage . . . to demonstrate how each individual was harmed by each Defendant." Opp. 13. That is exactly what Rules 8 and 10 require— *each Plaintiff* to allege facts to support his claims against *each Defendant*. *See* ECF. No. 59.

Defendants also lack adequate notice of Plaintiffs' claims. For example, the SAC does not provide notice of Plaintiffs' Title VII claims—indeed, even Plaintiffs' Opposition asserts that

---

[5] *See Gustave v. SBE ENT Holdings, LLC*, 2020 WL 5819847, at *3 (S.D. Fla. Sept. 30, 2020) (holding "the arbitration language in the [handbook] acknowledgment formed a binding contract"); *Vero Water, Inc. v. Shymanski*, 2018 WL 5098980, at *3–4 (S.D. Fla. Aug. 30, 2018) (granting arbitration based on handbook acknowledgment); *Owens v. Brookwood Med. Ctr. of Tampa, Inc.*, 1996 WL 376772, at *1 (M.D. Fla. Mar. 21, 1996) (same).

Plaintiffs have stated a Title VII claim for harassment "or any other type of Title VII claim." *See* Opp. 14. As such, it remains unclear if Plaintiffs are pursuing hostile-work-environment claims only, or if they are still pressing failure-to-accommodate, or other disparate-treatment claims, despite removing those Counts from the SAC. Likewise, Plaintiffs fail to plead facts providing notice of their emotional-distress claims; instead, they improperly try to supplement the SAC with one Plaintiff's declaration as an "example" of 88 other claims. Opp. 19 & Ex. 3.

***No Invasion-of-Privacy Claims.*** Defendants offered four reasons to dismiss Plaintiffs' invasion-of-privacy claim, (Mot. 20–22), and Plaintiffs ignored them all.[6] The Court need go no further. *See Hartford Steam Boiler Inspection & Ins. Co. v. Brickelhouse Condo. Ass'n*, 2016 WL 5661636, at \*3 (S.D. Fla. Sept. 30, 2016) (unaddressed motion-to-dismiss argument is conceded).

***All Plaintiffs Without Right to Sue Letters Must Have Their Title VII Claims Dismissed.*** *First*, as predicted (Mot. 23), Plaintiffs now admit that only "some" of the 89 Plaintiffs "have obtained right to sue letters." Opp. 13–14. Indeed, they admit that 40 Plaintiffs lack a right to sue letter. *Id.* Ex. 1 at 4. For the Court's convenience, Defendants list each of those 40 Plaintiffs on Exhibit A to this Reply. *Second*, Plaintiffs contend they have exhausted administrative remedies merely by *filing* an EEOC charge. However, "a private sector employee must *receive a right to sue letter* before initiating a Tile VII action in federal district court." *Smalley v. Holder*, 2010 WL 3719288, at \*3 (S.D. Fla. Sept. 21, 2010) (emphasis added); *accord Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996). *Third*, Plaintiffs argue that (i) they do not believe the EEOC will rule in their favor and (ii) it is "beyond the EEOC's jurisdiction" to discuss "EUA or the FDA approach." Opp. 14. But objections to the anticipated outcome of the EEOC proceeding do not absolve them of their exhaustion obligation. Mot. 24–25. And Plaintiffs assert

---

[6] The Opposition section titled invasion of privacy (Opp. 13) actually concerns negligence.

no EUA claim; the exhaustion arguments only apply to their Title VII claims.

**Plaintiffs Fail to State Any Title VII Religious Harassment Claims.** Plaintiffs fail to allege facts showing (1) that each Plaintiff was subject to "severe or pervasive" harassment (2) "based on a protected characteristic." *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279–80 (11th Cir. 2003); Mot. 25–30. In response, Plaintiffs improperly attempt to amend the SAC by submitting a declaration from Plaintiff Villella. Opp. Ex. 3. But even if Villella's declaration plausibly establishes that *he* faced severe or pervasive harassment based on his religion (it does not), that could not carry the federal pleading burden for the other 88 Plaintiffs. Just like a single-plaintiff case, Plaintiffs in this non-class case must provide "well-pled factual allegations of severe or pervasive harassment" for each Plaintiff. *Carter v. Cellco P'ship*, 2016 WL 8981056, at *5 (M.D. Fla. Mar. 23, 2016). After four bites at the apple, they still fail to do so. Plaintiffs try to avoid their pleading failures by arguing "this is not a complaint in which each plaintiff was discriminated against because of their religious beliefs in a distinctive way." Opp. 15. But this argument relies on the unstated and incorrect premise that Defendants' vaccination policy itself constituted severe or pervasive harassment. *See Leake v. Raytheon Techs. Corp.*, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) ("Plaintiffs' allegation that a hostile work environment was created through [masking and testing for unvaccinated employees], is shocking to the Court.").

Moreover, Plaintiffs' Title VII claims must be dismissed for the independent reason that the SAC does not allege any harassment "based on a protected characteristic." *Walton*, 347 F.3d at 1279. Numerous courts have dismissed similar COVID-19 claims for this reason, explaining, "[v]accination status is not a class to which Title VII protections apply." *Savel v. MetroHealth Sys.*, 2023 WL 4490395, at *8 (N.D. Ohio July 12, 2023); Mot. 28–29. The SAC undisputedly concerns conduct "because of" Plaintiffs' vaccine status—not "because of" their religion. *First*,

465

the SAC (¶¶ 12–13) sets out two groups of Plaintiffs—religious objectors who got vaccinated and religious objectors who did not. It then alleges that religious Plaintiffs who got vaccinated "were released from under the discriminatory practices." SAC ¶ 113. This makes clear that vaccination status, not religion, was the cause of the alleged discriminatory practices. *Second*, Plaintiffs concede that Defendants' COVID-19 policies allowed Plaintiffs to "file for religious and/or *medical exemptions*" (*id.* ¶¶ 65, 67, 110(ix)–(xiii) (emphasis added)), and that their "medical exemptions were granted." ECF No. 39 ¶ 187. Thus, Plaintiffs who were unvaccinated for non-religious (*i.e.*, medical) reasons were treated the same as unvaccinated religious employees.

Plaintiffs then stake their Opposition on *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), and a hypothetical about pork. Opp. 16. These arguments fail. *First*, *Bostock* offers no support because its holding relied on the principle that evidence of discrimination exists if the employer would not have taken the same action against someone outside the protected class (there, "sex") who engaged in the same or similar conduct. Specifically, the *Bostock* Court reasoned that an employer who discriminates against a homosexual employee would not take the same action against that employee if everything were held constant except sex—namely, an employer who "will not employ anyone who is homosexual" is penalizing male employees for being attracted to men, but not penalizing female employees who are likewise attracted to men. *See Bostock*, 140 S. Ct. at 1745. Thus, sex is the independent variable causing the employer's adverse action. By contrast, as explained above, the SAC alleges Defendants treated (i) *vaccinated religious* employees the same as *all other vaccinated employees* and (ii) *unvaccinated non-religious* employees (*i.e.*, medically exempt) the same as *unvaccinated religious* employees. Thus, unlike in *Bostock*, holding the protected characteristic constant (here, "religion") reveals no discrimination.

*Second*, Plaintiffs present a hypothetical employer who requires its employees to eat pork,

466

arguing that enforcing that requirement would be religious discrimination because "certain employees could not eat bacon without violating their religious beliefs." Opp. 16. This hypothetical fails for the same reason *Bostock* does not apply. Holding religion constant, the employer is treating all those who do not eat pork the same, regardless of their religion.

*No Constitutional Claims.* Plaintiffs' Opposition does not respond to the most basic problems with their constitutional claims: (i) the Supreme Court has squarely rejected challenges to vaccine mandates, *see Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), and (ii) Plaintiffs have no authority to support their claimed fundamental rights. Mot. 30–31. For these reasons, Plaintiffs' claims are irredeemably flawed and should be dismissed. Nonetheless, Plaintiffs' other arguments also fail. *First*, the cases Plaintiffs cite (Opp. 17) that found state action where a private actor and the government acted together involved a *specific agreement* to deprive *particular individuals* of constitutional rights. For instance, in *Adickes v. S.H. Kress & Co.*, a business owner conspired with police to racially segregate a group of diners. 398 U.S. 144, 158 (1970). By contrast, Plaintiffs allege only that Defendants are federal contractors who agreed with a "goal of achieving universal vaccination" against COVID-19. SAC ¶ 133. In *Ciraci v. J.M. Smucker Co.*, the Sixth Circuit rejected the same overbroad reading of *Adickes* Plaintiffs now urge. 62 F.4th 278, 286 (6th Cir. 2023). *Second*, Plaintiffs are wrong that their *Bivens* claims can proceed. On the contrary, "[t]he Supreme Court has rejected *Bivens* claims against private corporations[.]" *Id.* at 287 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Indeed, *Malesko* affirmed dismissal of a complaint against a private corporation for this very reason. 534 U.S. at 63.

*No IIED or NIED Claims.* Defendants asserted four challenges to Plaintiffs' ability to state a claim for IIED or, alternatively, NIED. Mot. 35–38 (conduct not outrageous; no intent alleged; no severe suffering alleged; and Florida does not recognize NIED under these facts).

467

Plaintiffs ignore two of these, discussing only outrageousness and suffering (and without citing the SAC).[7] As to outrageousness, Plaintiffs assert Defendants' conduct put employees in fear of their life and serious bodily harm. They appear to be referring to the prospect of getting vaccinated and, in any event, even threats of suffering are legally insufficient. Mot. 35–36. As to severe suffering, Plaintiffs respond that they have alleged "instances and examples of physical, mental, and emotional symptoms" resulting from Defendants' conduct, but they have pointed only to the declaration of Plaintiff Villella, which cannot be considered. *Marksman Sec. Corp. v. P.G. Sec., Inc.*, 2020 WL 12188373, at *8 (S.D. Fla. June 25, 2020) (Moore, J.). Nor could it support an IIED claim for Villella[8] or any of the other 88 Plaintiffs, even if it were considered.

*No Negligence Claims.* Plaintiffs' negligence arguments are scattered in two sections of their Opposition. *See* Opp. 13, 19–20. Their core response appears to be that "Plaintiffs have alleged that Defendants breached their duty of care by publishing PHI." *Id.* at 20. But they cannot repackage these intentional allegations into a negligence count and, in any event, the claim fails for the same reasons as their invasion-of-privacy claim. Mot. 38–39. Plaintiffs insist that their negligence claim is neither (i) an intentional invasion-of-privacy claim nor (ii) a negligent invasion-of-privacy claim (Opp. 13), but they never explain what their claim, based on the same factual allegations as those torts, actually is. Given that the negligence count only references disclosure of protected health information and a vague "violation of state and federal laws" (SAC ¶¶ 168–69), that must likewise fail (Mot. 39), Plaintiffs' negligence claims must be dismissed.

## CONCLUSION

Plaintiffs' SAC should be dismissed with prejudice.

---

[7] Plaintiffs concede Defendants' arguments relating to intent and NIED, and their claims should be dismissed on those grounds alone. *Hartford Steam*, 2016 WL 5661636, at *3.

[8] Like the SAC, his declaration addresses legally insufficient workplace harm. Mot. 35–36.

468

Dated: August 23, 2023

Respectfully submitted,

*/s/ Michelle Hogan*
Eliot Pedrosa
Florida Bar No. 182443
epedrosa@jonesday.com
Michelle Hogan
Florida Bar No. 1010992
mhogan@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700
Facsimile:  (305) 714-9799

Jonathan M. Linas (pro hac vice)
jlinas@jonesday.com
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Alexander V. Maugeri (pro hac vice)
amaugeri@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

***Attorneys for Defendant Atlas Air, Inc.***

*/s/ Matthew A. Green*
Matthew A. Green
Florida Bar No. 1019717
matthew.green@csklegal.com
S. Jonathan Vine
Florida Bar No. 10966
jonathan.vine@csklegal.com
COLE SCOTT KISSANE, PA
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone:  (561) 383-9200
Facsimile:  (561) 683-8977

***Attorneys for Flight Services International LLC***

469

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-23519-KMM

ESTATE OF LANE CAVINESS, *et al.*,

      Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

THIS CAUSE came before the Court upon Defendants' Consolidated Motion to Dismiss the Second Amended Complaint. ("Mot." or "Motion") (ECF No. 66). Plaintiffs filed a Response in Opposition to the Motion to Dismiss ("Response") (ECF No. 69). Defendants then filed a Reply in Support of the Motion to Dismiss ("Reply") (ECF No. 70). Plaintiffs' First Amended Complaint was previously dismissed without prejudice as a shotgun pleading. (ECF No. 59). As set forth below, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' Second Amended Complaint WITHOUT PREJUDICE. ("SAC") (ECF No. 63).

**I.     FACTUAL BACKGROUND**

Plaintiffs are pilots, flight attendants, and ground staff who work at Atlas Air, Inc. ("Atlas Air") or Flight Services International, LLC ("FSI"), who either remained unvaccinated due to their religious beliefs or became vaccinated despite their religious beliefs. SAC ¶¶ 12–15. Plaintiffs filed suit against Atlas Air and FSI asserting ten claims arising out of the companies' COVID-19 vaccination policies. *See generally id.* Against each Defendant, Plaintiffs allege the following five causes of action: invasion of privacy through public disclosure of private facts, creation of a hostile work environment, violation of § 1983, infliction of emotional distress, and negligence. *Id.*

470

¶¶ 93–246. Defendants contend that all claims against FSI and claims against Atlas Air from Plaintiffs without ties to Florida should be dismissed for lack of personal jurisdiction, all claims against FSI should be dismissed due to a mandatory arbitration clause, and the SAC fails to state any claim upon which relief can be granted. *See generally* Mot.

## II.   LEGAL STANDARD

### A.  Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to move to dismiss a claim for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When considering a motion to dismiss for lack of personal jurisdiction, a court must accept the facts alleged in the plaintiff's complaint as true, to the extent that they are not contradicted by defendant's affidavits. *See Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988); *Corneal v. CF Hosting, Inc.*, 187 F. Supp. 2d 1372, 1373 (S.D. Fla. 2001); *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). Once the plaintiff pleads sufficient material facts to form a basis for personal jurisdiction, the burden shifts to the defendant to challenge the plaintiff's allegations by affidavits or other pleadings. *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000); *Venetian Salami Co.*, 554 So. 2d at 502. When the nonresident defendant meets this burden, the plaintiff must substantiate the jurisdictional allegations in its complaint by affidavits or other competent proof and may not merely rely upon the factual allegations set forth in the complaint. *See Future Tech. Today, Inc.*, 218 F.3d at 1249; *Venetian Salami Co.*, 554 So. 2d at 502.

The court's determination of whether personal jurisdiction over a nonresident defendant exists requires a two-part analysis. *D.W. Mercer, Inc. v. Valley Fresh Produce, Inc.*, 146 F. Supp. 2d 1274, 1276 (M.D. Fla. 2001). First, the court must consider the jurisdictional question under Florida's long-arm statute. *See id.*; *see also* FLA. STAT. § 48.193.  A defendant can be subjected

to personal jurisdiction under Florida's long-arm statute in two ways: (1) FLA. STAT. § 48.193(1) enumerates various acts that subject a defendant to specific personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida; or (2) FLA. STAT. § 48.193(2) provides that, regardless of whether the claim arises from a defendant's activities in Florida, a Florida court may exercise general personal jurisdiction over a defendant "who is engaged in substantial and not isolated activity within this state." FLA. STAT. § 48.193(1)-(2). If there is a basis for the assertion of personal jurisdiction under the state statute, the court will next determine "whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *D.W. Mercer, Inc.*, 146 F. Supp. 2d at 1276 (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir. 1996)). Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant. *See Robinson*, 74 F.3d at 256.

"The reach of the Florida long-arm statute is a question of Florida law." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1271 (11th Cir. 2002) (cleaned up) ("[F]ederal courts are required to construe [such law] as would the Florida Supreme Court." (alterations in original)). As used in § 48.193(1)(a), "the term 'arising from' is somewhat broader than the concept of proximate cause," thus, "under Florida law there must nevertheless be some 'direct affiliation,' 'nexus,' or 'substantial connection' between the cause of action and the activities within the state." *St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, No. 19-22278-CIV, 2020 WL 956301, at *10 (S.D. Fla. Feb. 27, 2020), *appeal dismissed sub nom. St. Martinus Univ. v. Caribbean Health Holding, LLC*, No. 20-11991-EE, 2020 WL 7018197 (11th Cir. Sept. 28, 2020). Courts strictly construe Florida's long-arm statute in favor of the nonresident defendant.

472

*Stonepeak Partners, LP v. Tall Tower Cap., LLC*, 231 So. 3d 548, 552 (Fla. Dist. Ct. App. 2017). "[U]nder Florida law, a nonresident defendant commits 'a tortious act within [Florida]' when he commits an act outside the state that causes injury within Florida." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008)).

### B. Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.   DISCUSSION

### A. All Claims Against FSI and Most Claims Against Atlas Air Are Dismissed for

473

**Lack of Personal Jurisdiction**

The Court will first address both Defendants' claim that this Court lacks personal jurisdiction because "[a] court without personal jurisdiction is powerless to take further action." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999). As noted earlier, in assessing whether a nonresident defendant is subject to the exercise of personal jurisdiction, federal courts must determine "whether the exercise of jurisdiction (1) comports with the long-arm statute of the forum . . . ; and (2) does not violate the Due Process Clause." *Virgin Health Corp. v. Virgin Enterprises Ltd.*, 393 F. App'x 623, 626 (11th Cir. 2010).

### 1. General Personal Jurisdiction

Under Florida's long-arm statute, general jurisdiction "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) (discussing Florida law). Thus, determining whether general personal jurisdiction is proper is a one-step inquiry which requires courts to determine whether the exercise of jurisdiction over a defendant would exceed constitutional bounds. *Id.*

In *Daimler AG v. Bauman*, the U.S. Supreme Court concluded that the "paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business." 571 U.S. 117, 118 (2014). The Eleventh Circuit has explained that, outside of these paradigmatic circumstances, a corporate defendant will be considered at home in the "exceptional case" where it has operations that are "so substantial and of such a nature as to render the corporation at home in that state." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317 (11th Cir. 2018) (discussing *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 412 (2017)).

Here, Plaintiffs concede that Atlas Air is incorporated in Delaware and its principal place of business is New York. SAC ¶ 16. However, Plaintiffs allege that Atlas Air does "a high

percentage of their business and stage[s] a high percentage of their flights in and around southern Florida and the Miami International Airport" and trains many employees in Miami. *Id.* at ¶ 24. Because Florida is not one of Atlas Air's paradigm forums, the question becomes whether this is an "exceptional case." The Court finds that it is not. While Atlas Air may conduct business in Florida, *Daimler* expressly rejected the availability of general jurisdiction "in every State in which a corporation engages in a substantial, continuous, and systematic course of business." 571 U.S. at 119 (internal quotation marks omitted).

Plaintiffs also rely on *Mallory v. Norfolk Southern Railway Co.* to argue that the instant Action can be tried in Florida even though the events of this case did not take place in Florida. 143 S. Ct. 2028 (2023) (holding that a nonresident defendant's accession to Pennsylvania's business registration statute amounted to consent to personal jurisdiction). The Court is unconvinced. In *Waite*, the Eleventh Circuit explained that Florida law does not establish that a foreign corporation's registration to do business in Florida amounts to consenting to general jurisdiction in Florida courts. *See* 901 F.3d at 1320. Thus, *Mallory* does not apply here.

It is also undisputed that FSI is a Texas limited liability company with its principal place of business in Texas. SAC ¶ 20. For the same reasons articulated above, the Court finds that it does not have general jurisdiction over FSI.

### 2. Specific Personal Jurisdiction

Atlas Air and FSI are subject to specific jurisdiction under Florida's long-arm statute if either company's activities meet any of the enumerated acts listed in FLA. STAT. § 48.193(1).[1] The

---

[1] Florida's long-arm statute states, in relevant part:

(1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself . . . to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts: . . . .

SAC asserts that this Court has specific personal jurisdiction over Atlas Air and FSI because "Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida . . . that caused harm to numerous plaintiffs in the state of Florida." SAC ¶ 23. Atlas Air argues that, with respect to those Plaintiffs who do not work in Florida, the Court lacks specific jurisdiction because Plaintiffs have not explained how their claims arise from Atlas Air's contacts in the forum state. Mot. at 9–11. Similarly, FSI asserts that the SAC contains zero allegations regarding FSI's Florida contacts related to this lawsuit. *Id.* at 13.

"A court may exercise specific jurisdiction over a nonresident defendant only when the plaintiff's cause of action arises from or is directly related to a defendant's contacts with the forum state." *Design-Build Concepts, Inc. v. Jenkins Brick Co.*, No. 06-CV-558, 2008 WL 686150, at *2 (N.D. Fla. March 10, 2008) (citing *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n.3 (11th Cir. 2006)). Thus, specific jurisdiction requires connectivity, or some "direct affiliation, nexus, or substantial connection between the cause of action and the [defendant's] activities within the state." *Sun Trust Bank v. Sun Int'l Hotels, Ltd.*, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001) (internal quotation marks omitted) (quoting *Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*, 635 So. 2d 78, 81 (Fla. Dist. Ct. App. 1994)).

The Court's exercise of personal jurisdiction over a nonresident defendant must also

---

2. Committing a tortious act within this state. . . .

6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

> a. The defendant was engaged in solicitation or service activities within this state; or
>
> b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

FLA. STAT. § 48.193(1).

476

comport with the due process requirements of the United States Constitution. Federal courts in the Eleventh Circuit apply a three-prong due process test in specific personal jurisdiction cases, "which examines (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposely availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a "compelling case" that the exercise of jurisdiction would violate the traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands*, 593 F.3d at 1267).

First, FSI lacks minimum contacts with Florida under the traditional "minimum contacts" test. Under that test, courts "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposely availed himself of the privileges of doing business with the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357 (citing *SEC v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997)). Here, FSI has no direct or personal contacts with Florida. The SAC does not assert that FSI developed any of its COVID-19 policies in Florida or disseminated Plaintiffs' private information within Florida. *See generally* SAC. Nor are any FSI Plaintiffs based in Florida. Plaintiffs allege that FSI employees complete their training in Miami, but make no connection between the training and the alleged harm suffered when the Plaintiffs became vaccinated or remained unvaccinated.

477

Nor does FSI satisfy the "effects" test. Under this test, the exercise of personal jurisdiction in the context of an intentional tort is proper where the tort: "(1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Louis Vuitton*, 736 F.3d at 1356 (alterations incorporated). Here, there is no indication that the conduct underpinning Plaintiffs' invasion of privacy claims against FSI was aimed at Florida. FSI's only connection to Florida is sending its flight attendants to attend training at Atlas Air's Miami facility. None of the FSI Plaintiffs are based in Florida.

For these reasons, the Court finds that it lacks personal jurisdiction over FSI. Accordingly, the Court grants the Motion to Dismiss as to FSI, and all claims against FSI are dismissed without prejudice. Having found that the Court lacks personal jurisdiction over FSI, the Court need not address the arbitration clause and failure to state a claim arguments regarding Counts VI through X. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

With respect to claims from Plaintiffs that do live in Florida or have Florida as their work location, the Court finds that it has specific personal jurisdiction over Atlas Air. Atlas Air purposefully availed itself of the privileges of doing business with Florida by employing staff in Florida and by implementing COVID-19 policies that governed its Florida-based employees. *See Louis Vuitton*, 736 F.3d at 1357. The COVID-19 testing and vaccination requirements implemented by Atlas Air necessarily affected employees at their workplace and their home. Given these contacts, Atlas Air should reasonably anticipate being haled into Florida court for claims arising out of its employment policies by Plaintiffs who live in Florida or have Florida as their work base.

On the other hand, Atlas Air lacks minimum contacts and fails the effects test with respect to the claims from Plaintiffs who do not work or live in Florida. Atlas Air contends that 47 of the

84 Plaintiffs suing it do not live in Florida or have Florida as their work base of operation. *See* Declaration of Carleen A. Ybarra at 4–6 ("Ybarra Decl.") (ECF No. 66-2). These Plaintiffs' sole connection to Florida seems to be that they completed their training in Miami. *See* SAC ¶ 20; Response at 10. But the SAC fails to explain what, if any, illegal conduct by Atlas Air occurred in Florida during any employee's training. Thus, these Plaintiffs' claims do not relate to the forum state.

Plaintiffs request for this Court to conduct an evidentiary hearing so that they may explain how personal jurisdiction is proper "due to issues with numerosity of Plaintiffs" and wanting to "avoid[] exceeding the page limits." Response at 10. There is a vehicle that could have solved Plaintiffs' numerosity issue: the class action. The Court cannot reward Plaintiffs for skirting personal jurisdiction requirements as to each Plaintiff when they could have filed a class action lawsuit. Accordingly, the claims against Atlas Air with respect to Plaintiffs who do not live in Florida or have Florida as their base of operation are dismissed.

**B. The Remaining Counts Against Atlas Air Are Dismissed for Failure to State a Claim**

Of the 84 Plaintiffs suing Atlas Air, 37 have some connection to Florida in that they live in Florida and/or have Florida as their work base location. Ybarra Decl. at 4–6. Nevertheless, the remaining claims against Atlas Air are dismissed for failure to state a claim.

**1. Count I: Invasion of Privacy**

In Count I, Plaintiffs assert a claim for invasion of privacy by public disclosure of private facts. Under Florida law, the elements of the tort of invasion of privacy are: (1) the publication, (2) of private facts, (3) that are offensive, and (4) are not of public concern. *Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 725 (11th Cir. 2011) (citing *Cape Publ'ns, Inc. v. Hitchner*, 549 So.2d

479

1374, 1377 (Fla. 1989)). In this claim, Plaintiffs allege that Atlas Air gave publicity to Plaintiffs' protected private health information ("PHI") by publishing the information throughout the company and by forcing Plaintiffs to wear face masks, "effectively amplifying and broadcasting their PHI" to others. SAC ¶ 95. Defendants argue that Plaintiffs have failed to sufficiently allege each element of the invasion of privacy tort. Mot. at 20–22.

Plaintiffs do not respond to Atlas Air's argument that Atlas Air never published any PHI to the public at large. Nonetheless, the Court agrees with Atlas Air. To constitute publication, "the publicity given to private facts must be to the public at large or to so many persons that the matter must be regarded as substantially certain to become public knowledge." *Regions Bank v. Kaplan*, No. 17-15478, 2021 WL 4852268, at *13 (11th Cir. Oct. 19, 2021) (quoting *Williams v. City of Minneola*, 575 So. 2d 683, 389 (Fla. Dist. Ct. App. 1991). It is unclear how many employees at Atlas Air were given PHI belonging to another employee. Mot. at 20–21. Even so, the Court finds that publication within Atlas Air is not a disclosure to the public at large or a disclosure that is substantially certain to become public knowledge. Nor does the Court find that wearing a face mask would broadcast PHI to others. *See, e.g., Leake v. Raytheon Techs. Corp.*, No. CV-22-00436-TUC-RM, 2023 WL 2242857, at *5 (D. Ariz. Feb. 27, 2023) (finding that "masking requirements for vaccination-exempt employees does not create a 'scarlet letter' effect because the employees could be vaccination-exempt for a multitude of reasons, or the masking employees could be vaccinated but simply want the added facial protection").

Accordingly, the invasion of privacy claim against Atlas Air is dismissed.

### 2. Count II: Hostile Work Environment

To state a Title VII hostile work environment claim, an employee must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Atlas Air contends that this claim should fail because Plaintiffs have not alleged sufficiently severe harassment or that any harassment was based on religion. The Court agrees.

The only allegations regarding actions that Plaintiffs contend constituted harassment involved Atlas Air's face mask and vaccination requirements. Plaintiffs allege that they faced "severe and persistent pressure" to become vaccinated, "disparaging and unfavorable treatment" by coworkers, and "unwelcomed comments about . . . Plaintiffs' religious beliefs." SAC ¶ 110. These allegations are entirely conclusory, do not demonstrate that Atlas Air's COVID-19 policies targeted anyone based on their religion, and cannot withstand a motion to dismiss. The only remotely non-conclusory allegations come from one Plaintiff's experiences described in the SAC and in an affidavit attached to Plaintiffs' Response. James Villella claims that he was subjected to an Article 19 disciplinary hearing after he failed to comply with Atlas Air's COVID-19 testing policy and was removed from flight status as retaliation for his religious beliefs. *Id.* ¶ 80. He also states that union representatives ridiculed and mocked him for his religious beliefs during a phone call. Declaration of James Villella at 2–3 ("Villella Decl.") (ECF No. 69-3). These allegations do not rise to the level of severity and abuse necessary to constitute a hostile work environment, nor is it clear how the behavior of union representatives can be attributed to Atlas Air. Thus, Plaintiffs have failed to state a hostile work environment claim.

### 3. Count III: Section 1983 and *Bivens*

In Count III, Plaintiffs assert constitutional claims against Atlas Air under 42 U.S.C. § 1983 or, in the alternative, under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The claims lack merit under both theories.

481

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege deprivation of constitutional rights and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The Court finds that Plaintiffs have not sufficiently alleged that Atlas Air was acting under color of state law. As the Eleventh Circuit has explained, "[o]nly in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir.1992). Indeed, to hold that private parties like Atlas Air are state actors, this court must conclude that Atlas Air satisfies one of the three tests for establishing state action by what is otherwise a private person or entity: (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]" ("nexus/joint action test"). *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). Plaintiffs merely allege that "Atlas was a government actor" because "it has taken decisive employment actions that have caused Atlas Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action." SAC ¶ 132. This statement is a quintessential conclusory allegation and offers no information with which the Court could use in any of the state actor tests.

*Bivens* also does not apply in this case because the Supreme Court has held that *Bivens* may not be extended "to confer a right of action for damages against private entities acting under color of federal law." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Plaintiffs claim that Atlas Air acted in concert with the federal government "to achieve the Biden Administration's goal of achieving universal vaccination and to acquire said Plaintiffs' personal, genetic

482

information." SAC ¶¶ 132–134. Setting aside the argument that tampering with DNA constitutes an invasion of an individual's Fourth Amendment rights (for which Plaintiffs provide no legal support), Plaintiffs' claim necessarily requests the Court to find Defendants liable for acting under color of federal law, a finding the Supreme Court has clearly rebuked.

Accordingly, the § 1983 and *Bivens* claims against Atlas Air are dismissed.

### 4. Count IV: Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Atlas Air contends that Plaintiffs' claims of intentional infliction of emotional distress should be dismissed for multiple reasons: Atlas Air's alleged behavior does not rise to the requisite level of outrageous and extreme conduct required for an intentional infliction of emotional distress claim, and Plaintiffs have not plausibly alleged intent or severe suffering. *See* Mot. at 36–37. Atlas Air also moves to dismiss Plaintiffs' claims of negligent infliction of emotional distress because Plaintiffs did not suffer any physical impact nor did any family member witness death or serious injury. *See id.* at 37–38. Plaintiffs fail to respond to any of these points in their brief. Thus, these claims are forfeited. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ([T]he onus is upon the parties to formulate arguments.").

Accordingly, the infliction of emotional distress claim against Atlas Air is dismissed.

### 5. Count V: Negligence

In Count V, Plaintiffs assert a negligence claim that is based on the same allegations as Count I. Specifically, Plaintiffs allege that Atlas Air breached its "standard duty of employer to employee of reasonable care" by publishing Plaintiffs' PHI throughout the company and by forcing Plaintiffs to wear face masks. SAC ¶¶ 166–168. The Court concludes that these allegations fail to state a claim for the same reasons as the invasion of privacy claim. Even if Plaintiffs could

483

adequately allege publication, the Court finds that publication within Atlas Air is not a disclosure to the public at large or a disclosure that is substantially certain to become public knowledge. Nor does the Court find that wearing a face mask would broadcast PHI to others. Regardless, it is well settled under Florida law that "there is no such thing as the 'negligent commission of an 'intentional' tort." *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996).

Accordingly, the negligence claim against Atlas Air is dismissed.

**CONCLUSION**

UPON CONSIDERATION of the Second Amended Complaint (ECF No. 63), the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion to Dismiss (ECF No. 66) is GRANTED. The Second Amended Complaint (ECF No. 63) is DISMISSED WITHOUT PREJUDICE. Plaintiffs may amend their Complaint to address the aforementioned deficiencies by October 11, 2023.

DONE AND ORDERED in Chambers at Miami, Florida, this*20th* day of September, 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c:  All counsel of record

484

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G. BALLARD JR., LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, GREGORY BERRY, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR., APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, WILLIAM THOMPSON, __BRANDON THOROUGHMAN, GERI TONDA,__ | Cause No. 1:22-cv-23519-KMM<br><br>Assigned to<br><br>Judge K. Michael Moore<br><br>Magistrate Judge Lauren F. Louis<br><br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

485

**RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**
individuals,

          **Plaintiffs,**

            v.

**ATLAS AIR INC.,** a Delaware corporation,

          **And**

**FLIGHT SERVICES INTERNATIONAL, LLC,**

a Texas limited liability company,

individuals**,**

          **Defendants**

.

# THIRD AMENDED COMPLAINT

## NATURE OF THE CASE

1.     Plaintiffs are pilots, flight attendants and ground staff of Atlas Air, Inc. ("Atlas") and its affiliated company Flight Services International, LLC ("FSI"), whose rights were brazenly violated in connection with Defendants' implementation of mandates, policies and procedures relating to COVID-19 vaccinations.

2.     This is an action for relief to redress Defendants' invasions of privacy, negligence, failure to accommodate, disparate treatment, creation of a hostile work environment, violations of the Genetic Information NonDisclosure Act ("GINA") and intentional and negligent infliction of emotional distress. Such wrongful conduct was predicated on Defendants' unlawful discrimination, harassment, and retaliation against Plaintiffs.

3.     This action also seeks relief to redress Defendants' conduct, as federal government-type actors, redressing violations of Plaintiffs' civil rights that are established through the Bivens case and elsewhere, on the basis that Defendants' conduct was indistinguishable from that of the U.S. Government and that Defendants' vaccine and mask mandates, as applied, violates privacy,

equal protection and due process protections secured by both the Constitution of Florida and the Constitution of the United States.

4. Defendants used deception, discrimination, psychological and economic coercion, psychological manipulation, and physical isolation to force Plaintiffs, under threat of job termination, to participate in a dangerous social and medical experiment.

5. Defendants have made Plaintiffs "second-class citizens"—often on the basis of their religious beliefs—within their respective companies and targeted them in a campaign of harassment designed to force Plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy and to submit to mask wearing which was then known to be useless in inhibiting the spread of COVID-19.

6. Defendants' vaccine mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never wanted to make: take an experimental gene-based therapy at the expense of their religious beliefs and/or health or lose their livelihoods and the means by which they provide for their families.

7. Defendants purported to grant for a time Plaintiffs' religious 'accommodation' but continuously changed their standards and treatment, with an ever-present possibility of termination and immediately proceeded to deny them benefits and equal opportunities and created a hostile work environment by forcing Plaintiffs to wear individually identifiable symbols (facial masks) distinguishing them from their peers and gave public disclosure of their private and protected health information.

8. Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the vaccine without any information on the potential risks or benefits. Several Plaintiffs

(and other Atlas employees) have suffered adverse side-effects and harm as a result of submitting to the vaccine. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

9. This suit is further brought to redress the harms Defendants have dispassionately brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved.

### PARTIES

10. Plaintiffs are divided in the following 4 categories:

11. Atlas plaintiff are divided into the following 3 categories:

12. **Plaintiffs Category 1 – 65 Unvaccinated Atlas Pilot Plaintiffs.** These unvaccinated plaintiffs which are or were employed by Atlas were damaged by Atlas in, including but not limited to, the following manner: These Plaintiffs suffered hostile workplace harassment, invasion of privacy, discrimination and threats, including but not limited to continued threatened denial of religious and/or medical exemption from Atlas' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation are as follows:

> Patrick Akerlund, Michael Alzati, Eric W Anderson, Larry James Bearce Jr., Robert Bellman, Benjamin Bendiburg, Gregory Berry, Lynette Botha, Caleb Buehrer, Richard Bullock, Jon Carroll, Vergil Caskey, James Castor, Nathan Charboneau, Shawn Churchel, Joel Colon, Mark Connor, Matthew Cronauer, Fred Cunningham, Royal Danza, Elliot De Sousa, Eric Desandro, Steve Dixon, James Erickson, Luis Esquivia, Lee Estes, Robert Fratti, Dennis Gebhard, Mark Gilman, Robert Giudice, Eric Gordon, Rexford T. Heivilin,

488

Jason Henning, David Hewson III, Todd Hontz, Daniel Hudson, Roger Justice, Venancius Kassandji, John Kearins, Beth Kirby, Joseph Loschiavo, Andrew Lutz, Blythe Lutz, Rafael Macario, Jeffrey Michonski, Andrew Mickler, Corey Morris, Gregory Myers, Peter Napora, Patrick Phillips, Glen Pronk, Charles Randall, Jason Rogers, William Serritella , Gentry Shelton, Todd Snaza, Donald Sorrentino, Mark South, Michael Stark, Forrest Stowells, John Swift, Nick Taylor, William Thompson, James Villella, Farshad Zarrabian.

13. **Plaintiffs Category 2 – 13 Vaccinated Atlas Pilot Plaintiffs.** These vaccinated plaintiffs are still employed and who were damaged by Atlas in, including but not limited to, the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, including but not limited to threatened denial of religious exemption from Atlas' vaccination and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, who succumbed to Atlas' forcing them to take the vaccination, and also suffered and/or continue to suffer Vaccine Adverse Effects some reported to the VAERS system and some not reported, are as follows:

Michael G. Ballard Jr., Jason Frisbie, Tony Gamboa, Reza Ghods, Ricky Kinder, Andreas N. Koustas, Chad Kravetz, Carl Lindberg, April McQuillen, Christopher McQuillen, Peter Raymond, Joshua Roberts, Gustavo Verdes.

14. **Plaintiffs Category 3 – 6 Atlas ground employees, all 6** ground employee plaintiffs are unvaccinated and are or were employed by Atlas who were damaged by Atlas in, including but not limited to, the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, including but not limited to threatened denial of religious and/or medical exemption from Atlas' vaccination and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under

489

law, are as follows:

Timothy Frye, Douglas P. Mayo Jr., Joel Pardo, Lance Phillips, Kimberly Schreck, Brandon Thoroughman.

15.     **Plaintiffs Category 4 – All 5 FSI plaintiffs. All 5 FSI plaintiffs are unvaccinated** plaintiffs which are or were employed by FSI who were damaged by defendants in, including but not limited to, the following manner: They suffered hostile workplace harassment, invasion of privacy, discrimination and threats, including but not limited to continued threatened denial of religious exemption from defendants' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from defendants for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation are as follows:

Rebecca Robertson, Elizabeth Stoneking, Barbara Janeice Surber, Geri Tonda, Ricardo Torres Abarca

16.     Defendant **Atlas Air, Inc.** ("Atlas") is a Delaware corporation with its principal place of business in Purchase, New York. It is a wholly owned subsidiary of Atlas Air Worldwide Holdings, is a cargo airline, passenger charter airline, and aircraft lessor.[1]

17.     Atlas is a common carrier as defined under federal law.  Atlas has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists

---

[1] A previous EEOC investigation into Polar Air, a subsidiary of Atlas, found that it had discriminated against female pilots by not allowing them to fly into the Middle East. Polar Air was ordered to pay the individual $50,000 and to modify their discrimination/harassment policy.

490

of 30,000 square feet of administrative and Instructional space, including the operation of six flight simulation training devices. It "provides a wide range of advanced training solutions, specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000 pilots, flight engineers, flight attendants, and other aviation professionals each year."[2] The Atlas Miami Training Center ("MTC") has more pilots in a day than any base or station on the globe. All Atlas pilots are trained at the MTC, including annual or biannual recurrent training. There is always a massive presence of Atlas pilots, crew and other personnel in Miami.

18.     Atlas' flight training has always, since inception, been in Miami. If Atlas were to cease all operations at the MTC, it would cause a significant and detrimental impact on the operations of Atlas world-wide. Pilots do *not* spend any significant time at Atlas' Purchase, New York location.

19.     Several very important departments are based in Miami. The Vice President of Ground Operations has his primary office at the MTC because he oversees the following departments that are based at the MTC: Dangerous Goods, Special Loads and Ground Operations Training.

20.     Defendant **Flight Services International, LLC** ("FSI") is a Texas limited liability company with its principal place of business in Houston, Texas. It is a company whose exclusive business is to contract flight attendants to Atlas Air. All the flight attendants who are staffed on Atlas Air flights are contracted through FSI. FSI was founded by an Atlas contract

---

[2] *See*, https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/ (noting that "as pilots get their Atlas career off the ground, their first stop is Miami, home to the Atlas Air's world class Training Center." *(Emphasis added)*.

491

attorney and his spouse. All its employees receive all their training at the Atlas training facility in Miami. All FSI flight attendants are trained at the MTC, including annual or biannual recurrent training. There is always a significant presence of FSI personnel in Miami. FSI contracts its flight attendants to Atlas Air and receives millions in dollars from Atlas Air in return.

## MISNOMER/ ALTER EGO

21.     In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification", "misnomer," and/or such parties are/were "alter egos" of parties named herein.   Alternatively, Plaintiffs contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this case under 28 U.S. Code § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

23.     This Court has personal jurisdiction over defendants because under *International Shoe* and its progeny, they have at least minimum contacts with Florida such that traditional notions of fair play and substantial justice would not be offended by the exercise of jurisdiction. In addition, personal jurisdiction is appropriate under Florida's long-arm statute, 48.193. Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts within the state of Florida as well as acts outside the state of Florida that caused harm to numerous plaintiffs in the state of Florida.

24.     Venue is proper in the U.S. Southern District of Florida because Atlas Air and its affiliates, and leadership do a high percentage of their business and stage a high percentage of their flights in and around southern Florida and the Miami International Airport. In addition, the 30,000 square foot Atlas Training Center, that trains 10,000 people per year, is located in this

492

judicial district as set forth above.

## BACKGROUND

### A. The COVID-19 Pandemic and Vaccine Response

25. The United States government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus" (SARS-COV-2), commonly known as "COVID-19," that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

26. Three (3) separate COVID-19 vaccines have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson. None of the products are vaccines in the traditional meaning of the word. Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the particular condition. These products do not provide individuals with immunity from contracting COVID-19. Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

27. On or about September 11, 2021, the Centers for Disease Control ("CDC") dumbed down its official definition of "vaccination" from the traditional above-described definition "to prevent the disease," to now merely "the act of introducing a vaccine into the body to produce protection from a specific disease." On or around January 18, 2021, Merriam Webster diluted their definition of "vaccine" (after Moderna created their "vaccine") by adding an alternate subparagraph "b." to their definition which describes that the Moderna product codes the body to the produce spike protein which triggers an immune response.

**B. Recent History of Vaccination Mandates & Accompanying Litigation.**

28.     Three realms of employment have been the primary issue in COVID-19 litigation: (i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

29.     First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors. On January, 20, 2021, President Joe Biden signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic."[3]

30.     On September 9, 2021, Biden signed Executive Order 14042 ("EO 14042"),  to "promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."[4]

31.     On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[5]

---

[3] *See,* 86 Fed. Reg. 7,045-48 (Jan. 20, 2021).

[4] *See,* 86 Fed. Reg. 50,985-88 (Sept. 9, 2021).

[5] *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

32.     The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S. The Eleventh Circuit Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[6]

33.     Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, NFIB v. OSHA.[7]

34.     On September 9, 2021, Biden announced "a new plan to require more Americans to be vaccinated." This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[8]

35.     The declared purpose of the mandate was to increase vaccination rates at "businesses all across America," forcing eighty-four (84) million Americans to submit to the medical products.[9] Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII of the Civil Rights Act

---

[6] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[7] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[8] *Id.* at 663.

[9] *Id.* (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

495

of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin.[10] The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.[11]

36.     Third, the U.S. Supreme Court on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare and Medicaid funding to require their employees to be vaccinated.[12] However, the Court held that a facility *must recognize* an individual's religious and medical accommodation/ exemption *requests* pursuant to the rule, and *must comport with* the obligations prescribed by Title VII.[13] *(Emphasis added).*

37.     Governments supporting these "vaccine" mandates rely on, and widely mis-cited *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), claiming the government can force vaccination. However, the government never did force smallpox vaccination on Jacobson. He merely paid a five dollar fine, so Jacobson is a *de minimis* precedent for Defendants.

38.     Like EO's# 13991, 14042 and similar edicts being judicially lifted/reversed, there are multiple recent litigation precedents where agencies have been judicially blocked from enforcing COVID mandates, and reversed, due to them exceeding many constitution guardrails,

---

[10] *See*, Fed. Reg. 61402-551 (Nov. 5, 2021).

[11] *Id.*

[12] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[13] *See,* 86 Fed. Reg. 61571-72.

496

not just those protecting religious freedoms.

39.     Recent cases in state and federal courts have struck down vaccine mandates under a variety of legal theories. In New York City, workers fired over COVID mandates received reinstatement and full back pay after a court found the New York City Health Department had violated the separation of powers doctrine, violated the New York State Constitution's equal protection and procedural due process provisions, and that this mandate was arbitrary and capricious. *See George Garvey, et.al. v. The City of New York, et.al*, Supreme Court State of NY Index # 85163/2022. In *State of Louisiana, et.al. v. Zavier Becerra et.al. Memorandum Ruling*, Case no. 3:21-CV-04370, wherein 24 states sued Biden's Secretary of Health and Human Services to successfully enjoin enforcement of COVID mask and vaccine mandates in federally funded Head Start children's programs, U.S. District Judge Terry A. Doughty found that the defendants have violated of the separation of powers doctrine, and the major questions doctrine, denying Defendants' Motion to Dismiss and/or for Summary Judgment, and instead granting Plaintiffs' Motion for Summary Judgment. In, *Health Freedom Defense Fund v Joseph R. Biden, Jr.,* 599 F. Supp. 3d. 1144 (M.D. Fla. 2022), U.S. District Judge Kathryn Kimball Mizelle lifted the CDC COVID mandates on airlines and on all U.S. public transportation conveyances by air, land or sea comparing such mandates to "detention and quarantine"; then discussing that the mandates were arbitrary, capricious, did nothing to actually prevent spread of disease, and that CDC illegally skirted its agency protocol by forgoing the public comment input before enacting the rules.[14]

40.     A common thread underlines all these cases, namely that a government cannot

---

[14] *Health Freedom Defense Fund v Joseph R. Biden*, Jr., 599 F. Supp. 3d. 1144 (M.D. Fla. 2022).

497

impose a vaccine mandate on citizens without express authorization by the legislature directly related to healthcare. The existence of such particular legal authority is why the Medicaid and Medicare mandate was allowed to stand while other mandates without such express authority were overturned.

41. While portions of this case do not rely on the nonexistence of any constitutional authority for Defendants' actions, they are supported by fact that there was a similar lack of authority for Defendants' actions within Atlas' and FSI's Collective Bargaining Agreements with their employees, including the Plaintiffs. Just as a constitution sets forth the rights and responsibilities of citizens of a jurisdiction, a Collective Bargaining Agreement sets forth the rights and responsibilities of employees subject to that Collective Bargaining Agreement.

### C. Interpretation of Religion under Title VII

42. One of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[15] While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

43. In addressing this Title VII issue, Plaintiffs contend that their "sincerely held religious beliefs" must be accorded protection under Title VII . Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[16] Furthermore, this broad definition has been incorporated by the U.S. Equal Employment

---

[15] *See*, 42 U.S.C. § 2000e et seq.

[16] *See*, 42 U.S.C. § 2000(j).

Opportunity Commission ("EEOC") in promulgation of regulations pertaining to religious discrimination.

44.     Plaintiffs' sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

45.     Indeed, Plaintiffs contend that the term "religion", as it appears in Title VII, must be interpreted with equal breadth as the term "sex" has been interpreted.  Federal court precedents have interpreted the term "sex" to apply broadly to any discrimination that involves gender, including protections for pregnancy status, sexual orientation, and for transgender individuals. As such, the term "religion" must be interpreted equally broadly.

**D.  Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law**

46.     Plaintiffs possess sincerely held religious beliefs that their Creator planned their existence upon their creation, which included the creation and design of their unique genetic code, both DNA and RNA.  Plaintiffs' conscience prohibits them from being inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

47.     The "vaccines" in question are mRNA vaccines, which hijack a person's cells in the vicinity of an injection site in order to cause these cells to start making the same protein that is found in the COVID-19 virus.

48.     This type of "vaccine" differs significantly from standard vaccines, which do not hijack the human bodies own cells, but instead contain live or dead viruses.

49.     Plaintiffs' sincerely held religious beliefs are commonly shared by millions of people around the world.

499

50.      Plaintiffs' religious beliefs are not based upon social, political, economic, or personal philosophies.

51.      Plaintiffs' religious beliefs based on the teachings of globally accepted religions that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

52.      Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

## GENERAL ALLEGATIONS

### A. The COVID-19 Pandemic and Response

53.      By mid-March 2020, even though the untreated mortality rate was below one half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

54.      The three "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to Emergency Use Authorizations (EUA)'s.

55.      Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, available curative and prophylactic alternatives, and of the extent to which such benefits and risks are unknown.[17] "Consent" establishes that all persons must have the option to refuse administration of the product.

---

[17] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(II).

500

Punishments or consequences for refusing medical products are strictly prohibited based on the express wording and intent of the law.[18]

56. As such the FDA's grant of an EUA is still subject to informed consent requirements in order to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product."[19]

57. Plaintiffs are not unique or abhorrent; millions of Americans have also refused to take these experimental medical products for numerous reasons, including for religious reasons.

58. COVID-19 vaccines are Virus-Based Gene Therapies ("VBGT") according to the FDA's own definition.[20] Thus, these medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's own genetic information.

59. These genetic alterations are prohibited by Plaintiffs sincerely held religious beliefs and objections to these alterations. Further, these VBGT's were developed using stem cells harvested from human embryos. Plaintiffs have a conscientious duty to refuse participation in activities repugnant to human life and dignity.

60. The FDA approved the Pfizer Comirnaty vaccine on August 23, 2021, and on September 9, 2021, Biden signed EO 14042. Thus, Defendant Atlas sent an electronic communication to all Atlas employees and announced all Plaintiffs would be required to be "fully vaccinated" with a COVID-19 VBGT pursuant to EO 14042 by December 8, 2021.

---

[18] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III).

[19] *Id.*

[20] *See*, https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy

**B. Atlas' Vaccine Mandate Due to Government Orders**

61.    In October 2021, Atlas originally stated:

> As a Company, we support the views of health experts that [the
>
> VBGT] reduce the impact and spread of COVID-19. That said,
>
> we have been consistent in our position that [a VBGT] is a
>
> personal choice and we were not planning to mandate
>
> [VBGT's] for our employees. However, we are now required
>
> to comply with [EO 14042].[21]

62.    Yet, Defendant's' palpably disingenuous concerns about safety overwhelmingly support Plaintiffs' decisions to *not* be injected with a COVID-19 VBGT.

63.    Plaintiffs' reluctance to take the VBGT was supported by Defendants' own actions, since Defendants: (i) did not mandate any passenger flying on its aircraft or interacting with its staff to be vaccinated; (ii) did not mandate VBGT's for employees from other countries, (even though many Plaintiffs worked on the same aircraft and had contact with them); and (iii) did not mandate VBGT's for pilots from other airlines allowed to ride in the "jump seat" of any Atlas aircraft.

64.    On October 5, 2021, Atlas and FSI sent electronic communication to all plaintiffs informing that they would have to comply with the government mandates and all employees would have to be vaccinated. Only a week later, on October 11, Atlas and FSI emailed all plaintiffs with instructions on how to apply for a medical and/or religious exemptions.

---

[21] After the Biden Administration's mandate was enjoined by various federal courts, Atlas immediately reverted to a company-directed mandate.

65.     On the same electronic communication above, Atlas and FSI informed all plaintiffs that they must digitally report their vaccination status and that they must file for religious and/or medical exemptions to avoid VBGT inoculation. Pilots and flight attendants were falsely told that the information would be protected. Atlas pilots' and FSI flight attendants´ private vaccination status was disseminated to other employees under the supposed need to circulate the information about which crewmembers (vaccinated or unvaccinated) would qualify for certain flights involving company imposed COVID-19 restrictions. For no valid medical reason, **Category 1 unvaccinated Atlas pilots** and **Category 4 FSI flight attendants** received less flight opportunities than vaccinated ones from Atlas and FSI, respectively.

66.     Defendants set October 22, 2021, as the deadline "for [Plaintiffs] to request an exemption due to medical or religious reasons." No due date for a response was given by Defendants.

67.     Then, Defendants directed that November 25, 2021 was the deadline for Plaintiffs who did not apply for a religious or medical exemption to "report [their VBGT] status to the Company."

### C.  FSI's Vaccine Mandate

68.     FSI, whose sole business and source of revenue is through Atlas contracts, quickly followed suit and in early September 2021, FSI President Joni French sent an e-mail to Plaintiffs that made brazenly explicit the disparate treatment and hostility toward Plaintiffs. She wrote:

> The health and safety of all our Cabin Crewmembers remains a
>
> top priority for FSI. To support your well-being, as well as that
>
> of your work colleagues, we encourage everyone to pursue the

503

[VBGT]. Cabin Crewmembers who have proof of [VBGT] will

increasingly be able to operate with more flexibility under less

restrictive quarantine rules.

We are pleased to let you know that we will now provide 5

hours of additional compensation to every FSI Flight Attendant

who receives [a VBGT] and submits a copy of their

vaccination card.[22]

69.     Plaintiffs' lives were effectively placed on hold after October 2021 due to Defendants' continuous threats of unpaid leave and termination.

**D.  Atlas' Government-Directed Mandate Turns Into A Company-Directed Mandate**

70.     Plaintiffs applied for religious accommodation from the vaccine mandate prior to October 22, 2021.

71.     On January 13, 2022, The Supreme Court of the United States blocked the OSHA mandate requiring businesses with over 100 employees to impose vaccine and testing requirements.

72.     On or about January 25, 2022, in light of the Supreme Court's ruling, OSHA announced it was withdrawing its vaccine and testing requirements that were at issue. However,

---

[22] It is important to note that the term "vaccination" does not refer to a single event or transaction in this paragraph. Every new requirement by Atlas to take a booster to maintain "vaccination" status constitutes a new occurrence or transaction for the purposes of accommodation analysis under Title VII. Each transaction or occurrence rests upon a different set of operative facts.

Biden called upon businesses to voluntarily impose the mandates themselves.[23]

73. Despite their previous statements that they believed in personal choice when it came to the VBGT mandate issues and were only reluctantly abiding by federal law, the Defendants nevertheless immediately complied with the new direction issued by the Biden Administration and announced, through electronic communications to Plaintiffs, that they would do as the President "suggested" that business that rely on federal contracts for business do.

74. On January 25, 2022, Atlas sent out a communication stating:

> Earlier today, you received notice that all U.S. employees who must travel as an essential function of their position must be fully vaccinated by May 1, 2022. *This policy applies to you.* We recognize that you previously sought an accommodation from the COVID-19 [VBGT] mandates the company previously implemented to comply with [EO 14042] (applicable to federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees). (Emphasis added).

75. In that same communication, Atlas indicated that Plaintiffs would not be allowed to submit new medical or religious accommodation requests, but that the current exemptions would be reprocessed.

> Given your requests for accommodation from the Company's

---

[23] *See* https://khn.org/morning-breakout/biden-disappointed-by-courts-decision-urgesemployers-to-require-covid-shot/

505

previous COVID-19 vaccination mandates, the Company is assuming you are seeking a request for accommodation from the vaccine policy that will take effect May 1, unless you respond to this email and indicate otherwise by Friday, January 28, 2022. If you do not respond by January 28, the Company will process your new request for accommodation based on the information already in its possession and follow-up with you thereafter to identify any reasonable accommodations the Company can offer without undue hardship.

76.     On March 8, 2022, Atlas Plaintiffs pilots Categories 1 & 2 who worked for Atlas, received a communication from upper management stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence or reassignment regardless of the fact they had previously requested an accommodation. On March 25, 2022, Atlas walked back their statement and decided to allow unvaccinated pilots to continue working past May 1st as long as they submitted to monthly testing and masking. Atlas Plaintiffs who were unvaccinated were left in a continued state of legal, emotional and career limbo.

77.     Atlas Plaintiffs were left with the impossible choice of taking COVID-19 VBGT at the expense of their deeply held religious beliefs or be terminated. **Plaintiff Category 2** succumbed to the pressure and took the VBGT. After the implementation of the VBGT mandate, all unvaccinated Plaintiffs were subjected to repeated harassment and disparate treatment within the company for their deeply held religious beliefs.

78.     Defendants required unvaccinated Plaintiffs to wear the proven useless COVID-19 face masks which unlawfully required them to advertise their medical status and their objection to

506

the VBGT, and unlawfully required them to distinguished themselves from their peer groups by and amplifying their personal protected health information to their peers and to the public.

79. Theoretically, a "vaccinated" employee should have immunity to the disease and therefore bare no risk from the medical choices of another. However, Atlas CEO John Dietrich continued to discriminate against Plaintiffs by disseminating recorded video and oral statements that employees were unsafe around Plaintiffs whose religious or medical circumstances barred inoculation.

80. Plaintiff James Villella was damaged in the following manner: Plaintiff is a Boeing 737 Atlas pilot Captain that only flies domestic routes and requested a religious exemption to both vaccinating and testing but was issued the same blanket exemption that required him to be tested. After trying for 7 months to clarity his situation, Atlas attempted to get Plaintiff to change, alter, or abandon his religious beliefs and to submit to their COVID-19 testing policy. Villella was unjustly subjected to an "Article 19" disciplinary hearing in a blatant act of retaliation, harassment and discrimination. After having to defend himself of accusations of blatantly disregard for the company vaccination policy, and other libelous accusations, Plaintiff was removed from flight status and put on a desk job for approximately 3 months under

507

threat of being terminated for refusing to test due to his sincerely held religious beliefs. [24]

81.     For Plaintiffs whose religious exemptions were granted, Defendants continuously harassed Plaintiffs to disregard their conscience and/or health and submit to vaccination. This includes but is not limited to those plaintiffs listed above in Plaintiffs Categories 1, 3 & 4. Atlas and FSI disseminated the VBGT status of every Plaintiff in emails that were published showing the last name, employee number, and VBGT status of Plaintiffs, and gave public disclosure of protected health information. In addition to that, Atlas discriminated against unvaccinated Plaintiffs in **Plaintiffs Category 1** listed above and denied them bids for higher paying flights to certain destinations despite such destinations having no laws or restrictions against unvaccinated Plaintiffs.

---

[24] Atlas' claim that they could not accommodate Villella's accommodation request due to undue hardship was totally meritless. Contrary to Atlas' assertions, Villella operates on domestic flights, and thus no hotel restrictions or other restrictions that apply to international operations are applicable to him. Villella's accommodation request was to continue operating and following the same process (screening for COVID-19, as the CDC stated was appropriate for people without symptoms for COVID-19) all Atlas Air employees had been following for the entire COVID-19 pandemic up to May 1st, 2022, when the new Atlas testing "policy" took place. Since Atlas only had to accommodate this single individual, no undue hardship existed as Atlas claims since only one employee requested this accommodation *seven months* prior to the testing policy being implemented, and *two months* prior to the first communication received by Atlas about a mandatory COVID-19 testing policy.

### E.  FSI Changes Religious Accommodations For All Flight Attendants

82.     On March 8, 2022, Plaintiffs who worked for FSI, received a communication from FSI President Joni French stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence regardless of the fact they had previously requested an accommodation.  Twenty-three days later, on March 31, 2022, FSI informs Atlas it would no longer require Flight Attendants to be vaccinated or virus tested and that they can continue working after May 1st. Atlas' testing requirement would become effective May 1, while FSI's ended on that date.

### F. Atlas Changes Religious Accommodations For All Pilots And Ground Employees

83.     On March 25, 2022, Atlas attempted to mollify Plaintiffs by purporting to assure them that – despite maintaining a private company-wide VBGT mandate – those who had previously obtained a religious exemption pursuant to EO 14042 would be allowed to return to their regular work duties after the May 1, 2022 company vaccine mandate deadline "so long as they undergo requisite COVID-19 testing at their expense." Atlas´ testing requirement would become effective May 1, 2022 while FSI´s ended on that date.

84.     Atlas ordered its unvaccinated employees, even after they had established natural immunity from the disease, to test weekly (ground employees) or monthly (pilots and flight attendants) for COVID-19 unlike employees without religious beliefs who were deemed "vaccinated" by the Defendants.

85.     On April 21, 2022 Atlas sent Plaintiffs an updated Atlas COVID-19 Vaccination & Testing Policy now mandating that all COVID-19 **testing be videotaped** and retained by plaintiffs so that the videos could be sent to the company if requested.

509

### G. Defendants' Failure to Accommodate, Disparate Treatment and Creation of A Hostile Work Environment In Violation Of Title VII

86.     Defendants' actions against Plaintiffs have violated Title VII's prohibition against the denial of equal opportunity and discrimination and perpetuated a hostile work environment.

87.     Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance.  Specifically, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, *religion*, sex, or national origin…[25] *(Emphasis added).*

88.     Regardless of whether the VBGT mandate was held Constitutional (for healthcare workers regulated by a specific statutory scheme), employers are still bound to fulfill their obligations to employees pursuant to Title VII. These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing or retaliatory conduct.

89.     As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination, but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work

---

[25]  *See,* 42 U.S.C. § 2000e-2.

environment or harassment.

90. Given the foregoing disparate treatment set forth in the facts herein, Defendants' conduct had a disparaging impact on Plaintiffs.

91. Defendants' conduct satisfies the elements for claims of religious discrimination due to disparate treatment, failure to provide accommodations, harassment, and the creation of a hostile work environment.

H. **U.S. Equal Employment Opportunity Commission's ("EEOC") Failure To Mitigate Injury And Plaintiffs Ongoing Irreparable Harm**

92. All Plaintiffs have satisfied the requirement for exhaustion of administrative remedies.

## CAUSES OF ACTION 1-5 AGAINST ATLAS

## ---- COUNT I ----

## Invasion of Privacy - Public Disclosure of Private Facts

93. **Count I pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14 above.**

94. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-67, and 70-81 from above as though fully set forth herein.

95. Atlas gave publicity to Atlas Plaintiffs protected private health information ("PHI") by publishing the PHI throughout the company and by forcing Atlas Plaintiffs to wear political symbols, including functionally useless face masks, effectively amplifying and broadcasting their PHI to other employees and consumers.

96. The publication of Atlas Plaintiffs' PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

511

97.     As a proximate result of Atlas' public disclosure of Atlas Plaintiffs' PHI, said Plaintiffs have suffered injury. Atlas is liable to said Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

---- COUNT II ----

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***

**Defendants' Creation of a Hostile Work Environment**

98.     **Count II pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

99.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-67, 70-81, 83-85, and 86-91 from above as though fully set forth herein.

100.     Atlas engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

101.     Atlas Plaintiffs suffered discrimination and disparate treatment at the hands of Atlas based on said Plaintiffs' protected religious and other protected characteristics and classifications.

102.     Atlas' conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

103.     Atlas' conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of Atlas and Atlas Plaintiffs.

512

104. Plaintiffs were qualified to perform their duties as demanded by their employment.

105. In good-faith, Atlas Plaintiffs undertook all requisite and applicable procedures to inform Atlas of the harassment and toxicity that was pervasive around the workplace.

106. Atlas' actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

107. Atlas Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

108. Atlas Plaintiffs are members of several protected classifications.

109. Unvaccinated Category 1 & 3 Atlas Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines. Atlas' repeated attempts to coerce said Plaintiffs to go against their religious beliefs was unwelcomed harassment.

110. Additionally, after refusal to submit to unwelcomed and offensive actions against the Atlas Plaintiffs religious beliefs, Atlas subjected unvaccinated Atlas Plaintiffs Categories 1 & 3 to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on such Plaintiffs' sincerely held religious beliefs as a protected class under Title VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

  (i)  Atlas' creation of inflexible policies that directly target Atlas Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-

513

claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii)     Severe and persistent pressure to take VBGT's;

(iii)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Atlas against unvaccinated Atlas Categories 1 & 3 Plaintiffs, as compared to similarly situated Atlas Category 2 employees who folded and allowed themselves to be inoculated with one or more of the three VBGT's

(iv)     Unwelcomed comments about Categories 1 & 3 Plaintiffs' religious beliefs;

(v)      By committing the actions complained here, Atlas did openly violate the Collective Bargaining Agreement (CBA) between Teamsters and Atlas, which actions intentionally contributed to the toxic hostile workplace environment. The CBA at Article 1.a.4 (prior clause in effect at all times pertinent herein) and current version Article 26 R.1 both of which reiterate the Title VII prohibitions against discrimination based upon sex, religion, age.  Atlas also violated Article 26 R.1 which assures that employee-crew members will not be required to take any action which may result in any risk of harm, whereas said crew members assert that the required vaccination and masks posed such risk of harm.

(vi)     Atlas' intentional dissemination of Atlas Plaintiffs' PHI and vaccination status to customers, to Atlas employees, agents, and supervisors by forcing said Plaintiffs to wear facial masks which don't work and thus serve no other purpose than identifying "dissident" employees with the masks as political symbols, thus differentiating the masked dissidents from other subdued Category 2 employees who received VBGT's;

514

(vii)  Abuse of power by Atlas, who compelled managers and supervisors to make unreasonable demands of Atlas Plaintiffs during the course of their job responsibilities;

(viii)  Psychological harassment by blatant rejection of Atlas Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate Atlas Categories 1 & 3 Plaintiffs.

(ix)  Retaliatory conduct in response to Categories 1 & 3 Plaintiffs' filing declination of vaccination forms and filing religious and/or medical accommodation forms;

(x)  Seeking to replace Atlas Category 1 & 3 Plaintiffs' employment positions with individuals who did not seek religious and/or medical accommodation(s).

(xi)  Atlas Defendants disproportionately higher compensated employees who did not seek religious accommodation, especially rewarding those vaccinated Category 2 Atlas employees with less restrictions, more flexibility in scheduling and greater opportunities all around.

(xii)  Atlas' intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii)  Failing to participate in a meaningful manner or otherwise engage with Atlas Plaintiffs regarding their religious and/or medical accommodation.

111.  Atlas Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by Defendants.

112.  Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which Atlas engaged in such

515

discriminatory conduct against Atlas Categories 1 & 3 Plaintiffs.

113. Atlas' egregious above-described conduct toward Atlas Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment. Atlas Category 2 Plaintiffs buckled to the pressure and were released from under the discriminatory practices; Categories 1 & 3 Plaintiffs resisted and stood firm enduring the hardships deftly manufactured by Atlas.

114. Atlas is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

115. Atlas is directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

116. Accordingly, Atlas had actual knowledge of the above-described actions of its individual managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by the corporate Atlas entity itself.

117. Over the course of their employment, Atlas Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Atlas' conduct toward the (unfavored) unvaccinated Categories 1 & 3 Plaintiffs and their disparate treatment singling them out from the (favored) vaccinated Category 2 Plaintiffs.

118. Atlas, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

119. Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

516

120. The systematic discrimination, as previously set forth, further adversely affected the Atlas Plaintiffs through Atlas' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of the hated class of "Anti-Vaxxers."

121. Atlas failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

122. This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

123. Atlas' policies are only targeted at Atlas Plaintiffs Categories 1 & 3 and like-situated persons with conscientious objections to VBGT's.

124. Atlas' egregious discriminatory conduct, given the totality of circumstances, raises to a level at which an objectively reasonable person could find constitutes a hostile work environment.

125. The actions of Atlas, as set out herein, violate Title VII.

126. As a result of Atlas's conduct, the Atlas Categories 1 & 3 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss. The Category 2 vaccinated Atlas Plaintiffs suffer as well with physical disabilities due to adverse vaccine events, grounding at least one pilot from all flying.

127. Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the

517

said Plaintiffs.

128. Filing complaints or charges with the EEOC was futile for Plaintiffs, however, all of them have satisfied the requirement for exhaustion of administrative remedies.

---- COUNT III ----

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

129. **Count III pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

130. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, and 83-85 from above as though fully set forth herein.

131. Atlas Plaintiffs are citizens of the United States.

132. At all times relevant hereto, Atlas was a government actor and a person acting under the color of law. That is, Atlas has taken decisive employment actions that have caused Atlas Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling Atlas' actions whether through incentive or threat.

133. Atlas is also acting under color of law as it has conspired with Government officials to leverage Atlas Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire said Plaintiffs' personal, genetic information.

134. Atlas and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Atlas Plaintiffs' Constitutional rights. Through private and public

518

meetings, executive orders, and unlawful coercion and duress, Atlas has acted in concert with the federal government at the expense of their employees including Atlas Plaintiffs.

135. First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

136. Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

137. Applied here, Atlas Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by Atlas by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

138. This privacy right also includes Atlas Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, Atlas violated Atlas Plaintiffs' privacy rights when they broadcast their private information in memos, and published Plaintiffs PHI by forcing them to wear symbols, especially viciously targeting Atlas unvaccinated Plaintiffs Categories 1 & 3.

139. Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the

519

privileges or immunities of citizens of the United States; nor shall

any state deprive any person of life, liberty, or property, without

due process of law, nor deny to any person within its jurisdiction

the equal protection of the laws."

140. After the announcement of EO 14042, vaccinated employees received preferential treatment compared to Atlas Plaintiffs who had not been vaccinated, which included increase in pay, preferential scheduling, additional benefits and privileges.

141. Atlas knowingly and willfully discriminated against Atlas Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

142. Atlas, by allowing similarly situated Atlas Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

143. While the vaccine mandate appeared neutral on its face, in practice it denies Atlas Plaintiffs equal protection under the law.

144. Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by Atlas' conduct.

145. Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

146. Atlas Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

147. The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes Defendants as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

148. Here, Atlas' actions are those of a federal government-type Actor (parallel to the State actor definition in Title 42 USC 1983 but specifically applied to the federal government within the holding in Bivens vs. Six Unknown Named Agents, 403 U.S. 388 (1971)) and, while courts have recognized a compelling state interest in controlling the spread of infections, Atlas lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

149. Assuming the VBGT's could be said to satisfy the interest of preserving public health, Atlas' mandate is not narrowly tailored since it is not the least restrictive means necessary, and there are numerous less restrictive means to serve the same interest of public health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to provide greater protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin.

521

150.    As a direct and proximate result of Atlas' policies, practices, regulations and conduct, Atlas Plaintiffs have suffered harm.

151.    The conduct of Atlas as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

152.    Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

#### ---- COUNT IV ----

**Infliction of Emotional Distress (intentional or in the alternative negligent)**

153.    **Count IV pertains to Atlas Plaintiffs Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

154.    Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, 83-85, 95-97 and 100-128 from above as though fully set forth herein.

155.    Atlas acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

156.    Atlas' conduct has been and continues to be extreme and outrageous.

157.    As a proximate result of Atlas' actions, Atlas Plaintiffs have suffered severe emotional distress.

158.    The harm caused by Atlas was a reasonably foreseeable consequence of Atlas'

522

conduct.

159.    Atlas Plaintiffs allege that Atlas acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of Atlas Plaintiffs with respect to the conduct set forth in this Second Amended Complaint.  However, if upon proof it is determined such conduct does not to rise to such intentional level, Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

160.    As a proximate result of Atlas' conduct, Atlas Plaintiffs have suffered serious and/or severe emotional distress.

161.    The harm caused by Atlas was a reasonably foreseeable consequence of the Atlas' conduct.

162.    Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Atlas Plaintiffs not limited to but including emotional and mental harm, as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitations, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.). Additionally, there were actual adverse vaccine events and physical harm/complications that affected the vaccinated Atlas Plaintiffs in Category 2.

---- **COUNT V** ----

**Negligence**

163.    **Count V pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

523

164. Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-67, 70-81, and 95-97 from above as though fully set forth herein.

165. Atlas owes Atlas Plaintiffs a duty that has been breached.

166. The duty Atlas owes to Atlas Plaintiffs is the standard duty of employer to employee of reasonable care during the regular course of operating their business.

167. This duty includes protecting Atlas Plaintiffs' PHI via appropriate means and procedures.

168. Atlas breached this duty of care by, including but not limited to, publishing Atlas Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear useless facial masks which accomplished nothing more than political advertising which effectively amplified and broadcasted said Plaintiffs' PHI (unnecessarily) to other employees and consumers.

169. Defendants' negligence was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct.

170. As a proximate cause of Defendants negligence, Plaintiffs have suffered injury.

<strong>CAUSES OF ACTION 6-10 AGAINST FSI</strong>

<strong>---- COUNT VI ----</strong>

<strong>Invasion of Privacy - Public Disclosure of Private Facts</strong>

171. **Count VI pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

172. Category 4 FSI Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, and 82 from above as though fully set forth herein.

173. FSI gave publicity to Category 4 Plaintiffs' protected private health information ("PHI") by publishing the PHI throughout the company and by forcing Category 4 Plaintiffs to

524

wear face masks, effectively amplifying and broadcasting their Protected Health Information (PHI) to other employees and consumers.

174. The publication of Category 4 Plaintiffs' PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

175. As a proximate result of FSI's public disclosure of Category 4 Plaintiffs' PHI, Category 4 Plaintiffs have suffered injury. FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression. Because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

---- COUNT VII ----

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*

**Defendants' Creation of a Hostile Work Environment**

176. **Count VII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

177. Category 4 Plaintiffs Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, and 86-91 from above as though fully set forth herein.

178. FSI engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

179. Category 4 Plaintiffs suffered discrimination and disparate treatment at the hands of FSI based on said Plaintiffs' protected religious and other protected characteristics and classifications.

180. FSI's conduct was so severe or pervasive that it altered the terms, conditions, or

525

privileges of employment.

181. FSI's conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of FSI and Category 4 Plaintiffs.

182. Category 4 Plaintiffs were qualified to perform their duties as demanded by their employment.

183. In good-faith, Category 4 Plaintiffs undertook all requisite and applicable procedures to inform FSI of the harassment and toxicity that was pervasive around the workplace.

184. FSI's actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

185. Category 4 Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

186. Category 4 Plaintiffs are members of several protected classifications.

187. Unvaccinated (Category 4) FSI Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccine, and FSI repeated attempts to coerce Category 4 Plaintiffs to go against their religious beliefs was unwelcomed harassment.

188. Additionally, after refusal to submit to unwelcomed and offensive actions against Category 4 Plaintiffs' religious beliefs, FSI subjected said Plaintiffs to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on said Plaintiffs' sincerely held religious beliefs as a protected class under Title

526

VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

(i)    FSI's creation of inflexible policies that directly target Category 4 Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii)   Severe and persistent pressure to take VBGT's;

(iii)  Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of FSI as compared to similarly situated employees who received one or more of the three VBGT's

(iv)   Unwelcomed comments about Category 4 Plaintiffs' religious beliefs;

(v)    FSI's intentional dissemination of Category 4 Plaintiffs' PHI and vaccination status to customers, FSI employees, agents, and supervisors by forcing said Plaintiffs to wear useless face masks which differentiate them from other employees who received VBGT's;

(vi)   Abuse of power by FSI, who compelled managers and supervisors to make unreasonable demands of Category 4 Plaintiffs during the course of their job responsibilities;

(vii)  Psychological harassment by blatant rejection of Category 4 Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate said Plaintiffs.

(viii) Retaliatory conduct in response to Category 4 Plaintiffs' filing declination of

527

vaccination forms and filing religious accommodation forms;

(ix) Seeking to replace Category 4 Plaintiffs' employment positions by individuals who did not seek religious accommodation.

(x) FSI disproportionately compensated employees who did not seek religious accommodation.

(xi) Offensive or derogatory jokes in the office;

(xii) FSI's intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii) Failing to participate in a meaningful manner or otherwise engage with Category 4 Plaintiffs regarding their religious accommodation; and/or

189. Category 4 Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by FSI.

190. Category 4 Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which FSI engaged in such discriminatory conduct against said Plaintiffs.

191. FSI's egregious conduct toward Category 4 Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

192. FSI is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

193. FSI was directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

528

194. Accordingly, FSI had actual knowledge of the actions of its managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by FSI and Atlas.

195. Over the course of their employment, Category 4 Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding FSI's conduct toward said Plaintiffs and their disparate treatment.

196. FSI's supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

197. Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

198. The systematic discrimination, as previously set forth, further adversely affected the Category 4 Plaintiffs through FSI's promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "Anti-Vaxxer."

199. FSI failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

200. This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

201. FSI's policies are only targeted at Category 4 Plaintiffs and like-situated persons with conscientious objections to VBGT's.

202. FSI's egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work

529

environment.

203.    The actions of FSI, as set out herein, violate Title VII.

204.    As a result of FSI's conduct, Category 4 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.

205.    FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  FSI deliberately acted in either a conscious and intentional disregard of the high probability of injury to said Plaintiffs or, conversely, did deliberately act with indifference to the high probability of injury to the Plaintiffs.

206.    Filing complaints or charges with the EEOC is futile, however, most of the Plaintiffs have done so.

---- **COUNT VIII** ----

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

207.    **Count VIII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

208.    Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, and 82 from above as though fully set forth herein.

209.    Category 4 Plaintiffs are citizens of the United States.

210.    At all times relevant hereto, FSI was a government actor and a person acting under the color of law. That is, FSI has taken decisive employment actions that have caused Category 4 Plaintiffs harm that is so impregnated with governmental character that it can be regarded as

530

government action. The government is/was driving FSI action whether through incentive or threat.

211. FSI is also acting under color of law as they have conspired with Government officials to leverage Category 4 Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to unlawfully acquire said Plaintiffs' personal, genetic information.

212. FSI and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, FSI has acted in concert with the federal government at the expense of their employees including Plaintiffs.

213. First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

214. Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

215. Applied here, Category 4 Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by FSI by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

216. This privacy right also includes Category 4 Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control

531

the extent to which their medical information is shared and released. As a means of coercion, FSI violated Category 4 Plaintiffs' privacy rights when they broadcast their private information in memos, and published said Plaintiffs' PHI by forcing them to wear symbols in the form of medically useless face masks.

217. Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the
>
> privileges or immunities of citizens of the United States; nor shall
>
> any state deprive any person of life, liberty, or property, without
>
> due process of law, nor deny to any person within its jurisdiction
>
> the equal protection of the laws."

218. FSI knowingly and willfully discriminated against Category 4 Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

219. FSI, by stating they would allow similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more than the unvaccinated Category 4 Plaintiffs, and to have greater privileges/schedules, and not be required to wear political symbols, did engage in a facial deprivation of equal protection.

220. While the vaccine mandate appeared neutral on its face, in practice it denies Category 4 Plaintiffs equal protection under the law.

221. Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by FSI's conduct.

222.    Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

223.    Category 4 Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

224.    The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes FSI as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

225.    Here, Defendants actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, FSI lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

226.    Assuming the VBGT's could be said to satisfy the interest of preserving public health, FSI's mandate is not so narrowly tailored since it is not the least restrictive means. There are less numerous, less restrictive means which adequately serve thst public interest of protecting public health against COVID-19. For instance, it is evident that antibodies acquired through prior infection provide protection, and as stated throughout this Complaint, and that natural immunity has shown to provide superior protection than the COVID-19 vaccines. Service to the public

533

interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin, thus FSI's conduct fails the strict scrutiny test.

227.    As a direct and proximate result of FSI's policies, practices, regulations and conduct, Category 4 Plaintiffs have suffered harm.

228.    The conduct of FSI as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

229.    FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

----  COUNT IX  ---

**Infliction of Emotional Distress (intentional or in the alternative negligent)**

230.    **Count IX pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

231.    Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, 83-85, 173-175 and 178-206 from above as though fully set forth herein.

232.    FSI acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

233.    FSI conduct has been and continues to be extreme and outrageous.

534

234.     As a proximate result of FSI's actions, Category 4 Plaintiffs have suffered severe emotional distress.

235.     The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

236.     Category 4 Plaintiffs allege that FSI acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of said Plaintiffs with respect to the conduct set forth in this Second Amended Complaint.  However, if upon proof it is determined such conduct does not to rise to such intentional level, said Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

237.     As a proximate result of FSI's conduct, Category 4 Plaintiffs have suffered serious and/or severe emotional distress.

238.     The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

239.     FSI is liable to Category 4 Plaintiffs for punitive damages if found to have acted with intent, not mere negligence, because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the said Plaintiffs not limited to but including emotional and mental harm as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitation, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.).

#### ---- COUNT X ----

#### Negligence

240.    **Count X pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

241.    Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, 82, and 173-175 from above as though fully set forth herein.

242.    FSI owes a duty of reasonable care during the course of operating their business.

243.    This duty includes protecting the Category 4 Plaintiffs' PHI via appropriate means and procedures.

244.    FSI breached their duty of care when by publishing the Category 4 Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

245.    FSI's negligence was in violation of state and federal laws designed to protect Category 4 Plaintiffs against the type of harm caused by the FSI conduct.

246.    As a proximate cause of FSI's negligence, Category 4 Plaintiffs have suffered injury.

#### ---- COUNT XI ----

#### Violation of 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III), 21 CFR 50.25

247.    **Count XI pertains to all Plaintiffs and all Defendants.**

248.    Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

249.    Plaintiffs allege Defendants willfully or negligently violated established federal law under 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III) when they mandated one hundred percent of their employees to receive Emergency Use Authorized (EUA) experimental unapproved medical

536

products, EUA PCR testing, and EUA mask wearing. Defendants further violated the law when they administered and enforced consequences on those who refused to comply with the mandate for religious or other reasons. All the foregoing counts and injuries sustained by plaintiffs are a product of the total and egregious violation of this core EUA law violation. Even though Defendants' mandates were instituted during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: "even in a pandemic, the Constitution cannot be put away and forgotten." Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

250. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression, and Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs.

251. Specifically, this count is grounded in Defendants' willful, wanton, and blatant disregard of the core law on EUA's – 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) – requirement to be informed of the "*option to accept or refuse* administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (Emphasis added).

252. In addition, the 2005 Federal Register established the precedent regarding the "*option to accept or refuse administration of AVA; of the consequences*, if any, of refusing administration of the product; and of the alternatives to AVA that are available, and of their benefits and risks." See https://www.federalregister.gov/documents/2005/02/02/05-2028/authorization-of emergency-use-of-anthrax-vaccine-absorbed-for-prevention-of-inhalation-anthrax-by#. (Emphasis added). There is a private right of action to challenge the illegal mandate

of an investigational unapproved medical product. See Doe v. Rumsfeld, Civil Action No. 03-707 (EGS) (D.D.C. Apr. 6, 2005).

253.    The context of the EUA law and AVA precedent language originates from 21 CFR 50.25, Protection of Human Subjects and Elements of informed consent. That federal regulation explains that "*participation is voluntary*, that refusal to participate will involve *no penalty or loss of benefits* to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled." It also references "[t]he *consequences* of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject" in a manner making clear any such "consequences" are strictly medical in nature. See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=50.25.

254.    Defendants used deception, discrimination, psychological manipulation, and physical isolation to force Plaintiffs, under threat of termination, to participate in a dangerous social and medical experiment violative of established EUA law. Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the experimental unapproved medical product without any information on the potential risks or benefits. Several Plaintiffs (and other of Defendants' employees) have suffered adverse side-effects and harm as a result of submitting to the experimental unapproved medical product. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

255.    Defendants have made Plaintiffs second-class citizens within the company and targeted them in a campaign of harassment designed to force plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy. Defendants' experimental unapproved medical product mandate was illegally constituted, lacked a learned intermediary, and

it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never needed to make; take an experimental unapproved EUA medical product or potentially lose their livelihoods and the means by which they provide for their families.

256. The 21 USC 360bbb-3(e)(1)(a)(ii)(III) law is clear. The precedent in 2005 from the Federal Register for the first ever EUA applied to anthrax vaccine supports this and is also clear. The context of "consequences" from 21 CFR 50.25 supports it. No one can mandate investigational unapproved EUA medical products. This suit is brought to redress the harms Defendants have dispassionately and illegally brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved forever.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, The Atlas Plaintiffs pray for judgment against Defendant Atlas as follows:

    (i)    An award of compensatory damages in appropriate amounts to be established at trial;

    (ii)    Punitive damages in a maximum amount as permitted by law and as determined by the jury;

    (iii)    Awards of damages tailored to make vaccine-injured plaintiffs whole with regard to their manifest and likely future long-term injuries and disabilities;

    (iv)    An award of attorneys' fees and costs associated with this action;

539

(v)    And such other and further relief as the court deems just and proper.

AND WHEREFORE, The FSI Plaintiffs pray for judgment against Defendant FSI as follows:

(i)    An award of compensatory damages in appropriate amounts to be established at

trial;

(ii)    Punitive damages in a maximum amount as permitted by law and as determined

by the jury;

(iii)    An award of attorneys' fees and costs associated with this action;

(iv)    And such other and further relief as the court deems just and proper.

Dated: October 11, 2023.

Respectfully submitted,

**John Pierce Law P.C.**

By:         _/s/ John Pierce_
John M. Pierce, Esq.
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

PATRICK AKERLUND, *et al.*,

      Plaintiff,

    v.

ATLAS AIR, INC., *et al.*,

      Defendants.

Case No. 1:22-cv-23519-KMM-LFL

**ATLAS AIR, INC'S MEMORANDUM IN SUPPORT OF ITS INCORPORATED**
**MOTION TO DISMISS THE THIRD AMENDED COMPLAINT PURSUANT**
**TO RULES 12(B)(2) AND 12(B)(6)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................... 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT .......................................................................................................................... 3

      A.    Counts I Through X Of The TAC Should Be Dismissed With Prejudice Under The MTD Order, In Accord With The Parties' Stipulation, And For The Reasons In Defendants' Prior MTD ............................................................. 3

      B.    Count XI Cannot State Any Viable Claim And Should Be Dismissed With Prejudice. ....................................................................................................... 4

CONCLUSION ..................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page**

CASES

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ........................................................................................................ 7

*Anderson v. United Airlines,*
2023 WL 5721594 (N.D. Ill. Sept. 5, 2023) ................................................................. 7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................................ 3

*Bare v. Cardinal Health, Inc.,*
2022 WL 702593 (E.D. Tenn. Mar. 8, 2022) ............................................................... 7

*Berutti v. Wolfson,*
2023 WL 1071624 (D.N.J. Jan. 27, 2023) .................................................................... 6

*Bowlin v. Bd. of Dir. Of Judah Christian Sch.,*
2023 WL 6323302 (C.D. Ill. Sept. 28, 2023) ............................................................... 6

*Bridges v. Houston Methodist Hosp.,*
543 F. Supp. 3d 525 (S.D. Tex. 2021) .......................................................................... 7

*Ciraci v. J.M. Smucker Co.,*
2021 WL 6064748 (N.D. Ohio Dec. 22, 2021) ............................................................ 8

*Cockrell v. Sparks,*
510 F.3d 1307 (11th Cir. 2007) ................................................................................... 11

*Corsello v. Lincare, Inc.,*
428 F.3d 1008 (11th Cir. 2005) ................................................................................... 11

*Costa v. Celebrity Cruises,*
768 F. Supp. 2d 1237 (S.D. Fla. 2011) ......................................................................... 3

*DeJean v. Kelly,*
2022 WL 3345329 (M.D. Fla. Aug. 12, 2022) ............................................................. 7

*Doe v. Franklin Square Union Free Sch. Dist.*,
 568 F. Supp. 3d 270 (E.D.N.Y. 2021)..................................................................... 7

*Doe v. Rumsfeld*,
 2005 WL 1124589 (D.D.C. Apr. 6, 2005) ............................................................ 10

*Echols v. R.J. Reynolds Tobacco Co.*,
 2014 WL 12199984 (S.D. Fla. Feb. 18, 2014)........................................................ 3

*Evans v. N.Y.C. Health & Hosps. Corp.*,
 2023 WL 5920189 (S.D.N.Y. Aug. 7, 2023) .......................................................... 8

*Finkbeiner v. Geisinger Clinic*,
 623 F. Supp. 3d 458 (M.D. Pa. 2022) ..................................................................... 9

*Garfield v. Mid. Tenn. State Univ.*,
 2021 WL 5770877 (M.D. Tenn. Dec. 6, 2021)..................................................... 7, 8

*Goodrich v. Good Samaritan Regional Health Ctr.*,
 2022 WL 1623648 (S.D. Ill. May 23, 2022).......................................................... 7

*Guilfoyle v. Beutner*,
 2021 WL 4594780 (C.D. Cal. Sept. 14, 2021)....................................................... 7

*HPC US Fund 1, L.P. v. Wood*,
 2016 WL 4441582 (S.D. Fla. July 13, 2006) ......................................................... 4

*Ibekweh v. Ascend Learning, Inc.*,
 2023 WL 6292526 (E.D.N.Y. Sept. 27, 2023)........................................................ 6

*Jackson v. Methodist Health Servs. Corp.*,
 2023 WL 2486599 (C.D. Ill. Feb. 10, 2023).......................................................... 6

*Johnson v. Tyson Foods, Inc.*,
 607 F. Supp. 3d 790 (E.D. Tenn. 2022) .................................................................. 6

*Kiss v. Best Buy Stores*,
 2022 WL 17480936 (D. Or. Dec. 6, 2022) ............................................................. 6

*Legaretta v. Macias*,
 603 F. Supp. 3d 1050 (D.N.M. 2022) ..................................................................... 9

*Lloyd v. Sch. Bd. of Palm Beach Cnty.*,
 570 F. Supp. 3d 1165 (S.D. Fla. 2021)................................................................... 6

*McArthur v. Brabrand*,
    610 F. Supp. 3d 822 (E.D. Va. 2022) ................................................................ 6, 9, 10

*McCutcheon v. Enlivant ES, LLC*,
    2021 WL 5234787 (S.D. W.Va. Nov. 9, 2021) ........................................................ 9

*Miller v. Farris*,
    2023 WL 4680370 (C.D. Cal. June 14, 2023) ........................................................ 6

*Mogielo v. Hochul*,
    2023 WL 2307887 (W.D.N.Y. Mar. 1, 2023) ..................................................... 7, 8

*N.N.J. v. Broward Cnty. Sch. Bd.*,
    2007 WL 3120299 (S.D. Fla. Oct. 23, 2007) .......................................................... 3

*Norris v. Stanley*,
    73 F.4th 431 (6th Cir. 2023) ................................................................................. 8

*Roush on behalf of E.R. v. Alexander*,
    2022 WL 846807 (M.D. La. Feb. 24, 2022) ............................................................ 7

*Dolan-Cartwright on behalf of G.C. v. Alexander*,
    2022 WL 848088 (M.D. La. Feb. 24, 2022) ............................................................ 7

*Pittman v. Trans Union Credit Bureau*,
    2021 WL 7501146 (M.D. Fla. Oct. 22, 2021) ......................................................... 5

*Reed v. Tyson Foods*,
    2022 WL 2134410 (W.D. Tenn. June 14, 2022) ..................................................... 7

*Rhoades v. Savannah River Nuclear Solutions, LLC*,
    574 F. Supp. 3d 322 (D.S.C. 2021) ..................................................................... 8, 9

*Rivas v. Small*,
    2017 WL 6551159 (S.D. Fla. Nov. 3, 2017) .......................................................... 11

*Schmidt v. City of Pasadena*,
    2023 WL 4291440 (C.D. Cal. Mar. 8, 2023) .......................................................... 8

*Sibley v. Lando*,
    437 F.3d 1067 (11th Cir. 2005) ........................................................................... 11

*Smith v. Terminix Pest Control*,
 2023 WL 3569127 (E.D. La. May 19, 2023) ................................................................ 6

*Svendsen v. Ill. Dept. of Public Health*,
 2023 WL 1475058 (C.D. Ill. Feb. 2, 2023). .............................................................. 6

*Valdez v. Lujan Grisham*,
 2022 WL 3577112 (D.N.M. Aug. 19, 2022).............................................................. 9

STATUTES AND REGULATIONS

21 C.F.R. § 50.25............................................................................................................7

21 U.S.C. § 337 ........................................................................................................6, 10

21 U.S.C. § 360bbb-3................................................................................................*passim*

OTHER AUTHORITIES

*Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from
 Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*,
 2021 WL 3418599 (U.S. Dept. of Justice, Office of Legal Counsel 2021)........................5, 6, 8

## INTRODUCTION

Atlas Air, Inc. ("Atlas") moves to dismiss Count XI and seeks a with-prejudice dismissal of the entire Third Amended Complaint ("TAC").[1] The time has come to put an end to Plaintiffs' futile attempts to conjure a legal claim out of an unaltered set of benign facts. As confirmed by the Court's grant of the Parties' stipulation (ECF 80), the Court's September 20, 2023 Order ("MTD Order") already resolved nearly all of this Motion to Dismiss ("MTD"). *First*, the Court ruled that it lacks personal jurisdiction over all claims of 47 of the 84 Plaintiffs suing Atlas. ECF 73 at 5–10. *Second*, the Court held that none of the claims in Plaintiffs' Second Amended Complaint ("SAC") stated viable claims under Rule 12(b)(6). *Id.* at 10–15. Accordingly, the Court dismissed the SAC without prejudice and gave Plaintiffs until October 11, 2023, "to address the [ ] deficiencies" the MTD Order identified. *Id.* at 15.

On October 11, Plaintiffs filed the TAC. ECF 74. But, instead of addressing any deficiencies, Plaintiffs concede (i) "the only change from the [SAC] to the [TAC] filed pursuant to the Court's order of September 20, 2023 (ECF 73) is the addition of Count XI [an Emergency Use Authorization claim] at paragraphs 247–256," ECF 75 at 1, and (ii) that "Defendant Atlas Air only has to respond to the new Count in the [TAC]." ECF 80. Thus, the TAC reasserts Counts I through X from the SAC against Atlas without accounting for this Court's MTD Order holding that Plaintiffs did not state any viable claim under Rule 12(b)(6). And, despite containing no new jurisdictional facts, the TAC seeks to assert the new Count XI on behalf of *all 84 Atlas Plaintiffs*, notwithstanding that this Court already ruled that it lacks personal jurisdiction over the claims of

---

[1] Prior-Defendant Flight Services International LLC ("FSI") expressly preserves all of its bases for dismissal. FSI does not join this motion to dismiss, in reliance on the Court's Order directing the parties to file a stipulation of dismissal as to FSI and confirming that "Defendant FSI has no obligation to respond to the Third Amended Complaint at all." ECF 80.

547

47 of those Plaintiffs.

Fortunately, despite not trimming back their pleadings, Plaintiffs recognize that—based on this Court's MTD Order—the Court should dismiss Counts I through X of TAC. *See* ECF 79 at 1–2, 79-1, ¶¶ 1–2 (parties' joint stipulation that "Atlas shall have no obligation to respond to Counts I through X of the [TAC]"). On October 30, the Court granted that stipulation. ECF 80.

Because of this Court's MTD Order and the Parties' stipulation, the only new issue this Motion presents is whether Plaintiffs have validly pled claims over which this Court has personal jurisdiction under the Emergency Use Authorization Statute ("EUA") objecting to how the FDA originally approved the COVID-19 vaccines. The EUA cause of action is now Count XI. But the logic of this Court's personal jurisdiction ruling means that, as with Counts I through X, the 47 non-Florida Plaintiffs lack suit-related ties to Florida and must be dismissed on that ground. Further, Count XI fails on the merits, as every court to consider an EUA claim—including this one—has recognized: it is legally frivolous as asserted by private parties against a private employer. Specifically, Count XI cannot state a claim under Rule 12(b)(6) because: (1) the EUA does not create a private right of action; (2) the EUA applies only to medical providers administering the vaccine, not private employers like Atlas; (3) the COVID-19 vaccine received full FDA approval months before Atlas asked Plaintiffs to get vaccinated; and (4) 71 of the 84 Atlas Plaintiffs admit that they have never taken the COVID-19 vaccine, meaning they did not get vaccinated without informed consent.

Plaintiffs' sole new claim in Count XI is even more misguided and unsupported by existing law than the ones already dismissed. It should suffer the same fate. Further opportunities to amend are futile and will only continue to tax the judicial system.

**LEGAL STANDARD**

"[A] complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings need "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *N.N.J. v. Broward Cnty. Sch. Bd.*, 2007 WL 3120299, at \*1 (S.D. Fla. Oct. 23, 2007) (Moore, J.). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Echols v. R.J. Reynolds Tobacco Co.*, 2014 WL 12199984, at \*3 (S.D. Fla. Feb. 18, 2014) (Moore, J.). Thus, each Plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**ARGUMENT**

A. <u>Counts I Through X Of The TAC Should Be Dismissed With Prejudice Under The MTD Order, In Accord With The Parties' Stipulation, And For The Reasons In Defendants' Prior MTD.</u>

As explained above, both Plaintiffs' Notice (ECF 75) and the Parties' stipulation (ECF 79-1) acknowledge that Counts I through X of the TAC have not been substantively amended to address the jurisdictional and merits defects that led the Court to dismiss the SAC. Thus, by definition—and as confirmed by the Court's Order granting the Parties' stipulation (ECF 80)—the MTD Order squarely resolves Counts I through X. Defendants' prior MTD (which, as necessary, Atlas incorporates by reference here) presents additional grounds for dismissal, all of which apply with equal force to this Motion. *See* ECF 66, 67, 70.

Accordingly, consistent with Plaintiffs' concession that Atlas has no "obligation to respond to Counts I through X of the [TAC]—through an answer, a Rule 12 motion, or otherwise" (ECF 79-1 ¶ 2; *see also* ECF 80)—the Court should terminate these claims, by entering a with-prejudice dismissal. *See, e.g.*, *Costa v. Celebrity Cruises*, 768 F. Supp. 2d 1237, 1242 (S.D. Fla. 2011) (dismissing claims with prejudice where "[p]laintiffs have already had [an] opportunity to amend

549

their similar initial Complaint"); *HPC US Fund 1, L.P. v. Wood*, 2016 WL 4441582, at *5 (S.D. Fla. July 13, 2006) (dismissing with prejudice where plaintiff "had numerous opportunities to present the basis of his claim").

B. <u>Count XI Cannot State Any Viable Claim And Should Be Dismissed With Prejudice.</u>

1. **The Court Lacks Personal Jurisdiction Over the EUA Claims of the 47 Non-Florida Atlas Plaintiffs It Already Dismissed.**

The MTD Order requires dismissal of Count XI as to the 47 Atlas Plaintiffs who neither live nor work in Florida.[2] In its Order, the Court determined that it lacked general jurisdiction over Atlas because it was not incorporated in Florida, did not have its principal place of business in Florida, and lacked operations in Florida sufficiently extraordinary to "render [it] at home in [Florida]." *See* MTD Order at 5–6.

Moving on to specific jurisdiction, the Court found Atlas "lack[ed] minimum contacts and fail[ed] the effects test with respect to the claims from Plaintiffs who [did] not work or live in Florida" because Atlas's COVID-19 vaccination policy did not "affect[] [the non-Florida Plaintiffs] at their work place [or] their home" in Florida. *Id.* at 9–10.

The same reasoning requires dismissal of Count XI as to these 47 non-Florida Atlas Plaintiffs. As Plaintiffs admit (ECF 79-1), the TAC contains no new jurisdictional allegations. Thus, the Court continues to lack general jurisdiction over Atlas. MTD Order at 5–6. Nor are

---

[2] The 47 Atlas Plaintiffs whose claims the Court dismissed as to Counts I through X for lack of personal jurisdiction are Patrick Akerlund, Eric Anderson, Michael Ballard Jr., Benjamin Bendiburg, Gregory Berry, Lynette Botha, Caleb Buehrer, Jon Carroll, Vergil Caskey, James Castor, Nathan Charboneau, Mark Connor, Matthew Cronauer, Fred Cunningham, Royal Danza, Elliot De Sousa, Steve Dixon, James Erickson, Lee Estes, Robert Fratti, Jason Frisbie, Mark Gilman, Robert Giudice, Eric Gordon, Jason Henning, Daniel Hudson, Roger Justice, Ricky Kinder, Beth Kirby, Carl Lindberg, Joseph Loschiavo, Jeffrey Michonski, Andrew Mickler, Gregory Myers, Peter Napora, Glen Pronk, Charles Randall, Jason Rogers, Kimberly Schreck, Gentry Shelton, Donald Sorrentino, Mark South, Michael Stark, Forrest Stowells, John Swift, Nick Taylor, and Brandon Thoroughman. Ybarra Decl. (ECF 66-2) ¶ 13.

there any new facts that could support specific jurisdiction over the claims of the non-Florida Atlas Plaintiffs. Count XI challenges the same vaccination policies based on the identical jurisdictional facts as the dismissed Counts I–X. As to specific jurisdiction, the Court concluded that the "COVID-19 testing and vaccination requirements implemented by Atlas necessarily affected employees at their workplace and their home" and that Atlas therefore "lacks minimum contacts and fails the effects test with respect to the claims from Plaintiffs who do not work or live in Florida." MTD Order at 9. Count XI, like Counts I through X, challenges the same COVID-19 vaccination policy implemented by Atlas and thus the Court's determinations as to personal jurisdiction in its MTD Order apply inexorably to the new EUA claim in Count XI.[3] *See* TAC ¶ 249 (alleging that all the "foregoing counts [in the TAC] and injuries sustained by plaintiffs are a product of the . . . violation of this core EUA law violation"). Therefore, Count XI should be dismissed as to these Plaintiffs. *E.g.*, *Pittman v. Trans Union Credit Bureau*, 2021 WL 7501146, at *2 (M.D. Fla. Oct. 22, 2021) (dismissing where "[t]he Amended Complaint was brought against the same Defendants and had the same jurisdictional allegations" the court had already found insufficient).

### 2. Count XI Cannot State a Claim for Multiple Independent Reasons.

In their new Count XI, Plaintiffs seek to assert a claim under the FDA Act, 21 U.S.C. § 360bbb-3, against Atlas, a private employer. The FDA Act "authorizes the [FDA] to issue an 'emergency use authorization' ('EUA') for a medical product, such as a vaccine, under certain emergency circumstances." *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits*

---

[3] Plaintiffs' concession in the stipulation that the FSI Plaintiffs' claims likewise are subject to dismissal again due to lack of personal jurisdiction reinforces this fact. ECF 79-1 & 80; *see also* MTD at 8–9 (explaining that as to non-Florida FSI Plaintiffs' "there [was] no indication that the conduct underpinning Plaintiffs' . . . claims against FSI was aimed at Florida").

*Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*, 2021 WL 3418599, at *1 (U.S. Dept. of Justice, Office of Legal Counsel 2021) ("OLC Memo"). Through this process, the FDA initially approved three major COVID-19 vaccines. *See id.* at *3. Plaintiffs claim that Atlas violated the statutory rules governing the EUA by not obtaining informed consent from Plaintiffs.

Count XI legally fails for *four* independent reasons. *First*, Plaintiffs' EUA claim is not cognizable because "the EUA does not provide for a private right of action." *Jackson v. Methodist Health Servs. Corp.*, 2023 WL 2486599, at *5 (C.D. Ill. Feb. 10, 2023).  Specifically, the FDA Act provides that "all . . . proceedings for the enforcement, or to restrain violations, of [the FDA Act] shall be *by and in the name of the United States*." 21 U.S.C. § 337(a) (emphasis added). Citing this language, every federal court to consider an EUA-based challenge brought by a private individual against an employer or school's COVID-19 safety measures has dismissed it— including this Court. *See, e.g.*, *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1175 (S.D. Fla. 2021) (Moore, J.) (rejecting an EUA-based challenge to a school district's mask mandate because "the FDCA clearly states that its requirements may only be enforced by the United States government").[4]  This is why an EUA claim brought by the same counsel for these Plaintiffs was

---

[4] *Accord Bowlin v. Bd. of Dir. of Judah Christian Sch.*, 2023 WL 6323302, at *4 (C.D. Ill. Sept. 28, 2023) ("[T]he FDCA does not authorize a private right of action."); *Ibekweh v. Ascend Learning, Inc.*, 2023 WL 6292526, at *6 (E.D.N.Y. Sept. 27, 2023) ("Section 360bbb-3 does not provide an individual right."); *Miller v. Farris*, 2023 WL 4680370, at *10 (C.D. Cal. June 14, 2023) ("Section 360bbb-3. . . does not provide a private right of action for Plaintiff to sue Defendants."); *Smith v. Terminix Pest Control*, 2023 WL 3569127, at *2 (E.D. La. May 19, 2023) ("Th[e] [EUA] . . . does not confer a private right to sue."); *Svendsen v. Ill. Dept. of Public Health*, 2023 WL 1475058, at *4 (C.D. Ill. Feb. 2, 2023) ("Regarding Plaintiffs' . . . EUA claim, there is no private cause of action."); *Berutti v. Wolfson*, 2023 WL 1071624, at *5 (D.N.J. Jan. 27, 2023) ("Berutti is relying on section 360bbb of the FDCA.  But it is . . . well settled that the FDCA creates no private right of action."); *Kiss v. Best Buy Stores*, 2022 WL 17480936, at *8 (D. Or. Dec. 6, 2022) ("[T]he [EUA] provides no private right of action."); *McArthur v. Brabrand*, 610 F. Supp.

just rejected by the Northern District of Illinois. *See Anderson v. United Airlines*, 2023 WL 5721594, at *2 (N.D. Ill. Sept. 5, 2023) ("[Plaintiffs] cannot bring a claim based on an alleged violation of the EUA provision of the FDCA."). Defendants previously cited *Anderson* as supplemental authority in moving to dismiss the SAC. ECF 71.

Nor can 21 C.F.R. § 50.25—a federal regulation implementing part of the FDA Act (TAC ¶¶ 253, 256)—give Plaintiffs a private right of action where the FDA Act itself does not. As the Supreme Court has explicitly held, "language in a regulation can[not] conjure up a private cause of action that has not been authorized by Congress." *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). Accordingly, every federal court to consider the question has held that because the FDA Act does not create a private right of action, its implementing regulations do not create such a right either. *See, e.g.*, *DeJean v. Kelly*, 2022 WL 3345329, at *2 (M.D. Fla. Aug. 12, 2022) ("[A] violation of 21 C.F.R. § 50.20" is "not [a] recognizable claim[].."); *accord Mogielo v. Hochul*,

---

3d 822, 847 (E.D. Va. 2022) ("[A]ny proceedings under the [FDCA] of which the EUA is a part, must be brought by and in the name of the United States, and not as private actions."); *Johnson v. Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 807 (E.D. Tenn. 2022) ("It is well-settled that there is no private right of action under the FDCA."); *Reed v. Tyson Foods*, 2022 WL 2134410, at *11 (W.D. Tenn. June 14, 2022) ("Plaintiffs have failed to state a claim for Defendant's alleged violation of . . . 21 U.S.C. § 360bbb-3 . . . because there is no private right of action under that statute."); *Goodrich v. Good Samaritan Regional Health Ctr.*, 2022 WL 1623648, at *2 (S.D. Ill. May 23, 2022) ("[T]here is no private right of action to enforce the FDCA."); *Bare v. Cardinal Health, Inc.*, 2022 WL 702593, at *4 n.2 (E.D. Tenn. Mar. 8, 2022) ("Title 21, Section 360bbb-3, the EUA statute . . . does not provide [plaintiff] a private right of action."); *Roush on behalf of E.R. v. Alexander*, 2022 WL 846807, at *12 (M.D. La. Feb. 24, 2022) ("Plaintiff has no private right of action for a claim under Title 21."); *Dolen-Cartwright on behalf of G.C. v. Alexander*, 2022 WL 848088, at *16 (M.D. La. Feb. 24, 2022) ("Plaintiff has no private right of action for a claim under Title 21."); *Garfield v. Mid. Tenn. State Univ.*, 2021 WL 5770877, at *3 (M.D. Tenn. Dec. 6, 2021) (the EUA "creates neither an express nor an implied cause of action."); *Doe v. Franklin Square Union Free Sch. Dist.*, 568 F. Supp. 3d 270, 292 (E.D.N.Y. 2021) ("[The EUA] does not include a private right of action."); *Guilfoyle v. Beutner*, 2021 WL 4594780, at *27 (C.D. Cal. Sept. 14, 2021) ("Plaintiffs cannot state a claim for violation of [the EUA]" because "all such proceedings for the enforcement, or to restrain violation, of this chapter shall be by and in the name of the United States."); *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021) (concluding Section 360bbb-3 "does not confer a private opportunity to sue" an employer).

2023 WL 2307887, at \*12 (W.D.N.Y. Mar. 1, 2023) ("[B]ecause the statute under which a regulation is promulgated dictates whether a private right of action can enforce that regulation . . . 21 C.F.R. § 50.20 does not create a private right of action either."); *Garfield*, 2021 WL 5770877, at \*3 ("The regulations cited by Plaintiff [21 C.F.R. § 50.1, *et seq*] derive their authority from the [FDA Act], which, as the Court has already stated, does not create an express or implied cause of action. Accordingly, neither does the regulation cited by Plaintiff."). Count XI therefore cannot survive dismissal by relying on federal informed-consent regulations.

*Second*, even if the EUA gave Plaintiffs a private right of action, their EUA claim would still fail legally. Plaintiffs allege that Atlas's vaccine policy violated the EUA Statute's requirement that individuals to whom the vaccine is administered are "informed of the option to accept or refuse administration of the product [and] of the consequences, if any, of refusing." TAC ¶ 251. But, as the U.S. Department of Justice and the EEOC have explained, the FDA Act does not prohibit "private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs." *OLC Memo*, 2021 WL 3418599, at \*11. Rather, the condition that Plaintiffs reference applies only to medical providers administering the vaccine. *Id.* at \*5. Indeed, as the Sixth Circuit recently held, joining a chorus of district court decisions, "[t]he EUA statute's relevant language—ensuring that individuals to whom the product is administered are informed of their option to accept or refuse the vaccine—addresses the interaction between the medical provider and the person receiving the vaccine, not the interaction between an employer and an employee receiving a vaccine." *Norris v. Stanley*, 73 F.4th 431, 438 (6th Cir. 2023).[5]

---

[5] *Evans v. N.Y.C. Health & Hosps. Corp.*, 2023 WL 5920189, at \*8 (S.D.N.Y. Aug. 7, 2023) ("Th[e] [EUA's] informed consent requirement does not apply to Defendants because they are not

*Third*, Plaintiffs' TAC confirms that Atlas never asked them to take a COVID-19 vaccine that was only subject to an EUA approval. According to the TAC, Atlas "directed that November 25, 2021 was the deadline for Plaintiffs who did not apply for a religious or medical exemption to report their [vaccine] status to the Company." TAC ¶ 67. That date is three months after the TAC recognizes that the FDA granted full approval to Pfizer's COVID-19 vaccine on August 23, 2021, thereby rendering the EUA authorization irrelevant. *See* TAC ¶ 60 ("The FDA approved the Pfizer Comirnaty vaccine on August 23, 2021"); *Legaretta v. Macias*, 603 F. Supp. 3d 1050, 1059–60 (D.N.M. 2022) (rejecting EUA claim because by August 23, 2021 the "FDA ha[d] now given its full approval—not just emergency use authorization—to the Pfizer vaccine" for adults); *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 464 n.24 (M.D. Pa. 2022) (concluding that when the plaintiff referred "to the [COVID-19] vaccines as being 'EUA approved only,' she is simply wrong . . . the two-dose Pfizer-BioNTech vaccine has been full approved by the [FDA] since August 23, 2021"). In other words, Atlas never required Plaintiffs to receive a COVID-19 vaccine pursuant only to an EUA authorization; Plaintiffs had the opportunity to receive the fully-approved Pfizer vaccine, if that was their choice.

---

directly administering the vaccine to employees."); *Schmidt v. City of Pasadena*, 2023 WL 4291440, at *14 (C.D. Cal. Mar. 8, 2023) ("[T]he informed consent requirement of the [EUA] applies only to medical providers, not to employers, so long as the employer is not directly administering the vaccine."); *Ciraci v. J.M. Smucker Co.*, 2021 WL 6064748, at *2 n.1 (N.D. Ohio Dec. 22, 2021) ("[T]he EUA statute does not apply to private actors[.]"); *Rhoades v. Savannah River Nuclear Solutions, LLC*, 574 F. Supp. 3d 322, 344 (D.S.C. 2021) ("[The EUA] do[es] not prevent private employers like [defendant] from requiring employees to be vaccinated against COVID-19."); *McCutcheon v. Enlivant ES, LLC*, 2021 WL 5234787, at *3 (S.D. W. Va. Nov. 9, 2021) (EUA statute "outlines the rights and responsibilities of the [FDA] in an emergency; it has no impact upon the rights and responsibilities of private employers"); *Valdez v. Lujan Grisham*, 2022 WL 3577112, at *5 (D.N.M. Aug. 19, 2022) (EUA statute's "informed consent requirement only applies to medical providers," not to employers); *Finkbeiner*, 623 F. Supp. 3d at 464 n.24 ("Courts have been uniform that [the EUA] has no bearing in cases involving employer mandates.").

*Fourth*, even if these flaws did not preclude Plaintiffs' EUA claims against Atlas, the TAC admits that the vast majority of Plaintiffs never took a COVID-19 vaccine and therefore necessarily have no claim that they got vaccinated without their informed consent. *See, e.g.*, *McArthur*, 610 F. Supp. 3d at 847 (finding that the plaintiffs' EUA claim challenging a school's COVID-19 vaccination policy failed, among other reasons, because "all of the McArthur children remain unvaccinated"). The TAC divides the Atlas Plaintiffs into three categories, two of which are explicitly alleged to be unvaccinated. *See* TAC ¶ 12 ("Plaintiffs Category 1 – 65 Unvaccinated Atlas Pilot Plaintiffs"); *id.* ¶ 14 ("Plaintiffs Category 3 – 6 Atlas ground employees, all 6 ground employee plaintiffs are unvaccinated"). Thus, even if Plaintiffs somehow overcame the above three flaws, only the 13 vaccinated Atlas Plaintiffs could arguably have any potential injury. And, among that group, 4 Atlas Plaintiffs' EUA claims would still fail because the Court lacks personal jurisdiction over Atlas with respect to their claims, as they neither live nor work in Florida.[6]

Finally, Plaintiffs' reliance on *Doe v. Rumsfeld*, 2005 WL 1124589, at *1 (D.D.C. Apr. 6, 2005) (TAC ¶ 252), does not change the outcome. *First*, *Rumsfeld* does not explicitly authorize private rights of action to challenge an EUA. *Second*, even if *Rumsfeld* did so, it would be in direct conflict with the plain language of the FDA Act, 21 U.S.C. § 337(a), as the dozens of federal decisions cited above have held. *See* n.4. *Third*, *Rumsfeld* is simply inapplicable. It did *not* involve the *EUA provision* of the FDA Act. And, crucially, the claim in *Rumsfeld* was brought against the Department of Defense in conjunction with a mandatory anthrax vaccination program for servicemembers—not by at-will employees of a private employer like Atlas. Thus, Plaintiffs cannot allege a cause of action under the EUA.

---

[6] The 4 Atlas Plaintiffs in this group are Michael G. Ballard Jr., Jason Frisbie, Ricky Kinder, and Carl Lindberg. *Compare* Ybarra Decl. (ECF 66-2) ¶ 13 (listing the 47 non-Florida Atlas Plaintiffs), *with* TAC ¶ 13 (listing the 13 vaccinated Atlas Plaintiffs).

**3.      Count XI Should Be Dismissed With Prejudice Because, No Matter the Allegations, It Cannot Legally State a Claim.**

The Court should not grant Plaintiffs an opportunity to amend Count XI, as any amendment would be futile. At an absolute minimum, either of the first and second reasons supporting dismissal—no private right of action or lack of legal viability—foreclose any potential EUA claim, no matter what facts Plaintiffs could conceivably raise. When such a legal obstacle is present, the Eleventh Circuit directs that the complaint should be dismissed with prejudice. *See Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) (holding that "[l]eave to amend a complaint is futile when the complaint as amended would still be properly dismissed"); *Rivas v. Small*, 2017 WL 6551159, at *1–2 (S.D. Fla. Nov. 3, 2017) (dismissing claims on legal grounds and directing that "dismissal is with prejudice since leave to amend would be futile" (citing *Sibley v. Lando*, 437 F.3d 1067, 1073–74 (11th Cir. 2005)). With-prejudice dismissal is especially appropriate here, where Atlas is unaware of a single federal court holding that an employee's EUA claim challenging a private employer's COVID-19 policy states a valid legal claim (*supra* nn. 4–5).

Denying Plaintiffs another opportunity to amend is further supported by their unjustifiable delay in raising this EUA count, which their complaint has long referenced and Plaintiffs' counsel has raised repeatedly in other similar COVID-19 litigation. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014–1015 (11th Cir. 2005) (affirming denial of leave due to "undue delay, bad faith, [or] dilatory motive"). Indeed, demonstrating Plaintiffs' actual knowledge of this potential claim—which they failed to press until the TAC—Plaintiffs' original October 2022 complaint alleged that the COVID-19 vaccines "were rushed through pursuant to Emergency Use Authorizations ("EUAs") and then an extremely abbreviated FDA 'approval' process." ECF 1 ¶ 141.

557

Because Plaintiffs concede that Atlas need not respond to Counts I through X for the reasons set out in the MTD Order, which Plaintiffs elected not to address, when it dismisses Count XI, the Court should dismiss the entire TAC with prejudice—so that the case may finally conclude.

## CONCLUSION

For these reasons, all Counts of the TAC should be dismissed with prejudice.

Dated: November 1, 2023                    Respectfully submitted,


                                           /s/ Michelle Hogan
                                           Eliot Pedrosa
                                           Florida Bar No. 182443
                                           epedrosa@jonesday.com
                                           Michelle Hogan
                                           Florida Bar No. 1010992
                                           mhogan@jonesday.com
                                           JONES DAY
                                           600 Brickell Avenue, Suite 3300
                                           Miami, FL 33131
                                           Telephone:  (305) 714-9700
                                           Facsimile:  (305) 714-9799

                                           Jonathan M. Linas (pro hac vice)
                                           jlinas@jonesday.com
                                           JONES DAY
                                           110 N. Wacker Drive, Suite 4800
                                           Chicago, IL 60606
                                           Telephone: (312) 782-3939
                                           Facsimile: (312) 782-8585

                                           Alexander V. Maugeri (pro hac vice)
                                           amaugeri@jonesday.com
                                           JONES DAY
                                           250 Vesey Street
                                           New York, NY 10281
                                           Telephone: (212) 326-3939
                                           Facsimile: (212) 755-7306

                                           **_Attorneys for Defendant Atlas Air, Inc._**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2023, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

/s/ Michelle Hogan
Michelle Hogan

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PATRICK AKERLUND** *et al.*,
individuals,

              Plaintiffs,

v.                                    Case No. 22-cv-23519-KMM-LFL

**ATLAS AIR INC.,** *et al.*

              Defendants.

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**
<u>**THIRD AMENDED COMPLAINT**</u>

**INTRODUCTION**

Because Plaintiffs' Third Amended Complaint ("TAC") only adds a Count XI and

includes no other revisions from the Second Amended Complaint, they herein only address

Count XI. With respect to all the personal jurisdiction arguments that have been made in this

action and the rulings made regarding personal jurisdiction by the Court in connection with all

Plaintiffs and Defendants for which there has been a finding of no personal jurisdiction,

Plaintiffs respectfully disagree with those arguments and rulings and intend to pursue those

issues on appeal and/or file a new action or actions in other jurisdictions. With respect to the

merits-based arguments and rulings that have been made with respect to Counts I-X, Plaintiffs

respectfully disagree with those arguments and rulings and intend to pursue those issues on

appeal. Thus, for purposes of judicial economy of the Court and the parties, Plaintiffs herein only

address Count XI.

561

**ARGUMENT**

**A.      Regardless Of Emergency Use Authorization (EUA) Status, Plaintiffs Are Entitled To A Private Right Of Action And Have An Option To Refuse Administration Of A Medical Product**

      1.  Plaintiffs Are Entitled To A Private Right Of Action.

These so-called vaccines are investigational medical products, and as such, employees reserve the right to refuse such experimental drugs. No company or government may mandate an investigational medical product upon its employees. The law is that Plaintiffs are endowed by their Creator with inalienable rights to life, liberty and the pursuit of happiness. This does not exclude Plaintiffs' bodily autonomy. Further, federal law protects individuals against this exact situation.

The vaccines were *not* FDA approved. If the vaccines were FDA-approved, then there was no need for an EUA, because they would have been "approved" drugs. Therefore, 21 USC 360 applies. *Doe v. Rumsfeld* No. CIV.A.03-707(EGS) 341 F. Supp.2d 1 (2004) created a permanent injunction for the Anthrax EUA product to "all persons" after having issued a preliminary injunction of the Department of Defense's "involuntary anthrax inoculation program." This order, enumerated from 10 USC 1107a, created Section 21 USC 360 bbb3 in the FDCA which not only applies to the armed forces of the United States, but any individual United States citizen thereof. This *Doe v. Rumsfeld* order's permanent injunction allowed any individual United States citizen the preemptive inalienable right to not only refuse an investigational medical product, *i.e.*, EUA COVID shots, but upon refusal, no punitive action, "no penalty" would be taken (reference also the precedent-setting 2005 Federal register or 21 CFR 50.25 pertaining to informed consent and consequences medical in nature only (not job loss)).

562

*The Jackson v. Methodist Health Servs. Corp.*, No. 22-CV-1307, 2023 WL 2486599, at *5 (C.D. Ill. Feb. 10, 2023) argument that there is no private right of action fails because the order doesn't address the context of consequences section of 21 USC 360 bbb3, 2005 Federal register, or 21 CFR 50.25. Consequences are not defined in 21 USC 360bbb3. Whereas, 21 CFR provides the context for consequences and clearly shows it has nothing to do with job loss. Most importantly, that code, 21 CFR 50.25, is actually about informed consent in human protection. If the consequences section were taken into account, no punitive action would have been considered per the law, yet they were overlooked. The "no private right of action" argument fails due to the aforementioned arguments. Plaintiffs request the court completely implement all of these preemptive statutes.

2. <u>Plaintiffs Have The Option To Accept Or Refuse Administration Of A Medical Product</u>.

Additionally, the Defendants' willful, wanton, and blatant disregard for a core legal requirement—that every individual must be informed of the "option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." This mandate was unambiguously issued while these drugs were unmistakably categorized as experimental (EUA). The TAC details the negative employment actions that Plaintiffs faced for refusing the experimental vaccine. No COVID 19 vaccines have received FDA approval.  The vaccines that Defendants mandated their employees receive were not "FDA approved" by the FDA but merely authorized under the EUA, necessitating that Defendants comply with the provisions of 21 U.S.C. 360bbb-3(e)(1)(A)(ii)(III), which they did not do.  *See Apter v. Dept of Health & Human Svc*, No. 22-40802 (5th Cir. 2023)

**CONCLUSION**

The Court should deny Defendants' motion to dismiss.


Dated: November 15, 2023                         Respectfully submitted,


**John Pierce Law P.C.**
By: */s/ John Pierce*
John M. Pierce, Esq.
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com


**CERTIFICATE OF SERVICE**

I hereby certify that, on November 15, 2023, this motion was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

                              */s/ John M. Pierce*
                              John M. Pierce

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

PATRICK AKERLUND, *et al.*,

      Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

      Defendants.

Case No. 1:22-cv-23519-KMM-LFL

## ATLAS AIR'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE <u>THIRD AMENDED COMPLAINT</u>

In response to Atlas Air's ("Atlas") Motion to Dismiss the Third Amended Complaint [ECF No. 81] ("MTD"), Plaintiffs submitted a three-page brief in opposition. *See generally* Resp. to MTD [ECF No. 83] ("Response"). Plaintiffs' argument does not (and cannot) rebut that the Third Amended Complaint—including the one new count (Count XI) raising the Emergency Use Authorization ("EUA") claim—fails (1) to establish that this Court has personal jurisdiction over any of the 47 non-Florida Atlas Plaintiffs' claims under Rule 12(b)(2); and (2) to state any legally viable claim under Rule 12(b)(6). Therefore, Atlas respectfully waives reply and rests on the arguments already set forth in its MTD and earlier briefing. In particular, Atlas would direct the Court's attention to its prior decision in *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1175 (S.D. Fla. 2021) (*see* MTD at 6), which denied an EUA claim based on arguments similar to those raised in Atlas's MTD.

Accordingly, Atlas respectfully requests that the Court dismiss the Third Amended Complaint with prejudice.

Dated: November 16, 2023

Respectfully Submitted,


 /s/ Michelle Hogan
Michelle Hogan
Florida Bar No. 1010992
mhogan@jonesday.com
Eliot Pedrosa
Florida Bar No. 182443
epedrosa@jonesday.com
Jones Day
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700
Facsimile:  (305) 714-9799


Jonathan M. Linas (*pro hac vice*)
jlinas@jonesday.com
Jones Day
110 N. Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585


Alexander V. Maugeri (*pro hac vice*)
amaugeri@jonesday.com
Jones Day
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

***Attorneys for Defendant Atlas Air, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 16, 2023, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Michelle Hogan*
Michelle Hogan

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-23519-KMM

PATRICK AKERLUND, *et al.*,

      Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

      Defendants.

_____/

## ORDER

THIS CAUSE came before the Court upon Defendant Atlas Air, Inc.'s Motion to Dismiss the Third Amended Complaint. ("Mot." or "Motion") (ECF No. 81). Plaintiffs filed a Response in Opposition to the Motion to Dismiss ("Resp.") (ECF No. 83). Defendant then filed a Reply in Support of its Motion to Dismiss ("Reply") (ECF No. 85). Plaintiffs' Second Amended Complaint was previously dismissed without prejudice due to lack of personal jurisdiction and failure to state a claim. *See generally* (ECF No. 73). As set forth below, the Court GRANTS the Motion and DISMISSES Plaintiffs' Third Amended Complaint WITH PREJUDICE. ("TAC") (ECF No. 74).

## I.    BACKGROUND

The Court presumes the Parties' familiarity with the factual background of the case. *See, e.g.*, (ECF Nos. 59, 73). Nevertheless, the Court briefly describes the relevant facts applicable to the instant Motion.

Plaintiffs are pilots, flight attendants, and ground staff who work at Atlas Air, Inc. ("Atlas Air") or Flight Services International, LLC ("FSI"), who either remained unvaccinated due to their religious beliefs or became vaccinated despite their religious beliefs. TAC ¶¶ 12–15. In the Third Amended Complaint, Plaintiffs assert eleven claims arising out of the companies' COVID-19

568

vaccination policies. *See generally id.* Upon filing the TAC, Plaintiffs notified the Court that "the only change from the Second Amended Complaint and the Third Amended Complaint . . . is the addition of Count XI." (ECF No. 75) at 1. Count XI claims that Defendants violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), as codified at 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). TAC ¶ 249.

The FDCA establishes the statutory framework for emergency authorization of products (including drugs, devices, and biological products) by the Secretary of Health and Human Services. *See generally* 21 U.S.C. § 360bbb-3. As relevant here, the Secretary "may make a declaration that the circumstances exist justifying the authorization" for a product on the basis of "a determination by the Secretary that there is a public health emergency . . . that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents." § 360bbb-3(b)(1)(C). As to the conditions for authorization of a product for emergency use, the FDCA requires that, "to the extent practicable," steps be taken to ensure that individuals "on whom the product is administered" are informed "of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." § 360bbb-3(e)(1)(A)(ii)(III).

In Count XI, Plaintiffs allege that when Defendants mandated that their employees "receive Emergency Use Authorized (EUA) experimental unapproved medical products, EUA PCR testing, and EUA mask wearing," Defendants violated the FDCA by not allowing Plaintiffs the option to accept or refuse administration of the products. TAC ¶¶ 249–254. Considering the similarities between the Second Amended Complaint and Third Amended Complaint, the Parties submitted a

Joint Stipulation to the Court and agreed that "Defendant FSI has no obligation to respond [to] any part of the Third Amended Complaint" and that "Defendant Atlas shall have no obligation to respond to Counts I through X of the Third Amended Complaint." (ECF No. 79-1) at 2.

Now, Defendant Atlas Air moves to dismiss Count XI and seeks a dismissal with prejudice of the entire TAC. *See generally* Mot. Atlas Air argues that the Court's previous ruling on personal jurisdiction stands, so Count XI should be dismissed due to lack of personal jurisdiction as to all non-Florida Plaintiffs. *Id.* at 4–5. Atlas Air further argues that Count XI fails on the merits because it is legally frivolous for private parties to assert this claim against a private employer. *Id.* at 5–10.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal

conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.   DISCUSSION

Plaintiffs concede that the TAC is almost the same as the Second Amended Complaint that was previously dismissed by this Court. *See* (ECF No. 75) at 1. Thus, the Court will address any conclusions that remain unchanged from its previous dismissal of this case before turning to the new issue presented in the Motion to Dismiss.

### A. All Claims Against FSI and Most Claims Against Atlas Air Are Again Dismissed for Lack of Personal Jurisdiction or Failure to State a Claim

In the Court's previous Order granting Defendants' Motion to Dismiss the Second Amended Complaint, Counts VI through X were dismissed due to lack of personal jurisdiction as to Defendant FSI. (ECF No. 73) at 5–9. In the TAC, Plaintiffs have alleged no new facts supporting personal jurisdiction as to either Defendant. As such, the Court again dismisses all claims as to Defendant FSI (Counts VI through XI) due to lack of personal jurisdiction.

The Court's analysis of personal jurisdiction as to Defendant Atlas Air also remains unchanged. *See id.* at 9–10. Accordingly, the Court again dismisses all claims against Atlas Air (Counts I, II, III, IV, V, and XI) with respect to Plaintiffs who do not live in Florida or have Florida as their base of operation.

Because the TAC contains no new allegations concerning Counts I through V, these claims against Atlas Air are again dismissed for failure to state a claim. *See id.* at 10–15.

### B. Count XI Is Dismissed for Failure to State a Claim

The only new issue presented in the Motion to Dismiss is whether Plaintiffs properly state a claim against Atlas Air with respect to the Florida-based Plaintiffs in Count XI, violation of the FDCA when Atlas Air mandated their employees to receive EUA "medical products, EUA PCR

571

testing, and EUA mask wearing." TAC ¶ 249. Atlas Air argues that Count XI fails on the merits because every court to consider an EUA claim has recognized that such a claim is "legally frivolous as asserted by private parties against a private employer." Mot. at 2.

Defendant is correct that Plaintiffs cannot bring an FDCA-based claim against Atlas Air because the FDCA explicitly provides that there is no private right of action to enforce its provisions. Indeed, "the FDCA says that its requirements may only be enforced by the United States government." *Markland v. Insys Therapeutics, Inc.*, 758 F. App'x 777, 779 (11th Cir. 2018) (citing 21 U.S.C. § 337(a)). In response, Plaintiffs argue that they are entitled to a private right of action because *Doe v. Rumsfeld*, 2005 WL 1124589 (D.D.C. Apr. 6, 2005), supposedly allows "any individual United States citizen the preemptive inalienable right to not only refuse an investigational medical product, . . . but upon refusal, no punitive action." Resp. at 2.

Plaintiffs' interpretation of *Rumsfeld* is entirely incorrect: *Rumsfeld* simply modified an order to allow the military to administer an EUA anthrax vaccine on a voluntary basis. 2005 WL 1124589 at *1. It did not explicitly authorize private rights of action to challenge the FDCA, nor is it applicable here because *Rumsfeld* involved the Department of Defense, not a private employer such as Atlas Air. *See* Mot. at 10. Because the availability of private relief under the FDCA is "foreclosed by express provision [ ] of the statute itself," the Court must dismiss Count XI against Atlas Air. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989); *see also* Mot. at 6 (collecting cases).

Under Rule 15, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, Plaintiffs have already amended their complaint three times. Now, having considered the Third Amended Complaint and having found Plaintiffs' contentions to be deficient for almost the same reasons, the Court finds that further amendment of the Third Amended

Complaint would be futile. Therefore, dismissal of this case with prejudice is appropriate. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (citation omitted) ("[A] district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile.").

**CONCLUSION**

UPON CONSIDERATION of the Third Amended Complaint (ECF No. 74), the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion to Dismiss the Third Amended Complaint (ECF No. 81) is GRANTED. The Third Amended Complaint (ECF No. 74) is DISMISSED WITH PREJUDICE.

DONE AND ORDERED in Chambers at Miami, Florida, this __19th__ day of March, 2024.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

573

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-23519-KMM

PATRICK AKERLUND, *et al.*,

      Plaintiffs,

v.

ATLAS AIR, INC., *et al.*,

      Defendants.

_____/

## FINAL JUDGMENT

THIS CAUSE came before the Court upon the Court's March 19, 2024 Order dismissing this case with prejudice. (ECF No. 88). Pursuant to Rule 58 of the Federal Rules of Civil Procedure, it is hereby ORDERED AND ADJUDGED that Final Judgment is entered in favor of Defendants Atlas Air, Inc. and Flight Services International, LLC and against Plaintiffs.

DONE AND ORDERED in Chambers at Miami, Florida, this __19th__ day of March, 2024.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

574